# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

In re ELON MUSK, in his official capacity, et al.,

Petitioners.

———————————

On Petition for a Writ of Mandamus to the United States
District Court for the District of Columbia

———————————

## PETITION FOR A WRIT OF MANDAMUS

———————————

YAAKOV M. ROTH
  *Acting Assistant Attorney*
  *General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney*
  *General*

MARK R. FREEMAN
GERARD SINZDAK
JOSHUA DOS SANTOS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7242*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-0213*

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION AND SUMMARY.................................................................. 1

STATEMENT ............................................................................................... 4

ARGUMENT ................................................................................................12

The Court should exercise its mandamus authority to block the
    discovery order against White House defendants...................................12

    A.     The Supreme Court has made clear that discovery against
         the Office of the President is reserved for exceptional
         circumstances and must be a last resort. .......................................13

    B.  The discovery order here directly contravenes *Cheney* and
         violates separation-of-powers principles. .......................................16

        1.  The district court improperly ignored the constitutional
            burdens and separation-of-powers concerns that
            discovery against the Office of the President raises. .........18

        2.  The requested discovery is irrelevant to deciding
            plaintiffs' claims. ...................................................................23

        3.  The district court failed to consider alternatives that
            would avoid discovery...........................................................30

        4.  The discovery order is grievously overbroad. ..........................35

CONCLUSION..............................................................................................38

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:**                                                                **Page(s)**

*Alpine Sec. Corp. v. FINRA,*
    121 F.4th 1314 (D.C. Cir. 2024) ..................................................6, 34

*Andrade v. Regnery,*
    824 F.2d 1253 (D.C. Cir. 1987) ........................................... 26, 27, 28

*Appointments to the Commission on the Bicentennial*
    *of the Constitution,* 8 Op. O.L.C. 200 (1984) ................................. 28

*Association of Am. Physicians & Surgeons, Inc. v. Clinton,*
    997 F.2d 898 (D.C. Cir. 1993) ..................................................... 21, 28

*Bankers Life & Casualty Co. v. Holland,*
    346 U.S. 379 (1953) .........................................................................13

*Changji Esquel Textile Co. Ltd. v. Raimondo,*
    40 F.4th 716 (D.C. Cir. 2022) ........................................................ 29

*Cheney, In re,*
    406 F.3d 723 (D.C. Cir. 2005) ................................................. 12, 30

*Cheney v. U.S. Dist. Court for D.C.,*
    542 U.S. 367 (2004) ............................................... 2, 9, 12, 13, 14, 15, 16, 17, 19,
                                      20, 21, 22, 24, 25, 30, 31, 33, 36, 37, 38

*Clinton v. Jones,*
    520 U.S. 681 (1997) ................................................................. 13, 19

*FDA v. Alliance for Hippocratic Med.,*
    602 U.S. 367 (2024) ....................................................................... 32

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.,*
    561 U.S. 477 (2010) ................................................................... 25-26

*Freytag v. Commissioner,*
    501 U.S. 868 (1991) ....................................................................... 26

*Haaland v. Brackeen,*
    599 U.S. 255 (2023) ....................................................................... 32

*Lewis v. Mutond,*
62 F.4th 587 (D.C. Cir. 2023) ........................................................................ 24

*Lucia v. SEC,*
585 U.S. 237 (2018) ......................................................................................... 26

*Murthy v. Missouri,*
603 U.S. 43 (2024) ........................................................................................... 32

*Nixon v. Fitzgerald,*
457 U.S. 731 (1982) ............................................................................ 13, 14, 19

*Nyunt v. Chairman, Broad. Bd. of Governors,*
589 F.3d 445 (D.C. Cir. 2009) ........................................................................ 29

*Rodriguez v. Social Sec. Admin.,*
118 F.4th 1302 (11th Cir. 2024) ...................................................................... 28

*United States v. Nixon,*
418 U.S. 683 (1974) ................................................................................... 13, 19

*United States v. Texas,*
599 U.S. 670 ..................................................................................................... 32

*Wilkes-Barre Hosp. Co. v. National Labor Relations Bd.,*
857 F.3d 364 (D.C. Cir. 2017) ........................................................................ 27

**U.S. Constitution:**

Art. II, § 2, cl. 2 ............................................................................................... 25

**Statutes:**

All Writs Act,
28 U.S.C. § 1651 ......................................................................................... 1, 12

5 U.S.C. § 3161 .......................................................................................... 5, 29

5 U.S.C. § 3161(a)(1) ....................................................................................... 29

18 U.S.C. § 202(a) .............................................................................................. 6

**Regulatory Materials:**

Exec. Order No. 14,158,
   90 Fed. Reg. 8441 (Jan. 29, 2025) ....................................................... 4-5, 5, 21

Exec. Order No. 14,210,
   90 Fed. Reg. 9669 (Feb. 14, 2025) ........................................................... 5, 21

**Rule:**

Fed. R. Civ. P. 65(a)(2) ........................................................................... 8

# GLOSSARY

USDS..........................................................................................U.S. DOGE Service

## INTRODUCTION AND SUMMARY

Pursuant to the All Writs Act, 28 U.S.C. § 1651, the government respectfully asks this Court to issue a writ of mandamus quashing the district court's March 12, 2025 discovery order, which permits plaintiffs in this case to take broad, intrusive, and unnecessary discovery into the activities of the Office of the President and the President's senior advisor, Elon Musk. The government additionally asks in an accompanying stay motion that this Court stay the discovery order pending resolution of this petition, and rule on the stay motion by March 26, 2025, one week before discovery would be due.

The district court's broadly phrased and premature discovery order raises grievous separation-of-powers concerns. It requires the government to produce information regarding the activities of the U.S. DOGE Service (USDS)—an organization within the Executive Office of the President—and close presidential advisor Elon Musk. The order requires the White House to provide detailed information regarding the substance of the advice USDS and Mr. Musk have provided and the process through which that advice has been formulated and communicated within the Executive Branch. This unusual and highly invasive order threatens "the Executive's interests in

maintaining the autonomy of its office and safeguarding the confidentiality of its communications" and fails to accord the "'high respect that is owed to the office of the Chief Executive'" in the conduct of litigation. *Cheney v. U.S. District Court for D.C.*, 542 U.S. 367, 385 (2004).

Addressing a similar discovery order, the Supreme Court made clear that discovery directed at the Office of the President and the President's senior advisors must be reserved for the rarest and most exceptional of circumstances. *See Cheney*, 542 U.S. at 385-92. It is permissible, if at all, only when strictly necessary; only after all other avenues for resolving the plaintiffs' claims have been explored; and only when drawn as narrowly as possible. *Id.* The Court also expressly rejected the view that the threatened intrusion on the autonomy and confidentiality interests of the Office of the President can be addressed through the White House's assertion of executive privilege on a document-by-document basis. *See id.* at 389-90.

The district court's order flouts these principles at every turn. Rather than allowing discovery as a last resort, the court entered its discovery order at the very outset of the case, *before* any motion for a preliminary injunction and *before* resolving the government's motion to dismiss, which could obviate the need for discovery altogether or substantially narrow it.

Moreover, as the government explained below, discovery is *irrelevant* to the court's resolution of plaintiffs' claims. Plaintiffs allege a violation of the Appointments Clause and USDS's statutory authority on the theory that USDS and Mr. Musk are directing decision-making by agency officeholders. Those claims present pure questions of law that can be resolved—and rejected—on the basis of plaintiffs' complaint. In particular, precedent establishes that the Appointments Clause turns on proper *appointment* of officeholders; it is not concerned with the *de facto* influence over those who hold office. And plaintiffs' statutory claims can likewise be rejected based on the text of the statutes and applicable doctrine, taking their allegations as true. Indeed, the district court recognized that these claims present "legal issue[s] appropriate for resolution after fulsome briefing." Dkt. 60 at 8 (Op.). But rather than await such briefing, the court charged ahead with discovery into the functioning of the White House and the President's senior advisors.

The district court brushed aside the White House's concerns that plaintiffs were seeking privileged information, the disclosure of which would threaten core functions of the Office of the President. The court did so on the ground that the White House could protect its interests by asserting privilege on a case-by-case basis. That is precisely the reasoning the

Supreme Court rejected in *Cheney*. And the threat to the Executive Branch's interests is substantial here. Plaintiffs' vaguely worded requests, which the district court largely allowed, burden the White House with the task of identifying and assessing privileges for a significant amount of sensitive material, much of which would be both privileged and entirely irrelevant to the claims alleged.

The district court's discovery order was improper and warrants this Court's exercise of its mandamus authority to prevent the grave threat to separation-of-powers principles that the order poses.[1]

## STATEMENT

1.      Executive Order 14,158 establishes USDS as an entity in the Executive Office of the President. *See* 90 Fed. Reg. 8441, 8441 (Jan. 29, 2025). The Order states that USDS is led by the USDS administrator, who reports to the White House Chief of Staff. *Id.* The USDS helps carry out the work of "modernizing Federal technology and software to maximize governmental efficiency and productivity." *Id.* The order also establishes the "U.S. DOGE Service Temporary Organization" as a temporary organization within the DOGE Service under 5 U.S.C. § 3161, also led by the

---

[1] Plaintiffs oppose this petition and request for a stay.

USDS Administrator. 90 Fed. Reg. at 8441. And the Order requires USDS to coordinate with "DOGE Teams" within federal agencies and composed of employees of those agencies to achieve efficiency goals. *Id.* at 8441-42.

Executive Order 14,210 established a Workforce Optimization Initiative to "eliminat[e] waste, bloat, and insularity" within the government. *See* 90 Fed. Reg. 9669, 9669 (Feb. 14, 2025). Among other things, the Order directs agency heads to prepare plans regarding certain hiring decisions in consultation with DOGE Team leads. *Id.* at 9670. The Order also requires the USDS Administrator to submit a report to the President "regarding implementation of this order, including a recommendation as to whether any of its provisions should be extended, modified, or terminated." *Id.*

The parties agree that Defendant Elon Musk does not occupy an office of the United States and does not hold formal authority to exercise the powers of any such office. *See* Dkt. 2 at 4, 7, 56. Instead, Mr. Musk, a close presidential advisor, is a "special Government employee," which is defined by statute as "an officer or employee of the executive or legislative branch of the United States Government" who "is retained, designated, appointed, or employed to perform … temporary duties" for a limited time period allowed by statute. 18 U.S.C. § 202(a). *See* Dkt. 2 at 7.

2.      A collection of States brought this suit against USDS, the USDS

Temporary Organization, and Mr. Musk and the President in their official

capacities.  Plaintiffs allege that Mr. Musk is serving in violation of the

Appointments Clause and that USDS and the USDS temporary organization

have exceeded their statutory authority by directing significant actions taken

by agency officeholders—such as terminations of employees, contracts, or

grants.  Plaintiffs allege that defendants' actions could affect federal funding

that the States receive or could have downstream consequences that will

indirectly lead the States to expend more funds on various services than they

otherwise would have.  *See, e.g.*, Dkt. 2 at 50-52.

Based on these theories, plaintiffs moved for a temporary restraining

order on February 14, 2025, seeking to restrict the defendants' activities and

require disclosures.  *See* Dkt. 29 at 3; Dkt. 6 at 2-3.  The district court denied

the TRO on the ground that the plaintiffs had not shown irreparable harm,

only the "'possibility'" of harm.  Dkt. 29 at 6.  The court also noted this

Court's holding that "at least certain Appointments Clause violations are

'not, without more, an injury that necessitates preliminary injunctive relief.'"

*Id.* at 9 n.4 (quoting *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1334 (D.C.

Cir. 2024)).

6

Shortly afterward, plaintiffs filed an expedited motion seeking broad discovery in support of a still forthcoming preliminary injunction motion. Plaintiffs' requests included:

a)      production of all documents, including those that defendants have "created, compiled, or edited," related to defendants' involvement in data access, employee interviews, or terminations of grants, contracts, or employees within any agency, *see* Dkt. 45-1 at 5;

b)      production of all documents about USDS's future plans, expressly for the purpose of allowing plaintiffs to seek emergency relief before any such actions take place, *id.*;

c)      broad interrogatories about USDS's personnel, structure, and relationship to agencies (including the names of all USDS personnel and names of all agencies as to which "DOGE personnel" have recommended various actions or accessed systems), *id.* at 6; and

d)      a request for admissions of various allegations, such as that USDS or Mr. Musk directed various actions, *id.* at 7.

The government opposed on the grounds that discovery against the Office of the President and the President's close advisors is extraordinary, and that the requested discovery was unnecessary, overbroad, burdensome, and likely to implicate privileges. The government also explained that the Court should consider other options before permitting plaintiffs to take discovery, including prioritizing a decision on purely legal questions that could resolve or narrow the case. *See* Dkt. 48.

Soon thereafter, the government moved to dismiss the claims in their entirety, arguing that—taking plaintiffs' allegations as true—the claims failed for lack of standing and on the merits. *See* Dkt. 58. The government also requested to consolidate the preliminary injunction proceedings with the merits under Federal Rule of Civil Procedure 65(a)(2). *See* Dkt. 32.

**3.** The district court granted plaintiffs' expedited discovery requests nearly in full. Op. 4, 14.

The district court "recognize[d] that discovery into the Executive, particularly the White House and Senior Advisors, imposes a heightened burden" "requir[ing] careful consideration," and that the Supreme Court has instructed that the "'Executive's "constitutional responsibilities and status [are] factors counseling judicial deference and restraint" in the conduct of

litigation against it,'" "'including the timing and scope of discovery.'"  Op. 4, 11 (quoting *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 385 (2004)).  The court also recognized that a preliminary injunction motion was not yet pending and noted its prior conclusion that plaintiffs had failed to show irreparable harm.  Op. 2, 5-6.

Nonetheless, the court held that the possibility of "expeditious resolution of this case" "outweigh[ed] the burden" of discovery on the Executive Branch, which the court concluded was a "neutral" factor.  Op. 10-12.  Applying a "reasonableness" approach used in ordinary cases, the court reasoned that "discovery is inherently burdensome" and rejected the government's separation-of-powers concerns, reasoning that the White House could protect its interests by asserting privileges on a "case-by-case basis."  Op. 4-5, 9-10.  The court also decided that it would "not extend the heightened consideration afforded to senior members of the Executive Branch, to [USDS]" because it believed USDS might "wield[] … substantial authority independent of the President."  Op. 11 (quotation marks and citation omitted).  And although all agree that Mr. Musk is a close presidential advisor within the White House, the court stated that the

discovery burden was lower because "Defendants[] claim that Musk does not lead DOGE."  Op. 11.

As to breadth, the court rejected the government's concerns that the discovery requests were overbroad and unnecessary, stating that the numerous requested categories of documents and interrogatories were "reasonable," "narrowly tailored," and "necessary to resolve [plaintiffs'] forthcoming preliminary injunction motion."  Op. 2, 4-10.  In the court's view, the burdens on the government were also lower for various other reasons: *e.g.,* because USDS has existed "less than two months," and the requests did not cover "electronic communications."  Op. 7, 10-12.

In finding discovery to be necessary, the court declined to address the government's pending arguments that the discovery was irrelevant to the resolution of plaintiffs' claims.  Op. 8-9, 12-14.  The court acknowledged that the government had made standing and merits arguments that could obviate the need for discovery or at least reduce it—including in a pending motion to dismiss.  Op. 8, 12-14.  But the court stated, without elaboration, that it was "not convinced"" and that the government's arguments raised "legal issue[s] appropriate for resolution after fulsome briefing."  Op. 8-9.  Although

acknowledging that it would "benefit from briefing on the issue[s]," the court nonetheless "authorize[d] discovery in the interim." Op. 8-9, 13-14.

The court also recognized that the unusual timing of discovery—before resolution of a motion to dismiss or the filing of a preliminary injunction— "supports Defendants." Op. 12. But the court concluded that it need not wait to conduct discovery because the court had decided, per the government's request, to consolidate preliminary injunction proceedings with the merits. *Id.* And the court stated that the absence of a preliminary injunction motion was a "technical" issue of little consequence because plaintiffs had sought a TRO (which had already been denied). Op. 5-6.

The court's order thus adopted the language of plaintiffs' discovery demands largely in full. But the court clarified that discovery did not apply to the President, limited discovery to matters "that involve or engage with Plaintiff States, including entities and institutions operated or funded by Plaintiff States," and held that discovery into Mr. Musk's actions would be limited to documents regarding his "direction" of actions (rather than mere recommendations). Dkt. 61 at 1 (Order). The court also changed the production deadline from the seven days requested by plaintiffs to 21 days. Op. 12. And the court denied a request for depositions, though it warned that

"[i]f Defendants fail to adequately respond to Plaintiffs' written discovery, Plaintiffs may renew their requests for depositions." Op. 2, 12.

Lastly, the court denied the government's request for a stay of any discovery order so that the government could consider emergency relief. Op. 14.

## ARGUMENT

### The Court should exercise its mandamus authority to block the discovery order against White House defendants.

This Court may issue a writ of mandamus under the All Writs Act when mandamus would vindicate a "clear and indisputable" right, "no other adequate means" of relief exists, and the writ is "appropriate under the circumstances." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380-81 (2004) (quotation marks omitted); *see* 28 U.S.C. § 1651. The Supreme Court and this Court have long recognized that a discovery order that improperly intrudes on the separation of powers meets those requirements. *See, e.g.*, *Cheney*, 542 U.S. at 382; *In re Cheney*, 406 F.3d 723, 725 (D.C. Cir. 2005) (en banc). That is the case here. The district court's discovery order constitutes a "'clear abuse of discretion'" in violation of established precedent, leaves the Executive without any other recourse to avoid the threat to its interests in autonomy and confidentiality that the order threatens, and risks opening the

floodgates to similar orders in a variety of contexts.  *See Cheney*, 542 U.S. at 380 (quoting *Bankers Life & Casualty Co. v. Holland*, 346 U.S. 379, 383 (1953)).

### A. The Supreme Court has made clear that discovery against the Office of the President is reserved for exceptional circumstances and must be a last resort.

The Supreme Court has repeatedly held that "[t]he high respect that is owed to the office of the Chief Executive … is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997).  That office's "unique position in the constitutional scheme" "counsel[s] judicial deference and restraint." *Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982).  "[S]pecial considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated." *Cheney*, 542 U.S. at 385.  And because discovery against the White House raises the prospect of a "'constitutional confrontation'" between the Executive and Judicial Branches, the Supreme Court has made clear that it is reserved for exceptional circumstances and that such confrontations "should be avoided whenever possible." *Id.* at 389-90 (quoting *United States v. Nixon*, 418 U.S. 683, 692 (1974)).

The Supreme Court's decision in *Cheney* illustrates the proper application of these principles under circumstances remarkably similar to those here. There, President George W. Bush had established a "National Energy Policy Development Group" within the White House to help develop national energy policy over the course of five months. 542 U.S. at 373. The Group was headed by the Vice President and staffed exclusively by other senior government officials. *Id.* Because the Group was composed entirely of federal government employees, it was not subject to the Federal Advisory Committee Act's open meeting and disclosure requirements. *Id.*

The plaintiffs in *Cheney* brought suit, arguing that the Group was subject to the Act's requirements on the theory that several private persons constituted *de facto* members of the Group. 542 U.S. at 374. The plaintiffs then moved for broad discovery into the Group's meetings and activities, so that they could establish the private individuals' *de facto* membership. *Id.* at 375. The district court granted that "overly broad" request while "deferr[ing] ruling" on several dispositive arguments that did not depend on the requested information. *Id.* at 375, 377. The district court also "ignored" the Office of the President's asserted interests in protecting the autonomy of the Office's work and the confidentiality of its communications on the ground

that the government "could assert executive privilege to protect sensitive materials from disclosure." *Id.* at 375, 388-89.

The court of appeals subsequently denied the government's petition for a writ of mandamus. *See Cheney*, 542 U.S. at 376. Like the district court, the court of appeals concluded that the Office of the President could protect its interests by asserting privilege over particular documents. *Id.*

The Supreme Court reversed, squarely rejecting the reasoning of the district court and court of appeals. The Court emphasized that the case did not present "a routine discovery dispute" and that the courts had failed to take adequate account of the "special considerations" that "control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated." *Cheney*, 542 U.S. at 385. Given the separation of powers concerns present in those circumstances, the Court made clear that discovery into the actions of the President and his close advisors should be permitted only as a last resort, that district courts must "explore other avenues" to avoid it, and that courts must ensure that any permitted discovery is "precisely identified" and no broader than necessary to serve its purpose. *Id.* at 387, 390.

The Court also expressly rejected the view that the White House could adequately safeguard its interests by asserting privilege over specific documents. 542 U.S. at 385. To the contrary, the need to "winnow the discovery orders by asserting specific claims of privilege and making more particular objections" was itself a burden on the Executive Branch that raised constitutional concerns. *Id.* at 389. The Court accordingly vacated the denial of mandamus and instructed courts to "be sensitive to requests by the Government for interlocutory appeals" to resolve merits questions that would obviate the need for discovery. *Id.* at 392.

### B. The discovery order here directly contravenes *Cheney* and violates separation-of-powers principles.

The district court's discovery order repeats the same errors that the Supreme Court corrected in *Cheney*. The court granted plaintiffs' expedited discovery motion for broadly phrased document production, interrogatories, and admissions regarding the Office of the President's staff, activities, and even *planning*—essentially amounting to a dragnet search for information regarding defendants' activities since the President's inauguration and plans reaching months into the future. For example, as explained below, the vague and open-ended requests seek all documents demonstrating defendants' "directions" or "instructions" to agencies regarding a wide range of topics;

"lists, charts, or summaries that" the White House defendants "have created, compiled, or edited"; personnel decisions regarding employees, database access, and training; identification of all staff and details about their hiring; defendants' "purpose" for data access; and even "planning" documents regarding non-public plans for future action. Dkt. 45-1 at 6-7. The court thus authorized plaintiffs to seek information about the substance of the advice that the President's close advisors provided and the process through which those advisors formulated and communicated that advice. Yet in imposing those intrusive discovery requests, the district court's discovery order proceeds as though it were considering a garden-variety discovery motion.

Indeed, the district court's order is at odds with the approach the Supreme Court mandated in *Cheney* in almost every way. Contrary to the Supreme Court's instruction that discovery against the White House not be treated as "a routine discovery dispute," *Cheney*, 542 U.S. at 385, the district court applied a "reasonableness" approach used in ordinary litigation, Op. 3-4. Applying that approach, the court then committed the very same error that the district court and court of appeals in *Cheney* committed: it concluded that the burden of discovery against the White House in this case was a "neutral" factor because the government could raise privileges on a "case-by-

case basis." Op. 9-10, 12. And far from considering alternative ways to resolve plaintiffs' suit or narrow its discovery requests, the court granted plaintiffs' request for discovery before plaintiffs had filed a preliminary injunction motion and before deciding the government's pending motion to dismiss, ignoring the government's argument that the merits of plaintiffs' claims could be decided without discovery. Moreover, although the court mouthed some of the Supreme Court's admonitions about discovery in this area, Op. 4, 11, it refused to narrow in a meaningful way any of plaintiffs' broadly formulated requests. To make matters worse, the court issued the order on an expedited basis despite the fact that plaintiffs admittedly failed to identify irreparable harm or yet file a preliminary injunction motion.

That rushed approach to discovery against the Office of the President and one of his close advisors is clearly foreclosed under *Cheney* and warrants mandamus.

### 1. The district court improperly ignored the constitutional burdens and separation-of-powers concerns that discovery against the Office of the President raises.

The district court's failure to apply the "judicial deference and restraint" owed to the Office of the President is clear in the way it brushed aside the government's concerns about the intrusive nature of the discovery

requests. *Nixon*, 457 U.S. at 753. The district court stated that "discovery is inherently burdensome" and rejected the government's concerns about the separation-of-powers implications of plaintiffs' discovery request on the ground that privileges could be raised on a "case-by-case basis." Op. 9-10. The court further determined that any burden was "outweigh[ed]" because "it is in the best interest of all parties to have this case resolved as soon as possible, and expedited discovery serves that goal." Op. 10, 12. Based on those generic considerations, the district court described the burden on the Executive Branch as a "neutral" factor. Op. 12.

That treatment of the burdens of discovery into White House offices and advisors is irreconcilable with the precedents described above. "[T]he public interest requires that a coequal branch of Government 'afford Presidential confidentiality the greatest protection consistent with the fair administration of justice'" because of the "paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties." *Cheney*, 542 U.S. at 382 (quoting *Nixon*, 418 U.S. at 715); *see also Clinton*, 520 U.S. at 704 n. 39 (a court may not "proceed against the president as against an ordinary individual").

Moreover, *Cheney* expressly rejected the district court's principal rationale for discounting the government's burdens. As explained above, the Court rejected the argument that the Executive's ability to assert privileges over particular documents provides sufficient protection against the constitutional burden of discovery. *Cheney*, 542 U.S. at 387-88. The likelihood that the government may have to raise executive privileges on behalf of a White House defendant, thereby setting the Executive and Judicial Branches on a course for "constitutional confrontation," is a reason to *avoid* discovery, not to *grant* it. *Id.* at 387-89 (finding "no support for the proposition that the Executive Branch shall bear the burden of invoking executive privilege with sufficient specificity and of making particularized objections"). The court was thus required "explore other avenues, short of forcing the Executive to invoke privilege." *Id.* at 390.

The district court likewise erred in stating that it would "not extend the heightened consideration afforded to 'senior members of the Executive Branch,' to [USDS]." Op. 11 (citation omitted). Citing a preliminary injunction decision in another case, the court asserted that USDS might "wield[] … substantial authority independent of the President." Op. 11 (quoting *Citizens for Responsibility & Ethics in Washington v. U.S. DOGE*

*Serv.*, No. 25-cv-511 (CRC), slip op. at 23 (D.D.C. Mar. 10, 2025)). That assertion was fundamentally mistaken. USDS is "established in the Executive Office of the President" and renders advice to the President. 90 Fed. Reg. at 8441; *see* 90 Fed. Reg. at 9670 (requiring USDS to provide "recommendation" to the President). It is therefore just like the committee at issue in *Cheney*, which was likewise established by an Executive memorandum as a body within the Office of the President and tasked with providing the President with advice on a policy matter of national significance. *See Cheney*, 542 U.S. at 373. And at this stage of proceedings, before a preliminary injunction motion has even been filed, the district court had no basis for adopting a view that USDS is somehow "independent" of the Office of the President. *Cf. Association of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993) ("Article II not only gives the President the ability to consult with his advisers confidentially, but also, as a corollary, it gives him the flexibility to organize his advisers and seek advice from them as he wishes.").

The district court's reliance on the fact that Mr. Musk is not the USDS Administrator (Op. 11) is similarly difficult to understand. The parties agree that Mr. Musk is a special government employee within the White House,

and plaintiffs emphasize that Mr. Musk is a close advisor who conducts briefings in the Oval Office. *E.g.*, Dkt. 2 at 18. The separation-of-powers implications of discovery against presidential advisors thus squarely applies to Mr. Musk.

The other factors on which the district court relied only highlight the similarity between this case and *Cheney*. The court noted that USDS has existed "less than two months" and that plaintiffs seek "'no information from President Trump.'" Op. 7, 11. But the discovery requests cited in *Cheney* also did not seek information from the President, and the committee at issue had met for five months and then disbanded. *See* 542 U.S. at 373, 387. Those factors do not lessen the constitutional intrusion, and in any event the order here is even broader than the one in *Cheney* because it is directed at an office that is still active and it seeks information on "purpose" for certain actions and "planning" regarding future actions.

Similarly, the court's statement that the burdens would be reduced because the requests did not concern electronic communications and because the court would adopt a 21-day deadline only demonstrates that the court gave virtually no weight to the well-established separation-of-powers issues present in such discovery. Op. 19-10, 12. No reasonable reading of *Cheney*

would indicate that those limits make any difference. Carving out electronic communications and giving the White House defendants an additional two weeks to compile swathes of sensitive material does not dissipate the serious constitutional burden of intrusion into the Office of the President.

## 2. The requested discovery is irrelevant to deciding plaintiffs' claims.

The district court's discovery order is particularly unjustified in this case because the information plaintiffs seek is immaterial to the claims they assert. As noted, plaintiffs assert two legal claims. First, they allege that Elon Musk is a *de facto* principal officer serving in violation of the Appointment Clause. Second, they assert that USDS and the temporary USDS organization are acting in excess of statutory authority. Both claims present legal questions that can be decided (and rejected) on the existing record. At a minimum, the court should have considered the contours of those claims and the possibility of resolving them without intrusive discovery into the Office of the President before green-lighting such discovery.

To start, several categories of requests clearly have nothing to do with either of plaintiffs' claims.

For example, plaintiffs' many requests for "planning" information on a wide range of future potential USDS activities expressly have no relevance to

the merits of their existing claims.  Instead, plaintiffs sought this information solely for the purpose of finding potential *new* claims or to identify the irreparable harm from defendants' current or future actions that they have so far been unable to identify.  Dkt. 45 at 1.  Indeed, plaintiffs openly assert that "[t]he purpose of discovery" is to "show where the next imminent harm will be, so that Plaintiffs can bring it to the Court and allow the Court to decide, based on evidence, whether it is legitimate or illegal."  Dkt. 51 at 6.  Even in an ordinary case, discovery cannot be used to conduct a "fishing expedition."  *Lewis v. Mutond*, 62 F.4th 587, 596 (D.C. Cir. 2023).  Such a use of discovery is especially inappropriate here.

Plaintiffs' requests for details and names of all personnel and employees are also not only intrusive, but plainly irrelevant to the merits of plaintiffs' Appointments Clause claim or *ultra vires* claim.  These requests closely resemble the requests in *Cheney* for "[a]ll documents identifying … any staff … of the Task Force" or "any Sub-Group," which the Supreme Court described as "overly broad" despite the plaintiffs' argument that they needed to establish which persons were *de facto* members of the committee.  *See* 542 U.S. at 386-87.

More broadly, none of the requested information is relevant to the substance of plaintiffs' claims. Plaintiffs purportedly need discovery to show that USDS and Mr. Musk "are directing actions within federal agencies" as *de facto* decisionmakers. Dkt. 45 at 1. But that information would not help show that Mr. Musk is serving in violation of the Appointments Clause. The Appointments Clause concerns the means used to "appoint" "Officers of the United States"—*i.e.*, the means used to appoint those who exercise formal government authority. *See* U.S. Const. art. II, § 2, cl. 2. It is designed to ensure that, when Congress creates an office with certain legal authority, the person holding that office and exercising that authority has been selected and approved in an appropriate and politically accountable manner. It does not apply to non-officeholders, regardless of any *de facto* power and influence the non-officeholder may exert over the appointed official. Accordingly, Appointments Clause cases proceed by inquiring whether a statutorily-created office exercises "'significant authority pursuant to the laws of the United States,'" and if so, whether the individual officeholder was properly appointed. *See, e.g.*, *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 506 (2010); *Lucia v. SEC*, 585 U.S. 237, 248-49 (2018); *Freytag v. Commissioner*, 501 U.S. 868, 881 (1991). That is all.

Here, plaintiffs' own concessions answer that inquiry, and confirm no discovery is needed to reject their claims as a matter of law. Plaintiffs admit—indeed, emphasize—that Mr. Musk has not been appointed to any office and exercises no formal government authority. *See* Dkt. 2 at 4, 7, 56. That is the end of the analysis, regardless of what discovery might reveal about his informal influence. Indeed, although plaintiffs allege that various agencies have taken or will take actions that may harm them, they notably do not claim that any such action has or will be taken by anyone other than a properly appointed official at the relevant agency. Nothing more is needed. The Appointments Clause turns on formal authority, not functional influence; and a suit premised on the latter is fatally flawed from the start.

This Court's decision in *Andrade v. Regnery*, 824 F.2d 1253 (D.C. Cir. 1987), illustrates this principle. There, plaintiffs had been terminated as part of a reduction-in-force authorized by a validly appointed official. *Id.* at 1256-57. The plaintiffs nonetheless challenged the terminations on Appointments Clause grounds because the official had not been a validly appointed officer at the time that he "conceived and planned" the terminations and because a different invalidly appointed official bore "complete responsibility for crafting and executing" them and was therefore the *de facto* decisionmaker.

*Id.* at 1257.  This Court rejected that claim.  The Court explained that any direction or planning at a time when the official was not properly appointed was irrelevant for Appointments Clause purposes, so long as "actual implementation of the" decision "came at the hands of a duly appointed official."  *Id.*  And even though a different, improperly appointed official "was much more involved … in the planning and execution," that kind of direction "does not offend the Appointments Clause so long as the duly appointed official has final authority over the implementation of the governmental action."  *Id.*

The logic of other Appointments Clause precedents reinforce that conclusion.  This Court has repeatedly held that a decision adopted by an improperly appointed officeholder may be ratified by a properly appointed one.  *See, e.g.*, *Wilkes-Barre Hosp. Co. v. National Labor Relations Bd.*, 857 F.3d 364, 371 (D.C. Cir. 2017).  That is true without any inquiry into whether another person was the *de facto* decisionmaker.  Indeed, if the Appointments Clause analysis turned on a freewheeling inquiry into who is most responsible for a decision taken by an officeholder, litigants could challenge and obtain discovery on all manner of decisions, based on the influence of powerful White House advisors like the Chief of Staff or White House

counsel, or even recommendations of subordinates or decisions made by persons with delegated authority. *Cf. Rodriguez v. Social Sec. Admin.*, 118 F.4th 1302, 1312-13 (11th Cir. 2024) (rejecting claim that actions by persons with delegated authority violate the Appointments Clause).

Such results would also implausibly suggest that influential White House advisors in fact hold an office of the United States, which would contravene longstanding historical practice and lead to unworkable results. *See Andrade*, 824 F.2d at 1257 ("[I]t is an everyday occurrence in the operation of government for staff members to conceive and even carry out policies for which duly appointed or elected officials take official responsibility."); *cf. Association of Am. Physicians*, 997 F.2d at 908 (describing historical examples of influential advisors); Appointments to the Commission on the Bicentennial of the Constitution, 8 Op. O.L.C. 200, 207 (1984) (relying on the principle that advisors do not hold an office of the United States).

The discovery order also has no necessary relationship to plaintiffs' *ultra vires* claims that the temporary organization statute "does not provide [the USDS temporary organization] with the authority it has purported to exercise." Dkt. 2 at 57; *see* 5 U.S.C. § 3161. As an initial matter, that claim

can be decided based on the "extremely narrow scope" of an *ultra vires* cause of action under this Circuit's precedent, which, among other restrictions, applies only when "'there is no alternative procedure for review of the statutory claim'" and when the violation of delegated power is plain. *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721-22 (D.C. Cir. 2022); *see also Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.) (describing the doctrine as the equivalent of "a Hail Mary pass—and in court as in football, the attempt rarely succeeds"). The district court does not need discovery to apply those standards to plaintiffs' claim.

Nor is discovery necessary to ascertain the parties' disagreements over interpretation of the statute, which reduces to whether the activities alleged in the complaint (even taken as true) could qualify as a "project" that a temporary organization may be tasked with accomplishing. *See* Dkt. 58 at 33-34 (describing government's interpretation); 5 U.S.C. § 3161(a)(1) (defining a "temporary organization" as an organization "established by law or Executive order … for the purposes of performing a specific study or other project"); Dkt. 2 at 57 (citing only temporary organization statute to show *ultra vires* action).  Indeed, the Supreme Court in *Cheney* encouraged

this Court to decide a similar statutory question in that case because it did not require discovery, and this Court did so. *See In re Cheney*, 406 F.3d at 727 (deciding whether *de facto* membership in a committee would be sufficient to trigger the Federal Advisory Committee Act's requirements).

Discovery also would not aid plaintiffs' pursuit of their *ultra vires* claim, because, again, plaintiffs do not contend that the actions that purportedly harm them (or will harm them) were taken by agency decisionmakers who lacked the statutory authority to take those actions. The extent of USDS's influence over the various agency decisionmakers is thus irrelevant. If an agency official had authority to take a particular action, that action cannot be *ultra vires*.

### 3. The district court failed to consider alternatives that would avoid discovery.

Contrary to *Cheney*'s instructions, the district court also failed to adequately "explore other avenues" that may have obviated the need for discovery or at least significantly reduced its scope. *Cheney*, 542 U.S. at 390. Most obviously, the court improperly disregarded the opportunity to address jurisdictional and merits questions that could narrow the case or dispose of it entirely—despite a pending motion to dismiss. *See* Dkt. 58.

The district court's approach to standing illustrates how its rush to discovery is inconsistent with the care that *Cheney* requires to be "mindful of the burdens imposed on the Executive Branch." 542 U.S. at 391-92. As the government argued in its motion to dismiss, plaintiffs' theory of standing suffers from numerous fatal flaws, including that their complaint rests on speculation that reductions in federal personnel, grants, or contracts may have downstream effects that could cause the States to decide to expend more money. Dkt. 58 at 7-12; *see, e.g.*, Dkt. 2 at 32, 50-52. For example, plaintiffs allege that "threats to CDC and other programs that protect public health pose a threat to state residents" of "disease outbreaks" that could "impose significant harms and costs on states," Dkt. 2 at 133; that changes at the Consumer Financial Protection Bureau could lead to less regulatory activity, which could cause plaintiffs "to invest far greater resources and personnel to protect their citizens," *id.* at 34, 51-52; and that changes at the Department of Energy could lead to "increased risks to nuclear safety," *id.* at 32.

The district court acknowledged some of these problems when it denied plaintiffs' TRO request because plaintiffs alleged only a "'possibility'" of harm without "link[ing] Defendants' actions to imminent harm to Plaintiff

States in particular." Dkt. 29 at 6, 8. And the Supreme Court has recently admonished courts that such indirect theories of downstream harms are insufficient to support standing by States. *See United States v. Texas*, 599 U.S. 670, 680 n.3 ("[F]ederal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer" because "federal policies frequently generate indirect effects on state revenues or state spending."); *see also FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 392 (2024) ("declin[ing] to start the Federal Judiciary down [an] uncharted path" in which "virtually every citizen [would have] standing to challenge virtually every government action" based on downstream effects); *Murthy v. Missouri*, 603 U.S. 43, 62 (2024) (similar); *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (similar).

The district court should have given this argument serious consideration, particularly when a ruling in the government's favor would have avoided the constitutional tensions present in discovery or at least narrowed them. But instead, the court simply stated that it would "benefit from briefing on the issue[s]" and "authorize[d] discovery in the interim"— even though it may not have jurisdiction. Op. 13-14.

Even if the district court determined it had jurisdiction, the court had numerous merits arguments before it that could resolve or narrow the case. As touched on above and in the government's motion to dismiss, plaintiffs fail to allege a single governmental action taken by a person lacking the formal authority to take it. Plaintiffs' suit depends on a theory that this fact does not matter. But that is wrong as a matter of law, in that it conflates *influence* and *authority*. For the claims present here, the only thing that matters is actual power, not *de facto* direction. *See* Dkt. 58 at 17-35. The district court should have prioritized decisions on those dispositive questions (and if it disagreed with the government, considered certifying appeal). *See Cheney*, 542 U.S. at 391-92 (encouraging courts to be "be sensitive to requests by the Government for interlocutory appeals" that could dispose of the case without discovery). The court's statement that it was "not convinced" and would like more briefing was not a reason to grant expedited discovery against White House offices and advisors. Op. 8-9.

Although discovery before resolution of those questions would be inappropriate here regardless of its scope, the district court also ignored another obvious alternative. At the very least, the court could have postponed a ruling on plaintiffs' discovery motion until plaintiffs filed a

preliminary injunction motion.  Plaintiffs' request for injunctive relief might fail on other grounds, like the TRO motion already had.  Indeed, plaintiffs expressly stated that they sought to address "the concerns the Court expressed when considering Plaintiffs' application for an emergency TRO" by finding facts that would "show … irreparable harm"—a fundamentally improper request to shore up their own complaints' deficiencies that makes clear that plaintiffs have no imminent harm.  Dkt. 45 at 5-6.

Moreover, the prospect that plaintiffs' request for injunctive relief will fail on other grounds is likely here because, as the court noted, this Court has already held that typical Appointments Clause violations are "'not, without more, an injury that necessitates preliminary injunctive relief.'"  Dkt. 29 at 9 n.4 (quoting *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1334 (D.C. Cir. 2024)).  At a minimum, the preliminary injunction motion could narrow the issues.  And it was improper to grant discovery that may "provide" plaintiffs some of the relief they seek "on the merits."  *Cheney*, 542 U.S. at 388; Dkt. 2 at 58 (prayer for relief seeking similar disclosures).

Instead, the district court proceeded as though discovery was the default and plaintiffs' extraordinary requests are not especially burdensome. That turned applicable precedents on their head.

## 4. The discovery order is grievously overbroad.

Finally, the constitutional problems that plaintiffs' request for discovery raises are exacerbated by the broadly worded discovery requests at issue and their request for future "planning documents," which constitutes an egregious intrusion into White House activities. For example, the document production requests include requests to "[p]roduce all … planning, implementation, and operational documents" for a wide range of actions, including "directives, memoranda, presentations, FAQs, scripts (such as interview questions), templates, and phased plans"; all "lists, charts, or summaries that DOGE personnel or Musk have created, compiled, or edited reflecting the planned or completed" performance of various actions; and "all interagency agreements, memoranda of understanding, memoranda of action, or other similar documents." Dkt. 45-1 at 5. Many (or indeed most) of these requests are likely to implicate privileges like the deliberative process privilege—particularly as to "edits" or "planning."

The interrogatories seek equally intrusive information, including requests to identify "every individual serving as DOGE personnel," as well as "all individuals to whom they directly report" and "who hired them"; "all federal agencies" as to "which DOGE personnel or Musk" have taken certain

actions; "each contract, grant, or other agreement cancelled and the number of employees whose employment was terminated … pursuant to the direction of DOGE personnel or Musk, and" where they "worked"; as well as detailed information about systems as to which "DOGE personnel have obtained access or *plan* to obtain access between now and June 1, 2025" and the "purpose" of such access.  Dkt. 45-1 at 6 (emphasis added).

These expansively worded requests are striking similar to the "everything under the sky" requests in *Cheney* and may even go beyond them.  *See* 542 U.S. at 385, 387 (requests asked for "[a]ll documents identifying … any staff … of the Task Force" or "any Sub-Group," as well as the Group's "activities" and "preparation of [a] Report" with various agencies).  While in *Cheney* the committee's work was completed, these requests cover "planning" information regarding future activities, as well as "edits" and the "purpose" of certain actions.  The requests thus explicitly target the heartland of the deliberative process of White House offices and advisors and are fundamentally inconsistent with the separation of powers.

The breadth of the requests also creates onerous ambiguities that the Executive Branch must now decipher.  For example, the requests repeatedly use vague phrases such as "functional," "in charge," or "planning"; they

provide vague, open-ended definitions of key words (such as defining "direct" to mean "instructed, ordered, or *otherwise took action* to compel"); and some of the definitions and requests for production refer to nonparties. Dkt. 45-1 at 2, 5-6 (emphasis added). The district court's order improperly "require[s] the Executive Branch to bear the onus of" analyzing these ambiguities "line by line." *Cheney*, 542 U.S. at 388.

The district court sought to discount the clear intrusion of these requests into privileged information by stating that the requests "do[] not encompass draft or pre-decisional materials" but instead only "documents reflecting DOGE's plans to take actions." Op. 10. Similarly, the court revised a request seeking information related to action Mr. Musk "recommended" only to documents in which Mr. Musk "directed" such action, and also limited discovery on various matters to those "that involve or engage with Plaintiff States." Op. 8-9. But assessing what counts as a "plan[] to take action[]" rather than "pre-decisional material[]," or meets the request's vague definition of "direct," Dkt. 45-1 at 2, or "involve[s] or engage[s] with Plaintiffs States," will be another part of the burden of assessing privileges. That is itself a separation-of-powers problem. *See Cheney*, 542 U.S. at 388. And the government will have to do so under the

threat that "[i]f Defendants fail to adequately respond to Plaintiffs' written discovery, Plaintiffs may renew their requests for depositions."  Op. 12.

\* \* \*

In short, the district court's discovery order flouts well-established principles governing litigation against the Office of the President.  It gives short shrift to the substantial separation-of-powers concerns that plaintiffs' discovery request raises, instead treating plaintiffs' request as if it were a garden variety discovery matter.  Because the government has no alternative means for remedying the court's clear violation of established law and the significant intrusion on the functioning of the Executive Branch that it represents, mandamus is warranted.  Indeed, the generic Appointments Clause and *ultra vires* allegations at issue—based on arguments that presidential advisors *de facto* directed agency decisions—could proliferate across a multitude of contexts involving challenges to agency action.  The Court should make clear that discovery into the Office of the President is reserved for exceptional cases.

## CONCLUSION

For the foregoing reasons, this Court should grant this petition for a writ of mandamus to quash the discovery order.  The Court should also grant

a stay of the discovery order pending resolution of this petition, as requested in the accompanying stay motion.

Respectfully submitted,

YAAKOV M. ROTH
   *Acting Assistant Attorney*
     *General*

ERIC D. McARTHUR
   *Deputy Assistant Attorney*
     *General*

MARK R. FREEMAN
GERARD SINZDAK
   *s/ Joshua Dos Santos*
JOSHUA DOS SANTOS
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7242*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 305-1754*
   *joshua.y.dos.santos@usdoj.gov*

March 2025

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 21(d)(1) because it contains 7,793 words. This motion also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 21(d) and 32(c) because it was prepared using Microsoft Word 2016 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*s/ Joshua Dos Santos*

_____

JOSHUA DOS SANTOS

# CERTIFICATE OF SERVICE

I certify that, on March 18, 2025, I electronically filed this petition through this Court's CM/ECF system. I also certify that five copies of the petition will be delivered to the D.C. Circuit. I further certify that the petition has been served on counsel by email on March 18, 2025 and will also be served by first-class mail. Finally, I certify that the petition has been served on the district court via email on March 18, 2025, and will be delivered by courier on the next business day.

*s/ Joshua Dos Santos*

JOSHUA DOS SANTOS

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A.     Parties and Amici.

The defendant-petitioners are Elon Musk, in his official capacity; U.S. DOGE Service; U.S. DOGE Temporary Service Organization; and President Donald J. Trump, in his official capacity as President of the United States.

The plaintiffs in the district court are the States of New Mexico, Arizona, Michigan, California, Connecticut, Hawaii, Maryland, Minnesota, Massachusetts, Nevada, Oregon, Rhode Island, Vermont, and Washington.

## B.     Rulings Under Review.

Petitioners seek a writ of mandamus regarding the district court's memorandum opinion and order on March 12, 2025 (Dkt. Nos. 60, 61) granting in part the plaintiffs' motion for expedited discovery.

## C.     Related Cases

This case has not been before this Court.  Counsel are aware of the following cases raising related issues: *Doe. v. Musk*, No. 25-cv-462 (D. Md.); *Japanese American Citizens League v. Musk*, No. 25-cv-643 (D.D.C.).

*/s/ Joshua Dos Santos*
JOSHUA DOS SANTOS

# ADDENDUM

**TABLE OF CONTENTS**

Memorandum Opinion (Mar. 12, 2025)..............................................................A2

Order (Mar. 12, 2025) ........................................................................A15

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**STATE OF NEW MEXICO**, *et al.*

Plaintiffs,

v.

Civil Action No. 25-cv-429 (TSC)

**ELON MUSK**, *et al.*

Defendants.

### MEMORANDUM OPINION

Plaintiffs, fourteen states represented by their Attorneys General, sued Elon Musk, the U.S. Department of Government Efficiency ("DOGE") Service, U.S. DOGE Service Temporary Organization, and President Trump, alleging violations of the Appointments Clause of the U.S. Constitution, U.S. Const., Art. II, § 2, cl. 2, and conduct in excess of statutory authority. Compl. ¶¶ 253–72, ECF No. 2. Plaintiffs have moved for expedited discovery, ECF No. 45, to support their forthcoming motion for a preliminary injunction. Plaintiffs' requests, as amended by the court, are reasonable and narrowly tailored to their request for injunctive relief. Therefore, the court will GRANT in part and DENY in part Plaintiffs' Motion.

### I.    BACKGROUND

The court incorporates the factual and procedural background from its order denying Plaintiffs' motion for a temporary restraining order ("TRO"). *See New Mexico v. Musk*, No. 25-cv-429 (TSC), 2025 WL 520583, at *1–2 (D.D.C. Feb. 18, 2025). Plaintiffs brought this action for declaratory and injunctive relief on February 13, 2025. ECF No. 1. They immediately moved

for a TRO, seeking to enjoin Musk and DOGE[1] from (1) accessing, copying, or transferring any data systems, and (2) terminating or otherwise placing on leave any officers or employees at certain federal agencies. *New Mexico v. Musk*, 2025 WL 520583, at *2. The court denied that motion because Plaintiffs failed to provide clear evidence of imminent, irreparable harm, and ordered the parties to propose a schedule for further proceedings. *Id.* at *4. Plaintiffs stated their intention to seek expedited discovery to support a forthcoming preliminary injunction motion, while Defendants planned to move to dismiss. Proposed Briefing Schedule at 1–2, ECF No. 32. The court permitted both parties to proceed along their preferred paths—scheduling briefing for Plaintiffs' expedited discovery motion, Defendants' motion to dismiss, and Plaintiffs' motion for preliminary injunction. Order at 1–2, ECF No. 36.

Plaintiffs' expedited discovery motion seeks "to confirm public reporting about Defendants' conduct, show Defendants' future plans, and illustrate the nature and scope of the unconstitutional and unlawful authority that Defendants are exercising and will continue to imminently exercise." Pls.' Mot. for Expedited Disc. at 3, ECF No. 45 ("Pls.' Disc. Mot."). Plaintiffs ask the court to order Defendants to comply with five requests for document production, six interrogatories, six requests for admission, and two depositions. Pls.' Disc. Mot. Ex. A, ECF No. 45-1. The document requests and interrogatories generally concern DOGE's and Musk's conduct in four areas: (1) eliminating or reducing the size of federal agencies; (2) terminating or placing federal employees on leave; (3) cancelling, freezing, or pausing federal contracts, grants, or other federal funding; and (4) obtaining access, using, or making changes to federal databases or data management systems. *Id.* at 5–6. Plaintiffs do not seek "emails, text messages, or any

---

[1] "DOGE" refers collectively to the U.S. DOGE Service and U.S. DOGE Service Temporary Organization.

other similar electronically exchanged communication," and the time period for responsive materials is January 20, 2025 to the present. *Id.* at 1, 3. The requests for admission seek to confirm DOGE's and Musk's role and authority within the Administration. *Id.* at 7. Defendants oppose any discovery at this time. Defs.' Opp'n to Pls.' Disc. Mot., ECF No. 48 ("Defs.' Disc. Opp'n").

## II.    LEGAL STANDARD

In general, "a party may not seek discovery" before a Rule 26(f) conference. Fed. R. Civ. P. 26(d)(1). Pursuant to district courts' "broad discretion over the structure, timing, and scope of discovery," however, courts may, in certain circumstances, order expedited discovery. *Strike 3 Holdings, LLC v. Doe*, 964 F.3d 1203, 1207–08 (D.C. Cir. 2020) (citing *Hussain v. Nicholson*, 435 F.3d 359, 363–64 (D.C. Cir. 2006)). The Advisory Committee's notes to Federal Rule of Civil Procedure 26(d) state that expedited discovery "will be appropriate in some cases, such as those involving requests for a preliminary injunction," Fed. R. Civ. P. 26(d), but "do not provide specific standards for evaluating expedited discovery motions," *Disability Rts. Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*, 234 F.R.D. 4, 6 (D.D.C. 2006). In the absence of a specific standard, two common judicial approaches have emerged: the *Notaro* test, derived from *Notaro v. Koch*, 95 F.R.D. 403 (S.D.N.Y. 1982), and the reasonableness test. *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 97 (D.D.C. 2014).

The *Notaro* test closely tracks the preliminary injunction standard, requiring the moving party to demonstrate "(1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted." *Id.* (citing *Notaro*, 95 F.R.D. at 405). Under the reasonableness approach, courts consider "all of the surrounding circumstances," including five factors: "(1) whether a preliminary injunction is pending; (2) the

breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Id.* at 98. Courts are not "limited to these factors," however. *Attkisson v. Holder*, 113 F. Supp. 3d 156, 162 (D.D.C. 2015).

In this district, courts favor the reasonableness test because it better reflects their broad discretion over discovery matters. *See, e.g., id.*; *Guttenberg*, 26 F. Supp. 3d at 97–98; *Disability Rts.*, 234 F.R.D. at 6; *AFL-CIO v. Dep't of Lab.*, No. 1:25-cv-00339 (JDB), slip op. at 4 (D.D.C. Feb. 27, 2025), ECF No. 48. The reasonableness test is also the more appropriate standard "when a plaintiff requests expedited discovery for the purpose of fleshing out a preliminary injunction motion," as "it does not make sense to use preliminary injunction analysis factors to determine the proprietary of an expedited discovery request." *Guttenberg*, 26 F. Supp. 3d at 97 (citation omitted). This court agrees and will evaluate Plaintiffs' motion under the reasonableness test.

## III.    ANALYSIS

The court concludes that granting expedited discovery is in the best interest of all parties. Plaintiffs' discovery requests target information necessary to resolve their forthcoming preliminary injunction motion. The court recognizes that discovery into the Executive, particularly the White House and Senior Advisors, imposes a heightened burden. Accordingly, the court does not authorize all the discovery that Plaintiffs request, imposes several additional restrictions on the scope, and extends Defendants' time to respond. With those adjustments, the court finds expedited discovery is reasonable and necessary to evaluate Plaintiffs' request for injunctive relief. In addition, to avoid prejudice to Defendants and expeditiously resolve this case, the court will exercise its discretion to consolidate the motion for a preliminary injunction with the merits under Federal Rule of Civil Procedure 65(a)(2).

A. **Forthcoming Preliminary Injunction**

The first factor—whether a preliminary injunction is pending—weighs in Plaintiffs' favor. "Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." *Ellsworth Assoc., Inc. v. United States*, 917 F. Supp. 841, 844 (D.D.C. 1996). Although Plaintiffs have not yet filed their preliminary injunction motion, they promptly sought injunctive relief in the form of a TRO and indicated they planned to file a preliminary injunction motion, for which the court has scheduled briefing. Pls.' Disc. Mot. at 5; Pls.' TRO Mot., ECF No. 6. Defendants do not argue that the technical absence of a pending preliminary injunction weighs against discovery and concede that Plaintiffs' discovery requests target information relevant to the anticipated motion. Defs.' Disc. Opp'n at 8. Plaintiffs urgently seek injunctive relief and expedited discovery to bolster that injunctive relief request, and therefore this factor supports granting discovery. *See Legal Tech. Grp., Inc. v. Mukerji*, No. 17-cv-631 (RBW), 2017 WL 7279398, at *3 (D.D.C. June 5, 2017) ("[T]his factor weighs in [Plaintiffs'] favor because, although a motion for a preliminary injunction is not yet pending, the very purpose of [Plaintiff's] motion for expedited discovery is to support its anticipated motion for a preliminary injunction."); *AFL-CIO.*, No. 1:25-cv-00339 (JDB), slip op. at 7; *cf. Guttenberg*, 26 F. Supp. 3d at 98–99 (finding a "lack of urgency" weighs against granting expedited discovery).

B. **Breadth and Purpose of Discovery**

The second and third factors are closely related. Courts permit discovery "narrowly tailored to reveal information related to the preliminary injunction," *Guttenberg*, 26 F. Supp. 3d at 98, but do not allow plaintiffs "to circumvent the normal litigation process," *In re Fannie May Derivative Litig.*, 277 F.R.D. at 143, by seeking information beyond the preliminary injunction scope to "substantially advance plaintiffs' claim on the merits," *Guttenberg*, 26 F. Supp. 3d at 98. The scope of expedited discovery should be narrowly tailored to the purpose—supporting

Plaintiffs' forthcoming preliminary injunction motion.  Within that limited scope, the traditional rules of discovery dictate relevance.  *See Strike 3*, 964 F.3d at 1210.  Plaintiffs may not "'abuse[] the discovery process' by seeking irrelevant information," *id.* at 1210–11 (quoting *AF Holdings, LLC v. Does 1-1058*, 752 F.3d 990, 997 (D.C. Cir. 2014)), but "information may qualify as relevant even if not admissible," *Goodwin v. District of Columbia*, No. 21-cv-806 (BAH), 2021 WL 1978795, at *5 (D.D.C. May 18, 2021).  When evaluating an expedited discovery request, courts must "determine if the requested discovery is relevant and proportional to the needs of the case." *Strike 3*, 964 F.3d at 1210 (citing Fed. R. Civ. P. 26(b)(1)).  Information is relevant if "it has any tendency to make a fact more or less probable that it would be without the evidence" and "the fact is of consequence in determining the action."  Fed. R. Evid. 401.

The parties agree that the purpose of Plaintiffs' discovery requests is to support their forthcoming preliminary injunction motion, Pls.' Disc. Mot. at 5; Defs.' Disc. Opp'n at 8; but Defendants contend that is not an adequate reason to expedite discovery, *id*.  Courts in this jurisdiction, however, have consistently found that preliminary injunction proceedings are exactly the kind of circumstance warranting expedited discovery.  *See*, *e.g.*, *Ellsworth Assoc.*, 917 F. Supp. at 844; *cf. Damus v. Nielson*, 328 F.R.D. 1, 5 (D.D.C. 2018); *AFL-CIO v. Dep't of Lab.*, No. 1:25-cv-00339 (JDB), slip op. at 7–8.  This is particularly so when the requested information is unavailable from other sources and within Defendants' exclusive control.  *See Strike 3*, 964 F.3d at 1207–08; *Goodwin*, 2021 WL 1978795, at *7.  Because the court agrees that Plaintiffs' discovery requests "are realistically tethered" to their forthcoming preliminary injunction motion, *Goodwin*, 2021 WL 1978795, at *5, it finds that the third factor weighs in Plaintiffs' favor.

The relationship between Plaintiffs' requested injunctive relief and the case as a whole presents a unique challenge.  Courts reject requests for expedited discovery that "are not narrowly

tailored to reveal information related to the preliminary injunction as opposed to the case as a whole." *Guttenberg*, 26 F. Supp. 3d at 98. For instance, in *Guttenberg*, the court rejected expedited discovery "to prove the extent of damages," an issue that would only arise if plaintiffs prevailed on the merits. *Id.* Here, Plaintiffs' forthcoming preliminary injunction and the merits are intertwined. To bolster their forthcoming preliminary injunction motion, Plaintiffs' discovery requests for admission go to the heart of their Appointments Clause claim. Pls.' Disc. Mot. at 6. Because Plaintiffs only seek injunctive and declaratory relief, the preliminary injunction ruling will likely resolve all issues. In light of the court's decision to consolidate the motion for a preliminary injunction with the merits under Federal Rule of Civil Procedure 65(a)(2), this case is dissimilar to cases involving expedited discovery requests exclusively related to the merits. *Guttenberg*, 26 F. Supp. 3d at 98.

Turning to the breadth of Plaintiffs' discovery requests, the court largely finds them sufficiently specific and narrowly tailored to obtaining injunctive relief. First, the requests contain several overarching limitations. They are limited to a specific time period—January 20, 2025 to the present—of less than two months. Pls.' Disc. Mot. at 7; Pls.' Disc. Mot. Ex. A at 3. Plaintiffs do not seek any "emails, text messages, or any other similar electronically exchanged communications," which significantly reduces the pool of materials subject to the request. *Id.* And the court will incorporate Plaintiffs' representation that they do not seek information from President Trump. Pls.' Disc. Mot. at 11 & n.5. With these parameters, Plaintiffs appropriately and significantly limit the universe of responsive information.

Second, the requests target information relevant to Plaintiffs' claims for injunctive relief, with a few adjustments. Plaintiffs' document requests seek information regarding DOGE's and Musk's involvement in (1) eliminating or reducing the size of federal agencies; (2) terminating or

placing federal employees on leave; (3) cancelling, freezing, or pausing federal contracts, grants, or other federal funding; and (4) obtaining access, using, or making changes to federal databases or data management systems. *Id.* at 5–7. Evidence that Defendants eliminated agencies that work with Plaintiffs, terminated employees responsible for managing programs with Plaintiffs, or cancelled contracts with Plaintiffs is relevant to whether Defendants exceeded their statutory and constitutional authority. *Warner Bros. Recs. Inc. v. Does 1–6*, 527 F. Supp. 2d 1, 2 (D.D.C. 2007) (granting expedited discovery where "Plaintiffs have made a showing of good cause for the discovery they seek, as the information is not only relevant but crucial to the prosecution of plaintiffs' claims."). In the declarations accompanying Plaintiffs' TRO Motion, they identify the federal funds, agencies, and contracts that Plaintiff States rely on and the harm that would result from pausing or terminating those resources. *See, e.g.*, Pls.' TRO Mot. Exs. A–G, J, ECF No. 6-2 – 6-8, 6-11. To accurately tailor the requests, the court will adopt a narrowing principle: Plaintiffs' requests shall be read to encompass only information regarding agencies, employees, legal agreements, or data management systems that involve or engage with Plaintiff States, including entities and institutions operated or funded by Plaintiff States. Information reflecting harm to other parties is not relevant. *See Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021).

Again, subject to a minor amendment, Plaintiffs have sufficiently tailored their interrogatories and requests for admission as well. Those requests seek to identify DOGE personnel and the parameters of DOGE's and Musk's authority—a question central to Plaintiffs' claims. Pls.' Disc. Mot. Ex. A at 6–7; Pls.' Disc. Mot. at 6–7. Defendants argue that the "inner workings of government" are immaterial to an Appointments Clause claim, which "turns entirely on the authority for certain outward-facing acts." Defs.' Disc. Opp'n at 7. The court is not convinced, but that is a legal issue appropriate for resolution after fulsome briefing. At this stage,

it is sufficient that Plaintiffs' discovery requests intend to reveal the scope of DOGE's and Musk's authority. Defendants also attempt to reframe Plaintiffs' interrogatories and requests for admissions to encompass mere advice and casual conversation. *Id.* at 11. The court does not read them so broadly. For instance, Plaintiffs ask Defendants to "Identify all federal agencies for which DOGE personnel or Musk: (1) *cancelled or directed the cancellation* of federal contracts . . . (2) *terminated employment or placed on leave or directed the termination or placement on leave*. . ." Pls.' Disc. Mot. Ex. A at 6 (emphasis added). Casual advice would not be responsive. Nonetheless, the court will alter Plaintiffs' Fourth Interrogatory to avoid any confusion. As written, it asks Defendants to identify federal agencies where DOGE personnel or Musk "recommended" cancellation of federal contracts or terminations, and when such action occurred "pursuant to the recommendation" of DOGE or Musk. *Id.* The court will strike "recommended" and "recommendation" and insert "directed" and "direction." *See AFL-CIO*, No. 1:25-cv-00339 (JDB), slip op. at 12 (adjusting Plaintiffs' discovery requests). That said, Defendants may not creatively interpret the interrogatories to circumvent their discovery obligations.

Finally, Defendants' broad privilege assertions are unavailing. Defs.' Disc. Opp'n at 10–11. They argue that the presidential communications privilege and deliberative process privilege cover much of the requested information, *id.*, but fail to "invoke[] either privilege with sufficient specificity," *Damus*, 328 F.R.D. at 6. Just because a privilege exists does not mean it applies. *See Simon v. Republic of Hungary*, No. 10-cv-01770 (BAH), 2021 WL 13069772, at *5 (D.D.C. Oct. 19, 2012). Defendants' general privilege assertions cannot preclude discovery, particularly when the discovery requests have been crafted specifically to avoid infringing on governmental privileges. First, as mentioned above, Plaintiffs do not seek information from President Trump. Pls.' Disc. Reply at 11–12, ECF No. 51. Second, and most significantly, Plaintiffs do not seek any

electronic communications.    Pls.' Disc. Mot. at 7.    Materials containing the "candid" communications covered by the privileges Defendants invoke, Defs.' Disc. Opp'n at 11, would likely appear in emails, text messages, and other informal communications, which Plaintiffs intentionally exclude, Pls.' Disc. Mot. at 7.  Instead, Plaintiffs seek materials reflecting "a factual account of a decision already rendered—a recitation that is not privileged." *Damus*, 328 F.R.D. at 6 (citing *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997)).  To the extent the term "planning . . . documents" in Plaintiffs' Requests for Production is unclear, Pls.' Disc. Ex. A at 5, the court clarifies that it does not encompass draft or pre-decisional materials.  Rather, as Plaintiffs explain, it refers to documents reflecting DOGE's plans to take actions.  Pls.' Reply at 12 ("Plaintiffs' requests are geared toward decisions that have already been made and directives that have been sent or will be sent to agencies or employees.").  If Defendants' concerns persist, they may assert privilege claims on a case-by-case basis.  Because Plaintiffs' requests are "bounded both in temporal scope and substance" to their request for injunctive relief, *Damus*, 328 F.R.D. at 5—the second and third factors weigh in Plaintiffs' favor.

## C.  <u>Burden of Compliance</u>

Although discovery is inherently burdensome, the court finds that the benefit, including expeditious resolution of this case, outweighs the burden here.  *See Ellsworth Assoc.*, 917 F. Supp. at 844 (granting expedited discovery that "would expedite resolution of their claims for injunctive relief"); *Goodwin*, 2021 WL 1978795, at *7 (granting expedited discovery where "the 'likely benefit' of the proposed discovery largely outweighs its burden").  Defendants argue that (1) burden is presumed for discovery into the Executive Branch, especially for senior advisors and departments within the Executive Office, Defs.' Disc. Opp'n at 5–6, 10, and (2) the requests seek a "stunning amount" of material in a condensed time frame, *id.* at 12.  In addition to the limits discussed above, the court adopts further safeguards to minimize any burden.

"[C]ourts have routinely granted expedited discovery in cases involving challenges to constitutionality of government action." *Ellsworth Assoc.*, 917 F. Supp. at 844 (citing *Optic-Elec. Corp. v. United States*, 683 F. Supp. 269, 271 (D.D.C. 1987)). But discovery requests directed at the Executive Branch, particularly at the highest levels, require careful consideration. The "Executive's 'constitutional responsibilities and status [are] factors counseling judicial deference and restraint' in the conduct of litigation against it," "including the timing and scope of discovery." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 385 (2004) (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 753 (1982)). Accordingly, courts are permitted to narrow discovery requests to minimize burdens on the Executive. *Id.* at 389–90.

Given the limited discovery requested here, the court cannot conclude that compliance is likely to interfere with "the Executive's Article II prerogatives." *Id.* at 389. Defendants seem mainly concerned with discovery requests targeting President Trump and his Senior Advisor, Musk. Defs.' Disc. Opp'n at 10–12. Plaintiffs explicitly concede, and the court will order, that the requests "seek no information from President Trump." Pls.' Disc. Reply at 11. As to Musk, he is subject to two document requests and two interrogatories. Pls.' Disc. Ex. A at 6–7. Factoring the narrow time frame, Defendants' claim that Musk does not lead DOGE, Decl. of Joshua Fischer ¶ 6, ECF No. 24-1, and the electronic communications exemption, those four requests are unlikely to unduly burden the Executive Branch. And the court will not extend the heightened consideration afforded to "senior members of the Executive Branch," *Cheney*, 542 U.S. at 385, to DOGE, an office that other courts have concluded "wields . . . substantial authority independent of the President." *Citizens for Resp. & Ethics in Wash. v. U.S. DOGE Serv.*, No. 25-cv-511 (CRC), slip op. at 23 (D.D.C. Mar. 10, 2025), ECF No. 18.

Moreover, the court will add two further modifications to avoid any "unnecessary intrusion into the operation of the Office of the President." *Cheney*, 542 U.S. at 387. First, it will extend the time for compliance from seven days to twenty-one days. Second, it will not permit Plaintiffs to notice depositions at this time. Plaintiffs request two depositions and, even though Plaintiffs agree not to seek to depose President Trump or Musk, Pls.' Disc. Reply at 10, the court recognizes that depositions impose a heavier burden than written discovery, *see, e.g.*, *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008). If Defendants fail to adequately respond to Plaintiffs' written discovery, Plaintiffs may renew their requests for depositions. With these adjustments, the fourth factor is neutral. The court also notes that "[i]t is in the best interest of all parties to have this case resolved as soon as possible," and expedited discovery serves that goal. *See Optic-Elec. Corp.*, 683 F. Supp. at 271.

**D.  Timing**

The parties concede that the fifth factor—whether discovery occurs in advance of the typical process—supports Defendants. Pls.' Disc. Mot. at 6; Defs.' Disc. Opp'n at 2–4. Defendants argue that the court should not permit discovery before resolving their motion to dismiss. Defs.' Disc. Opp'n at 2–4. Although some courts have refused to expedite discovery with a motion to dismiss pending, *see Guttenberg*, 26 F. Supp. 3d at 99, the "mere possibility" that a "defendant may defeat a complaint at a later stage is not a legitimate basis to deny a Rule 26(d)(1) [expedited discovery] motion that otherwise satisfies Rule 26's discovery standards," *Strike 3*, 964 F.3d at 1211. The court deliberately set a briefing schedule that permitted Defendants to seek dismissal before Plaintiffs' preliminary injunction motion and it intends to promptly resolve Defendants' motion to dismiss. Order, ECF No. 36. Moreover, in light of the court's decision to consolidate Plaintiffs' preliminary injunction with the merits, which Defendants requested, *see* Proposed Briefing Schedule at 2, this factor holds little weight.

### E.  **Defendants' Motion to Dismiss**

The court also briefly addresses an argument that Defendants previewed in their opposition to Plaintiffs' discovery requests and raised in their motion to dismiss.  *See* Defs.' Disc. Opp'n at 2–4; Defs.' Mot. to Dismiss at 6–16, ECF No. 58.  Defendants question the court's jurisdiction by suggesting Plaintiffs lack Article III standing.  Defs.' Disc. Opp'n at 2.  Although the court awaits full briefing on the issue, it has jurisdiction to rule on the request for discovery.[2]

Article III limits federal courts' jurisdiction to the resolution of "Cases" and "Controversies."  U.S. Const., Art. III, § 2; *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  "For there to be a case or controversy under Article III, the plaintiff must have 'a personal stake' in the case—in other words, standing."  *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)).  In this Circuit, a court may order discovery to assure itself of standing at the pleadings stage.  *See Nat. Res. Def. Council v. Pena*, 147 F.3d 1012, 1024 (D.C. Cir. 1998) (collecting cases) (holding that discovery into standing is "consistent with our precedent allowing jurisdictional discovery and factfinding if allegations indicate its likely utility"); *Haase v. Sessions*, 835 F.2d 902, 907 (D.C. Cir. 1987).  Plaintiffs' Complaint alleges injuries that "[i]f adequately supported through discovery, . . . might establish their standing."  *Nat. Res. Def. Council*, 147 F.3d at 1024.  For

---

[2] The court did not address Plaintiffs' standing in its TRO Opinion.  *See New Mexico v. Musk*, 2025 WL 520583.  When ruling on a preliminary injunction or TRO motion, courts typically address whether Plaintiffs have a "substantial likelihood of standing" under the "substantial likelihood of success on the merits" prong.  *Elec. Priv. Info. Ctr., Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019) (citation omitted).  Because the court found that Plaintiffs failed to sufficiently show irreparable harm—"a threshold requirement in granting injunctive relief"—it did not meaningfully address Plaintiffs' likelihood of success on the merits or standing.  *New Mexico v. Musk*, 2025 WL 520583, at *3 (quoting *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 8 (D.D.C. 2009)); *see also Am. Foreign Serv. Ass'n v. Trump*, No. 25-cv-352 (CJN), 2025 WL 573762, at *7 n.3 (D.D.C. Feb. 21, 2025) ("Setting aside whether that allegation is sufficient to support Article III standing, Plaintiffs have not demonstrated that any hindrance to their mission as a result of those challenged actions belongs to the category of 'great' harms that could warrant a preliminary injunction in a case like this." (citation omitted)).

instance, Plaintiffs claim that Defendants obtained unlawful access to Plaintiffs' proprietary data, *see* Compl. Ex. C ¶¶ 25–26, ECF 2-3; and Plaintiffs' departments have been unable to draw down federal grants, Compl. Ex. E ¶¶ 12–19, ECF No. 2-5. Unlawful data disclosure and loss-of-funding may suffice to show an injury-in-fact under Article III. *See TransUnion*, 594 U.S. at 432 (recognizing "disclosure of private information" is a sufficiently "concrete injury in fact under Article III"); *Biden v. Nebraska*, 143 S. Ct. 2355. 2365–66 (2023) (federal policy that impairs an instrumentality of a State in the "performance of its public function is necessarily a direct injury to [the State] itself"). The court will benefit from briefing on the issue but authorizes discovery in the interim.

## IV.    CONCLUSION

Plaintiffs' discovery requests, as amended by the court, are narrowly tailored to support their forthcoming motion for a preliminary injunction. The burden to Defendants is minimized by the narrow time period for responsive materials, the exclusion of electronic communications, explicitly exempting President Trump from the requests, extending Defendants' time to respond, and denying Plaintiffs' request to notice depositions. Therefore, considering all the surrounding circumstances and the expedited nature of these proceedings, the court finds Plaintiffs' discovery requests reasonable and will GRANT in part and DENY in part Plaintiffs' Motion. Because the court extends Defendants' time to respond, it denies the request for a stay.

Date: March 12, 2025

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STATE OF NEW MEXICO**, *et al.* | |
| Plaintiffs, | |
| v. | Civil Action No. 25-cv-429 (TSC) |
| **ELON MUSK**, *et al.* | |
| Defendants. | |

## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, ECF No. 60, Plaintiffs' Motion for Expedited Discovery, ECF No. 45, is GRANTED in part and DENIED in part.

It is hereby ORDERED that Plaintiffs may serve the written discovery requests attached to their Motion as Exhibit A, ECF No. 45-1 ("Plaintiffs' Discovery Requests"), on Defendants Elon Musk, U.S. Department of Government Efficiency ("DOGE") Service, and U.S. DOGE Temporary Organization, subject to the below clarifications and amendments:

- Plaintiffs' Discovery Requests shall not apply to President Trump;

- Plaintiffs' Discovery Requests shall be limited to information and materials regarding agencies, employees, contracts, grants, federal funding, legal agreements, databases, or data management systems that involve or engage with Plaintiff States, including entities and institutions operated or funded by Plaintiff States;

- "Recommended" and "recommendation" shall be deleted from Plaintiffs' Fourth Interrogatory and replaced with "directed" and "direction."

It is further ORDERED that Defendants Elon Musk, U.S. DOGE Service, and U.S. DOGE Temporary Organization shall produce the requested documents and respond to the interrogatories and requests for admissions in Plaintiffs' Discovery Requests, as amended by the court, within 21

A15

days of this Order.  Defendants' request for a stay of any order granting expedited discovery is DENIED.

It is further ORDERED that Plaintiffs' request to notice two depositions is DENIED without prejudice.

It is further ORDERED that Plaintiffs' forthcoming motion for a preliminary injunction shall be CONSOLIDATED with a hearing on the merits under Federal Rule of Civil Procedure 65(a)(2).


Date: March 12, 2025


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge