# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA

In re ELON MUSK, in his official capacity, *et al.*,

Petitioners.

On Petition for a Writ of Mandamus to the United States District Court for the District of Columbia

## RESPONSE TO PETITION FOR A WRIT OF MANDAMUS

RAUL TORREZ
   *Attorney General of New Mexico*
STEVEN PERFREMENT\*
   *Senior Litigation Counsel*
408 Galisteo Street
Santa Fe, NM 87501

KRISTIN K. MAYES
   *Attorney General of Arizona*
Joshua Bendor\*
   *Solicitor General*
   2005 North Central Avenue
Phoenix, AZ 85004

DANA NESSEL
   *Attorney General of Michigan*
JASON EVANS
   *Assistant Attorney General*
525 W. Ottawa St
Lansing, MI 48933

      *\* Counsel of Record*

      Date: March 24, 2025

(Names and addresses of additional counsel appear on inside cover.)

**RAÚL TORREZ**
Attorney General of the State of New Mexico

Anjana Samant
  *Deputy Counsel*
James Grayson
  *Chief Deputy Attorney General*
Julie Sakura
  *Senior Litigation Counsel*
Astrid Carrete
Malina Simard-Halm
  *Assistant Attorney General*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
jgrayson@nmdoj.gov
asamant@nmdoj.gov
jsakura@nmdoj.gov
acarrete@nmdoj.gov
msimard-halm@nmdoj.gov
(505) 270-4332
*Attorneys for the State of New Mexico*

**DANA NESSEL**
Attorney General, State of Michigan

Joseph Potchen
  *Deputy Attorney General*
Linus Banghart-Linn
  *Chief Legal Counsel*
Michigan Department of Attorney General
525 W. Ottawa St
Lansing, MI 48933
(517) 335-7632
evansj@michigan.gov
potchenj@michigan.gov
*Attorneys for the People of the State of Michigan*

**KRISTIN K. MAYES**
Attorney General for the State of Arizona

Joshua D. Bendor
  *Solicitor General*
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
Joshua.Bendor@azag.gov
*Attorneys for the State of Arizona*

**ROB BONTA**
Attorney General for the State of California

Nicholas R. Green
  *Deputy Attorney General*
Thomas S. Patterson
*Senior Assistant Attorney General*
Mark R. Beckington
John D. Echeverria
  *Supervising Deputy Attorneys General*
Maria F. Buxton
Michael E. Cohen
Carolyn F. Downs
  *Deputy Attorneys General*
California Attorney General's Office
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
(415) 510–4400
nicholas.green@doj.ca.gov
*Attorneys for the State of California*

**WILLIAM TONG**
Attorney General for the State of Connecticut

Timothy Holzman
*Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.Skold@ct.gov
*Attorneys for the State of Connecticut*

**ANNE E. LOPEZ**
Attorney General for the State of Hawai'i

Kaliko'onālani D. Fernandes
*Solicitor General*
David D. Day
*Special Assistant to the Attorney General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorneys for the State of Hawai'i*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

Adam D. Kirschner
*Senior Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6424
AKirschner@oag.state.md.us
*Attorneys for the State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

Gerard J. Cedrone
*Deputy State Solicitor*
Massachusetts Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov
*Attorneys for the State of Massachusetts*

**KEITH ELLISON**
Attorney General for the State of Minnesota

Liz Kramer
*Solicitor General*
445 Minnesota Street, Suite 600
St. Paul, MN 55101
(651) 757-1010
liz.kramer@ag.state.mn.us
*Attorneys for the State of Minnesota*

**AARON D. FORD**
Attorney General for the State of Nevada

Heidi Parry Stern
*Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
HStern@ag.nv.gov
*Attorneys for the State of Nevada*

**DAN RAYFIELD**
Attorney General for the State of
Oregon

Benjamin Gutman
    *Solicitor General*
Philip Thoennes
    *Senior Assistant Attorney General*
1162 Court St. NE
Salem, Oregon 97301-4096
(503) 378-4402
benjamin.gutman@doj.oregon.gov
philip.thoennes@doj.oregon.gov
*Attorneys for the State of Oregon*

**PETER F. NERONHA**
Attorney General for the State of Rhode
Island

Katherine Connolly Sadeck
    *Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
ksadeck@riag.ri.gov
*Attorneys for the State of Rhode Island*

**CHARITY R. CLARK**
Attorney General for the State of
Vermont

Ryan P. Kane
    *Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
ryan.kane@vermont.gov
*Attorneys for the State of Vermont*

**NICHOLAS W. BROWN**
Attorney General for the State of
Washington

Kelsey Endres
    *Assistant Attorney General*
Emma Grunberg
    *Deputy Solicitor General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
kelsey.endres@atg.wa.gov
emma.grunberg@atg.wa.gov
*Attorneys for the State of Washington*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................5

TABLE OF AUTHORITIES .........................................................7

GLOSSARY ...............................................................................10

INTRODUCTION .......................................................................11

BACKGROUND ........................................................................13

    A.    The TRO Proceedings ........................................................13

    B.    Respondents' Request for Expedited Discovery.................14

    C.    The District Court's Discovery Order................................16

LEGAL STANDARD...................................................................18

ARGUMENT ..............................................................................19

I.    Petitioners fail to show a clear and indisputable right to relief. ...................20

    A.    *Cheney* did not purport to completely insulate the Executive Branch from discovery in civil cases. ................................21

    B.    The district court here properly considered separation-of-powers concerns. ...................................................................25

        i.    The discovery requests avoid privileged material. ...................25

        ii.    The discovery requests are not impermissibly burdensome. ..............................................................................30

        iii.    Respondents have a clear and compelling need for the information sought. ................................................................33

            (a)    Petitioners' criticisms of two discovery requests are unavailing and do not entitle them to the relief they seek.............................................34

            (b)    The Appointments Clause cannot be evaded by inventing new offices not established by law................35

(c) The district court's discretionary decision to grant discovery before ruling on the motion to dismiss does not warrant mandamus. ..............................37

II. Petitioners have other adequate means to obtain their desired relief. ...........38

III. Mandamus is not appropriate under the circumstances................................41

CONCLUSION ..........................................................................................................43

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ...........44

CERTIFICATE OF COMPLIANCE......................................................................46

CERTIFICATE OF SERVICE ...............................................................................47

ADDENDUM ...........................................................................................................48

TABLE OF CONTENTS..........................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Al-Tamimi v. Adelson*,
    916 F.3d 1 (D.C. Cir. 2019)................................................................28

*Andrade v. Regnery*,
    824 F.2d 1253 (D.C. Cir. 1987) ........................................................37

*Beale v. District of Columbia*,
    545 F. Supp. 2d 8 (D.D.C. 2008) ......................................................42

*Burka v. United States Dep't of Health & Hum. Servs.*,
    87 F.3d 508, 516 (D.C. Cir. 1996) ....................................................26

*Cause of Action Inst. v. Exp.-Imp. Bank of the United States*,
    521 F. Supp. 3d 64 (D.D.C. 2021) ....................................................26

*Cheney v. U.S. Dist. Ct. for D.C.*,
    542 U.S. 367 (2004)................................................................ passim

*Clinton v. Jones*,
    520 U.S. 681 (1997).........................................................................30

*Cobbledick v. United States*,
    309 U.S. 323 (1940).........................................................................38

*Dellums v. Powell*,
    561 F.2d 242 (1977).........................................................................25

*Does 1-26 v. Musk*,
    No. CV 25-0462-TDC, --- F. Supp. 3d ---, 2025 WL 840574 (D. Md. Mar. 18,
    2025) ........................................................................ 35, 37, 45

*Ellsworth Assocs., Inc. v. United States*,
    917 F. Supp. 841 (D.D.C. 1996) .......................................................43

*Ex parte Fahey*,
    332 U.S. 258 (1947).........................................................................19

*Freytag v. Comm'r of Internal Rev.*,
    501 U.S. 868 (1991) .......................................................................36

*Gov't of Manitoba v. Bernhardt*,
    923 F.3d 173 (D.C. Cir. 2019) .................................................. 29, 39

*Illinois v. Ferriero*,
    60 F.4th 704 (D.C. Cir. 2023) .................................................20

*In re Al Baluchi*,
    952 F.3d 363 (D.C. Cir. 2020) ...............................................21

*In re Cheney*,
    334 F.3d 1096 (D.C. Cir. 2003) ...................................... 22, 23, 27, 40

*In re Cheney*,
    544 F.3d 311 (D.C. Cir. 2008) ...............................................32

*In re Clinton*,
    973 F.3d 106 (D.C. Cir. 2020) ...............................................42

*In re Kellogg Brown & Root, Inc.*,
    756 F.3d 754 (D.C. Cir. 2014) .................................................. 41, 42

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) .................................................. 25, 26, 30

*Jud. Watch, Inc. v. Nat'l Energy Pol'y Dev. Grp.*,
    No. 1:01CV01530 (EGS) (D.D.C. Oct. 17, 2001) ...............................22

*Jud. Watch, Inc. v. United States Dep't of Def.*,
    847 F.3d 735 (D.C. Cir. 2017) ...............................................26

*Mallard v. U.S. Dist. Ct. for S. Dist. of Iowa*,
    490 U.S. 296 (1989) .......................................................38

*Mohawk Industries, Inc. v. Carpenter*,
    558 U.S. 100 (2009) .................................................. 40, 41

*NLRB v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975) .......................................................26

*Thornton v. Corcoran*,
407 F.2d 695 (D.C. Cir. 1969) ...............................................................38

*Trump v. United States*,
603 U.S. 593 (2024) ...............................................................................36

*Twin Rivers Paper Co. v. Sec. & Exch. Comm'n*,
934 F.3d 607 (D.C. Cir. 2019) ...............................................................39

*United States v. Nixon*,
418 U.S. 683 (1974) ......................................................................... 30, 31

**Statutes and Constitution**

28 U.S.C. § 1292(b) ......................................................................... 39, 40

U.S. Const. art. 2, § 2, cl. 2 .....................................................................36

**Rules and Other Authorities**

Exec. Order No. 14,158 (Jan. 20, 2025) ..................................................32

Federal Rule of Appellate Procedure 21(a)(2)(C) ...................................11

Federal Rule of Civil Procedure 26(c) ............................................. 20, 39

# GLOSSARY

"CFPB" refers to the Consumer Financial Protection Bureau.

"DOGE" or "DOGE Entities" refers to the United States DOGE Service and the US DOGE Service Temporary Organization.

"FOIA" refers to the Freedom of Information Act.

"GSA" refers to the General Services Administration.

"NEPDG" refers to the National Energy Policy Development Group referenced in *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367 (2004).

"TRO" stands for Temporary Restraining Order.

"USAID" refers to the United States Agency for International Development.

# INTRODUCTION

In recent months, Elon Musk "has rapidly taken steps to fundamentally reshape the Executive Branch" while "[b]ypassing" the Appointments Clause. ADD024.[1] This conduct is unconstitutional and strikes at the heart of our government's fundamental structure, undermining core separation of powers principles, not to mention generating mass chaos and confusion for state governments and everyday Americans.

Fourteen States brought this lawsuit against Mr. Musk, President Trump, and two organizations within the Executive Office of the President—the United States DOGE Service, the U.S. DOGE Service Temporary Organization (collectively "DOGE" or the "DOGE Entities") to stop this unlawful conduct. But despite Mr. Musk's public boasting of trying to tear down the federal government, he and the DOGE Entities have tried to cloak how they are operating in practice. *Compare, e.g.*, Complaint, ADD050 ¶¶ 98-100, -060 ¶ 146, -061 ¶ 156 (Mr. Musk boasting of "shutting" USAID, that he would dismantle CFPB, and that he had "deleted" a GSA technology group), *and* ADD137 (statement by President Trump to joint session of Congress that DOGE "is headed by Elon Musk"), *with* ADD094-095 ¶¶ 4-6 (trying

---

[1] Pursuant to Federal Rule of Appellate Procedure 21(a)(2)(C), Respondents have included copies of "any order or opinion or parts of the record that may be essential to understand the matters set forth in the petition" in the Addendum, cited by page numbers (e.g., ADD001).

to claim that Mr. Musk is just a "Senior Advisor to the President," with "no actual or formal authority to make government decisions himself," and is not the administrator of DOGE or an employee of DOGE). Accordingly, at the TRO stage the record of Petitioners' conduct consisted largely of newspaper reports, upon which the district court determined it could not grant emergency relief.

The Plaintiff States (here, Respondents) therefore moved for limited, expedited discovery to obtain admissible evidence that it was in fact Mr. Musk and DOGE who had unraveled the agencies, fired the personnel, canceled the contracts, and accessed and manipulated the agency data, and to learn what they were going to do next so Respondents could stop them before it was too late. Respondents carefully crafted their discovery requests to exclude any pre-decisional documents or any communications with the President or his immediate advisors, and expressly disavowed seeking any discovery from the President.

Petitioners opposed the request for expedited discovery largely by ignoring the details of the discovery Respondents actually requested, and instead attacking a straw man. The district court saw through this and granted the request for expedited discovery in part, while taking pains to construe and revise certain discovery requests to make sure that they would not infringe on the deliberative process or presidential communications privilege.

In this court, Petitioners repeat their tactic below, making sweeping privilege arguments that are untethered to the discovery actually ordered, which carefully limits the scope of the discovery at issue. Petitioners therefore fail to show that the district court clearly and indisputably erred. And they make no effort to show that they have no other adequate means to obtain relief; that forfeiture dooms their Petition.

## BACKGROUND

Respondents filed this lawsuit on February 13, 2025. The Complaint asserts two claims. First, that Mr. Musk is exercising the authority of an "Officer of the United States" without holding an office established by law to which he has been appointed consistent with the Appointments Clause. And second, that Mr. Musk and the DOGE Entities are acting in excess of authority.

### A. The TRO Proceedings

Respondents moved for a temporary restraining order. The court found that "[Respondents] raise a colorable Appointments Clause claim with serious implications" and "legitimately call into question what appears to be the unchecked authority of an unelected individual and an entity that was not created by Congress and over which it has no oversight." ADD024-025. But the record regarding Petitioners' conduct largely consisted of newspaper reporting and Petitioners' own statements in social media, and the court concluded that on that record "[i]t remains

'uncertain' when and how the catalog of state programs that [Respondents] identify will suffer," and that Respondents had not established a clear connection between their alleged harms and Petitioners' actions. ADD022, -024. The court also found that it could not rely exclusively on the "widespread media reports that DOGE has taken or will soon take certain actions, such as mass terminations" in order to find irreparable harm. ADD023.

## B. Respondents' Request for Expedited Discovery

In response, Respondents sought leave to take discovery on an expedited basis to support their forthcoming motion for a preliminary injunction, and Petitioners indicated their intent to move to dismiss. The court then entered an order setting briefing schedules for (1) a motion for expedited discovery, (2) a motion to dismiss, and (3) a preliminary injunction motion. The discovery motion has been resolved, and the motion to dismissed is fully briefed. The preliminary injunction motion is due on April 11.

Respondents moved for leave to take expedited discovery, in the form of written discovery requests attached to their motion and two depositions. The main discovery requests seek DOGE's post-decisional documents regarding what it has done and will soon do to the federal workforce, funding, and data systems. *See* ADD115-117 (Requests for Production 1-4, Interrogatories 3-5, Requests for Admission 3-4). Respondents also seek limited documents explaining the DOGE

entities' relationship with other federal agencies, *see* ADD115 (Request for Production 5), and DOGE's personnel and reporting structure, ADD116 (Interrogatories 1-2), to clarify who authored the documents and how decision-making works, both at DOGE and between the main DOGE operation and its agency teams. And a handful of Requests for Admission aim to verify Petitioners' public statements and other information regarding Mr. Musk's role with respect to DOGE. *See* ADD117 (Requests for Admission 1-2, 5-6).

Respondents intentionally limited these discovery requests in three important ways.

*First*, Respondents carefully crafted their discovery requests not to seek discovery from the President or to aim at communications or materials prepared for presidential decisionmaking or pre-decisional deliberative documents. *See* ADD115-117. And Respondents expressly disclaimed any intent to seek discovery from the President in their representations to the district court. *See* ADD127-128. The district court appropriately credited that representation.

*Second*, Respondents expressly excluded from their expedited discovery requests "emails, text messages, or other electronic communications," so that Petitioners would "not need to sort through such exchanges for relevance or possible privilege." ADD102; *see also* ADD111 (last sentence of definition of "Document," excluding such communications). Once again, the district court properly analyzed

the scope of Respondents' requested discovery in view of that limiting representation.

*Third*, Respondents limited the time period for their requests to go back to only January 20, 2025. *See* ADD113 (Instruction 3). That limitation placed significant guardrails on the quantity of responsive documents and information.

Respondents asked that Petitioners be required to produce the requested documents and discovery responses within 7 days of any Court order authorizing the discovery. *See* ADD112.

## C. The District Court's Discovery Order

After briefing, the district court concluded that "[Respondents]' requests, as amended by the court, are reasonable and narrowly tailored to their request for injunctive relief" and that "expedited discovery is reasonable and necessary to evaluate [Respondents]' request for injunctive relief." ADD001, -004. The court therefore granted Respondents' motion in part and denied it in part.

The court concluded that the discovery requests were relevant because "[e]vidence that [Petitioners] eliminated agencies that work with [Respondents], terminated employees responsible for managing programs with [Respondents], or cancelled contracts with [Respondents] is relevant to whether [Petitioners] exceeded their statutory and constitutional authority." ADD008. But the court narrowed the requests "to encompass only information regarding agencies . . . that involve or

engage with [Respondents]," not information reflecting harm only to other parties. *Id.* The court also disagreed with Petitioners' argument that the discovery requests "encompass mere advice and casual conversation." ADD009. But "to avoid any confusion," the court altered one of the interrogatories to apply only to situations in which Mr. Musk and DOGE "directed" action, rather than merely having "recommended" it. *Id.*

On privilege, the district court noted that "the discovery requests have been crafted specifically to avoid infringing on governmental privileges" and that in response Petitioners made only "general privilege assertions." *Id.* These assertions failed in part because "[m]aterials containing the 'candid' communications covered by the privileges [Petitioners] invoke, would likely appear in emails, text messages, and other informal communications, which [Respondents] intentionally exclude." ADD010 (internal citations omitted). The court recognized that "[Respondents] seek materials reflecting 'a factual account of a decision already rendered—a recitation that is not privileged.'" *Id.* (citation omitted). And to avoid any doubt, the court clarified that "the term 'planning . . . documents' in [Respondents'] Requests for Production . . . does not encompass draft or pre-decisional materials" but instead "refers to documents reflecting DOGE's plans to take actions." *Id.* Of course, Petitioners retained the right to assert privilege on a case-by-case basis. *Id.*

Finally, the court concluded that the requested discovery was unlikely to interfere with the Executive's constitutional prerogatives. ADD011. Petitioners were "mainly concerned" with discovery requests aimed at the President or Mr. Musk. *Id.* But Respondents had "explicitly concede[d]," and the court ordered, that the requests "seek no information from President Trump." *Id.* Mr. Musk is subject to only two document requests and two interrogatories, which the court concluded were unlikely to unduly burden the Executive because of "the narrow time frame, [Petitioners'] claim that Musk does not lead DOGE, and the electronic communications exemption." *Id.* (internal citation omitted). And the court declined to grant DOGE "the heightened consideration afforded to 'senior members of the Executive Branch,'" in part because another court had already found that DOGE "wields . . . substantial authority independent of the President." *Id.* (citations omitted). But to once more be extra careful of the burden on Petitioners, the court extended the time for compliance from 7 to 21 days and declined Respondents' request for depositions. ADD012.

Nearly one week after the District Court issued its carefully reasoned decision, Petitioners filed this Petition.

## LEGAL STANDARD

The writ of mandamus is a "'drastic and extraordinary' remedy 'reserved for really extraordinary causes.'" *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380

(2004) (quoting *Ex parte Fahey,* 332 U.S. 258, 259-260 (1947)). A petitioner seeking mandamus must show that (1) "his right to issuance of the writ is 'clear and indisputable,'" (2) he has "no other adequate means to attain the relief he desires," and (3) the writ is appropriate under the circumstances. *Id.* at 380-81 (citations omitted).

## ARGUMENT

Petitioners fail all three prongs of the mandamus test.

*First*, Petitioners fail to show a clear and indisputable right to relief. The district court carefully accounted for the special considerations appropriate to discovery of the Executive Branch, and approved the discovery requests only after ensuring that they would not intrude on the executive privileges or impose a significant burden on the Executive. Petitioners appear to read *Cheney* as providing the Executive Branch nearly a complete shield against discovery, but *Cheney* did no such thing. Petitioners also fail to make any particularized privilege or burden argument regarding the discovery requests at issue here, for which Respondents have a compelling need. As a result, Petitioners fail to show that the district court clearly and indisputably erred.

*Second*, Petitioners fail to show that mandamus is their only adequate way to obtain relief. Indeed, they do not even *attempt* to make that showing. Their Petition fails based on that forfeiture alone, which cannot be cured on reply. And in fact,

Petitioners have several alternatives available—for example, they could move for a protective order under Federal Rule of Civil Procedure 26(c), seek in camera review of any responsive documents they believe are privileged, or move for a certificate of appealability of the order below. Because Petitioners have not shown and cannot show that mandamus is the only way to obtain relief, their Petition fails.

*Third*, even if Petitioners could satisfy the first two factors—which they cannot—they cannot show that mandamus is appropriate under the circumstances. Mr. Musk and DOGE are dismantling federal agencies and causing havoc to the federal government, without constitutional or statutory authority. Thus, allowing the limited, expedited discovery necessary to support Respondents' forthcoming motion for a preliminary injunction would protect the separation of powers, not endanger it as in *Cheney*. By contrast, granting the writ to quash the discovery would be counterproductive.

## I.     Petitioners fail to show a clear and indisputable right to relief.

To meet their burden to show a "clear and indisputable right to relief," Petitioners "must show that the challenged action is 'plainly and palpably wrong as [a] matter of law.'" *Illinois v. Ferriero*, 60 F.4th 704, 715 (D.C. Cir. 2023) (citation omitted) (alteration in original). A "petitioner's right to relief is 'clear and indisputable' where he or she can point to cases in which a federal court has held that relief is warranted in a matter involving like issues and compatible

circumstances." *In re Al Baluchi*, 952 F.3d 363, 369 (D.C. Cir. 2020) (cleaned up, citation omitted). This Court "will deny mandamus even if a petitioner's argument, though packing substantial force, is not clearly mandated by statutory authority or case law." *Id.* (cleaned up, citation omitted).

Relying heavily on a misreading of *Cheney*, Petitioners fall well short of this high bar. They claim that *Cheney* "made clear that discovery directed at the Office of the President and the President's senior advisors must be reserved for the rarest and most exceptional of circumstances," and conclude that such discovery "is permissible" only (1) "when strictly necessary;" (2) "after all other avenues … have been explored," and (3) "when drawn as narrowly as possible." Pet. at 9[2] (citing *Cheney*, 542 U.S. at 385-392). That is not the law—Petitioners stretch *Cheney* far beyond any reasonable reading. Because their so-called "clear and indisputable right to relief" depends entirely on their overstatement of *Cheney*'s holding and their flawed attempt to draw parallels to its facts, Petitioners fail to make the necessary showing.

### A.    *Cheney* did not purport to completely insulate the Executive Branch from discovery in civil cases.

Petitioners' argument comes very close to suggesting that, in *Cheney*, the Supreme Court *completely* shielded the Executive Branch from discovery in civil

---

[2] Citations to the Petition refer to the page number assigned by the Court's electronic filing system.

cases. That is a drastic over-reading of *Cheney*, which contains no such holding. In *Cheney*, the Supreme Court reviewed the denial of a petition for a writ of mandamus, which had sought to vacate "discovery orders issued by the district court" and other relief. *In re Cheney*, 334 F.3d 1096, 1101 (D.C. Cir. 2003) (citation omitted), *vacated sub nom. Cheney*, 542 U.S. 367 (2004).

The petition in *Cheney* arose from consolidated lawsuits against the National Energy Policy Development Group (the "NEPDG") and several of its members. *In re Cheney*, 334 F.3d at 1099. The NEPDG was a group "within the Executive Office of the President," created by President George W. Bush via a memorandum that named Vice President Cheney and several cabinet secretaries as members, among others. Motion to Dismiss, Attachment 2, *Judicial Watch, Inc. v. Nat'l Energy Pol'y Dev. Grp.*, No. 1:01CV01530 (EGS) (D.D.C. Oct. 17, 2001), ECF 10-2 at 1 (the "Bush Memo"). President Bush directed the NEPDG to "develop a national energy policy," "gather information, deliberate, and . . . make recommendations to the President," and "submit reports to [the President]." *Id.* at 2.

After five months of work, "the NEPDG issued a final report and . . . terminated all operations." *Cheney*, 542 U.S. at 373. The plaintiffs brought claims arguing that NEPDG "had failed to comply" with statutory "procedural and disclosure requirements," *id.*, and sought an order directing NEPDG to provide the "plaintiffs a full and complete copy of all records made available to or prepared for

[NEPDG]" along with "detailed" meeting minutes containing "a complete and accurate description of matters discussed and conclusions reached." *In re Cheney*, 334 F.3d at 1099-1100 (cleaned up).

After denying in part motions to dismiss, the district court approved a discovery plan. *Id.* at 1100. In response, the "government produced some 36,000 pages of documents" on behalf "of all federal defendants except the Vice President." *Id.* The Vice President then sought a protective order and leave to file a summary judgment motion, but the district court denied both requests, ordered production of "non-privileged documents and a privilege log," and denied a motion to certify its order for interlocutory appeal. *Id.* at 1100-01 (citation omitted).

The defendants sought mandamus relief, *id.*, but this court rejected the mandamus petition, reasoning that it was "premature" because the petitioners "have yet to assert a privilege in the district court," rendering "the separation of powers conflict that [they] anticipate . . . hypothetical." *Id.* at 1104-05. The Supreme Court granted certiorari to review "whether the Court of Appeals was correct to conclude it 'ha[d] no authority to exercise the extraordinary remedy of mandamus' . . . on the ground that the Government could protect its right by asserting executive privilege in the District Court." *Cheney*, 542 U.S. at 380 (citation omitted) (alteration in original).

Contrary to Petitioners' explanation of *Cheney*, it did not purport to place broad limits on civil discovery directed at the Executive Branch. Rather, *Cheney*'s central holding was that the President and Vice President need not invoke executive privilege in order to seek mandamus review of an order compelling discovery in a civil case. 542 U.S. at 389-90. Vacating the court of appeals' opinion, the Supreme Court held that where a mandamus petition "implicates the separation of powers," the court of appeals must examine "whether the District Court's actions constituted an unwarranted impairment of another branch in the performance of its constitutional duties." *Id.* at 390.

To be sure, *Cheney* criticized the discovery requests at issue there in the context of its lengthy discussion distinguishing civil discovery requests from criminal subpoenas directed at the President. *Id.* at 383-90. This discussion provides important guidance for courts when conducting a separation of powers analysis, but it did not create a broad presumption against all discovery requests directed at every component of the Executive Branch. Indeed, the *Cheney* court did not even expressly hold that the discovery requests at issue there were impermissible; it "decline[d] . . . to direct the Court of Appeals to issue the writ against the District Court," and remanded the case for further consideration. *Id.* at 391.

**B.** **The district court here properly considered separation-of-powers concerns.**

This Court must analyze whether the district court's order constitutes "an unwarranted impairment of another branch in the performance of its constitutional duties." *Id.* at 390. *Cheney* identifies considerations to guide this analysis, but it does not dictate the result. The Court should analyze Respondents' "need for information," the "burden imposed by the discovery orders," and whether the discovery requests are overly broad and implicate executive privilege. *Id.* at 385.

With these considerations in mind, the district court's discovery order is plainly appropriate and does not impair "another branch in the performance of its constitutional duties." *Id.* at 390.

**i.** **The discovery requests avoid privileged material.**

The discovery requests at issue here are appropriately tailored to avoid privileged material. Executive privilege refers generally to two privileges: the presidential communications privilege and the deliberative process privilege. *See In re Sealed Case*, 121 F.3d 729, 737-38 (D.C. Cir. 1997). Neither is absolute. *Id.* at 745 (privilege can be "overcome by an adequate showing of need"); *see also Dellums v. Powell*, 561 F.2d 242, 245 (1977) (collecting cases and "begin[ning the] discussion by rejecting Mr. Nixon's contention" of an absolute bar).

The presidential communications privilege protects "documents or other materials that reflect presidential decisionmaking and deliberations and that the

President believes should remain confidential." *In re Sealed Case*, 121 F.3d at 744. Its application is "construed as narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected." *Id.* at 752. The privilege applies only to the President's decision making, arising as it does from the "President's unique constitutional role." *Id.* at 745. Protection for documents created by others is limited to "communications made by presidential advisers in the course of preparing advice for the President." *Id.* at 752.

The deliberative process privilege, by contrast, "protect[s] the decision making processes of government agencies." *Cause of Action Inst. v. Exp.-Imp. Bank of the United States*, 521 F. Supp. 3d 64, 76-77 (D.D.C. 2021) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)).[3] It protects only records that are "deliberative" and "predecisional." *Id.* at 77. "Documents are 'predecisional' if they are generated before the adoption of an agency policy, and 'deliberative' if they reflect the give-and-take of the consultative process." *Jud. Watch, Inc. v. United States Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017) (citation and some quotation marks omitted, alteration accepted).

---

[3] Much of the authority regarding this privilege arises from FOIA cases. But FOIA Exemption 5, at issue in those cases, is precisely coextensive with litigation privileges. *Burka v. United States Dep't of Health & Hum. Servs.*, 87 F.3d 508, 516 (D.C. Cir. 1996).

The discovery at issue here avoids any privileged material. Indeed, the district court considered privilege and found that the requests "have been crafted specifically to avoid infringing on governmental privileges." ADD009. The district court noted that the discovery requests are not directed at President Trump, "do not seek any electronic communications," and "seek materials reflecting 'a factual account of a decision already rendered—a recitation that is not privileged.'" ADD009-010. The district court did not just take Respondents' word; it explicitly ordered that "Plaintiffs' Discovery Requests shall not apply to President Trump," ADD015, and it narrowed certain requests to clearly carve out privileged material, ADD009 (revising interrogatory to exclude "advice"), -010 (clarifying that request for production "does not encompass draft or pre-decisional materials").

This is a far cry from the discovery requests at issue in *Cheney*, which called for privileged materials. The plaintiffs there sought discovery directly from the Vice President and members of the cabinet, including communications with and involving them "relating to the activities of the" NEPDG. 542 U.S. at 387. The plaintiffs also sought materials and communications prepared for the purpose of "giv[ing] advice and mak[ing] recommendations to the President." *Id.* at 385; *In re Cheney*, 334 F.3d at 1099-1100 (noting that plaintiffs sought "a full and complete copy of all [NEPDG] records" including "a complete and accurate description of matters discussed and

conclusions reached"). And unlike the district court in *Cheney*, the district court here exercised its authority to narrow the scope of the discovery sought.

Moreover, Petitioners do not even muster an argument that the district court erred in concluding that the discovery requests avoid documents protected by the deliberative process privilege or presidential decision-making privilege. In the district court, Respondents represented that "their discovery requests are not aimed at information implicating the presidential communications privilege or the deliberative process privilege" but are instead are aimed at "post-decisional documents." ADD126-128. The district court agreed and construed the discovery requests accordingly. *See* ADD010 (recognizing that "[Respondents] seek materials reflecting 'a factual account of a decision already rendered—a recitation that is not privileged,'" and clarifying that "the term 'planning . . . documents' in [Respondents]' Requests for Production . . . does not encompass draft or pre-decisional materials" but instead "refers to documents reflecting DOGE's plans to take actions" (citation omitted)).

Petitioners never identify the supposed error in this critical aspect of the district court's holding. They have therefore forfeited that argument. *See Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("A party forfeits an argument by failing to raise it in his opening brief.").

Nor do Petitioners identify with any specificity which privilege supposedly applies to which discovery requests. The closest they get in their entire petition is two stray, conclusory sentences, neither of which provides any analysis or any response to the district court's applicable holdings. *See* Pet. at 17 (summarizing requests for production of documents and then concluding that "[t]he court thus authorized plaintiffs to seek information about the substance of the advice that the President's close advisors provided and the process through which those advisors formulated and communicated that advice"), 42 (again summarizing requests for production and concluding that "[m]any (or indeed most) of these requests are likely to implicate privileges like the deliberative process privilege—particularly as to 'edits' or 'planning.'"). They have therefore forfeited this argument as well. *See Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019) (holding that a party forfeits any argument when it mentions it only "in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones") (citation omitted). That is especially true with respect to the interrogatories and requests for admission, which Petitioners barely mention. Nor could they seriously claim that any of the Requests for Admission call for privileged information; perhaps that is why they entirely avoid the issue.

To the extent there is some hypothetical document or piece of information that implicates a privilege claim, then that should be considered in due course, but such

an abstract possibility is not fatal to these discovery requests, which are constructed in a manner to avoid such claims. Rather, courts routinely assess privilege and can do so in this hypothetical instance. *In re Sealed Case*, 121 F.3d at 752 (determining that presidential communications privilege "should never serve as a means of shielding information regarding governmental operations that do not call ultimately for direct decisionmaking by the President"). Petitioners are, no doubt, familiar with the normal procedure for withholding and logging specific documents that are responsive to requests, but privileged, and raising any concrete privilege disputes before the court as they arise. They provide no reason why that procedure is unworkable here. More broadly, Petitioners cannot avoid any and all discovery, based only on the abstract possibility of privilege.

### ii.    The discovery requests are not impermissibly burdensome.

The Executive Branch is not immune from any burden arising from litigation. Indeed, interactions "between the Judicial Branch and the Executive, even quite burdensome interactions, [do not] necessarily rise to the level of constitutionally forbidden impairment of the Executive's ability to perform its constitutional mandated functions." *Clinton v. Jones*, 520 U.S. 681, 702 (1997) (permitting civil suit against the sitting President to move forward). The President is not "above the law." *Cheney*, 542 U.S. at 382 (quoting *United States v. Nixon*, 418 U.S. 683, 715 (1974)). Rather, as "a coequal branch of Government," the courts both ensure the

"fair administration of justice" and "protect[] the Executive Branch from *vexatious* litigation that might distract it from" its "duties." *Cheney*, 542 U.S. at 382 (quoting *Nixon*, 418 U.S. at 715) (quotation mark omitted) (emphasis added).

The district court considered the burden of compliance and concluded the compliance with "the limited discovery requested here" was not likely to interfere with "the Executive's Article II prerogatives." APP011. The district court focused on "the narrow time frame" of the requests and their exclusion of President Trump and electronic communications. ADD012. It also modified the discovery requests to "avoid any 'unnecessary intrusion into the operation of the Office of the President.'" *Id.* (quoting *Cheney*, 542 U.S. at 387). The district court "extend[ed] the time for compliance," and denied Respondents' request to notice depositions, recognizing "that depositions impose a heavier burden than written discovery." *Id.*

Petitioners say this approach is inconsistent with *Cheney*, but they are wrong. The discovery requests there were "directed to the Vice President and other senior Government officials who served on the NEPDG." 542 U.S. at 385. The "senior Government officials" at issue in *Cheney* included the Secretaries of Treasury, Interior, Agriculture, Commerce, Transportation, and Energy, the FEMA Director, and the EPA Administrator. *See* Bush Memo at 1. Nothing in *Cheney* can be read to suggest that the court intended to suggest that the same considerations apply to every person in the Executive Branch. Nor have Petitioners mustered an argument

that Mr. Musk or any employees of DOGE are "senior Government officials" akin to the cabinet officials in *Cheney*, not that they could and be consistent with their theory on the merits. *E.g.* ADD094-095 ¶¶ 4-6 (claiming that Mr. Musk has "no actual or formal authority to make government decisions himself").

Additionally, the petitioners in *Cheney* had already produced 36,000 pages of documents, and the dispute centered on whether they should be required to produce even more. Here, Petitioners have produced nothing. Further, the discovery requests there were coextensive with the underlying relief the plaintiffs sought, which was the disclosure of information. *Cheney*, 542 U.S. at 388 (noting that the discovery requests "provide respondents all the disclosure to which they would be entitled" if "they prevail on the merits, and much more besides"); *In re Cheney*, 544 F.3d 311, 313 (D.C. Cir. 2008) (discussing *Cheney*).

The Supreme Court in *Cheney* also focused on the fact that the NEPDG was created "to give advice and make recommendations to the President." 542 U.S. at 385. In contrast, the Executive Order creating the DOGE Entities directs them to "implement the President's DOGE Agenda by modernizing Federal technology and software to maximize governmental efficiency and productivity." Exec. Order No. 14,158 (Jan. 20, 2025). Unlike the NEPDG, the DOGE Entities were not created to deliberate and give advice to the President; they were created to act.

Like their privilege arguments, Petitioners' burden arguments are utterly lacking in specificity. As the district court noted, only two document requests and two interrogatories apply to Mr. Musk. Which of these requests do Petitioners contend is overly burdensome, and why? They never say. Nor do they indicate that they have done any due diligence to determine roughly the number of documents in their possession that are responsive to the five requests for production.

### iii. Respondents have a clear and compelling need for the information sought.

This is a serious case. Mr. Musk and DOGE are dismantling large swathes of the federal government, without any constitutional or statutory authority. *See* ADD024 ("Even [Petitioners] concede there is no apparent 'source of legal authority granting [DOGE] the power' to take some of the actions challenged here." (quoting ADD091). The conduct alleged in the complaint goes to the very essence of the separation of powers principles upon which the government is built. But Petitioners' own representations to the courts are contradictory and cloak their actions in a veil of uncertainty. *Compare, e.g.*, ADD137 (statement by the President to joint session of Congress that DOGE "is headed by Elon Musk"), *and* ADD050 ¶¶ 98-100, -060 ¶ 146, -061 ¶156 (Mr. Musk boasting of "shutting" USAID, that he would dismantle CFPB, and that he had "deleted" a GSA technology group), *with* ADD095 ¶ 6 (declaration stating that Mr. Musk is not the administrator of DOGE or an employee of DOGE). Respondents' Complaint includes detailed information obtained through

public sources and admissions about Petitioners' actions, but the specifics of what Petitioners have done, who has been doing it, and what they plan to do in the future remain unknown to Respondents—that information is uniquely in Petitioners' possession.

Thus, discovery is necessary to obtain admissible evidence showing which dismantling of agencies, firing of staff, and cancelling of contracts is attributable to Mr. Musk and DOGE. *See* ADD023 ("[W]idespread media reports . . . cannot substitute for 'specific facts in an affidavit.'"). It will also show where Mr. Musk and DOGE will act next, so Respondents can effectively challenge their unlawful conduct before it occurs, rather than trying to put the pieces of a federal agency back together after it has been shattered. That is especially important because Mr. Musk and DOGE have acted with unprecedented speed and secrecy to avoid scrutiny until it is too late to correct their overreaches.

> **(a)** **Petitioners' criticisms of two discovery requests are unavailing and do not entitle them to the relief they seek.**

Petitioners challenge the details of a couple of discovery requests. For example, they contend that the "planning" documents sought as part of Request for Production 1 and 2 are irrelevant to Respondents' existing claims and an inappropriate fishing expedition to identify new claims. Pet. at 29-30. Not so. This request will provide Respondents with post-decisional documents—as clarified by

the district court—showing which harms that they have already suffered (due to dismantled agencies, canceled contracts, etc.) are attributable to Petitioners, rather than others, and likewise which similar harms are imminent.

Petitioners also criticize the request for information about DOGE personnel in Interrogatory 2, but Respondents need information about who works at DOGE, and who they report to, to understand the DOGE documents called for in Requests for Production 1 through 5. Interrogatory 2 will also shed light on whether the DOGE Team members located at agencies report to the "main DOGE" operation or to their duly appointed agency head, which is directly relevant to the Appointments Clause claim.

In any event, Petitioners did not ask the district court to reject certain specific discovery requests, nor have they asked this Court for a writ tailored to specific requests. They cannot obtain relief they have not sought.

> **(b)** **The Appointments Clause cannot be evaded by inventing new offices not established by law.**

Petitioners also argue that no discovery is relevant because, as long as Mr. Musk exercises significant power *without* holding an office established by law, he cannot violate the Appointments Clause. Pet. at 32-35, 40. This argument is precisely backwards, which is why another district court just decisively rejected it. *See Does 1-26 v. Musk*, No. CV 25-0462-TDC, --- F. Supp. 3d. ---, 2025 WL 840574, at *15 (D. Md. Mar. 18, 2025) ("To deny Plaintiffs' Appointments Clause claim

solely on the basis that, on paper, Musk has no formal legal authority relating to the decisions at issue, even if he is actually exercising significant authority on governmental matters, would open the door to an end-run around the Appointments Clause" and reduce the Clause to "a technical formality.").

The Appointments Clause prevents the President from "creating and filling offices as he [sees] fit." *Trump v. United States*, 603 U.S. 593, 645 (2024) (Thomas, J., concurring). "Before the President . . . can appoint any officer . . . the Constitution requires that the underlying office be 'established by Law.'" *Id.* at 644. What the President may not do is "both create a multitude of offices and then fill them with his supporters." *Id.* at 645. "By requiring that Congress create federal offices 'by Law,' the Constitution imposes an important check against the President." *Id.* at 643.

The requirement imposed by the Appointments Clause, then, is straightforward. To designate a person an "Officer of the United States" is to imbue them with "significant authority." *Freytag v. Comm'r of Internal Rev.*, 501 U.S. 868, 881 (1991) (citation omitted). And before this may be done, the person must be appointed, by the appropriate manner described in the Clause, to an office "established by Law." U.S. Const. art. 2, § 2, cl. 2. To exercise power without holding an office violates the Constitution, and is precisely what the Appointments Clause was meant to prevent.

Petitioners' argument is not resurrected by *Andrade v. Regnery*, 824 F.2d 1253 (D.C. Cir. 1987). *Andrade* noted that staff members frequently "conceive and even carry out policies for which duly appointed or elected officials take official responsibility," and this "does not offend the Appointments Clause so long as the duly appointed official has final authority over the implementation of the governmental action." *Id.* at 1257. But that still requires a "duly appointed official" to have "final authority," and Petitioners have provided no evidence in this case that any duly appointed officials had final authority over the conduct at issue. That is what discovery will test. *See also Does 1-26*, 2025 WL 840574, at *18 ("[T]he present record supports the conclusion that Musk, without having been duly appointed as an Officer of the United States, exercised significant authority reserved for an Officer while serving in a continuing governmental position[.]"). The same goes for Respondents' *ultra vires* claim. *See* Pet. at 35-37.

> **(c)** **The district court's discretionary decision to grant discovery before ruling on the motion to dismiss does not warrant mandamus.**

Petitioners also suggest that the district court erred by not deferring discovery until after resolution of the motion to dismiss. Pet. at 37-39. But Petitioners fail to mention that the district court reviewed their motion to dismiss prior to entering its discovery order and addressed their arguments regarding standing and jurisdiction. ADD013 ("Although the court awaits full briefing [on standing], it has jurisdiction

to rule on the request for discovery. . . . Plaintiffs' Complaint alleges injuries that '[i]f adequately supported through discovery, . . . might establish their standing.") (citation omitted). Petitioners make no attempt to show that this exercise of the district court's discretion to manage its cases warrants the extraordinary remedy of mandamus.

## II. Petitioners have other adequate means to obtain their desired relief.

Petitioners seek a writ "quashing the district court's March 12, 2025 discovery order." Pet. at 8. To succeed, Petitioners must demonstrate that they have no other adequate means to obtain this relief. *See Cheney*, 542 U.S. at 380-81. This is crucial because mandamus, "when sought during or before trial[,] runs counter to the requirement of 'finality that as a condition of review is an historic characteristic of federal appellate procedure.'" *Thornton v. Corcoran*, 407 F.2d 695, 697 (D.C. Cir. 1969) (quoting *Cobbledick v. United States*, 309 U.S. 323, 324 (1940)) (parenthesis omitted).

Petitioners have forfeited their opportunity to make this indispensable showing. Case law is clear: Petitioners alone bear the burden to convince this Court that no alternative avenue to relief exists. *Mallard v. U.S. Dist. Ct. for S. Dist. of Iowa*, 490 U.S. 296, 309 (1989) ("[P]etitioners must show that they lack adequate alternative means to obtain the relief they seek."). But Petitioners' single mention of this crucial piece of the analysis merely states their preferred conclusion. Pet. at

45 (concluding that "the government has no alternative means for remedying the court's [decision]").) This is forfeiture. *See Gov't of Manitoba*, 923 F.3d at 179. Because this prong of the inquiry comprises a necessary showing, Petitioners' failure even to attempt to meet their burden is fatal to their petition. And it is too late to cure that now. *Twin Rivers Paper Co. v. Sec. & Exch. Comm'n*, 934 F.3d 607, 615 (D.C. Cir. 2019) (recognizing "basic precept that arguments generally are forfeited if raised for the first time in reply").

Regardless, although it is not their burden to do so, Respondents explain why Petitioners could not have made the requisite showing here. Several other available avenues for relief were, or remain, open. For example, Petitioners could have moved for a protective order under Federal Rule Civil Procedure 26(c). Or, given the parties' dispute regarding whether the discovery order even potentially implicates executive or deliberative privileges, Petitioners could have sought *in camera* review of a small subset of facially responsive documents to which they claim a privilege attaches (to the extent there are such documents that implicate privilege). As a third option, Petitioners could have moved for a certificate of appealability under 28 U.S.C. § 1292(b).

*Cheney* offers a helpful roadmap, noting the "flurry of activity" that began when the court denied the motion to dismiss. 542 U.S. at 379. In particular, the petitioner filed, "among other papers," a motion for a protective order, a motion to

stay pending appeal, and a motion for leave to appeal pursuant to 28 U.S.C. § 1292(b). *Id.*[4] The majority approved of these efforts as reflecting "the drastic nature of mandamus and our precedents holding that mandamus may not issue so long as alternative avenues of relief remain available." *Id.* at 379.

In *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100, 110-11 (2009), the Supreme Court defined § 1292(b) review as one of "several potential avenues of review" for "litigants confronted with a particularly injurious or novel privilege ruling"; it explained that the statute's strictures "are most likely to be satisfied when a privilege ruling involves a new legal question or is of special consequence." This aligns with *Cheney*, which acknowledges interlocutory appeal as an available avenue to relief. *See* 542 U.S. at 381 ("These facts and allegations remove this case from the category of ordinary discovery orders where interlocutory appellate review is unavailable, through mandamus *or otherwise*." (emphasis added)). Mr. Musk and DOGE suggest that their position and office are constitutionally equivalent to those of the President and Vice President, Pet. at 27-28, but, if that is true, it makes a motion under § 1292(b) only more likely to succeed. *See Cheney*, 542 U.S. at 391-

---

[4] Because the district court denied its motion for a certificate of appealability, the *Cheney* petitioner filed an interlocutory appeal under the collateral-order doctrine. *In re Cheney*, 334 F.3d at 1109. This represents yet a fourth option available to Petitioners. *But see Mohawk Indus., Inc.*, 558 U.S. at 114 (disfavoring collateral-order-doctrine appeals as a way to vindicate attorney-client privilege in discovery context).

92 ("Special considerations applicable to the President and the Vice President suggest that the courts should be sensitive to requests by the Government for interlocutory appeals[.]").

Relying on *Mohawk Industries* in another case, this court concluded that a petitioner seeking mandamus had shown it had no other adequate means of obtaining relief in part because the petitioner had sought a certificate of appeal, even though the district court had denied the motion. *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 761 (D.C. Cir. 2014) (Kavanaugh, J.); *see also id.* at 756 (noting that district court had reviewed documents *in camera*). Petitioners here have made no such attempt.

Even apart from the rest of Petitioners' brief, this court can deny Petitioners' petition for either of two independently sufficient reasons: They declined to turn to the district court for their sought-after relief, despite the existence of multiple avenues for doing so, and—as a direct result of that decision—they could not, and did not, address this indispensable prerequisite to mandamus relief in their petition. This Court should deny the petition.

## III. Mandamus is not appropriate under the circumstances.

Even if Petitioners had carried their burden on the first two mandamus factors, issuing the writ would not be "appropriate under the circumstances." *Cheney*, 542 U.S. at 381. This third mandamus factor establishes a "relatively broad and

amorphous totality of the circumstances consideration" and provides courts the discretion to decline to issue a writ "[e]ven in cases of clear district court error." *In re Kellogg Brown & Root, Inc.*, 756 F.3d at 762.

In this case, the balance of equities tips clearly in favor of denying the petition and allowing the limited discovery ordered by the district court. Respondents have raised grave allegations of the Executive Branch usurping significant powers of Congress. Unlike in *Cheney*, discovery in this instance therefore serves to *protect* the principle of separation of powers. The district court's ruling carves out privileged materials, as discussed above, and thus, the discovery order does not put "coequal branches of the Government . . . on a collision course." *Cheney*, 542 U.S. at 389. Further, the district court's discovery order does not have "potentially far-reaching consequences" that would frustrate important "congressional aims" as in *In re Clinton*, 973 F.3d 106, 118 (D.C. Cir. 2020). In contrast, withholding discovery would frustrate the district court's ability "to fulfill its constitutional responsibility to resolve cases and controversies within its jurisdiction," *Cheney*, 542 U.S. at 385, which the nature of the controversy makes all the more important.

District courts have broad discretion to manage discovery. *Beale v. District of Columbia*, 545 F. Supp. 2d 8, 15 (D.D.C. 2008). "Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings. . . . [and] courts have routinely granted

expedited discovery in cases involving challenges to constitutionality of government action." *Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841, 844 (D.D.C. 1996) (internal citation omitted). Respondents submitted discovery requests that were reasonable, narrowly tailored, and crafted to avoid raising issues of privilege. The district court further limited and clarified the discovery requests to address burden and privilege. Mandamus relief is not appropriate under the circumstances.

## CONCLUSION

The Petition should be denied.


Respectfully submitted,

<div style="margin-left: 50%;">

**KRISTIN K. MAYES**
Attorney General for the State of Arizona

/s/ *Joshua D. Bendor*
Joshua D. Bendor
*Solicitor General*
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
Joshua.Bendor@azag.gov

</div>

March 24, 2025

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**Parties and Amici**

On March 20, 2025, after the Petition was filed, the district court entered an order consolidating the underlying district court action with *Japanese American Citizens League v. Musk*, No. 25-cv-643 (D.D.C.) (the "JACL Action").

Except for the following parties, all parties appearing before the district court and in this court are listed in the Petition (at 49):

The plaintiffs in the now-consolidated JACL Action are:

- Japanese American Citizens League;
- OCA – Asian Pacific American Advocates;
- Sierra Club; and
- Union of Concerned Scientists.

Additional defendants in the now-consolidated JACL Action are:

- Amy Gleason, in her official capacity as Acting Administrator of U.S. DOGE Service;
- Office of Personnel Management (OPM);
- Charles Ezell, in his official capacity as Acting Director of OPM;
- U.S. Department of Education;
- Linda McMahon, in her official capacity as Secretary of Education;
- National Park Service;
- Jessica Bowron, in her official capacity as Acting Director of the National Park Service;
- U.S. Forest Service;
- Tom Schultz, in his official capacity as Chief of the U.S. Forest Service;
- Bureau of Land Management;
- Jon Raby, in his official capacity as Acting Director of the Bureau of Land Management;
- National Oceanic and Atmospheric Administration (NOAA);
- Vice Admiral Nancy A. Hann, in her official capacity as Acting Administrator of NOAA;

- U.S. Department of Commerce;
- Howard Lutnick, in his official capacity as Secretary of Commerce;
- U.S. Department of Interior;
- Doug Burgum, in his official capacity as Secretary of the Interior;
- U.S. Department of Health and Human Services;
- Robert F. Kennedy, Jr., in his official capacity as Secretary of Health and Human Services;
- National Institutes of Health (NIH);
- Matthew J. Memoli, in his official capacity as NIH Director;
- Substance Abuse and Mental Health Services Administration (SAMHSA);
- Christopher D. Carroll, in his official capacity as Principal Deputy Assistant Secretary of SAMHSA;
- Environmental Protection Agency (EPA);
- Lee M. Zeldin, in his official capacity as EPA Administrator;
- National Science Foundation (NSF);
- Sethuraman Panchanathan, in his official capacity as Director of NSF;
- United States Department of Agriculture;
- Brooke Rollins, in her official capacity as Secretary of Agriculture;
- Federal Emergency Management Agency (FEMA);
- Cameron Hamilton, in his official capacity as Acting FEMA Administrator;
- United States Department of Housing and Urban Development (HUD); and
- Scott Turner, in his official capacity as Secretary of HUD.

**Rulings under Review**

References to the rulings at issue appear in the Petition (at 49).

**Related cases**

This case has not previously been before this Court. In addition to the JACL Action listed above, which has now been consolidated with the underlying action, Respondents are aware of the following related case: *Doe v. Musk*, No. 25-cv-462 (D. Md.).

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 7,409 words. The brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word in proportionally spaced 14-point Times New Roman typeface.

*s/ Joshua D. Bendor*
Joshua D. Bendor

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit through the appellate CM/ECF system.  Paper copies of the brief will also be delivered to the D.C. Circuit.  Finally, I certify that the brief has been served on the district court via e-mail on March 24, 2025.

*s/ Joshua D. Bendor*

Joshua D. Bendor

**ADDENDUM**

# TABLE OF CONTENTS

| Document | ECF No. | Addend. Pg. # |
|---|---|---|
| **District Court Orders** | | |
| Memorandum Opinion re Motion for Expedited Discovery (March 12, 2025) | ECF No. 60 | ADD001-ADD014 |
| Order re Motion for Expedited Discovery (March 12, 2025) | ECF No. 61 | ADD015-ADD016 |
| Order re Motion for Temporary Restraining Order (Feb. 18, 2025) | ECF No. 29 | ADD017-ADD026 |
| **Other District Court Filings** | | |
| Corrected Complaint (Feb. 14, 2025) | ECF No. 10-1 | ADD027-ADD090 |
| Defendants' Supplemental Notice (Feb. 17, 2025) | ECF No. 24 | ADD091-ADD093 |
| Declaration of Joshua Fisher (Feb. 17, 2025) | ECF No. 24-1 | ADD094-ADD096 |
| Plaintiffs' Motion for Expedited Discovery (Feb. 24, 2025) | ECF No. 45 | ADD096-ADD-109 |
| Plaintiffs' Proposed Discovery Requests (Feb. 24, 2025) | ECF No. 45-1 | ADD110-ADD117 |
| Plaintiffs' Reply in Support of Motion for Expedited Discovery (Mar. 3, 2025) | ECF. No. 51 | ADD118-ADD136 |
| Plaintiffs' Supplemental Notice (Mar. 5, 2025) | ECF No. 54 | ADD137-ADD142 |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**STATE OF NEW MEXICO**, *et al.*

                    Plaintiffs,

          v.                                                    Civil Action No. 25-cv-429 (TSC)

**ELON MUSK**, *et al.*

                    Defendants.

---

## <u>MEMORANDUM OPINION</u>

Plaintiffs, fourteen states represented by their Attorneys General, sued Elon Musk, the U.S. Department of Government Efficiency ("DOGE") Service, U.S. DOGE Service Temporary Organization, and President Trump, alleging violations of the Appointments Clause of the U.S. Constitution, U.S. Const., Art. II, § 2, cl. 2, and conduct in excess of statutory authority. Compl. ¶¶ 253–72, ECF No. 2. Plaintiffs have moved for expedited discovery, ECF No. 45, to support their forthcoming motion for a preliminary injunction. Plaintiffs' requests, as amended by the court, are reasonable and narrowly tailored to their request for injunctive relief. Therefore, the court will GRANT in part and DENY in part Plaintiffs' Motion.

### I.    BACKGROUND

The court incorporates the factual and procedural background from its order denying Plaintiffs' motion for a temporary restraining order ("TRO"). *See New Mexico v. Musk*, No. 25-cv-429 (TSC), 2025 WL 520583, at *1–2 (D.D.C. Feb. 18, 2025). Plaintiffs brought this action for declaratory and injunctive relief on February 13, 2025. ECF No. 1. They immediately moved

for a TRO, seeking to enjoin Musk and DOGE[1] from (1) accessing, copying, or transferring any data systems, and (2) terminating or otherwise placing on leave any officers or employees at certain federal agencies. *New Mexico v. Musk*, 2025 WL 520583, at *2. The court denied that motion because Plaintiffs failed to provide clear evidence of imminent, irreparable harm, and ordered the parties to propose a schedule for further proceedings. *Id.* at *4. Plaintiffs stated their intention to seek expedited discovery to support a forthcoming preliminary injunction motion, while Defendants planned to move to dismiss. Proposed Briefing Schedule at 1–2, ECF No. 32. The court permitted both parties to proceed along their preferred paths—scheduling briefing for Plaintiffs' expedited discovery motion, Defendants' motion to dismiss, and Plaintiffs' motion for preliminary injunction. Order at 1–2, ECF No. 36.

Plaintiffs' expedited discovery motion seeks "to confirm public reporting about Defendants' conduct, show Defendants' future plans, and illustrate the nature and scope of the unconstitutional and unlawful authority that Defendants are exercising and will continue to imminently exercise." Pls.' Mot. for Expedited Disc. at 3, ECF No. 45 ("Pls.' Disc. Mot."). Plaintiffs ask the court to order Defendants to comply with five requests for document production, six interrogatories, six requests for admission, and two depositions. Pls.' Disc. Mot. Ex. A, ECF No. 45-1. The document requests and interrogatories generally concern DOGE's and Musk's conduct in four areas: (1) eliminating or reducing the size of federal agencies; (2) terminating or placing federal employees on leave; (3) cancelling, freezing, or pausing federal contracts, grants, or other federal funding; and (4) obtaining access, using, or making changes to federal databases or data management systems. *Id.* at 5–6. Plaintiffs do not seek "emails, text messages, or any

---

[1] "DOGE" refers collectively to the U.S. DOGE Service and U.S. DOGE Service Temporary Organization.

other similar electronically exchanged communication," and the time period for responsive materials is January 20, 2025 to the present. *Id.* at 1, 3. The requests for admission seek to confirm DOGE's and Musk's role and authority within the Administration. *Id.* at 7. Defendants oppose any discovery at this time. Defs.' Opp'n to Pls.' Disc. Mot., ECF No. 48 ("Defs.' Disc. Opp'n").

## II.    LEGAL STANDARD

In general, "a party may not seek discovery" before a Rule 26(f) conference. Fed. R. Civ. P. 26(d)(1). Pursuant to district courts' "broad discretion over the structure, timing, and scope of discovery," however, courts may, in certain circumstances, order expedited discovery. *Strike 3 Holdings, LLC v. Doe*, 964 F.3d 1203, 1207–08 (D.C. Cir. 2020) (citing *Hussain v. Nicholson*, 435 F.3d 359, 363–64 (D.C. Cir. 2006)). The Advisory Committee's notes to Federal Rule of Civil Procedure 26(d) state that expedited discovery "will be appropriate in some cases, such as those involving requests for a preliminary injunction," Fed. R. Civ. P. 26(d), but "do not provide specific standards for evaluating expedited discovery motions," *Disability Rts. Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*, 234 F.R.D. 4, 6 (D.D.C. 2006). In the absence of a specific standard, two common judicial approaches have emerged: the *Notaro* test, derived from *Notaro v. Koch*, 95 F.R.D. 403 (S.D.N.Y. 1982), and the reasonableness test. *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 97 (D.D.C. 2014).

The *Notaro* test closely tracks the preliminary injunction standard, requiring the moving party to demonstrate "(1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted." *Id.* (citing *Notaro*, 95 F.R.D. at 405). Under the reasonableness approach, courts consider "all of the surrounding circumstances," including five factors: "(1) whether a preliminary injunction is pending; (2) the

ADD003

breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Id.* at 98. Courts are not "limited to these factors," however. *Attkisson v. Holder*, 113 F. Supp. 3d 156, 162 (D.D.C. 2015).

In this district, courts favor the reasonableness test because it better reflects their broad discretion over discovery matters. *See*, *e.g.*, *id.*; *Guttenberg*, 26 F. Supp. 3d at 97–98; *Disability Rts.*, 234 F.R.D. at 6; *AFL-CIO v. Dep't of Lab.*, No. 1:25-cv-00339 (JDB), slip op. at 4 (D.D.C. Feb. 27, 2025), ECF No. 48. The reasonableness test is also the more appropriate standard "when a plaintiff requests expedited discovery for the purpose of fleshing out a preliminary injunction motion," as "it does not make sense to use preliminary injunction analysis factors to determine the proprietary of an expedited discovery request." *Guttenberg*, 26 F. Supp. 3d at 97 (citation omitted). This court agrees and will evaluate Plaintiffs' motion under the reasonableness test.

## III.    ANALYSIS

The court concludes that granting expedited discovery is in the best interest of all parties. Plaintiffs' discovery requests target information necessary to resolve their forthcoming preliminary injunction motion. The court recognizes that discovery into the Executive, particularly the White House and Senior Advisors, imposes a heightened burden. Accordingly, the court does not authorize all the discovery that Plaintiffs request, imposes several additional restrictions on the scope, and extends Defendants' time to respond. With those adjustments, the court finds expedited discovery is reasonable and necessary to evaluate Plaintiffs' request for injunctive relief. In addition, to avoid prejudice to Defendants and expeditiously resolve this case, the court will exercise its discretion to consolidate the motion for a preliminary injunction with the merits under Federal Rule of Civil Procedure 65(a)(2).

## A.  Forthcoming Preliminary Injunction

The first factor—whether a preliminary injunction is pending—weighs in Plaintiffs' favor. "Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." *Ellsworth Assoc., Inc. v. United States*, 917 F. Supp. 841, 844 (D.D.C. 1996).  Although Plaintiffs have not yet filed their preliminary injunction motion, they promptly sought injunctive relief in the form of a TRO and indicated they planned to file a preliminary injunction motion, for which the court has scheduled briefing.  Pls.' Disc. Mot. at 5; Pls.' TRO Mot., ECF No. 6.  Defendants do not argue that the technical absence of a pending preliminary injunction weighs against discovery and concede that Plaintiffs' discovery requests target information relevant to the anticipated motion.  Defs.' Disc. Opp'n at 8.  Plaintiffs urgently seek injunctive relief and expedited discovery to bolster that injunctive relief request, and therefore this factor supports granting discovery.  *See Legal Tech. Grp., Inc. v. Mukerji*, No. 17-cv-631 (RBW), 2017 WL 7279398, at *3 (D.D.C. June 5, 2017) ("[T]his factor weighs in [Plaintiffs'] favor because, although a motion for a preliminary injunction is not yet pending, the very purpose of [Plaintiff's] motion for expedited discovery is to support its anticipated motion for a preliminary injunction."); *AFL-CIO.*, No. 1:25-cv-00339 (JDB), slip op. at 7; *cf. Guttenberg*, 26 F. Supp. 3d at 98–99 (finding a "lack of urgency" weighs against granting expedited discovery).

## B.  Breadth and Purpose of Discovery

The second and third factors are closely related.  Courts permit discovery "narrowly tailored to reveal information related to the preliminary injunction," *Guttenberg*, 26 F. Supp. 3d at 98, but do not allow plaintiffs "to circumvent the normal litigation process," *In re Fannie May Derivative Litig.*, 277 F.R.D. at 143, by seeking information beyond the preliminary injunction scope to "substantially advance plaintiffs' claim on the merits," *Guttenberg*, 26 F. Supp. 3d at 98. The scope of expedited discovery should be narrowly tailored to the purpose—supporting

Plaintiffs' forthcoming preliminary injunction motion.  Within that limited scope, the traditional rules of discovery dictate relevance.  *See Strike* 3, 964 F.3d at 1210.  Plaintiffs may not "'abuse[] the discovery process' by seeking irrelevant information," *id.* at 1210–11 (quoting *AF Holdings, LLC v. Does 1-1058*, 752 F.3d 990, 997 (D.C. Cir. 2014)), but "information may qualify as relevant even if not admissible," *Goodwin v. District of Columbia*, No. 21-cv-806 (BAH), 2021 WL 1978795, at *5 (D.D.C. May 18, 2021).  When evaluating an expedited discovery request, courts must "determine if the requested discovery is relevant and proportional to the needs of the case." *Strike* 3, 964 F.3d at 1210 (citing Fed. R. Civ. P. 26(b)(1)).  Information is relevant if "it has any tendency to make a fact more or less probable that it would be without the evidence" and "the fact is of consequence in determining the action."  Fed. R. Evid. 401.

The parties agree that the purpose of Plaintiffs' discovery requests is to support their forthcoming preliminary injunction motion, Pls.' Disc. Mot. at 5; Defs.' Disc. Opp'n at 8; but Defendants contend that is not an adequate reason to expedite discovery, *id*.  Courts in this jurisdiction, however, have consistently found that preliminary injunction proceedings are exactly the kind of circumstance warranting expedited discovery.  *See*, *e.g.*, *Ellsworth Assoc.*, 917 F. Supp. at 844; *cf. Damus v. Nielson*, 328 F.R.D. 1, 5 (D.D.C. 2018); *AFL-CIO v. Dep't of Lab.*, No. 1:25-cv-00339 (JDB), slip op. at 7–8.  This is particularly so when the requested information is unavailable from other sources and within Defendants' exclusive control.  *See Strike 3*, 964 F.3d at 1207–08; *Goodwin*, 2021 WL 1978795, at *7.  Because the court agrees that Plaintiffs' discovery requests "are realistically tethered" to their forthcoming preliminary injunction motion, *Goodwin*, 2021 WL 1978795, at *5, it finds that the third factor weighs in Plaintiffs' favor.

The relationship between Plaintiffs' requested injunctive relief and the case as a whole presents a unique challenge.  Courts reject requests for expedited discovery that "are not narrowly

ADD006

tailored to reveal information related to the preliminary injunction as opposed to the case as a whole." *Guttenberg*, 26 F. Supp. 3d at 98. For instance, in *Guttenberg*, the court rejected expedited discovery "to prove the extent of damages," an issue that would only arise if plaintiffs prevailed on the merits. *Id.* Here, Plaintiffs' forthcoming preliminary injunction and the merits are intertwined. To bolster their forthcoming preliminary injunction motion, Plaintiffs' discovery requests for admission go to the heart of their Appointments Clause claim. Pls.' Disc. Mot. at 6. Because Plaintiffs only seek injunctive and declaratory relief, the preliminary injunction ruling will likely resolve all issues. In light of the court's decision to consolidate the motion for a preliminary injunction with the merits under Federal Rule of Civil Procedure 65(a)(2), this case is dissimilar to cases involving expedited discovery requests exclusively related to the merits. *Guttenberg*, 26 F. Supp. 3d at 98.

Turning to the breadth of Plaintiffs' discovery requests, the court largely finds them sufficiently specific and narrowly tailored to obtaining injunctive relief. First, the requests contain several overarching limitations. They are limited to a specific time period—January 20, 2025 to the present—of less than two months. Pls.' Disc. Mot. at 7; Pls.' Disc. Mot. Ex. A at 3. Plaintiffs do not seek any "emails, text messages, or any other similar electronically exchanged communications," which significantly reduces the pool of materials subject to the request. *Id.* And the court will incorporate Plaintiffs' representation that they do not seek information from President Trump. Pls.' Disc. Mot. at 11 & n.5. With these parameters, Plaintiffs appropriately and significantly limit the universe of responsive information.

Second, the requests target information relevant to Plaintiffs' claims for injunctive relief, with a few adjustments. Plaintiffs' document requests seek information regarding DOGE's and Musk's involvement in (1) eliminating or reducing the size of federal agencies; (2) terminating or

ADD007

placing federal employees on leave; (3) cancelling, freezing, or pausing federal contracts, grants, or other federal funding; and (4) obtaining access, using, or making changes to federal databases or data management systems. *Id.* at 5–7. Evidence that Defendants eliminated agencies that work with Plaintiffs, terminated employees responsible for managing programs with Plaintiffs, or cancelled contracts with Plaintiffs is relevant to whether Defendants exceeded their statutory and constitutional authority. *Warner Bros. Recs. Inc. v. Does 1–6*, 527 F. Supp. 2d 1, 2 (D.D.C. 2007) (granting expedited discovery where "Plaintiffs have made a showing of good cause for the discovery they seek, as the information is not only relevant but crucial to the prosecution of plaintiffs' claims."). In the declarations accompanying Plaintiffs' TRO Motion, they identify the federal funds, agencies, and contracts that Plaintiff States rely on and the harm that would result from pausing or terminating those resources. *See, e.g.*, Pls.' TRO Mot. Exs. A–G, J, ECF No. 6-2 – 6-8, 6-11. To accurately tailor the requests, the court will adopt a narrowing principle: Plaintiffs' requests shall be read to encompass only information regarding agencies, employees, legal agreements, or data management systems that involve or engage with Plaintiff States, including entities and institutions operated or funded by Plaintiff States. Information reflecting harm to other parties is not relevant. *See Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021).

Again, subject to a minor amendment, Plaintiffs have sufficiently tailored their interrogatories and requests for admission as well. Those requests seek to identify DOGE personnel and the parameters of DOGE's and Musk's authority—a question central to Plaintiffs' claims. Pls.' Disc. Mot. Ex. A at 6–7; Pls.' Disc. Mot. at 6–7. Defendants argue that the "inner workings of government" are immaterial to an Appointments Clause claim, which "turns entirely on the authority for certain outward-facing acts." Defs.' Disc. Opp'n at 7. The court is not convinced, but that is a legal issue appropriate for resolution after fulsome briefing. At this stage,

it is sufficient that Plaintiffs' discovery requests intend to reveal the scope of DOGE's and Musk's authority. Defendants also attempt to reframe Plaintiffs' interrogatories and requests for admissions to encompass mere advice and casual conversation. *Id.* at 11. The court does not read them so broadly. For instance, Plaintiffs ask Defendants to "Identify all federal agencies for which DOGE personnel or Musk: (1) *cancelled or directed the cancellation* of federal contracts . . . (2) *terminated employment or placed on leave or directed the termination or placement on leave*. . ." Pls.' Disc. Mot. Ex. A at 6 (emphasis added). Casual advice would not be responsive. Nonetheless, the court will alter Plaintiffs' Fourth Interrogatory to avoid any confusion. As written, it asks Defendants to identify federal agencies where DOGE personnel or Musk "recommended" cancellation of federal contracts or terminations, and when such action occurred "pursuant to the recommendation" of DOGE or Musk. *Id.* The court will strike "recommended" and "recommendation" and insert "directed" and "direction." *See AFL-CIO*, No. 1:25-cv-00339 (JDB), slip op. at 12 (adjusting Plaintiffs' discovery requests). That said, Defendants may not creatively interpret the interrogatories to circumvent their discovery obligations.

Finally, Defendants' broad privilege assertions are unavailing. Defs.' Disc. Opp'n at 10–11. They argue that the presidential communications privilege and deliberative process privilege cover much of the requested information, *id.*, but fail to "invoke[] either privilege with sufficient specificity," *Damus*, 328 F.R.D. at 6. Just because a privilege exists does not mean it applies. *See Simon v. Republic of Hungary*, No. 10-cv-01770 (BAH), 2021 WL 13069772, at *5 (D.D.C. Oct. 19, 2012). Defendants' general privilege assertions cannot preclude discovery, particularly when the discovery requests have been crafted specifically to avoid infringing on governmental privileges. First, as mentioned above, Plaintiffs do not seek information from President Trump. Pls.' Disc. Reply at 11–12, ECF No. 51. Second, and most significantly, Plaintiffs do not seek any

electronic communications.    Pls.' Disc. Mot. at 7.    Materials containing the "candid" communications covered by the privileges Defendants invoke, Defs.' Disc. Opp'n at 11, would likely appear in emails, text messages, and other informal communications, which Plaintiffs intentionally exclude, Pls.' Disc. Mot. at 7.  Instead, Plaintiffs seek materials reflecting "a factual account of a decision already rendered—a recitation that is not privileged." *Damus*, 328 F.R.D. at 6 (citing *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997)).  To the extent the term "planning . . . documents" in Plaintiffs' Requests for Production is unclear, Pls.' Disc. Ex. A at 5, the court clarifies that it does not encompass draft or pre-decisional materials.  Rather, as Plaintiffs explain, it refers to documents reflecting DOGE's plans to take actions.  Pls.' Reply at 12 ("Plaintiffs' requests are geared toward decisions that have already been made and directives that have been sent or will be sent to agencies or employees.").  If Defendants' concerns persist, they may assert privilege claims on a case-by-case basis.  Because Plaintiffs' requests are "bounded both in temporal scope and substance" to their request for injunctive relief, *Damus*, 328 F.R.D. at 5—the second and third factors weigh in Plaintiffs' favor.

## C.  <u>Burden of Compliance</u>

Although discovery is inherently burdensome, the court finds that the benefit, including expeditious resolution of this case, outweighs the burden here.  *See Ellsworth Assoc.*, 917 F. Supp. at 844 (granting expedited discovery that "would expedite resolution of their claims for injunctive relief"); *Goodwin*, 2021 WL 1978795, at *7 (granting expedited discovery where "the 'likely benefit' of the proposed discovery largely outweighs its burden").  Defendants argue that (1) burden is presumed for discovery into the Executive Branch, especially for senior advisors and departments within the Executive Office, Defs.' Disc. Opp'n at 5–6, 10, and (2) the requests seek a "stunning amount" of material in a condensed time frame, *id.* at 12.  In addition to the limits discussed above, the court adopts further safeguards to minimize any burden.

ADD010

"[C]ourts have routinely granted expedited discovery in cases involving challenges to constitutionality of government action." *Ellsworth Assoc.*, 917 F. Supp. at 844 (citing *Optic-Elec. Corp. v. United States*, 683 F. Supp. 269, 271 (D.D.C. 1987)). But discovery requests directed at the Executive Branch, particularly at the highest levels, require careful consideration. The "Executive's 'constitutional responsibilities and status [are] factors counseling judicial deference and restraint' in the conduct of litigation against it," "including the timing and scope of discovery." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 385 (2004) (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 753 (1982)). Accordingly, courts are permitted to narrow discovery requests to minimize burdens on the Executive. *Id.* at 389–90.

Given the limited discovery requested here, the court cannot conclude that compliance is likely to interfere with "the Executive's Article II prerogatives." *Id.* at 389. Defendants seem mainly concerned with discovery requests targeting President Trump and his Senior Advisor, Musk. Defs.' Disc. Opp'n at 10–12. Plaintiffs explicitly concede, and the court will order, that the requests "seek no information from President Trump." Pls.' Disc. Reply at 11. As to Musk, he is subject to two document requests and two interrogatories. Pls.' Disc. Ex. A at 6–7. Factoring the narrow time frame, Defendants' claim that Musk does not lead DOGE, Decl. of Joshua Fischer ¶ 6, ECF No. 24-1, and the electronic communications exemption, those four requests are unlikely to unduly burden the Executive Branch. And the court will not extend the heightened consideration afforded to "senior members of the Executive Branch," *Cheney*, 542 U.S. at 385, to DOGE, an office that other courts have concluded "wields . . . substantial authority independent of the President." *Citizens for Resp. & Ethics in Wash. v. U.S. DOGE Serv.*, No. 25-cv-511 (CRC), slip op. at 23 (D.D.C. Mar. 10, 2025), ECF No. 18.

Moreover, the court will add two further modifications to avoid any "unnecessary intrusion into the operation of the Office of the President." *Cheney*, 542 U.S. at 387. First, it will extend the time for compliance from seven days to twenty-one days. Second, it will not permit Plaintiffs to notice depositions at this time. Plaintiffs request two depositions and, even though Plaintiffs agree not to seek to depose President Trump or Musk, Pls.' Disc. Reply at 10, the court recognizes that depositions impose a heavier burden than written discovery, *see, e.g.*, *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008). If Defendants fail to adequately respond to Plaintiffs' written discovery, Plaintiffs may renew their requests for depositions. With these adjustments, the fourth factor is neutral. The court also notes that "[i]t is in the best interest of all parties to have this case resolved as soon as possible," and expedited discovery serves that goal. *See Optic-Elec. Corp.*, 683 F. Supp. at 271.

## D. Timing

The parties concede that the fifth factor—whether discovery occurs in advance of the typical process—supports Defendants. Pls.' Disc. Mot. at 6; Defs.' Disc. Opp'n at 2–4. Defendants argue that the court should not permit discovery before resolving their motion to dismiss. Defs.' Disc. Opp'n at 2–4. Although some courts have refused to expedite discovery with a motion to dismiss pending, *see Guttenberg*, 26 F. Supp. 3d at 99, the "mere possibility" that a "defendant may defeat a complaint at a later stage is not a legitimate basis to deny a Rule 26(d)(1) [expedited discovery] motion that otherwise satisfies Rule 26's discovery standards," *Strike 3*, 964 F.3d at 1211. The court deliberately set a briefing schedule that permitted Defendants to seek dismissal before Plaintiffs' preliminary injunction motion and it intends to promptly resolve Defendants' motion to dismiss. Order, ECF No. 36. Moreover, in light of the court's decision to consolidate Plaintiffs' preliminary injunction with the merits, which Defendants requested, *see* Proposed Briefing Schedule at 2, this factor holds little weight.

### E.  Defendants' Motion to Dismiss

The court also briefly addresses an argument that Defendants previewed in their opposition to Plaintiffs' discovery requests and raised in their motion to dismiss.  *See* Defs.' Disc. Opp'n at 2–4; Defs.' Mot. to Dismiss at 6–16, ECF No. 58.  Defendants question the court's jurisdiction by suggesting Plaintiffs lack Article III standing.  Defs.' Disc. Opp'n at 2.  Although the court awaits full briefing on the issue, it has jurisdiction to rule on the request for discovery.[2]

Article III limits federal courts' jurisdiction to the resolution of "Cases" and "Controversies."  U.S. Const., Art. III, § 2; *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  "For there to be a case or controversy under Article III, the plaintiff must have 'a personal stake' in the case—in other words, standing."  *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)).  In this Circuit, a court may order discovery to assure itself of standing at the pleadings stage.  *See Nat. Res. Def. Council v. Pena*, 147 F.3d 1012, 1024 (D.C. Cir. 1998) (collecting cases) (holding that discovery into standing is "consistent with our precedent allowing jurisdictional discovery and factfinding if allegations indicate its likely utility"); *Haase v. Sessions*, 835 F.2d 902, 907 (D.C. Cir. 1987).  Plaintiffs' Complaint alleges injuries that "[i]f adequately supported through discovery, . . . might establish their standing."  *Nat. Res. Def. Council*, 147 F.3d at 1024.  For

---

[2] The court did not address Plaintiffs' standing in its TRO Opinion.  *See New Mexico v. Musk*, 2025 WL 520583.  When ruling on a preliminary injunction or TRO motion, courts typically address whether Plaintiffs have a "substantial likelihood of standing" under the "substantial likelihood of success on the merits" prong.  *Elec. Priv. Info. Ctr., Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019) (citation omitted).  Because the court found that Plaintiffs failed to sufficiently show irreparable harm—"a threshold requirement in granting injunctive relief"—it did not meaningfully address Plaintiffs' likelihood of success on the merits or standing.  *New Mexico v. Musk*, 2025 WL 520583, at *3 (quoting *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 8 (D.D.C. 2009)); *see also Am. Foreign Serv. Ass'n v. Trump*, No. 25-cv-352 (CJN), 2025 WL 573762, at *7 n.3 (D.D.C. Feb. 21, 2025) ("Setting aside whether that allegation is sufficient to support Article III standing, Plaintiffs have not demonstrated that any hindrance to their mission as a result of those challenged actions belongs to the category of 'great' harms that could warrant a preliminary injunction in a case like this." (citation omitted)).

instance, Plaintiffs claim that Defendants obtained unlawful access to Plaintiffs' proprietary data, *see* Compl. Ex. C ¶¶ 25–26, ECF 2-3; and Plaintiffs' departments have been unable to draw down federal grants, Compl. Ex. E ¶¶ 12–19, ECF No. 2-5.  Unlawful data disclosure and loss-of-funding may suffice to show an injury-in-fact under Article III.  *See TransUnion*, 594 U.S. at 432 (recognizing "disclosure of private information" is a sufficiently "concrete injury in fact under Article III"); *Biden v. Nebraska*, 143 S. Ct. 2355. 2365–66 (2023) (federal policy that impairs an instrumentality of a State in the "performance of its public function is necessarily a direct injury to [the State] itself").  The court will benefit from briefing on the issue but authorizes discovery in the interim.

## IV.    CONCLUSION

Plaintiffs' discovery requests, as amended by the court, are narrowly tailored to support their forthcoming motion for a preliminary injunction.  The burden to Defendants is minimized by the narrow time period for responsive materials, the exclusion of electronic communications, explicitly exempting President Trump from the requests, extending Defendants' time to respond, and denying Plaintiffs' request to notice depositions.  Therefore, considering all the surrounding circumstances and the expedited nature of these proceedings, the court finds Plaintiffs' discovery requests reasonable and will GRANT in part and DENY in part Plaintiffs' Motion.  Because the court extends Defendants' time to respond, it denies the request for a stay.

Date: March 12, 2025

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

ADD014

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**STATE OF NEW MEXICO**, *et al.*

        Plaintiffs,

      v.

**ELON MUSK**, *et al.*

        Defendants.

Civil Action No. 25-cv-429 (TSC)

---

**<u>ORDER</u>**

For the reasons set forth in the accompanying Memorandum Opinion, ECF No. 60, Plaintiffs' Motion for Expedited Discovery, ECF No. 45, is GRANTED in part and DENIED in part.

It is hereby ORDERED that Plaintiffs may serve the written discovery requests attached to their Motion as Exhibit A, ECF No. 45-1 ("Plaintiffs' Discovery Requests"), on Defendants Elon Musk, U.S. Department of Government Efficiency ("DOGE") Service, and U.S. DOGE Temporary Organization, subject to the below clarifications and amendments:

- Plaintiffs' Discovery Requests shall not apply to President Trump;

- Plaintiffs' Discovery Requests shall be limited to information and materials regarding agencies, employees, contracts, grants, federal funding, legal agreements, databases, or data management systems that involve or engage with Plaintiff States, including entities and institutions operated or funded by Plaintiff States;

- "Recommended" and "recommendation" shall be deleted from Plaintiffs' Fourth Interrogatory and replaced with "directed" and "direction."

It is further ORDERED that Defendants Elon Musk, U.S. DOGE Service, and U.S. DOGE Temporary Organization shall produce the requested documents and respond to the interrogatories and requests for admissions in Plaintiffs' Discovery Requests, as amended by the court, within 21

ADD015

days of this Order.  Defendants' request for a stay of any order granting expedited discovery is DENIED.

It is further ORDERED that Plaintiffs' request to notice two depositions is DENIED without prejudice.

It is further ORDERED that Plaintiffs' forthcoming motion for a preliminary injunction shall be CONSOLIDATED with a hearing on the merits under Federal Rule of Civil Procedure 65(a)(2).

Date: March 12, 2025

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**STATE OF NEW MEXICO**, *et al.*

　　　　　Plaintiffs,

　　v.

**ELON MUSK**, *et al.*

　　　　　Defendants.

Civil Action No. 25-cv-429 (TSC)

---

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs, fourteen states represented by their Attorneys General, have filed an Emergency Motion for a Temporary Restraining Order ("TRO") against Elon Musk, the U.S. Department of Government Efficiency ("DOGE") Service, U.S. DOGE Service Temporary Organization, and President Trump. Emergency Mot. for TRO, ECF No. 6 ("Mot."). Based on the parties' briefing, oral argument, and the current record, the court finds that Plaintiffs have not carried their burden of showing that they will suffer imminent, irreparable harm absent a temporary restraining order, and therefore Plaintiffs' motion is DENIED.

### I.　　BACKGROUND

On January 20, 2025, President Trump established the "Department of Government Efficiency" and a subsidiary organization, U.S. DOGE Service Temporary Organization (collectively, "DOGE"), by Executive Order. Compl. ¶¶ 52–56, ECF No. 2; Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025). Elon Musk directs the work of DOGE personnel but is formally classified as a "special government employee." Compl. ¶¶ 59–63; *see also* Decl. of Joshua Fisher ¶¶ 3–6, ECF No. 24-1 (classifying Musk as a "non-career Special Government Employee" and "Senior Advisor to the President").

Plaintiffs brought this action for declaratory and injunctive relief, alleging that Musk's actions violate the Appointments Clause of the U.S. Constitution because he has not been nominated by the President and confirmed by the Senate as an "Officer[] of the United States," U.S. Const., Art. II, § 2, cl. 2; Compl. ¶¶ 253–60, and that Musk and DOGE lack statutory authority for their actions, Compl. ¶¶ 261–72. Plaintiffs allege that Musk "exercises virtually unchecked power across the Executive Branch, making decisions about expenditures, contracts, government property, regulations, and the very existence of federal agencies." *Id.* ¶ 67. They claim that in the last few weeks, Musk and DOGE Defendants have gained access to "sensitive data, information, systems, and technological and financial infrastructure across the federal government." *Id.* ¶ 68. Defendants have allegedly used this unfettered access and authority to terminate personnel, ¶¶ 112, 178, 196; place entire agencies on temporary leave, *id.* ¶¶ 102–04; transfer data to outside servers, *id.* ¶¶ 111–114; take over physical office spaces, *id.* ¶¶ 165–66; and terminate contracts valued in the hundreds of millions of dollars, *id.* ¶ 170. Defendants concede that there is no apparent "source of legal authority granting" Musk or DOGE "the power to order personnel actions" at federal agencies but do not deny that Defendants are taking such actions. Defs.' Notice at 1–2, ECF No. 24.[1]

---

[1] Defendants filed a Notice and Declaration by Joshua Fisher, Director of the Office of Administration, responding to the court's questions during the February 17, 2025 hearing. Defendants state: "Neither of the President's Executive Orders regarding 'DOGE' contemplate—much less furnish—[] authority" to "order personnel actions at any of the agencies" specified. Defs.' Notice at 2. Based on the Executive Orders' plain text, "new career appointment hiring decisions" at each federal agency "shall be made in consultation with the agency's DOGE Team Lead" and agencies "shall not fill any vacancies for career appointments that the DOGE Team Lead assesses should not be filled, unless the Agency Head determines the positions should be filled." Exec. Order No. 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025). At a minimum, this language "contemplates" DOGE's authority over personnel actions. Defense counsel is reminded of their duty to make truthful representations to the court. Fed. R. Civ. P. 11(b).

On February 14, 2025, Plaintiffs moved for a TRO to enjoin eleven categories of conduct by Musk and DOGE.  Pls.' Proposed TRO, ECF No. 6-13.[2]  That day, the court held a hearing during which Plaintiffs significantly narrowed the scope of their requested relief.  At the court's request, Plaintiffs filed a revised proposed TRO, which asks the court to enjoin Musk and DOGE Defendants from: (1) accessing, copying, or transferring any data systems in the Office of Personnel Management, and the Departments of Education, Labor, Health and Human Services, Energy, Transportation, and Commerce; and (2) terminating or otherwise placing on leave any

---

[2] Plaintiffs asked the court to enter the following order:

Mr. Musk, U.S. DOGE Service; U.S. DOGE Service Temporary Organization, along with personnel associated with these entities, are [ordered to identify] all ways in which any data obtained through unlawful agency access was used, including whether it was used to train any algorithmic models or create/obtain derivative data, and destroy any copies or any derivative data in Defendants' possession, custody, or control, and that they are temporarily enjoined from:

    (a) ordering any change in the disbursement of public funds by agencies;

    (b) extending offers on behalf of the United States that would bind the government to an appropriation that has not been authorized by law;

    (c) cancelling government contracts;

    (d) disposing of government property;

    (e) ordering the rescission or amendment of regulations;

    (f) making personnel decisions for agency employees;

    (g) taking steps to dismantle agencies created by law or otherwise asserting control over such agencies, including, e.g., placing employees on administrative leave;

    (h) accessing sensitive and confidential agency data, using agency data for other than its authorized purpose;

    (i) altering agency data systems without authorization by law and without taking all appropriate protections against cybersecurity risks; or

    (j) engaging in any other conduct that violates the Appointments Clause or exceeds statutory authority.

Pls.' Proposed TRO at 1–2, ECF No. 6-13.

officers or employees within those same agencies.  Pls.' Proposed TRO at 1–2, ECF No. 19-1.[3]  In light of the narrowed scope and the parties' briefing, the court heard further argument on February 17, 2025.

## II.    LEGAL STANDARD

A temporary restraining order is "an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion." *Hulli v. Mayorkas*, 549 F. Supp. 3d 95, 99 (D.D.C. 2021) (quoting *Postal Police Off. Ass'n v. U.S. Postal Serv.*, 502 F. Supp. 3d 411, 418 (D.D.C. 2020)).  As with a preliminary injunction, a party seeking a TRO must establish "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038

---

[3] Plaintiffs submitted the following proposed revised order:

Defendants Elon Musk, U.S. DOGE Service, U.S. DOGE Service Temporary Organization, and their agents, officers, and employees, or anyone acting in active concert with them, are temporarily restrained from:

(a) Accessing or continuing to access any data systems and the information and code contained within those systems, including but not limited to systems containing sensitive or confidential agency and personnel data, at the Office of Personnel Management, the Department of Education, the Department of Labor, the Department of Health and Human Services, the Department of Energy, the Department of Transportation, and the Department of Commerce, or any components of any of those agencies, or copying, transferring, or in any way disseminating any data from any of the agencies identified in this paragraph; and

(b) Terminating, furloughing, or otherwise placing on involuntary leave—whether paid or unpaid—any officers or employees of the federal government working within any of the Departments and agencies identified in paragraph (a), other than officers or employees of the Defendant entities, or directing any federal department or agency, not including the Defendant entities, to take the prohibited actions described in this paragraph.

Pls.' Proposed Order at 1–2, ECF No. 19-1 (footnotes omitted).

ADD020

(D.C. Cir. 2014) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)).  A court also considers the "underlying purpose" of a TRO—"preserving the status quo and preventing irreparable harm" until it has an opportunity to rule on the merits.  *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974); *Shelley v. Am. Postal Workers Union*, 775 F. Supp. 2d 197, 202 (D.D.C. 2011) ("The court may issue a temporary restraining order ('TRO') when a movant is faced with the possibility that irreparable injury will occur even before the hearing for a preliminary injunction required by Federal Rule of Civil Procedure 65(a) can be held."); *Elec. Data Sys. Fed. Corp. v. Gen. Servs. Admin.*, 629 F. Supp. 350, 352 (D.D.C. 1986) ("In the context of the limited purpose of a temporary restraining order, the Court's analysis of these factors seeks principally to ensure preservation of the status quo.").

## III.    ANALYSIS

The court's analysis here begins and ends with irreparable harm, "a threshold requirement in granting temporary injunctive relief."  *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 8 (D.D.C. 2009) (citing *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)).  To show irreparable harm, the "injury alleged must be 'both certain and great, actual and not theoretical, beyond remediation, and of such *imminence* that there is a clear and present need for equitable relief.'"  *Church v. Biden*, 573 F. Supp. 3d 118, 138 (D.D.C. 2021) (quoting *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015)).  The "'possibility of irreparable harm' is not enough."  *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  A plaintiff must demonstrate "a clear and present need for extraordinary equitable relief to prevent harm."  *Id.* (citation omitted).  "If a party fails to make a sufficient showing of irreparable injury, a court may deny a motion for injunctive relief."  *Beattie*, 663 F. Supp. 2d at 8; *Hulli*, 549 F. Supp.

3d at 99 ("[M]ovants are barred from receiving such relief should they fail to establish irreparable injury.").

On the record before it, the court cannot conclude that Plaintiffs satisfy the "high standard for irreparable injury." *Church*, 573 F. Supp. 3d at 138 (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). Plaintiffs' declarations are replete with attestations that *if* Musk and DOGE Defendants cancel, pause, or significantly reduce federal funding or eliminate federal-state contracts, Plaintiff States will suffer extreme financial and programmatic harm:

- "If the actions of [DOGE], led by Elon Musk, cancel federal-state contracts or significantly federal funding for/from partner federal agencies, it will impact Washington State's ability to adequately serve and uphold its own legal commitments to its residents." Decl. of Katherine 'K.D.' Chapman-See ¶ 5, ECF No. 6-2.

- "Upon information and belief if [the Department of Labor's] sensitive data is compromised, the State of New Mexico would be vulnerable to embezzlement, cyber theft, ransom attacks, and other financial crimes." Decl. of Sarita Nair ¶ 26, ECF No. 6-4.

- "If existing programs are canceled or federal workers administering these programs are terminated, the state of New Mexico will not be able to receive reimbursements." Decl. of Wayne Propst ¶ 15, ECF No. 6-11.

- Connecticut's Department of Social Services funding is "potentially impacted by the actions of DOGE." Decl. of Jeffrey R. Beckham ¶ 9, ECF No. 6-12.

The court is aware that DOGE's unpredictable actions have resulted in considerable uncertainty and confusion for Plaintiffs and many of their agencies and residents. *See, e.g.*, Decl. of Ben Henderson ¶ 11, ECF No. 6-7; Decl. of Kimberly Bush-Koleszar ¶¶ 4-6, ECF No. 6-9. But the "possibility" that Defendants *may* take actions that irreparably harm Plaintiffs "is not enough." *See Church*, 573 F. Supp. 3d at 138 (citation omitted); *Beattie*, 663 F. Supp. 2d at 9 ("[F]eared possibilities fall short of the imminent threat of injury required to grant a TRO."). It remains "uncertain" when and how the catalog of state programs that Plaintiffs identify will suffer. *Church*,

ADD022

573 F. Supp. 3d at 141.  When litigants have identified specific individuals or programs imminently targeted by Defendants, courts have issued appropriately tailored TROs.  *See, e.g.*, *Drs. for Am. v. OPM*, No. 25-cv-322-JDB, 2025 WL 452707, at *8–11 (D.D.C. Feb. 11, 2025) (granting TRO prohibiting further removal or modification and compelling reinstatement of CDC, DHHS, and FDA webpages); *AIDS Vaccine Advoc. Coal. v. Dep't of State*, No. 25-cv-400-AHA, 2025 WL 485324, at *4–6 (D.D.C. Feb. 13, 2025) (granting TRO prohibiting Defendants from implementing the "blanket suspension of foreign aid funding," but refusing to enjoin specific personnel or operational decisions absent "evidence of non-compliance" with TRO).  Conversely, when litigants have failed to show imminent harm, courts in this district have refused to issue emergency TROs.  *See, e.g.*, Mem. Op. & Order at 11, 13, *Univ. of Cal. Student Assoc. v. Carter*, No. 25-cv-354-RDM (D.D.C. Feb. 17, 2025), ECF No. 20 (denying TRO motion because Plaintiff failed to show "mere 'access' to personal data by government employees who are not formally authorized to view it, without more, creates an irreparable injury"); *Doe v. OPM*, No. 25-cv-234-RDM, 2025 WL 513268, at *7 (D.D.C. Feb. 17, 2025) ("Plaintiffs have failed to demonstrate that there is a significant risk that their .gov email addresses will be stolen or publicly disclosed in the next 14 days.").

Plaintiffs ask the court to take judicial notice of widespread media reports that DOGE has taken or will soon take certain actions, such as mass terminations.  But these reports cannot substitute for "specific facts in an affidavit or a verified complaint" that "clearly show that immediate and irreparable injury, loss, or damage will result."  Fed. R. Civ. P. 65(b)(1)(A); *see also Gomez v. Kelly*, 237 F. Supp. 3d 13, 14 (D.D.C. 2017); *cf. AIDS Vaccine Advoc. Coal.*, 2025 WL 485324, at *3–4.  The court may take judicial notice of news articles for their existence, but not for the truth of the statements asserted therein.  *See, e.g.*, *Hourani v. Psybersolutions*, 164 F.

Supp. 3d 128, 132 n.1 (D.D.C. 2016); *cf. Banks v. Booth*, 459 F. Supp. 3d 143, 149, 154 (D.D.C. 2020) (refusing to consider counsel's assertions during preliminary injunction oral argument absent corroborating record evidence). And even if the court could appropriately consider the news reports in conjunction with Defendants' vague representation that "a select set of agencies in fact terminated a number of employees at the end of last week," Defs.' Notice at 1, that would not cure the motion's deficiencies. Terminating thousands of federal employees may cause extreme harm to the individual employees, and potentially the institution writ large. *See, e.g., Dellinger v. Bessent*, No. 25-cv-385-ABJ, 2025 WL 471022, at *10–11 (D.D.C. Feb. 12, 2025); *Am. Foreign Serv. Ass'n v. Trump*, No. 25-cv-352-CJN, 2025 WL 435415, at *2 (D.D.C. Feb. 7, 2025). But "harm that might befall unnamed third parties does not satisfy the irreparable harm requirement in the context of emergency injunctive relief, which must instead be connected specifically to the parties before the Court." *Church*, 573 F. Supp. 3d at 146 (citations omitted). Plaintiffs have not adequately linked Defendants' actions to imminent harm to *Plaintiff States* in particular.

That said, Plaintiffs raise a colorable Appointments Clause claim with serious implications. Musk has not been nominated by the President nor confirmed by the U.S. Senate, as constitutionally required for officers who exercise "significant authority pursuant to the laws of the United States." *United States v. Arthrex, Inc.*, 594 U.S. 1, 12 (2021) (citation omitted); Compl. ¶ 64; TRO Mot. Hr'g Tr. 29:07–22 (Feb. 17, 2025), ECF No. 27. Bypassing this "significant structural safeguard[] of the constitutional scheme," *Edmond v. United States*, 520 U.S. 651, 659 (1997), Musk has rapidly taken steps to fundamentally reshape the Executive Branch, *see* Compl. ¶¶ 66–76; Pls.' Reply at 1–3, ECF No. 21. Even Defendants concede there is no apparent "source of legal authority granting [DOGE] the power" to take some of the actions challenged here. *See*

ADD024

Defs.' Notice at 2. Accepting Plaintiffs' allegations as true, Defendants' actions are thus precisely the "Executive abuses" that the Appointments Clause seeks to prevent. *Edmond*, 520 U.S. at 659. But even a strong merits argument cannot secure a temporary restraining order at this juncture.[4]

Plaintiffs legitimately call into question what appears to be the unchecked authority of an unelected individual and an entity that was not created by Congress and over which it has no oversight. In these circumstances, it must be indisputable that this court acts within the bounds of its authority. Accordingly, it cannot issue a TRO, especially one as wide-ranging as Plaintiffs request, without clear evidence of imminent, irreparable harm to these Plaintiffs. The current record does not meet that standard.

---

[4] In some circumstances, constitutional violations may constitute irreparable injury. *See Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009). Plaintiffs have not identified, and the court is unaware of, any case granting a TRO based on an Appointments Clause violation. And the D.C. Circuit has recently held that at least certain Appointments Clause violations are "not, without more, an injury that necessitates preliminary injunctive relief." *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1332–33 (D.C. Cir. 2024) (collecting cases).

**CONCLUSION**

For the reasons explained, it is hereby **ORDERED** that Plaintiffs' Emergency Motion for a Temporary Restraining Order is **DENIED**.  It is further **ORDERED** that the parties shall meet and confer regarding further proceedings.  If Plaintiffs intend to move for a preliminary injunction, the parties shall file a proposed briefing schedule, and state their positions on consolidating the merits with the preliminary injunction briefing, by 5:00 PM on February 19, 2025.

Date: February 18, 2025

*Tanya S. Chutkan*
_____
TANYA S. CHUTKAN
United States District Judge

ADD026

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STATE OF NEW MEXICO,
  408 Galisteo St.
  Santa Fe, NM  87501;

STATE OF ARIZONA,
  2005 N. Central Ave.
  Phoenix, AZ  85004;

THE PEOPLE OF THE STATE
OF MICHIGAN,
  525 Ottawa St.
  Lansing, MI  48933;

STATE OF CALIFORNIA,
  1300 I St.
  Sacramento, CA 95814;

STATE OF CONNECTICUT,
  165 Capitol Ave.
  Hartford, CT 06106;

STATE OF HAWAI'I,
  425 Queen St
  Honolulu, HI  96813;

STATE OF MARYLAND,
  200 St. Paul Place, 20th Fl.
  Baltimore, MD  21202;

STATE OF MASSACHUSETTS,
  1 Ashburton Pl
  Boston, MA  02108

STATE OF MINNESOTA,
  445 Minnesota St., Ste. 600
  St. Paul, MN  55101;

STATE OF NEVADA
  1 State of Nevada Way, Ste. 100

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

C.A. No.   1:25-cv-00429

ADD027

Las Vegas, NV  89119

STATE OF OREGON,
 100 SW Market St
 Portland, OR  97210

STATE OF RHODE ISLAND,
 150 South Main St
 Providence, RI  02903;

STATE OF VERMONT,
 109 State St.
 Montpelier, VT  05609;

STATE OF WASHINGTON,
 800 Fifth Ave., Ste. 2000
 Seattle, WA  98104;

                    Plaintiffs,

        v.

ELON MUSK, in his official capacity,
c/o Executive Office of the President
 1600 Pennsylvania Avenue, NW
 Washington, DC 20530

U.S. DOGE SERVICE
 1600 Pennsylvania Avenue, NW
 Washington, DC 20530

U.S. DOGE SERVICE TEMPORARY
ORGANIZATION,
c/o Executive Office of the President
 1600 Pennsylvania Avenue, NW
 Washington, DC 20530

DONALD J. TRUMP, in his official capacity as
PRESIDENT OF THE UNITED STATES,
 1600 Pennsylvania Avenue, NW
 Washington, DC 20530

                    Defendants.

2

ADD028

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      There is no greater threat to democracy than the accumulation of state power in the hands of a single, unelected individual. Although our constitutional system was designed to prevent the abuses of an 18th century monarch, the instruments of unchecked power are no less dangerous in the hands of a 21st century tech baron. In recent weeks, Defendant Elon Musk, with President Donald J. Trump's approval, has roamed through the federal government unraveling agencies, accessing sensitive data, and causing mass chaos and confusion for state and local governments, federal employees, and the American people.

2.      Oblivious to the threat this poses to the nation, President Trump has delegated virtually unchecked authority to Mr. Musk without proper legal authorization from Congress and without meaningful supervision of his activities. As a result, he has transformed a minor position that was formerly responsible for managing government websites into a designated agent of chaos without limitation and in violation of the separation of powers.

3.      The Founders of this country fought for independence from the British monarchy due in no small part to the King's despotic power to create an unlimited number of governmental offices and to fill those offices with the King's supporters. In fact, this practice so severely undermined the Founders' freedoms that it is a listed grievance in the Declaration of Independence.

4.      Informed by that history, the Framers of the Constitution crafted the Appointments Clause to protect against such tyranny in our system of government. The Appointments Clause

3

ADD029

was designed to buttress the separation of powers in two ways: first by requiring that Congress create an office before the President can fill it, and second by requiring that the Senate confirm a nominee to an office created by law. These limitations on the President's power make executive appointments accountable to Congress and make the Senate's confirmation decisions accountable to the people. *See United States v. Arthrex*, 594 U.S. 1, 12 (2021). In this way, the Appointments Clause serves a vital role in curbing Executive abuses of power.

5.      Mr. Musk's seemingly limitless and unchecked power to strip the government of its workforce and eliminate entire departments with the stroke of a pen or click of a mouse would have been shocking to those who won this country's independence. There is no office of the United States, other than the President, with the full power of the Executive Branch, and the sweeping authority now vested in a single unelected and unconfirmed individual is antithetical to the nation's entire constitutional structure.

6.      Mr. Musk does not occupy an office of the United States and has not had his nomination for an office confirmed by the Senate. His officer-level actions are thus unconstitutional. This Court should restore constitutional order and, consistent with the Appointments Clause, enjoin Mr. Musk from issuing orders to any person in the Executive Branch outside of DOGE and otherwise engaging in the actions of an officer of the United States, and declare that his actions to date are *ultra vires* and of no legal effect.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction under 28 U.S.C. §§ 1331 and 2201(a).

8.      The Court may grant declaratory, injunctive and other relief pursuant to 28 U.S.C. §§ 2201–02.

4

9.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a).

10.    Venue is proper in the District of Columbia under 28 U.S.C. §§ 1391(b)(2) and (e)(1).  Defendants are organizations of the United States, the President of the United States, and an individual employed by the United States sued in his official capacity, and a substantial part of the events or omissions giving rise to the claims in this Complaint occurred and continue to occur within this District.

## PARTIES

### A.  Plaintiffs

11.    Plaintiff the State of New Mexico is a sovereign state of the United States. New Mexico is represented by Attorney General Raúl Torrez. The Attorney General is New Mexico's chief law enforcement officer and is authorized to pursue this action pursuant to N.M. Stat. Ann. § 8-5-2(B).

12.    Plaintiff the State of Arizona is a sovereign state of the United States. Arizona is represented by Attorney General Kris Mayes. The Attorney General is Arizona's chief law enforcement officer and is authorized to pursue this action pursuant to Arizona Revised Statutes § 41-193(A)(3).

13.    Plaintiff the People of the State of Michigan is represented by Attorney General Dana Nessel. The Attorney General is Michigan's chief law enforcement officer and is authorized to bring this action on behalf of the People of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.

14.    Plaintiff the State of California is a sovereign state of the United States. California is represented by Attorney General Rob Bonta. The Attorney General is California's chief law

ADD031

enforcement officer and is authorized to pursue this action pursuant to section 13 of article V of the California Constitution.

15.    Plaintiff the State of Connecticut is a sovereign state of the United States. Connecticut is represented by Attorney General William Tong, who is the chief law enforcement officer of Connecticut.

16.    Plaintiff the State of Hawai'i is a sovereign state of the United States. Hawai'i is represented by and through Attorney General Anne E. Lopez, who is the chief law enforcement officer of Hawai'i.

17.    Plaintiff the State of Maryland is a sovereign state of the United States. Maryland is represented by and through Attorney General Anthony G. Brown, who is the chief law enforcement officer of Maryland.

18.    Plaintiff State of Massachusetts is a sovereign state of the United States. Maryland is represented by and through Attorney General Andrea Joy Campbell, who is the chief law enforcement officer of Maryland.

19.    Plaintiff the State of Minnesota is a sovereign state of the United States. Minnesota is represented by Attorney General by Attorney General Keith Ellison who is the chief law enforcement officer of Minnesota.

20.    Plaintiff the State of Nevada is a sovereign state of the United States. Nevada is represented by Attorney General Aaron Ford who is the chief law enforcement officer of Nevada.

21.    Plaintiff the State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield, who is the chief law enforcement officer of Oregon.

ADD032

22.     Plaintiff the State of Rhode Island is a sovereign state of the United States. Rhode Island is represented by Attorney General Peter F. Neronha who is the chief law enforcement officer of Rhode Island.

23.     Plaintiff the State of Vermont is a sovereign state of the United States. Vermont is represented by Attorney General Charity Clark who is the chief law enforcement officer of Vermont.

24.     The State of Washington is a sovereign state in the United States. Washington is represented by Attorney General Nicholas W. Brown. The Attorney General of Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern.

**B.  Defendants**

25.     Defendant Elon Musk is sued in his official capacity as a "special Government employee" of the Executive. 18 U.S.C. § 202(a).

26.     Defendant the United States Department of Government Efficiency Service was established by Executive Order on January 20, 2025, and is a group organized within the Executive Office of the President.

27.     Defendant the United States Department of Government Efficiency Service Temporary Organization was established by Executive Order on January 20, 2025.

28.     Defendant Donald J. Trump is sued in his official capacity as the President of the United States.

**LEGAL FRAMEWORK**

29.     The Constitution creates a deliberate and ordered process for the exercise of significant authority over the Nation's laws, its purse, and its people.  While the President has the

ADD033

authority to recommend to Congress "such measures as he shall judge necessary and expedient," U.S. Const. art. II, § 3, it is Congress that ultimately wields the power to enact a law authorizing the exercise of significant authority and disbursing any necessary funding.

30.      The separation of powers is one of the core, fundamental principles that undergirds our constitutional structure. It is Congress, not the President, that possesses the power to enact laws and appropriate funds. Among the President's responsibilities include his obligation to "take care that the laws" Congress enacts are "faithfully executed." U.S. Const. art. II, § 3.

31.      Likewise, the Constitution prevents the President from making unilateral changes to existing laws concerning the structure of the Executive Branch and federal spending. For example, the President cannot establish—or "delete"—federal agencies. Nor may the President unilaterally shut off federal funding where Congress has already appropriated the money.

32.      In these and a host of other ways, the Constitution reflects the Framers' clear intent to provide checks and balances among the coordinate branches of government.

### A.      The Appointments Clause

33.      The Appointments Clause is a pillar of this basic constitutional structure and serves as a vital bulwark against "the danger of one branch's aggrandizing its power at the expense of another branch." *Freytag v. C.I.R.*, 501 U.S. 868, 880 (1991).

34.      The Appointments Clause provides that the President:

> shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

ADD034

U.S. Const. art. II, § 2, cl. 2.

35.    The Appointments Clause is among the Constitution's most "significant structural safeguards of the constitutional scheme," *Edmond v. United States*, 520 U.S. 651, 659 (1997), because it prevents one branch from "aggrandizing its power" or "dispensing it too freely . . . to inappropriate members of the Executive Branch." *Freytag,* 501 U.S. at 878, 80. The Supreme Court has explained that "[i]f there is any point in which the separation of the legislative and executive powers ought to be maintained with great caution, it is that which relates to officers and offices." *Myers v. United States*, 272 U.S. 52, 116 (1926) (quoting 1 ANNALS OF CONG. 581 (1789)).

36.    The Appointments Clause also serves the twin purposes of transparency and accountability. "'Assigning the nomination power to the President guarantees accountability for the appointees' actions because the 'blame of a bad nomination would fall upon the president singly and absolutely.'" *Arthrex*, 594 U.S. at 12 (quoting The Federalist No. 77, p. 517 (J. Cooke ed. 1961) (A. Hamilton)). Likewise, "[t]he Appointments Clause adds a degree of accountability in the Senate, which shares in the public blame 'for both the making of a bad appointment and the rejection of a good one.'" *Id.* (citation omitted). The Clause allows the public to scrutinize individuals who exercise significant authority through a public vetting process under an oath of office pursuant to 5 U.S.C. § 3331.

37.    Precedent interpreting the Appointments Clause distinguishes between two types of "officers": "inferior" officers and what have become known as "principal" or "noninferior" officers. *See Arthrex*, 594 U.S. at 12. In essence, there are three types of Executive Branch personnel (other than the President and Vice President): (1) principal officers, (2) inferior officers, and (3) employees. *See generally id*.

9

ADD035

38.    Principal officers must always be nominated by the President and confirmed by the Senate. *Id.*

39.    Inferior officers must be nominated by the President and confirmed by the Senate unless Congress creates an exception and "by Law vest[s] the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. In other words, when there is no law addressing the appointment of an inferior officer, the principal-officer procedure applies; only the President can nominate the officer, and appointment requires the advice and consent of the Senate.

40.    The hiring of employees—who are distinct from "Officers of the United States"— is not governed by the Appointments Clause because they are categorized as "lesser functionaries subordinate to officers of the United States." *Buckley v. Valeo*, 424 U.S. 1, 126 n.162 (1976) (per curiam).

41.    The difference between an officer and an employee is that an officer exercises "significant authority" on behalf of the United States on a continuing basis. *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 245 (2018) (quoting *Buckley*, 424 U.S. at 6).

42.    Continuing offices are distinguished from those that are personal, contractual, or limited to a single task. *Edmond v. United States*, 520 U.S. 651, 661 (1997).

43.    There is not "an exclusive criterion for distinguishing between principal and inferior officers for Appointments Clause purposes," but the central rule is that "'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond*, 520 U.S. at 661, 663.

44.    Importantly, the Appointments Clause only grants the President the power to nominate officers to offices that Congress has already "established by Law." U.S. Const. art. II, §

10

2, cl. 2. "If Congress has not reached a consensus that a particular office should exist, the Executive lacks the power to unilaterally create and then fill that office." *Trump v. United States*, 603 U.S. 593, 650 (2024) (Thomas, J., concurring). "By keeping the ability to create offices out of the President's hands, the Founders ensured that no President could unilaterally create an army of officer positions to then fill with his supporters. Instead, our Constitution leaves it in the hands of the people's elected representatives to determine whether new executive offices should exist." *Id.* at 646 (Thomas, J., concurring).

45.    The "significant authority" that distinguishes officers subject to the Appointments Clause from employees not subject to the Clause includes, among other things, the binding execution or interpretation of the laws. This applies to many types of executive decisions, such as the authority to receive, oversee, or disburse public funds, authority over contracts, the power to determine the use of and access to government property, and the power to issue regulations.[1]

### B.    Temporary Organization Statute

46.    "Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) (per curiam).

47.    Congress has provided that the President may establish a "temporary organization" for a "specific period not in excess of three years for the purpose of performing a specific study or

---

[1] *See, e.g.*, *Buckley*, 424 U.S. at 140 ("determinations of eligibility for funds" are among duties implicating Appointments Clause); *id.* ("rulemaking . . . represents the performance of a significant government duty exercised pursuant to public law" and may only be "exercised" by officers); *United States v. Tingey*, 30 U.S. (5 Pet.) 115, 126 (1831) (discussing officers "for the purpose of making contracts, or for the purchase of supplies"); *United States v. Maurice*, 26 F. Cas. 1211, 1214 (Cir. Ct. D. Va. 1823).

ADD037

other project." 5 U.S.C. § 3161. By its plain terms, this limited authorization does not amount to a *carte blanche* grant of authority to the Executive to create new federal agencies from whole cloth.

48.    Although the Executive Order that created the United States DOGE Service Temporary Organization purports to invoke this statute, 5 U.S.C. § 3161 does not provide DOGE with the authority it has purported to exercise.

49.    The "major questions" doctrine further constrains administrative power by requiring "Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 117 (citation and quotation marks omitted). When the executive branch purports to exercise such powers, "the question" is whether a statute (or the Constitution) "plainly authorizes" that action. *Id.*

## FACTUAL BACKGROUND

50.    On November 12, 2024, then President-elect Trump announced on X (formerly known as Twitter) that he planned to establish a "Department of Government Efficiency," describing it as a "Manhattan Project" for the federal government that would "pave the way" to "dismantle Government Bureaucracy, slash excess regulations, cut wasteful expenditures, and restructure Federal Agencies."[2]

51.    President Trump's earliest indication that Mr. Musk would lead such an effort appeared was during a YouTube conversation between the two on August 12, 2024, in which President Trump enthusiastically responded to Mr. Musk offering to take a leadership role on a government efficiency commission, noting that Mr. Musk was "the greatest cutter."

---

[2] Donald Trump (@RealDonaldTrump), X (Nov. 12, 2024).

ADD038

52.     On the day of his inauguration, President Trump issued an Executive Order ("DOGE Executive Order") creating the United States Department of Government Efficiency Service ("DOGE Service").

53.     While President Trump purported to simply be renaming the pre-existing entity United States Digital Service, he gave the DOGE Service a different mission and structure.[3]

54.     Through the DOGE Executive Order, President Trump created a DOGE Administrator position to lead another new entity, the U.S. DOGE Service Temporary Organization ("DOGE Temporary Organization"). The DOGE Administrator was directed to implement a "Software Modernization Initiative" "to improve the efficiency of federal software and information technology systems and promote interoperability among agency networks and systems."[4]

55.     The DOGE Executive Order also created DOGE Teams that are intended to be embedded in every federal agency and will typically consist of a Team Lead, one engineer, one human resources specialist, and one attorney. The DOGE Teams were to be created through consultation between the relevant agency head and the DOGE Administrator.[5]

56.     President Trump tasked the DOGE Temporary Organization with advancing the "President's DOGE agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity" before its termination date, July 4, 2026.[6]

---

[3] Establishing and Implementing the Presidents Department of Government Efficiency," Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025), https://www.govinfo.gov/content/pkg/FR-2025-01-29/pdf/2025-02005.pdf [hereinafter "DOGE Executive Order"].
[4] DOGE Executive Order at § 4(a)
[5] *Id.* at § 4(a).
[6] *Id.* at § 1.

ADD039

57.    In the DOGE Executive Order, President Trump further directed federal agency heads to "take all necessary steps, in coordination with the [DOGE] Administrator and to the maximum extent consistent with law, to ensure [DOGE] has full and prompt access to all unclassified agency records, software systems, and IT systems."[7]

58.    On its face, the Executive Order exempts the DOGE Service, DOGE Administrator, and DOGE Teams from the July 4, 2026, sunset provision.[8]

59.    The statements and actions of President Trump, other White House officials, and Mr. Musk himself indicate that Mr. Musk has been directing the work of DOGE personnel[9] since at least January 21, 2025.

60.    On February 3, 2025, White House Press Secretary Karoline Leavitt confirmed that, as President Trump had planned, Mr. Musk had taken charge of DOGE: "As you know, President Trump tasked Mr. Musk with starting up DOGE, and he already has done that in the first week, they've been incredibly productive and efficient already, saving taxpayers tens of billions of dollars, so we welcome Mr. Musk's support in this effort."

61.    During this initial period, DOGE secured access to sensitive material in dozens of federal agencies, including the Department of the Treasury,[10] the Office of Personnel

---

[7] *Id.* at § 4(b).

[8] *Id.* at § 1.

[9] Unless otherwise indicated, Plaintiffs use "DOGE personnel" and "DOGE-affiliated personnel" to refer individuals whose apparent or actual authority derives from the DOGE Executive Order.

[10] Alan Rappeport, Maggie Haberman, Theodore Schleifer, & Andrew Duehren, *Elon Musk's Team Now Has Access to Treasury's Payments System*, N.Y. Times (Feb. 1, 2025), https://www.nytimes.com/2025/02/01/us/politics/elon-musk-doge-federal-payments-system.html.

ADD040

Management,[11] the Centers for Medicare and Medicaid Services,[12] the Department of Labor,[13] the Department of Education,[14] the Department of Energy (which oversees nuclear weapons), the Department of Defense, and the Centers for Disease Control.

62.    After this conduct became public, White House Press Secretary Leavitt revealed that Mr. Musk was a "special government employee," though she could not confirm whether he had received any security clearance and did not disclose the date on which he became a "special government employee."[15]

63.    "[S]pecial Government employee" is a statutory term that means, in relevant part, "an officer or employee of the executive . . . of the United States Government , . . . who is retained, designated, appointed, or employed to perform, with or without compensation, for not to exceed one hundred and thirty days during any period of three hundred and sixty-five consecutive days, temporary duties either on a full-time or intermittent." 18 U.S.C. § 202(a).

**MR. MUSK'S UNLAWFUL CONDUCT**

---

[11] Caleb Ecarma & Judd Legum, *Musk associates given unfettered access to private data of government employees,* MUSK WATCH (Feb. 3, 2025), at https://www.muskwatch.com/p/muskassociates-given-unfettered (last accessed Feb. 3, 2025).

[12] Alan Condon, *DOGE sets sights on Medicaid,* NY TIMES (Feb. 3, 2025) (noting that DOGE has been provided access to key payment and contracting systems at CMS).

[13] Kim Kelly (@GrimKim), X (Feb. 4, 2025, 5:04 PM ET), https://x.com/GrimKim/status/1886898588099240401 (reporting that DOL workers were ordered to give DOGE access to anything they want without regard to security protocols).

[14] Jeff Stein et al., *U.S. government officials privately warn Musk's blitz appears illegal,* WASH. POST (Feb. 4, 2025), https://www.washingtonpost.com/business/2025/02/04/elon-musk-government-legal-doge/ ("Inside the Education Department, some staffers are deeply alarmed by the fact that DOGE staffers have gained access to federal student loan data, which includes personal information for millions of borrowers. Some employees have raised the alarm up their chain of management").

[15] Bobby Allyn & Shannon Bond, *Elon Musk's DOGE Team Sets Off Tensions in the Federal Government,* NPR (Feb. 3, 2025), https://www.npr.org/2025/02/03/nx-s1-5285539/doge-musk-usaid-trump.

64.     Although he occupies a role President Trump—not Congress—created and even though the Senate has never voted to confirm him, Mr. Mr. Musk has and continues to assert the powers of an "Officer[] of the United States" under the Appointments Clause. Indeed, in many cases, he has exceeded the lawful authority of even a principal officer, or of the President himself.

65.     As explained below, Mr. Musk: (1) has unprecedented and seemingly limitless access across the federal government and reports solely to President Trump, (2) has asserted significant and sweeping authority across a broad swath of federal agencies, and (3) has engaged in a constellation of powers and activities that have been historically associated with an officer of the United States, including powers over spending and disbursements, contracts, government property, regulations, and agency viability.

66.     In sum, Mr. Musk purports to exercise and in fact asserts the significant authority of a principal officer on behalf of the United States.  Yet, he does not occupy an office created by Congress and has not been nominated by the President or confirmed by the Senate. As a result, all of Mr. Musk's actions are *ultra vires* and contrary to law.

**A.     Mr. Mr. Musk Has Unprecedented Access and Reports Only to President Trump.**

67.     Mr. Musk is far more than an adviser to the White House. He executes the President's agenda by exercising virtually unchecked power across the entire Executive Branch, making decisions about expenditures, contracts, government property, regulations, and the very existence of federal agencies. No executive position wields as much power over the operations of the Executive Branch other than the President.

68.     Mr. Musk has gained sweeping and unprecedented access to sensitive data, information, systems, and technological and financial infrastructure across the federal government. This access is seemingly limitless and dependent upon Mr. Mr. Musk's discretion.

16

ADD042

69.     For instance, on February 7, 2025, President Trump verified that Mr. Musk and DOGE did not need the access they had attained to sensitive Treasury Department information. Asked why DOGE needed access to Americans' sensitive data, he replied, "It doesn't. … But they get it very easily.  And we don't have very good security in our country, and they get it very easily."[16]

70.     Mr. Musk's DOGE personnel has inserted itself into at least 17 federal agencies. On February 7, 2025, when asked whether there was anything in the federal government that Mr. Mr. Musk had been instructed not to touch, President Trump replied: "Well, we haven't discussed that much.  He added, "I guess maybe you could say some high intelligence or something.  And I'll do that myself if I have to."[17]

71.     In addition, statements by Mr. Musk and President Trump make clear that the individual with the closest proximity to Mr. Musk is President Trump and Mr. Musk reports only to President Trump.

72.     President Trump's February 8, 2025, statements illustrate that no one stands between Mr. Musk and Trump in the Executive chain-of-command: "I've instructed him to go check out Education, to check out the Pentagon."[18]

---

[16] Hanna Perry, *Trump Says DOGE Does Not Even Needs Its Access to Sensitive Info*, Newsweek (Feb. 7, 2025), https://www.newsweek.com/trump-says-doge-does-not-even-need-its-access-sensitive-info-2028177.

[17] *See* Erica L. Green & Michael D. Shear, *Musk Wields Scythe on Federal Work Force, With Trump's Full Blessing*, N.Y. TIMES (Feb. 8, 2025).

[18] *See* Erica L. Green & Michael D. Shear, *Musk Wields Scythe on Federal Work Force, With Trump's Full Blessing*, N.Y. TIMES (Feb. 8, 2025).

73.     And despite the numerous, monumental actions Mr. Musk and DOGE have taken, Mr. Musk evidently has significant autonomy regarding when, how frequently, and in what depth he briefs the President, which briefings the White House has described simply "as needed."[19]

74.     Indeed, there have been reports that Mr. "Mr. Musk is not fully briefing White House Chief Of Staff Susie Wiles about his plans and that the White House is effectively in the dark," and that there is no clarity about "the proper chain of communication … between agencies and the White House" with respect to DOGE.

75.     On February 11, 2025, Mr. Musk and President Trump jointly addressed the public from the White House Oval Office.[20] If there were any doubt about the reach of Mr. Musk's *de facto* power over Executive-Branch operations, his remarks delivered *from the Oval Office* on February 11, 2025—with the President sitting in silence at the Resolute as Mr. Musk held the floor—should dispel it.

76.     Mr. Musk's authority to direct and veto the staffing decisions of agencies was supported by an additional Executive Order. This Executive Order expressly mandated large-scale reductions in workforce by every agency, requires hiring plans with all decisions made in consultation with DOGE personnel, and prohibits the filling of any vacancies without DOGE approval.[21]

**B.     Mr. Musk Has Exercised Sweeping Authority Across Numerous Federal Agencies.**

---

[19] Jake Lahut, *Elon Musk's Takeover Is Causing Rifts in Donald Trump's Inner Circle,* Wired (Feb. 5, 2025), https://www.wired.com/story/trump-aides-concern-musk-takeover/.

[20] Elena Moore, *Trump and Musk appear together in the Oval Office to defend the work of DOGE*, NPR (Feb. 11, 2025), https://www.npr.org/2025/02/11/nx-s1-5293504/trump-musk-doge-oval-office.

[21] "Implementing the President's 'Department of Workforce Efficiency" Workforce Optimization Initiative" (Feb. 11, 2025) https://www.whitehouse.gov/presidential-actions/2025/02/implementing-the-presidents-department-of-government-efficiency-workforce-optimization-initiative/

ADD044

77.     The specifics of Mr. Musk's conduct within various agencies confirm that he is wielding the power of a principal officer, a principal officer that has never previously existed. Mr. Musk has purported to exercise, and in fact exercised, sweeping authority across a wide swath of federal agencies. Defendants' conduct has already impaired the work of several of these agencies, perhaps irrevocably, harming the people they serve and the Plaintiff States.

### U.S. Department of Treasury (Treasury)

78.     The U.S. Treasury Department maintains and safeguards our nation's central bank account.  Treasury's Bureau of the Fiscal Services ("BFS") receives coded payment instructions in the form of payment files from a host of federal agencies to disburse funds to tens of millions of Americans every year. These funds include social security benefits, veteran's benefits, childcare tax credits, Medicaid and Medicare reimbursements, federal employee wages, and federal tax refunds. Plaintiff States also receive billions of dollars in funds every year directly from Treasury through BFS under federal grant programs.

79.     BFS also operates the Treasury Offset Program, which, among other things, helps states recover delinquent state income taxes and child support by subtracting those debts from a person's federal income tax refund. This program recovered $720.9 million in state income tax debt and $1.4 billion in child support in fiscal year 2024.[22]

---

[22] United States Dep't of the Treasury, Bureau of the Fiscal Serv., Treasury Offset Program, How the Treasury Offset Program Collects Money for State Agencies, https://www.fiscal.treasury.gov/top/state-programs.html (last visited Feb. 5, 2025).

ADD045

80. BFS processes payments after the payment files are certified by the responsible agency and checked against Treasury's "do not pay" system.[23]

81. Mr. Musk has publicly criticized BFS for not using its role as payment processor to interfere with congressionally authorized and agency-certified payments.[24]

82. On January 24, 2025, Tom Krause, a tech executive apparently working with or behalf of DOGE, asked Trump appointee and then-acting Treasury Secretary David A. Lebryk, to halt certain foreign aid payments through BFS systems because Mr. Musk believed they violated certain executive orders.[25] On information and belief, at the time Mr. Krause made this request, he was not a Treasury employee but rather was affiliated with DOGE.

83. DOGE was not seeking to stop the payments because they were going to an improper payee. Rather, DOGE sought to stop the payments for policy reasons.[26]

84. Mr. Lebryk stated that he did not believe "we have the legal authority to stop an authorized payment certified by an agency" and that the less legally risky route would be for the State Department to stop and evaluate the propriety of the payments.[27] Mr. Krause responded by

---

[23] *See* U.S. Dep't of the Treasury, Press Releases, Treasury Department Letter to Members of Congress Regarding Payment Systems, https://home.treasury.gov/news/press-releases/sb0009 (Feb. 4, 2025); Payment Integrity Information Act of 2019, codified at 31 U.S.C. § 3351.

[24] *See, e.g.*, Elon Musk (@Elon Musk), X (Feb. 8, 2025), https://x.com/elonmusk/status/1888314848477376744.

[25] *See* Katelyn Polantz & Phil Mattingly, *Musk Associates Sought to Use Critical Treasury Payment System to Shut Down USAID Spending, Emails Show*, CNN, updated Feb. 6, 2025, 3:31 P.M. EST, https://www.cnn.com/2025/02/06/politics/elon-musk-treasury-department-payment-system/index.html.

[26] Tim Reid, *Helen Coster & James Oliphant, Musk's DOGE Cuts Based More On Political Ideology Than Real Cost Savings So Far*, REUTERS (Feb. 12, 2025), http://reuters.com/world/us/musk-cuts-based-more-political-ideology-than-real-cost-savings-so-far-2025-02-12/.

[27] *See* Katelyn Polantz & Phil Mattingly, *supra.*

20

threatening Mr. Lebryk, telling him he could face legal risk himself if he did not comply with DOGE.

85.     Shortly after Scott Bessent was confirmed as Treasury Secretary on January 27, 2025, Mr. Lebryk was placed on administrative leave and ultimately resigned after 30 years of federal service.[28] Beginning February 2, 2025, Secretary Bessent granted DOGE personnel full access to BFS payment systems, which contain sensitive Treasury data, including Social Security and Medicare customer payment data as well as Plaintiff States' bank account and related financial information.

86.     On February 2, 2025, in response to a tweet about Lutheran Family Services,  Mr. Musk responded, "The @DOGE team is rapidly shutting down these illegal payments."[29] Lutheran Family Services provides child behavioral health, substance abuse rehabilitation, and refugee resettlement services pursuant to government contracts. Mr. Musk has not substantiated his claim that payments to Lutheran Family Services pursuant to those contracts, are illegal.

87.     An internal email sent to BFS IT personnel by the BFS threat intelligence team has identified DOGE access as "the single greatest insider threat risk the Bureau of the Fiscal Service has ever faced." The intelligence team recommended the DOGE members be monitored as an insider threat.  Critically, they called for "suspending" any access to payment systems and "conducting a comprehensive review of all actions they may have taken on these systems."[30]

---

[28] Alan Rappeport, Maggie Haberman, Theodore Schleifer, & Andrew Duehren, *Elon Musk's Team Now Has Access to Treasury's Payments System*, N.Y. TIMES (Feb. 1, 2025), https://www.nytimes.com/2025/02/01/us/politics/elon-musk-doge-federal-payments-system.html.
[29]    Elon    Musk    (@Elon    Musk),    X    (Feb.    2,    2025), https://x.com/elonmusk/status/1885964969335808217.
[30] Vittoria Elliot & Leah Feiger, *A U.S. Treasury Threat Intelligence Analysis Designates DOGE Staff as "Insider Threat*, Wired (Feb. 7, 2025), https://www.wired.com/story/treasury-bfs-doge-insider-threat/.

ADD047

88.     The letter discusses reports "at other federal agencies indicating that DOGE members have performed unauthorized changes and locked civil servants out of the sensitive systems they gained access to." This contradicts statements from administration officials denying such changes.

89.     This kind of authority over Treasury, including its management of personnel, its funding decisions, programs, and systems, may only be exercised by a duly appointed officer.

90.     DOGE's unauthorized access to the BFS system poses a threat to cybersecurity and system malfunction[31] and has endangered the Plaintiff States' access to billions of dollars in lawfully appropriated Congressional funding and the security of their banking information. These risks are exacerbated by DOGE's use of artificial intelligence to analyze data gathered from agencies.[32]

91.     These risks are not mere speculation:  A court filing revealed that, on February 6, Treasury officials found that Marko Elez had accidentally been given "read/write" permissions to one of the payment databases, allowing him to make changes to the sensitive payment database.[33]

**U.S. Agency for International Development (USAID)**

92.     USAID is created by statute and funded by Congressional appropriations. 22 U.S.C. § 6563. It is one of the foremost development agencies in the world, providing food, medicine, and infrastructure funding in developing countries around the world, both to aid those countries

---

[31] Robert E. Rubin, Lawrence H. Summers, Timothy F. Geithner, Jacob J. Lew, & Janet L. Yellen, *Five Former Treasury Secretaries: Our Democracy Is Under Siege*, N.Y. TIMES (Feb. 10, 2025), https://www.nytimes.com/2025/02/10/opinion/treasure-secretaries-doge-musk.html.

[32] Jeff Stein et al., *In Chaotic Washington Blitz, Elon Musk's Ultimate Goal Becomes Clear*, WASH. POST (Feb. 8, 2025); Charlie Warzel et al., *The Government's Computing Experts Say They Are Terrified*, THE ATLANTIC (Feb. 7, 2025).

[33] Jess Bidgood, *When Musk's Team Shows Up at Your Doorstep*, N.Y. TIMES (Feb. 12, 2025), https://www.nytimes.com/2025/02/12/us/politics/elon-musk-doge-cfpb-trump.html.

and to further U.S. foreign policy. In doing so, it buys millions of dollars of products from American farmers. The agency also has contracts with American universities to provide certain services, including public universities in the Plaintiff States.

93.    With a budget of over $40 billion, USAID accounts for more than half of all U.S. foreign assistance. USAID has missions in over 100 countries. As of January 2025, USAID had a workforce of over 10,000, with approximately two-thirds serving overseas.

94.    On Saturday, February 1, 2025, a group of about eight DOGE personnel entered the USAID building and demanded access to every door and floor, despite only a few of them having the requisite security clearance.[34] The areas to which they sought access included a sensitive compartmented information facility—commonly known as a SCIF—an ultra-secure room where officials and government contractors take extraordinary precautions to review highly classified information.  DOGE personnel, aided by phone calls from Mr. Musk, had pressured USAID officials for days to access the secure facility and its contents.[35]

95.    When USAID personnel attempted to block access to some areas, DOGE personnel, including Mr. Musk, threatened to call federal marshals. Under threat, the agency personnel acquiesced, and DOGE personnel were eventually given access to the secure spaces.

---

[34] *See* John Hudson, Ellen Nakashima, Missy Ryan, Mariana Alfaro & Faiz Siddiqui, *Trump Moves To Wrest Control Of USAID As Musk Says, "We're shutting it down,"* WASH. POST (Feb. 3, 2025). https://www.washingtonpost.com/politics/2025/02/02/usaid-trump-musk/.
[35] *See* Andrew Roth, *Doge V USAID: How Elon Musk Helped His Acolytes Infiltrate World's Biggest Aid Agency*, THE GUARDIAN (Feb. 5, 2025), https://www.theguardian.com/us-news/2025/feb/05/musk-doge-takeover-usaid.

96.     Later that day, top officials from USAID and the bulk of the staff in USAID's Bureau for Legislative and Public Affairs were put on leave. Some of them were not notified but had their access to agency terminals suspended.  USAID's security official was also put on leave.[36]

97.     Within hours, USAID's website vanished. It remains inoperative.[37]

98.     On Sunday, February 2, 2025, Mr. Musk tweeted, "USAID is a criminal organization.  Time for it to die."[38] Later, he tweeted, "We spent the weekend feeding USAID into the woodchipper."[39]

99.     Mr. Musk provided no support for his claim that USAID is a criminal organization.

100.     On Monday, February 3, 2025, Mr. Musk stated that he was in the process of closing the agency, with President Trump's blessing. Mr. Musk stated: "I went over it with him [President Trump] in detail, and he agreed that we should shut it down. And I actually checked with him a few times [and] said 'are you sure?' The answer was yes. And so we're shutting it down."[40]

101.     On Monday, February 3, 2025, USAID staffers were told that the agency's headquarters in Washington, D.C., would be closed.[41] That day, USAID contract officers emailed agency higher-ups asking for the required authorization and justification needed to cancel

---

[36] *Id.*; John Hudson, Ellen Nakashima, Missy Ryan, Mariana Alfaro & Faiz Siddiqui, *Trump Moves To Wrest Control Of USAID As Musk Says, "We're shutting it down,"* WASH. POST (Feb. 3, 2025).
[37] USAID, https://www.usaid.gov (last visited Feb. 8, 2025).
[38]     Elon     Musk     (@Elon     Musk),     X     (Feb.     2,     2025), https://x.com/elonmusk/status/1886102414194835755.
[39]     Elon     Musk     (@Elon     Musk),     X     (Feb.     2,     2025), https://x.com/elonmusk/status/1886307316804263979.
[40]  John Hudson, et al., *Trump Moves To Wrest Control Of USAID As Musk Says, "We're shutting it down,"* WASH. POST (Feb. 3, 2025).
[41] *See* Ellen Knickmeyer, Farnoush Amiri, & Adriana Gomez Licon, *Trump And Must Move To Dismantle USAID, Igniting Battle With Democratic Lawmakers*, AP NEWS (Feb. 3, 2025), https://apnews.com/article/trump-musk-usaid-c0c7799be0b2fa7cad4c806565985fe2.

24

programs abroad. But the response came directly from DOGE personnel, one of the contract workers said in a sworn account filed with the federal court.[42]

102.    That same day, DOGE personnel approached the agency's acting leadership and handed them a list of 58 people, almost all senior career officials, to put on administrative leave.[43] The acting leadership of the agency—including two Trump appointees—were skeptical, but eventually relented.[44]

103.    On Tuesday, February 4, 2025, USAID sent out an email placing nearly its entire workforce on administrative leave.

104.    This authority over USAID, including its management of personnel, its funding decisions, programs, and systems, may only be exercised by a duly appointed officer.

105.    Defendants' attempts to destroy USAID have injured the Plaintiff States by endangering the funding that their public universities receive pursuant to contracts with USAID.

106.    On Friday, February 7, 2025, a federal judge in the U.S. District Court for the District of Columbia issued a TRO, temporarily enjoining USAID from (1) placing 2,200 USAID employees on administrative leave; and (2) engaging in a mandatory expedited evacuation of USAID employees from their host countries. Among other things, the Court held that these actions

---

[42] Ellen Knickmeyer, *Lawsuit Describes Musk's DOGE Teams Overseeing The Ending Of Hundreds Of USAID Programs Abroad*, AP (Feb. 12, 2025); Declaration of Thomasina Doe, Civil Action No. 1:25-CV-352, at 9 ("While the Senior Procurement Executive sent the email, there was no indication from whom the order was coming officially for documentation purposes. When someone asked the Senior Procurement Executive, Jami Rodgers, [a DOGE official] named Jeremy Lewin responded").

[43] *See* Nahal Toosi & Robbie Gramer, *How spending $153M to pay its bills put USAID in DOGE's crosshairs*, POLITICO (Feb. 8, 2025), https://www.politico.com/news/2025/02/08/usaid-trump-musk-doge-00203191.

[44] *Id.*

25

could violate the Further Consolidated Appropriations Act of 2024, Pub. L. 118-47 §§ 7063(a),

(b), 138 Stat. 460 (2024), and place USAID employees abroad at risk of physical and other harms.

*See American Foreign Service Assoc. v. Trump*, No. 1:25-cv-00352-CJN, Doc. 15 (D.D.C. Feb. 7,

2025).

## Office of Personnel Management (OPM)

107.    OPM serves as the chief human resources agency and personnel policy manager for

the federal government. Among other things, OPM formulates and oversees policies related to

federal employment, ensuring compliance with merit system principles and federal laws.

108.    OPM administers benefits programs such as health insurance, retirement plans, and

life insurance for federal employees. Accordingly, OPM maintains and manages extensive data on

federal employees.

109.    OPM also maintains a security clearance database. Past data breaches of OPM have

implicated the security clearance database and have resulted in the leak of five million digitized

fingerprints and sensitive background records.[45]   The systems include a vast database called

Enterprise Human Resources Integration, which contains dates of birth, Social Security numbers,

appraisals, home addresses, pay grades and length of service of government workers, the officials

said. [46]

---

[45] Ellen Nakashima, *Hacks of OPM databases compromised 22.1 million people, federal authorities say*, WASH. POST (July 9, 2015), https://www.washingtonpost.com/news/federal-eye/wp/2015/07/09/hack-of-security-clearancesystem-affected-21-5-million-people-federal-authorities-say/ (last accessed Feb. 2, 2025).
[46] Tim Reid, *Exclusive: Musk aides lock workers out of OPM computer systems*, REUTERS (Feb. 2, 2025), https://www.reuters.com/world/us/musk-aides-lock-government-workers-out-computer-systems-us-agency-sources-say-2025-01-31/?utm_source=chatgpt.com.

110.    Upon information and belief, DOGE gained full and unfettered access to OPM systems over the existing CIO's objection on or about January 20, 2025.[47]

111.    DOGE-affiliated personnel directed OPM staff to grant them high-level access to OPM computer systems, and quickly took control of them, including systems containing large troves of personally identifiable information. DOGE-affiliated personnel also locked career civil servants at OPM out of at least some of those systems, giving them completely unchecked control over the systems and the information they contain.

112.    On January 27, 2025, an unknown "OPM employee for nearly a decade and a Federal Employee for almost 20 years" posted a message to the r/FedNews discussion board on https://Reddit.com.  The message stated, "According to the FedNews Message, 'Our CIO, Melvin Brown, . . . was pushed aside just one week into his tenure because he refused to setup email lists to send out direct communications to all career civil servants. Such communications are normally left up to each agency."

113.    At some point after the inauguration, DOGE created an "outside server" to store records of millions of federal employees and their sensitive data.

114.    The outside server installed by DOGE is of unknown nature and origin. Upon information and belief, the outside server was installed by an "outside employee" that had not undergone background investigations.

115.    This server was created to facilitate DOGE's attempts to send a mass email offering the "Fork in the Road" buyout package to nearly all employees.

---

[47] Isaac Stanley-Becker et al., *Musk's DOGE agents access sensitive personnel data, alarming security officials*, WASH. POST (Feb. 6, 2025), https://www.washingtonpost.com/national-security/2025/02/06/elon-musk-doge-access-personnel-data-opm-security/ ("At least six DOGE agents were given broad access to all personnel systems at the OPM on the afternoon of Jan. 20, the day of Trump's inauguration, according to two agency officials.").

116.    On January 28, 2025, Executive Branch personnel across federal agencies—as well as many contractors—received an email from HR@opm.gov with the subject line "Fork in the Road," describing a "deferred resignation program."[48]

117.    This email was received by 2.3 million federal employees and contractors. The email offered them continued pay and benefits through September 2025 if they resigned by February 6th by simply sending an email to the Office of Personnel Management with the word "Resign" in the subject line.[49]

118.    The connection between the "Fork in the Road" program and Mr. Musk is clear. Upon his 2022 acquisition of then-Twitter, Mr. Musk made a similar offer to company employees through an email identically titled "Fork in the Road" that promised three months' severance to those who resigned within 24 hours. This history supports a reasonable belief that Mr. Musk conceived of and offered the "deferred resignation program" to federal employees.

119.    This email purports to make binding spending commitments on behalf of the federal government.

120.    According to subsequent reporting, Mr. Musk and his team have exerted direct control over OPM and the "Fork in the Road" initiative. The email was sent out via a custom-built email system from Mr. Musk's team and was sent without consultation with other advisers to the President or OMB officials.[50]

---

[48] OPM, *Fork in the Road* (Jan. 28, 2025), at https://www.opm.gov/fork (last accessed Feb. 3, 2025).

[49] *Id.*

[50] Caleb Ecarma & Judd Legum, *Musk associates given unfettered access to private data of government employees,* MUSK WATCH (Feb. 3, 2025), at https://www.muskwatch.com/p/muskassociates-given-unfettered (last accessed Feb. 3, 2025).

ADD054

121.    It appears that OPM is now significantly controlled by Mr. Musk.[51] This authority over OPM, including its management of personnel, its funding decisions, programs, and systems, may only be exercised by a duly appointed officer.

### U.S. Department of Health and Human Services (HHS)

122.    HHS is a federal agency charged with enhancing the health and well-being of Americans. Of its 13 operating divisions, 10 are public health service agencies and three are human service agencies.

123.    Through these divisions, HHS oversees or operates more than 100 programs, including social services such as Temporary Assistance to Needy Families (TANF), HeadStart, and other childcare programs. HHS also offers health prevention and wellness programs and participates in national efforts to prepare for, respond to, and recover from disasters and public health emergencies. The agency also conducts and funds health-related research.

124.    One critical division of HHS is the Center for Medicare and Medicaid Services (CMS).  CMS is responsible for overseeing critical entitlement programs providing health coverage for many older, disabled, or low-income enrollees. It serves more than 160 million enrollees across Medicare, Medicaid, CHIP, and the Health Insurance Marketplace. CMS spends about $1.5 trillion yearly, which is about 22% of all federal healthcare spending.

125.    Another critical division within HHS is the Centers for Disease Control (CDC), the nation's leading science-based, data-driven service organization protecting the public's health.

126.    Several of HHS's operating divisions maintain personally identifiable data for large numbers of individuals.

---

[51] Jeff Stein et al., *In Chaotic Washington Blitz, Elon Musk's Ultimate Goal Becomes Clear*, WASH. POST (Feb. 8, 2025).

ADD055

127.    On February 5, 2025, the Wall Street Journal reported that DOGE representatives had "access to key payment and contracting systems" at CMS.[52]

128.    CMS confirmed the reports of DOGE access as well. On February 5, 2025, it put out a press release stating that two "Agency veterans" were leading the collaboration with DOGE, including ensuring appropriate access to CMS systems and technology."[53]

129.    Bloomberg reported that DOGE "gained access to payment and contracting systems."[54] Because much of Medicare is administered through employers, contracts contain key information about Medicare's functioning.

130.    Reportedly, DOGE personnel also visited the CDC in Atlanta, requesting "lists of new employees and employees who are still on probation."[55] It is unclear why DOGE would need these lists except to select employees to fire. But DOGE personnel do not have the legal authority to fire CDC employees.

131.    This kind of authority over the HHS, including its management of personnel, its funding decisions, and systems, may only be exercised by a duly appointed officer.

---

[52] Anna Wild Mathews & Liz Essley Whyte, *DOGE Aides Search Medicare Agency Payment Systems for Fraud,* (Feb. 5, 2025), https://www.wsj.com/politics/elon-musk-doge-medicare-medicaid-fraud-e697b162.

[53] Centers for Medicare & Medicaid Servs., Press Release, CMS Statement on Collaboration with DOGE, https://www.cms.gov/newsroom/press-releases/cms-statement-collaboration-doge (Feb. 5, 2025).

[54] Riley Griffin & Madison Muller, *Musk's DOGE Team Mines for Fraud at Medicare, Medicaid*, BLOOMBERG (Feb. 5, 2025), https://www.bloomberg.com/news/articles/2025-02-05/musk-s-doge-team-mines-for-fraud-at-medicare-and-medicaid.agency.

[55] Joyce Lupiani, *Elon Musk's DOGE Team Visits CDC in Atlanta, Reports Say*, FOX 5 ATLANTA (Feb. 6, 2025), https://www.fox5atlanta.com/news/elon-musks-doge-team-visits-cdc-atlanta-reports-say.

132.    Plaintiff States stand to suffer immediate harm from this unauthorized access. The States receive funding and programming support from HHS. *See, e.g.,* Chapman-See Decl. ¶ 11 (outlining $16,313,304,384 in federal grant funds received by the State of Washington in FY 2024 from HHS).

133.    Moreover, threats to CDC and other programs that protect public health pose a threat to state residents.[56]   As the experience of COVID-19 shows, disease outbreaks impose significant harms and costs on states, inflicting classic pocketbook injuries. And public health threats to residents inflicted by federal actions infringe the state's sovereign interests. *See Massachusetts v. EPA*, 549 U.S. 497, 518, 520 (2007).

### U.S. Department of Energy (DOE)

134.    DOE advances the energy, environmental, and nuclear security of the United States. It promotes scientific and technological innovation and manages the environmental cleanup of the nuclear weapons complex. DOE is the largest federal sponsor of basic research in the physical sciences, including in Plaintiff States' public universities. *See* Chapman-See Decl. ¶ 12.

135.    DOE also operates the State Energy Program, which "provides resources directly to the states for allocation by the governor-designated State Energy Offices for use in efficiency, renewable, and alternative energy demonstration activities." The State Energy Program provides $50 million to states annually.

136.    A particularly critical division within the DOE is the National Nuclear Security Administration. The NNSA maintains the nuclear weapons stockpile, provides the Navy with

---

[56] Pien Huang & Will Stone, *Morale Plummets At The CDC As Staff Fear Job Losses*, NPR (Feb. 7, 2025), https://www.npr.org/sections/shots-health-news/2025/02/07/nx-s1-5290273/cdc-employee-lists-doge ("Losing even half of these workers would be "devastating" for the agency's current disease outbreak responses, which includes H5N1 bird flu, measles and mpox.").

nuclear propulsion, and responds to nuclear emergencies around the world.[57] Its computer systems carry some of the most critical, confidential information in our nation, including information regarding nuclear weapons.

137.    On February 5, 2025, DOGE representative Luke Farritor (Farritor), a former SpaceX intern, received access to the DOE's IT system. The move was opposed by the DOE's general counsel's office and chief information office, in part because Farritor lacked a security clearance.[58]

138.    Two days later, a different DOGE representative, Ryan Riedel, was installed as the DOE's chief information officer. According to officials within the DOE, "DOGE members will have access to computer drives and human resource systems, data on grants and loans on energy projects and financial management systems."[59]

139.    This authority over DOE, including its management of personnel, its funding decisions, programs, and systems, may only be exercised by a duly appointed officer.

140.    Plaintiff States stand to suffer immediate harm from these actions, both because of their public universities' relationship with the DOE as grantees, *see, e.g.*, Chapman-See Decl. ¶ 12 (outlining $82,949,065 in funds received in FY2024 to facilitate approximately 100 federal grant programs), and because any increased risks to nuclear safety pose a clear danger to their

---

[57] U.S. Dep't of Energy, NNSA, About NNSA, https://www.energy.gov/nnsa/about-nnsa (last visited Feb. 7, 2025).

[58] Ella Nilsen & Sean Lyngaas, *Trump Energy Secretary Allowed 23-Year-Old DOGE Rep to Access IT Systems Over Objections From General Counsel*, CNN (Feb. 7, 2025), https://www.cnn.com/2025/02/06/climate/doge-energy-department-trump/index.html.

[59] Timothy Gardner, *Three DOGE Members Raise Access Concerns at U.S. Energy Department, Sources Say*, REUTERS, (Feb. 7, 2025), https://www.reuters.com/world/us/three-doge-members-raise-access-concerns-us-energy-department-sources-say-2025-02-07/.

ADD058

sovereign interests. *See Massachusetts*, 549 U.S. at 518, 520 (2007) (states receive "special solicitude" in standing analysis where federal action poses a threat to "sovereign territory" or "the earth and air within" a state's domain).

141.    Control over or access to the DOE's IT systems poses more mundane threats as well. Payments to states under the State Energy Program must be certified by the agency before BFS can process them. A failure in the DOE's IT systems or a decision using those systems not to fund the Program would immediately endanger Plaintiffs' ability to provide energy security for their residents and would force Plaintiffs to divert resources currently used for other things.

## **Consumer Financial Protection Bureau (CFPB)**

142.    Congress created the CFPB after the great recession of 2007-08. Congress assigned the CFPB the mission of supporting and protecting American consumers in the financial marketplace. To fulfill its statutory mission, CFPB monitors financial markets for risks to consumers; enforces consumer finance law; investigates consumer complaints; and writes rules to protect consumers from unfair, deceptive, or abusive practices in the financial sector.[60]

143.    In recent years, CFPB has issued rules to protect Americans from medical debt, expand their access to banking services, and crack down on financial institutions that levy high fees on customers, resulting in more than $21 billion returned to taxpayers.

144.    CFPB's rules assist the Plaintiff States in enforcing their own consumer protection laws.

145.    CFPB's investigative work can be highly sensitive, including extraordinary access to a bank's communications, customer records, and other nonpublic data.

---

[60] Pub. L. 111–203 (2010), https://www.consumerfinance.gov/about-us/the-bureau/.

146.    On Friday, February 7, 2025, Mr. Musk's aides set up shop in a conference room at CFPB's headquarters and began their review of the agency, accessing and parsing its sensitive personnel and financial records.[61]  Hours later that afternoon, Mr. Musk tweeted "CFBP RIP."[62]

147.    That night, CFPB's website, consumerfinance.gov, was no longer working and remains down.

148.    Just three days later, all CFPB employees were told to "[s]tand down from performing any work task" and "[e]mployees should not come into the office," by the agency's acting Director Russell Vought.[63]

149.    If allowed to continue, Defendants' assault on the CFPB will harm the Plaintiff States by requiring them to invest far greater resources and personnel to protect their citizens.  As just one example, CFPB is co-Plaintiff with the State of Minnesota in two consumer cases but is no longer taking an active role, requiring the State of Minnesota to devote additional resources to the litigation.

150.    This authority over CFPB, including its management of personnel, its funding decisions, programs, and systems, may only be exercised by a duly appointed officer.

## U.S. Department of Defense (Defense Department)

---

[61] *See* Tony Room, *DOGE targets Consumer Financial Protection Bureau as Musk tweets 'RIP'*, WASH. POST (Feb. 7, 2025).

[62]    Elon    Musk    (@Elon    Musk),    X    (Feb.    7,    2025), https://x.com/elonmusk/status/1887979940269666769.

[63] *See* Stacey Cowley, *Confusion Reigns as 'a Wrecking Ball Hits the Consumer Bureau*," (Feb. 10, 2025), https://www.nytimes.com/2025/02/10/business/cfpb-shutdown-confusion.html.

151.    On Friday, February 7, 2025, President Trump stated that he had "instructed [Mr. Musk] . . . to check out the Pentagon."[64] He added that Mr. Musk would be going through "just about everything" at the Defense Department.

152.    The Defense Department has billions of dollars in contracts with Mr. Musk through SpaceX and other companies he owns. The Defense Department relies on SpaceX to get most of its satellites into orbit and works closely with his companies on a variety of other initiatives.

153.    This authority over the Defense Department, including its contracts, management of personnel, its funding decisions, programs, and systems, may only be exercised by a duly appointed officer.

### U.S. General Services Administration (GSA)

154.    The GSA is the central procurement agency for the Federal Government. Among many other services, it acquires real estate for office space, provides vehicles for governmental use, including non-tactical vehicles for the military, and supplies office space needs. Its 18F technology group assists government agencies in building and buying technology products and fixing technical problems.

155.    On January 27, 2025, only a week into the new administration, DOGE announced that it already had terminated three GSA leases as the "first steps" to "right size the federal real estate portfolio of more than 7,500 leases."[65]

156.    Mr. Musk claimed on X that he had "deleted" GSA's 18F technology group.[66]

---

[64] *See* Erica L. Green & Michael D. Shear, *Musk Wields Scythe on Federal Work Force, With Trump's Full Blessing*, N.Y. TIMES (Feb. 8, 2025).

[65] Department of Government Efficiency (@DOGE), X (Jan. 27, 2025), https://x.com/DOGE/status/1884015256957296917.

[66] Weslan Hansen, *DOGE Chief Claims to 'Delete' GSA's 18F Tech Group*, MERITALK (Feb. 4, 2025), https://www.meritalk.com/articles/doge-chief-claims-to-delete-gsas-18f-tech-group/.

157.   According to news reports, Mr. Musk and DOGE have "taken over the Office of Personnel Management and the General Services Administration along with their computer systems."[67]

158.   DOGE has been interviewing GSA employees, "frequently with almost no notice and often scheduled over existing client meetings." Employees "fear that, based on the brief interaction, their job is on the line." The DOGE questions led GSA staffers to believe the group was looking to cull employees.[68]

159.   DOGE is assisting with the development of a chatbot called GSAi to "increase worker productivity" and have proposed other AI tools to scrub contracts for redundancies and streamline processes.[69]

160.   DOGE workers said they plan to automate a majority of GSA jobs, and Mr. Musk plans to liquidate as much as half of the federal government's nonmilitary real estate holdings.[70]

161.   This kind of authority over the GSA, including its contracts, management of personnel, its funding decisions, programs, and systems, may only be exercised by a duly appointed officer.

162.   Haphazard cuts in personnel that cause service outages at GSA — even relatively brief ones — could be disastrous for the States and citizens who use GSA services. GSA operates

---

[67] Tom Hals & Jack Queen, *Is Elon Musk's Government Efficiency Drive Legal?* , REUTER (Feb. 5, 2025),       https://www.reuters.com/world/us/is-elon-musks-government-efficiency-drive-legal-2025-02-05/.

[68] Danny Nguyen, 'Anxiety provoking': Government workers describe their DOGE interviews, POLITICO (Feb. 12, 2025), https://www.politico.com/news/2025/02/12/government-workers-doge-interviews-016214.

[69] *Id.*

[70] Jeff Stein et al., *In Chaotic Washington Blitz, Elon Musk's Ultimate Goal Becomes Clear*, WASH. POST (Feb. 8, 2025).

Login.gov, the central login system for Medicare, Medicaid, Social Security and other public assistance lifelines.[71]

### U.S. Department of Education (ED)

163.    The Department of Education provides critical services to the country. Although education is primarily a state and local responsibility, ED operates several important programs, including those that provide funding for low-income schools, special education, and financial aid for college students.

164.    As of February 4, 2025, DOGE personnel have gained access to ED's student loan database.[72]

165.    As of February 7, 2025, several DOGE personnel were working out of the undersecretary's office on the seventh floor of ED's headquarters. Staff members have been told little about the group, which has been spotted in hallways and rummaging through boxes.  This group of DOGE personnel does not interact at all with anyone who is not part of their team.[73]

166.    The highest-ranking officials at ED — even those recently appointed by President Donald Trump — were pushed out of their own offices.  DOGE personnel even rearranged the furniture and set up white noise machines to muffle their voices.[74]

---

[71] Danny Nguyen, 'Anxiety provoking': Government workers describe their DOGE interviews, POLITICO (Feb. 12, 2025), https://www.politico.com/news/2025/02/12/government-workers-doge-interviews-016214.

[72] Jeff Stein et al., *U.S. Government Officials Privately Warn Musk's Blitz Appears Illegal,* WASH. POST (Feb. 4, 2025), https://www.washingtonpost.com/business/2025/02/04/elon-musk-government-legal-doge/.

[73] *See* Collin Binkley & Bianca Vázquez Toness, *Musk Team's Access To Student Loan Systems Raises Alarm Over Borrowers' Personal Information*, AP (Feb. 7, 2025), https://apnews.com/article/education-department-trump-doge-8c5bba3883b3d924b28114a4f291bec4.

[74] Annie Nova, How Elon Musk's DOGE took over the Education Department, one office at a time, CNBC (Feb. 12, 2025), https://www.cnbc.com/2025/02/12/trump-doge-education-elon-musk-cuts.html.

167.    DOGE personnel have obtained administrator-level electronic accounts at ED, allowing them to access sensitive information.[75] Upon information and belief, the two DOGE personnel with administrator-level status have no familiarity with ED's inner workings prior to this time. One of them has accessed the back end of the Department of Education website. It is highly unusual for anyone from another government agency to obtain such access.

168.    On February 7, 2025, Mr. Musk tweeted, "What is this 'Department of Education' you keep talking about?  I just checked and it doesn't exist."[76]

169.    At a press conference that day, Trump said that he had "instructed" Mr. Musk to "go check out Education" and that Mr. Musk "will be looking at education pretty quickly."[77]

170.    As promised, DOGE announced three days later that the Agency had 'terminated 89 contracts worth $881mm," and another 29 DEI training grants totaling $101mm.[78] Eliminating the agreements effectively halted the work of the Institute of Education Sciences, the arm of ED responsible for gathering information about students and schools nationwide.[79]

171.    This kind of authority over ED, including its management of personnel, its contracts, its funding decisions, programs, and systems, may only be exercised by a duly appointed officer.

---

[75] Tyler Kingkade & Natasha Korecki, *Inside DOGE's takeover of the Education Department,* NBC NEWS (Feb. 8, 2025).
[76]    Elon    Musk    (@Elon    Musk),    X    (Feb.    7,    2025), https://x.com/elonmusk/status/1888038615780909178.
[77] *See* Erica L. Green & Michael D. Shear, *Musk Wields Scythe on Federal Work Force, With Trump's Full Blessing*, N.Y. TIMES (Feb. 8, 2025).
[78]    Department    of    Government    Efficiency    (@DOGE),    X    (Feb.    10,    2025), https://x.com/DOGE/status/1889113011282907434.
[79] Zachary Schermele, DOGE slashes millions from Education Department research, USA TODAY (Feb.    11,    2025),    https://www.usatoday.com/story/news/education/2025/02/11/doge-musk-education-department-research/78411180007/.

172.    States, school districts, and public universities rely on ED's funding and personnel. *See* Padilla Decl. ¶¶ 8(a)-(e) (identifying $1,879,210,362 in grants to New Mexico alone); Chapman Decl. ¶14 (outlining $2,493,055,346 in funding to the state of Washington for federal programs in FY2024).

173.    Title I grants provide supplemental education funding to school districts and charter schools, especially those with high rates of poverty. *See* Padilla Decl. ¶ 8(a). These funds serve an estimated 26 million students in nearly 90% of school districts and nearly 60% of all public schools and are critical to closing the funding gaps between schools in communities with high rates of poverty and their wealthier counterparts.  In fiscal year 2024, Title I provided over $18 billion in funding. *See* Padilla Decl. ¶ 8(a) (identifying $146,145,066 in grant awards to New Mexico alone).[80]

174.    The Individuals with Disabilities Education Act (IDEA) provides formula grants to help states pay the additional cost of providing special education and related services to children with disabilities. *See* Padilla Decl. ¶8(d).  In fiscal year 2024, IDEA provided over $14 billion in grants to states. *See* Padilla Decl. ¶ 8(d) (identifying $109,028,430 in grant awards to New Mexico alone).[81]

175.    Each year, ED awards financial aid to approximately 13 million students.[82]  ED's student loan database contains highly sensitive information about these borrowers, including their

---

[80]    *See* Department of Education, Fiscal Year 2025 Budget Summary at 15, www.ed.gov/sites/ed/files/about/overview/budget/budget25/summary/25summary.pdf.

[81]    Department of Education, Fiscal Year 2025 Budget Summary at 28, www.ed.gov/sites/ed/files/about/overview/budget/budget25/summary/25summary.pdf;

[82]    *See* Department of Education, Federal Student Aid, https://www.ed.gov/about/ed-offices/fsa/federal-student-aid.

ADD065

Social Security number, date of birth, student loan account information, contact information, driver's license number, and financial information throughout the student aid lifecycle.[83]

### U.S. Department of Labor  (DOL)

176.    On February 4, 2025, Department of Labor leadership reportedly told its employees that USDS would be accessing the DOL headquarters around 4 p.m. on February 5, 2024.

177.    A journalist shared on social media that her sources told her that "DOGE is going after the DOL next. DOL workers have been ordered to give DOGE access to anything they want- or risk termination."[84] This included providing access to any requested DOL system without regard to security protocols.

178.    Upon information and belief, DOL leadership told employees that when Mr. Musk and his team visit the DOL, they are to do whatever they ask, not to push back, not to ask questions. They were told to provide access to any DOL system they requested access to and not to worry about any security protocols; just do it. Based on leadership's statements, the employee believed they could face termination if they did not comply.[85]

179.    The States rely on DOL for funding, resources, and personnel.  *See* Decl. Nair, ¶¶ 8-17; ¶ 23.

180.    This kind of authority over the DOL, including its management of personnel, its funding decisions, programs, and systems, may only be exercised by a duly appointed officer.

### U.S. Department of Transportation (DOT)

---

[83]    *See* Department of Education, Privacy Policy for StudentAid.gov, https://studentaid.gov/notices/privacy.

[84] 2 Kim Kelly (@GrimKim), X (Feb. 4, 2025, 5:04 PM ET), https://x.com/GrimKim/status/1886898588099240401.

[85]    Affidavit from Rushab Sanghvi, https://storage.courtlistener.com/recap/gov.uscourts.dcd.277150/gov.uscourts.dcd.277150.1.0_2. pdf.

181.    The Department of Transportation plans and coordinates federal transportation projects and sets safety regulations for major modes of transportation, including air travel, which is regulated by the Federal Aviation Administration (FAA).

182.    The FAA provides air traffic control service for "more than 45,000 flights and 2.9 million airline passengers traveling across the more than 29 million square miles that make up the U.S. national airspace system."[86]

183.    On Wednesday, February 5, Mr. Musk posted on X: "With the support of President [Trump], the @DOGE team will aim to make rapid safety upgrades to the air traffic control system." Secretary of Transportation Sean Duffy confirmed that Mr. Musk and his team will "plug in to help upgrade our aviation system" and "remake our airspace . . . quickly."[87]

184.    The systems involved in air traffic control are immense and complex. "A single program run by the FAA to help air-traffic controllers, En Route Automation Modernization, contains nearly 2 million lines of code; an average iPhone app, for comparison, has about 50,000."[88] The consequences of changes in these systems could be catastrophic: "In the FAA, even a small systems disruption could cause mass grounding of flights, a halt in global shipping, or worse, downed planes."[89]

---

[86] Federal Aviation Administration, National Airspace System (last updated April 20, 2023), https://www.faa.gov/air_traffic/nas.

[87]  Jason Lalljee, *Musk Sets Sights on Aviation Reform*, AXIOS (Feb. 5, 2025), https://www.axios.com/2025/02/05/dc-plane-crash-musk-doge ; *see also* Secretary Sean Duffy (@SecDuffy), X (Feb.5, 2025), https://x.com/SecDuffy/status/1887209012867047525.

[88] Charlie Warzel & Ian Bogost, *The Government's Computing Experts Say They Are Terrified*, THE ATLANTIC (Feb. 7, 2025), https://www.theatlantic.com/technology/archive/2025/02/elon-musk-doge-security/681600/.

[89] *Id.*

185.    Thus, Mr. Musk is planning to make—and may have already started to make—rapid-fire changes to FAA systems and processes, potentially without the subject matter expertise, testing, coordination, and oversight ordinarily required.

186.    Further, Mr. Musk now has, or will imminently have, access to FAA systems, although the FAA oversees SpaceX's operations in commercial airspace and Mr. Musk previously threatened to sue the FAA for "regulatory overreach" when it did not approve launch licenses quick enough for SpaceX.[90]

187.    This kind of authority over the FAA, including its management of personnel, its funding decisions, programs, and systems, may only be exercised by a duly appointed officer.

### National Oceanic and Atmospheric Administration (NOAA)

188.    The NOAA provides critical information to state governments, including information about weather, severe storms, wildfires, tornados, hurricanes, and coastal flooding.

189.    DOGE has been investigating NOAA.  Former NOAA officials said that DOGE staffers visited NOAA headquarters in Silver Spring, Md., and the Hoover Building in Washington, D.C., the location of NOAA's parent agency, the U.S. Department of Commerce. The agency has been told it should expect to lose half of its 13,000 employees and to prepare for 30% budget cuts.[91]

---

[90]    Elon    Musk    (@Elon    Musk),    X    (Feb.    5,    2025),    https://x.com/elon musk/status/1887233566263967812 ("Just a few days ago, the FAA's primary aircraft safety notification system failed for several hours!").

[91] Laura Geller & Tracy J. Wholf, *Democrats Concerned DOGE Is Targeting NOAA, Sources Say*, CBS NEWS (Feb. 5, 2025).

190.    DOGE has also accessed NOAA IT systems. As of February 5, 2025, several key NOAA websites were down. [92]

191.    The National Marine Fisheries Service, a division of the NOAA, received an emailed order to halt "ALL INTERNATIONAL ENGAGEMENTS."[93] The order includes all participation with international agencies and emails "with foreign national colleagues."

192.    DOGE-affiliated personnel Nikhil Rajpal was also given edit access to the NOAA's documents after an alleged order came from acting Commerce Secretary Jeremy Pelter. Rajpal previously worked at Tesla and Twitter.

193.    This authority over the NOAA, including its management of personnel, its funding decisions, programs, and systems, may only be exercised by a duly appointed officer.

### Federal Emergency Management Agency (FEMA)

194.    On February 9, 2025, Homeland Security Secretary Kristi Noem acknowledged that DOGE has access to FEMA's data, including that of federal disaster aid recipients' personal information, as part of an "audit."[94]

195.    On February 9, Mr. Musk tweeted that "FEMA is broken."[95] On February 10, Mr. Musk tweeted that DOGE had discovered that FEMA spent nearly $60 million housing migrants

---

[92] ABC Climate Unit, *DOGE Now Has Access To NOAA's IT Systems; Reviewing DEI Program, Sources Say*, ABC NEWS (Feb. 5, 2025), https://www.kron4.com/hill-politics/democrats-accuse-doge-of-going-after-noaa/amp/.

[93] Dell Cameron, *NOAA Employees Told to Pause Work with 'Foreign Nationals,'* WIRED (Feb. 5, 2025).

[94] Aileen Graef & Veronica Stracqualursi, *DOGE Team Has Access To FEMA Private Information On Those Who Received Disaster Relief Grants*, ACTION NEWS NOW (Feb. 9, 2025), https://www.actionnewsnow.com/news/doge-team-has-access-to-fema-private-information-on-those-who-received-disaster-relief-grants/article_9f408dd9-cffd-57ae-ab33-17b5e6d450a5.html

[95] Elon Musk (@Elon Musk), X (Feb. 9, 2025), https://x.com/elonmusk/status/1888488867809956267.

in what he alleged were "luxury" New York City hotels. He wrote that the money "violated the law" and that "a clawback demand will be made today to recoup those funds."[96]

196.    That day, four FEMA officials were fired. FEMA's acting administrator, Cameron Hamilton, stated that the payments were suspended and that personnel "will be held accountable."[97]

197.    This authority over the FEMA, including its management of personnel, its funding decisions, and systems, may only be exercised by a duly appointed officer.

### Small Business Administration

198.    Mr. Musk and DOGE have gained access to all systems of the Small Business Administration—including HR, contracts, and business systems—which supported more than 100,000 financings to small businesses last year alone.[98]

199.    This authority over the Small Business Administration, including its personnel, data, funding decisions, and technological infrastructure, may only be exercised by a duly appointed officer.

### C.    Mr. Musk Has Engaged in Conduct That Exceeds the Authority Historically Recognized As Belonging to an Officer.

---

[96]    Elon    Musk    (@Elon    Musk),    X    (Feb.    10,    2025), https://x.com/elonmusk/status/1888891512303263815.

[97] Antonio Pequeno IV, *Four FEMA Officials Fired After Musk's DOGE Claims Agency Funded Migrant    Housing    In    'Luxury'    Hotels*    (Feb.    11,    2025), http://forbes.com/sites/antoniopequenoiv/2025/02/11/four-fema-officials-fired-after-musks-doge-claims-agency-funded-migrant-housing-in-luxury-hotels/.

[98] Nicole Narea, *Elon Musk's Secretive Government IT Takeover, Explained*, Vox (Feb. 5, 2025), https://www.vox.com/politics/398366/musk-doge-treasury-sba-opm-budget; Bobby Allyn & Shannon Bond, *Elon Musk Is Barreling into Government with DOGE, Raising Unusual Legal Questions,* NPR (Feb. 3, 2025), https://www.npr.org/2025/02/03/nx-s1-5285539/doge-musk-usaid-trump.

200.    The exercise of significant authority associated with officers of the United States includes the authority to receive, oversee, or disburse public funds, authority over contracts, the power to determine the use of and access to government property, and the power to issue regulations.  Mr. Musk has asserted or promised to assert all these forms of significant authority, and more, through his widespread actions across the Executive Branch, both within and between agencies.

### Controlling Expenditures and Disbursements of Public Funds

201.    Under the banner of improving efficiency, cutting waste, and rooting out fraud, Mr. Musk and DOGE have assumed and exercised authority over public funds held by the federal government.

202.    Mr. Musk announced his intent to use DOGE to take control of federal spending and reduce it by $2 trillion and to drastically downsize the federal government.[99] It is doubtful that *any* officer in the Executive Branch has the power to do so, let alone a non-confirmed government employee.

### Terminating Federal Contracts and Exercising Control over Federal Property

203.    DOGE has expressly indicated that it intends to eliminate every contract not essential to operations or required by law, over objection from agency officials.

---

[99] Jonathan Schwabish, *The Implications of Shrinking the Federal Workforce by DOGE's Recommended 75 Percent*, URBAN INSTITUTE (Jan. 20, 2025), https://www.urban.org/urban-wire/implications-shrinking-federal-workforce-doges-recommended-75-percent; Madeliene Ngo and David A. Fahrenhold, *Musk Wants to Slash $2 Trillion in Federal Spending. Is That Possible?*, N.Y. TIMES (Nov. 16, 2024), https://www.bloomberg.com/news/videos/2024-10-28/elon-musk-we-can-cut-2-trillion-from-us-budget-video.

ADD071

204.    Federal employees have reported that "DOGE teams don't tell department staffers which contracts they need to cancel."[100]

205.    On January 31, 2025, DOGE said in a post on X that it had eliminated 104 contracts related to diversity, equity, inclusion and accessibility (DEIA) at more than a dozen federal agencies.[101]

206.    On February 3, DOGE wrote in a post on X that it had canceled twenty-two leases in the past six days.[102] DOGE also posted that it had canceled thirty-six contracts across six agencies to cut federal expenditures.[103]

207.    DOGE wrote on February 4 that it canceled twelve contracts in the GSA and the Department of Education.[104]

208.    DOGE posted on its X account on February 7, 2025, that "coordination across 35 agencies over the last two days" had resulted in cuts of $250 million through the termination of 199 contracts.[105]

209.    Mr. Musk and DOGE have made clear that they will continue to eliminate federal contracts.

---

[100] Annie Nova, How Elon Musk's DOGE took over the Education Department, one office at a time, CNBC (Feb. 12, 2025), https://www.cnbc.com/2025/02/12/trump-doge-education-elon-musk-cuts.html.

[101] Department of Government Efficiency (@DOGE), X (Jan. 31, 2025), https://x.com/DOGE/status/1885420298138247458

[102] Department of Government Efficiency (@DOGE), X (Feb. 3, 2025), https://x.com/DOGE/status/1886273522214813785

[103] Department of Government Efficiency (@DOGE), X (Feb. 3, 2025), https://x.com/DOGE/status/1886578681805504608.

[104] Department of Government Efficiency (@DOGE), X (Feb. 4, 2025), https://x.com/DOGE/status/1886982858369020330.

[105] Department of Government Efficiency (@DOGE), X (Feb. 7, 2025), https://x.com/DOGE/status/1888046273543979183

210.    Among the cuts sought by the DOGE team is an 80% reduction in spending on a contract to manage websites and call center technology that parents and students use for help applying for federal student aid. There are two years remaining on an $824 million contract with information technology services company Accenture for the work.[106]

211.    DOGE also plans to sell government real estate holdings at GSA.

## Binding the Government to Future Financial Commitments Without Congressional Authorization

212.    Through the "Fork in the Road" initiative, Mr. Musk has committed to severance packages through September.

### Eliminating Agency Regulations and Entire Agencies and Departments

213.    Mr. Musk has made clear that he plans to embark on a massive and unprecedented deregulation project by rescinding thousands of agency regulations.

214.    Mr. Musk has publicly remarked that "regulations, basically, should be default gone" and has promised a "wholesale removal of regulations."[107]

---

[106] Collin Binkley & Bianca Vazquez Toness, *Musk team's access to student loan systems raises alarm over borrowers' personal information*, AP NEWS (Feb. 7, 2025), https://apnews.com/article/education-department-trump-doge-8c5bba3883b3d924b28114a4f291bec4

[107] Matt Shuham, *Elon Musk Suggests Getting Rid Of All Regulations In Midnight Call*, HUFFPOST (Feb. 3, 2025), https://www.yahoo.com/news/elon-musk-suggests-getting-rid-212557557.html (""These regulations are added willy-nilly all the time. So we've just got to do a wholesale, spring cleaning of regulation and get the government off the backs of everyday Americans so people can get things done.").

215.    Trump stated that Mr. Musk "will pave the way for my Administration to dismantle Government Bureaucracy, slash excess regulations, cut wasteful expenditures, and restructure Federal Agencies."[108]

216.    Mr. Musk has called for the elimination of entire federal organizations, such as the CFPB and USAID.[109]

217.    Again, it is doubtful that any one officer of the Executive Branch has the authority to engage make such cuts, let alone an unconfirmed government employee.

**Directing Action by Agencies**

218.    The Executive Order creating DOGE purports to create a hierarchy in which the DOGE Administrator answers to the White House Chief of Staff.

219.    However, public reporting makes clear that Mr. Musk is acting unsupervised by anyone and without advance consultation with President Trump or White House staff about his or DOGE's actions.

220.    Further, Trump is "not closely monitoring Mr. Musk's moves"; instead, he provides Mr. Musk unfettered discretion to take control of federal finances, agency operations, and sensitive information as he sees fit because he "views Mr. Musk as doing the task he assigned him."[110]

---

[108] Soo Rin Kim, *Some Ethics Experts Raise Concerns Over Musk and Ramaswamy's Department of Government Efficiency Roles*, ABC NEWS (Nov. 13, 2024), https://abcnews.go.com/US/ethics-experts-raise-concerns-musk-ramaswamys-department-government/story?id=115838961.
[109] Elon Musk (@Elon Musk), X (Nov. 27, 2024, 12:35 AM ET), https://x.com/elonmusk/status/1861644897490751865 (identifying the CFPB as an area of federal government to "delete"). Last week, Mr. Musk posted: "CFPB RIP."
[110] Isaac Arnsdorf & Jacqueline Alemany, *Trump, Musk wage two-front war as donor does president's 'dirty work'*, WASH. POST (Feb. 4, 2025), https://www.washingtonpost.com/politics/2025/02/03/trump-musk-president-role/.

ADD074

221.     Mr. Musk and his DOGE personnel have conducted their work by threatening, ignoring, and overriding any objections or concerns raised by agency heads and staff.  Federal employees have reported that they feel "afraid," "confused," and intimidated.[111]

222.     Constantly shifting demands from DOGE employees about how much funding they need to cut have left employees confused and afraid, two employees told CNBC.

223.     What's more, they said, the demands of DOGE teams appear to be arbitrary, and not rooted in any political or policy goals.

### Acting as a Principal Officer Unsupervised by Heads of Departments

224.     Mr. Musk is not subject to removal by any officer higher than himself as DOGE Administrator—only by President Trump.

225.     Mr. Musk's authority extends across all agencies in the Executive Branch in an unprecedented manner.

**D.     Defendants' Actions Have Harmed the Plaintiff States and Will Continue to Harm Them Unless Enjoined.**

226.     "[J]udicial review of an Appointments Clause claim will proceed even where any possible injury is radically attenuated." *Landry v. F.D.I.C.*, 204 F.3d 1125, 1131 (D.C. Cir. 2000); *see also Lofstad v. Raimondo*, 117 F.4th 493, 497 (3rd Cir. 2024) ("A litigant need not show direct harm or prejudice caused by an Appointments Clause violation . . . Such harm is presumed" (citing *Cirko v. Comm'r of Soc. Sec.*, 948 F.3d 148, 154 (3rd Cir. 2020)).

227.     Here, however, Mr. Musk's unlawful assault on the federal government has directly harmed the Plaintiff States.  Mr. Musk has interfered with funding that goes directly to the Plaintiff

---

[111] Annie Nova, How Elon Musk's DOGE took over the Education Department, one office at a time, CNBC (Feb. 12, 2025), https://www.cnbc.com/2025/02/12/trump-doge-education-elon-musk-cuts.html.

ADD075

States and stated his intent to continue interfering with such funding. That amounts to a classic pocketbook injury.

228.    Defendants have also unlawfully accessed financial data, including of the Plaintiff States, and exposed that data to cybersecurity risks.

**Financial and Programmatic Harms to States**

229.    The federal government disburses billions of dollars directly to the States, to support law enforcement, health care, education, and many other programs. *See, e.g.*, Gilliam Decl. ¶ 7 ("Federal funding comprises 42% of the New Mexico Environment Department's budget."); Chang Decl. ¶ 8 (noting that New Mexico's Abandoned Mine Lands Program is fully federally funded and its Coal Mine Reclamation Program is 79% federally funded); Henerson Decl. ("In FY 2025, the State of Arizona is slated to receive more than $30 billion in federal funding" for a huge array of State agencies."). In fiscal year 2022, 36.4% of state revenue came from federal dollars.[112]

230.    Defendants have attempted to use their unlawful control of federal agencies to stop many such payments, and they have expressed their intent to continue and expand those efforts.

231.    For example, Defendants have halted payments from USAID to public universities, including in the Plaintiff States, *see* Brunell Decl. ¶¶ 3-8; stated that they intend to use Treasury's BFS system to halt payments to innumerable recipients, including the Plaintiff States; and stated that they intend to destroy the U.S. Department of Education, which provides billions of dollars in funding to the Plaintiff States.

---

[112] Rebecca Thiess, Kate Watkins & Justin Theal, *Record Federal Grants to States Keep Federal Share of State Budgets High*, Pew (Sept. 10, 2024), https://www.pewtrusts.org/en/research-and-analysis/articles/2024/09/10/record-federal-grants-to-states-keep-federal-share-of-state-budgets-high.

232.    Mr. Musk has also stated that he intends to "delete" the CFPB.  The destruction of CFPB, the U.S. Department of Education, or other agencies would place unanticipated financial and resource constraints on Plaintiff States.

233.    For example, CFPB's investigations into and enforcement of consumer protection laws benefits residents of Plaintiff States. With the cessation of CFPB operations, state consumer protection agencies and other enforcement authorities will likely face an increase in complaints and requests for assistance, resulting in the need to invest greater resources and personnel to protect their citizens.  *See supra* ¶ 145.

234.    Since its formation in 2011, the CFPB has shouldered a massive burden for Plaintiff States by regulating and enforcing consumer protection laws against industries that exploit financially vulnerable consumers, including payday lenders, mortgage servicers, foreclosure relief services, and debt collectors. These industries already account for a substantial percentage of all complaints Plaintiff States receive each year. Complaints will increase dramatically if the CFPB ceases enforcement of the Consumer Financial Protection Act and abandons the CFPB-prescribed rules that bring uniformity to the information financial institutions and debt collectors must provide to consumers.

235.    The CFPB also produces educational resources that aid consumers with questions or issues related to finances, a burden Plaintiff States will bear if the CFPB halts operations. Further, the CFPB operates a unique victims fund that has provided more $3.3 billion in restitution to 6.7 million consumers harmed by insolvent businesses, a cost the states cannot possibly bear.

236.    Likewise, the U.S. Department of Education Office of Civil Rights (OCR) has jurisdiction over areas that state civil rights offices may not. For example, some state civil rights offices do not have clear jurisdiction over public schools under state statutes prohibiting

ADD077

discrimination against people with disabilities. Without OCR, discrimination against students with disabilities in public schools (e.g., with respect to Individualized Education Programs (IEPs), protections under Section 504 of the Rehabilitation Act of 1973, like prohibitions against seclusion and restraint) will go without investigation or oversight by a government entity. The public will then turn to state civil rights offices, which will have to spend time and resources to review the cases to determine jurisdiction.

237.    Plaintiff States operate numerous programs through federal-state partnerships and contracts, whereby the two parties collectively oversee and administer programs that serve both the States themselves and their citizens.[113] For example, New Mexico's Department of Workforce Solutions has approximately 85 contracts with the federal government.  *See* Declaration of Sarita Nair, ¶¶ 8-17; ¶ 23

238.    If the federal government ceases to fulfill its obligations under these agreements, Plaintiff States will incur greater financial costs and strain on personnel and other resources to compensate for the lost federal funding and staffing needed to administer and operate these programs, or else cut them entirely.  *See, e.g.*, Henderson Decl. ¶¶ 3-4, 10-11; Gilliam Decl. ¶¶ 9-11; Padilla Decl. ¶¶ 9-12.

239.    Aside from cooperatively administered programs, many federal programs are overseen and operated entirely by states at the local level. Federal hiring freezes or workforce reductions can lead to understaffed federal agencies, causing delays and inefficiencies in program implementation. States may need to allocate additional resources to manage these programs effectively, adding to their financial burdens.  *See, e.g.*, Chang Decl. ¶¶ 3-11.

---

[113] Bridget Fahey, *Coordinated Rulemaking and Cooperative Federalism's Administrative Law*, 132 YALE L.J. 1320, 1323 (2023).

**Unauthorized Access to and Disclosure of the States' Private Data**

240.    Plaintiff States have a proprietary interest in maintaining the privacy and security of their financial and banking information that they have transmitted to federal agencies. *See TransUnion LLC v. Ramirez,* 594 U.S. 413, 424 (holding that "disclosure of private information" is a concrete harm "traditionally recognized as providing a basis for lawsuits in American courts.").

241.    Plaintiff States' bank account information and other sensitive financial data, such as taxpayer identification numbers, financial account numbers, are stored in the Bureau of the Fiscal Service ("BFS") payment systems within Treasury.

242.    Unauthorized access to State financial data jeopardizes the privacy and security of the States' data.

243.    Because the Federal Government is under constant threat of cyberattacks, increasing the number of people with access to secure systems and rewriting basic programs presents grave cybersecurity risks, including with respect to the Plaintiff States' data.

244.    Further, the rushed and reckless manipulation of federal agency data management and storage systems by people unfamiliar with agency systems creates opportunities for cyberhacking, jeopardizing national security and infrastructure controlled by agencies like DOT, DOD, and DOE.

245.    Defendants have also defied the strict cybersecurity controls for accessing federal networks, including by reportedly connecting personal devices to sensitive government systems[114] and ignoring information-security protocols.

---

[114] Letter from Senators to Susan Wiles, White House Chief of Staff Executive (Feb. 5, 2025), https://www.bennet.senate.gov/wp-content/uploads/2025/02/DOGE-Letter.pdf.

53

ADD079

246.    Agency employees have attempted to raise the alarm about this reckless conduct. Treasury's security contractor even flagged DOGE's conduct as an "insider threat."

247.    Mr. Musk and DOGE have already gained access to and altered IT networks for numerous agencies that are responsible for maintaining and protecting critical infrastructure and national safety, including the Department of Energy.

248.    Media reporting as of February 9, 2025, indicated that Mr. Musk and DOGE intended to access another secure Treasury database, the Central Accounting Reporting System (CARS) in the next few days. CARS was created to promote uniformity in accounting procedures across federal agencies to enable the federal government to better track financial transactions for the purpose of identifying potential national security risks.  The database is believed to be of interest to foreign intelligence agencies.  When government auditors have examined the system in the past, the Treasury has pushed for them to do it in secure environments or on the Fiscal Service's laptops.

249.    Thousands of citizens have contacted officials at Plaintiff States to voice their fears about Mr. Musk's and DOGE's unprecedented access to protected financial, personal, and other sensitive data. *See, e.g.*, Bush-Koleszar Decl. ¶¶ 4-7 (describing some of the more than 2,600 citizen letters detailing concerns about Mr. Musk and DOGE having unauthorized access to personal information held by federal agencies); Clinton Decl. ¶¶ 7-7-13 (describing some of the more than 1,600 citizen letters detailing same).

250.    Defendants' expanded access may cause a chilling effect on accessing or applying for state programs. Some state citizens have expressed reluctance to provide private information to the government due to fears about data security and data misuse, whether through pursuit of the DOGE agenda or the use of federal data for Mr. Musk's private ventures.

251.    On February 11, 2025, U.S. District Court Judge Paul A. Engelmayer issued an order amending a preliminary injunction entered on February 8, 2025, restraining Defendant President Trump, the Department of Treasury, and Treasury Secretary Scott Bessent from (a) granting access to "personally identifiable and/or confidential financial information of payees" to individuals other than "career employees with a need for access to perform their job duties within the BFS who have passed all background checks and security clearances and taken all information security training called for in federal statutes and Treasury Department regulations," (b) "granting access to all political appointees, special government employees, and government employees detailed from an agency outside the Treasury Department, to any Treasury Department payment record, payment systems, or any other data systems maintained by the Treasury Department containing personally identifiable information and/or confidential financial information of payees."

252.    Judge Engelmayer further ordered Defendant Trump, the Department of Treasury, and Secretary Bessent "to direct any person prohibited above from having access to such information, records and systems but who has had access to such information, records, and systems since January 20, 2025, to immediately destroy any and all copies of material downloaded." Order, at *3, *New York v. Trump*, 1:25-cv-01144-JAV (S.D.N.Y. Feb. 8, 2025).

ADD081

## CAUSES OF ACTION

### COUNT I

**Violation of the Appointments Clause of the U.S. Constitution**

**Against All Defendants**

253.    The Plaintiffs States incorporate the preceding allegations as if alleged herein.

254.    Mr. Musk is an "Officer[] of the United States." U.S. Const. art. II, § 2, cl. 2.

255.    Mr. Musk asserts significant and unprecedented authority in the Executive branch, including making decisions about spending, personnel, contracts, government property, regulations, and agency existence.  And he occupies a continuing position as part of the federal government.

256.    Mr. Musk takes actions that can only be taken by a nominated and confirmed principal officer of the United States.  But President Trump did not appoint Mr. Musk with the advice and consent of the Senate.

257.    Mr. Musk does not occupy an office created by law and has no authority to exercise the powers of a principal officer, or any other officer.

258.    Mr. Musk's actions violate Article II, Section 2 of the United States Constitution.

259.    Mr. Musk's actions, personally and through his oversight of DOGE and DOGE personnel, have harmed Plaintiff States.

260.    To remedy the Appointments Clause violation, the improperly appointed officer's challenged actions should be rendered invalid. *Ryder v. United States*, 515 U.S. 177 (1995); *Lucia v. SEC*, 585 U.S. 237 (2018); *Stern v. Marshall*, 564 U.S. 462 (2011); *Clinton v. City of New York*, 524 U.S. 417 (1998); *INS v. Chadha*, 462 U.S. 919 (1983).

### COUNT II

56

**Conduct in Excess of Statutory Authority**
**Against Defendants Mr. Musk, U.S. DOGE Service, and U.S. DOGE Temporary Service**
**Organization**

261.    The Plaintiffs States incorporate the preceding allegations as if alleged herein.

262.    DOGE has purported to exercise authority of its own, and not merely to have acted as an adviser to the President.

263.    "Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) (per curiam).

264.    Congress has not provided any authority to DOGE.

265.    The Constitution does not provide any authority to DOGE.

266.    The temporary organization statute, 5 U.S.C. § 3161, does not provide DOGE with the authority it has purported to exercise.

267.    That statute provides that a "temporary organization" is defined as an organization "established by law or Executive order for a specific period not in excess of three years for the purpose of performing a specific study or other project." 5 U.S.C. § 3161(a)(1) (emphasis added).

268.    There is no plausible definition of "project" that would include DOGE's attempt to remake the entire Executive Branch, as described above, or to destroy agencies, fire personnel, halt funding, or dispose of government property.

269.    That conclusion is supported by the major questions doctrine, under which courts "expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 117 (citation and quotation marks omitted).

ADD083

270.    When the executive branch purports to exercise such powers, "the question" is whether a statute (or the Constitution) "plainly authorizes" that action.  *Id.*

271.    The temporary organization statute, 5 U.S.C. § 3161, does not "plainly authorize" DOGE to remake the entire Executive Branch as described above, or to destroy agencies, fire personnel, halt funding, or dispose of government property.

272.    Accordingly, DOGE's conduct to that effect has been *ultra vires* and DOGE must be enjoined from any such further conduct.

<p style="text-align:center">**PRAYER FOR RELIEF**</p>

WHEREFORE, the Plaintiff States pray that this Court grant the following relief:

**A.    Injunctive Relief**

273.    Issue a temporary restraining order that immediately and temporarily, until such time as the Court may hear a motion for preliminary injunction, orders Mr. Musk to identify all ways in which any data obtained through unlawful agency access was used, including whether it was used to train any algorithmic models or create or obtain derivative data, orders Mr. Musk to destroy any copies or any derivative data from such unauthorized access in his or DOGE's possession, custody, or control, and bars Mr. Musk and DOGE from:

(a) ordering any change in the disbursement of public funds by agencies;

(b) extending offers on behalf of the United States that would bind the government to an appropriation that has not been authorized by law;

(c) cancelling government contracts;

(d) disposing of government property;

(e) ordering the rescission or amendment of regulations;

(f) making personnel decisions for agency employees;

(g) taking steps to dismantle agencies created by law or otherwise asserting control over such agencies, including, *e.g.*, placing employees on administrative leave;

<p style="text-align:center">58</p>

(h) accessing sensitive and confidential agency data, using agency data for other than its authorized purpose;

(i) altering agency data systems without authorization by law and without taking all appropriate protections against cybersecurity risks; or

(j) engaging in any other conduct that violates the Appointments Clause or exceeds statutory authority.

274.    Issue preliminary and permanent injunctions granting the same Relief as set forth in the preceding paragraph of this Complaint.

### B.    Declaratory Relief

275.    (1) Declare that Mr. Musk's officer-level governmental actions to date, including those of his subordinates and designees, are *ultra vires* and shall have no legal effect; and (2) declare that any future orders or directions by Mr. Musk or DOGE in the categories outlined in the Injunctive Relief section of this Prayer for Relief above are *ultra vires* and of no legal effect.

### A.  Other Relief

276.    Award the Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412.

277.    Award such other relief as this Court may deem just and proper.


Dated: Santa Fe, New Mexico
    February 14, 2025

Respectfully submitted,

RAÚL TORREZ
Attorney General of the State of New Mexico

By: /s/ *Anjana Samant*
Anjana Samant

Deputy Counsel

59

D.D.C. Bar No. 4267019
James Grayson*
Chief Deputy Attorney General
Steven Perfrement
Assistant Attorney General
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
jgrayson@nmdoj.gov
asamant@nmdoj.gov
SPerfrement@nmdoj.gov
(505) 270-4332

*Attorneys for the State of New Mexico*


**DANA NESSEL**
Attorney General, State of Michigan

By: */s/ Joseph Potchen*
Joseph Potchen*
*Deputy Attorney General*
Linus Banghart-Linn*
*Chief Legal Counsel*
Jason Evans*
*Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48933
(517) 335-7632
evansj@michigan.gov

*Attorneys for the People of the State of Michigan*


**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: */s/ Joshua D. Bendor*
Joshua D. Bendor*
Solicitor General
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Bendor@azag.gov

60

*Attorneys for the State of Arizona*

**ROB BONTA**
Attorney General for the State of California

By: */s/ Laura L. Faer*
Laura L. Faer*
Supervising Deputy Attorney General
1515 Clay St.
Oakland, CA 94612
(510) 879–3304
Laura.Faer@doj.ca.gov

*Attorneys for the State of California*

**WILLIAM TONG**
Attorney General for the State of Connecticut

By: */s/ Michael K. Skold*
Michael K. Skold*
Solicitor General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.Skold@ct.gov

*Attorneys for the State of Connecticut*

**ANNE E. LOPEZ**
Attorney General for the State of Hawai'i

By: /s/ Kaliko'onālani D. Fernandes
Kaliko'onālani D. Fernandes*
Solicitor General
David D. Day*
Special Assistant to the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

61

ADD087

*Attorneys for the State of Hawai'i*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Adam D. Kirschner*
Adam D. Kirschner*
Senior Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6424
AKirschner@oag.state.md.us

*Attorneys for the State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By:  */s/ David C. Kravtiz*
David C. Kravitz

1Ashburton Pl., 20th Fl
Boston, MA 02108
(617) 963-2277
david.kravitz@mass.gov

*Attorneys for the State of Massachusetts*

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Liz Kramer*
Liz Kramer*
Solicitor General
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us

*Attorneys for the State of Minnesota*

62

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: */s/ Deanna J. Chang*
Deanna J. Chang*
Senior Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Deanna.j.chang@dog.oregon.gov

*Counsel for the State of Oregon*


**PETER F. NERONHA**
Attorney General for the State of Rhode Island

By: */s/ Jeff Kidd*
Jeff Kidd*
Special Assistant Attorney General
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400
jkidd@riag.ri.gov

*Attorneys for the State of Rhode Island*


**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 793-1646
Jonathan.rose@vermont.gov

*Attorneys for the State of Vermont*

63

ADD089

**NICHOLAS W. BROWN**
Attorney General for the State of Washington
By: */s/ Andrew Hughes*
Andrew Hughes*
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
Andrew.Hughes@atg.wa.gov

*Attorneys for the State of Washington*

* *Pro Hac Vice Forthcoming*

64

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
STATE OF NEW MEXICO, et al.,                        )
                                                    )
                            Plaintiffs,             )
                                                    )
            v.                                      )    Civil Action No. 1:25-CV-00429
                                                    )
ELON MUSK, in his official capacity, et al.,        )
                                                    )
                                                    )
                            Defendants.             )
_____)

During today's hearing, the Court asked counsel for Defendants for further information regarding (i) whether any federal employee terminations took place at the end of last week; and (ii) any future plans by the non-Defendants identified in the States' revised TRO (the Office of Personnel Management, the Department of Education, the Department of Labor, the Department of Health and Human Services, the Department of Energy, the Department of Transportation, and the Department of Commerce) to engage in any widespread layoffs or personnel actions within the next fourteen days. Defendants are aware that that a select set of agencies in fact terminated a number of employees at the end of last week. Defendants cannot make a programmatic representation at this juncture about how each of the seven non-Defendants noted above may go about personnel actions over the next two weeks.

But as the attached declaration of Joshua Fisher explains, Elon Musk "has no actual or formal authority to make government decisions himself"—including personnel decisions at individual agencies. Decl. ¶ 5. He is an employee of the White House Office (not USDS or the U.S. DOGE Service Temporary Organization); and he only has the ability to advise the President, or communicate the President's directives, like other senior White House officials. *Id.* ¶¶ 3, 5. Moreover, Defendants

are not aware of any source of legal authority granting USDS or the U.S. DOGE Service Temporary Organization the power to order personnel actions at any of the agencies listed above. Neither of the President's Executive Orders regarding "DOGE" contemplate—much less furnish—such authority. *See* "Establishing and Implementing the President's Department of Government Efficiency," Exec. Order No. 14,158 (Jan. 20, 205); "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative," Exec. Order 14,210 (Feb. 11, 2025).

Dated: February 17, 2025

Respectfully submitted,

BRETT A. SHUMATE
*Acting Assistant Attorney General, Civil Division*

*/s/ Joshua E. Gardner*
JOSHUA E. GARDNER (FL Bar No. 302820)
Special Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
(202) 305-7583
Joshua.e.gardner@usdoj.gov

HARRY GRAVER (DC Bar No. 1779585)[*]
United States Department of Justice
Counsel to the Assistant Attorney General,
Civil Division
950 Pennsylvania Ave, NW
Washington, DC 20530
Tel: (202) 514-2000
harry.graver@usdoj.gov

---

[*] Mr. Graver has been unable to obtain e-filing privileges with the Court, due to the outage on Friday, and the current holiday weekend. He has provided his Notice of Appearance to Chambers, and will file it on the docket as soon as filing-privileges are granted.

ADD093

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

STATE OF NEW MEXICO, et al.

    *Plaintiffs,*

    v.

ELON MUSK, in his official capacity, et al.,

    *Defendants.*

Case No. 1:25-cv-00429

## DECLARATION OF JOSHUA FISHER

I, Joshua Fisher, pursuant to the provisions of 28 U.S.C. § 1746, declare, under penalty of perjury, as follows:

1.    I make these statements based on personal knowledge and knowledge obtained in the course of my official duties.

2.    I am the Director of the Office of Administration. I have held that position since January 20, 2025. In that capacity, I am personally involved in the appointment of special government employees. I have personal knowledge of Mr. Elon Musk's employment status with the federal government.

3.    Mr. Musk is an employee of the White House Office. He holds that position as a non-career Special Government Employee ("SGE").

4.    In that job, Mr. Musk is a Senior Advisor to the President. It is not uncommon for the President to have Senior Advisors who are SGEs. For instance, Anita Dunn was an influential Senior Advisor to President Biden, while serving as an SGE.

5.    In his role as a Senior Advisor to the President, Mr. Musk has no greater authority than other senior White House advisors. Like other senior White House advisors, Mr. Musk has no

1

ADD094

actual or formal authority to make government decisions himself. Mr. Musk can only advise the President and communicate the President's directives.

6.     The U.S. DOGE Service is a component of the Executive Office of the President. The U.S. DOGE Service Temporary Organization is within the U.S. DOGE Service. Both are separate from the White House Office. Mr. Musk is an employee in the White House Office. He is not an employee of the U.S. DOGE Service or U.S. DOGE Service Temporary Organization. Mr. Musk is not the U.S. DOGE Service Administrator.


Dated: Washington, D.C.
        February 17, 2025

                                        _____
                                        Joshua Fisher
                                        Director
                                        Office of Administration

ADD095

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STATE OF NEW MEXICO, *et al.,*

        Plaintiffs,

        v.

ELON MUSK, *et al.*,

        Defendants.

C.A. No. 1:25-cv-00429

**PLAINTIFF STATES' MOTION FOR EXPEDITED DISCOVERY**

## INTRODUCTION

Plaintiff States seek an order from this Court granting expedited discovery so that they may confirm what investigative reporting has already indicated: Defendants Elon Musk and the Department of Government Efficiency ("DOGE") are directing actions within federal agencies that have profoundly harmed the States and will continue to harm them.  Defendants assert that Mr. Musk is merely an advisor to the President, with no authority to direct agency action and no role at DOGE.  The public record refutes that implausible assertion.  But only Defendants possess the documents and information that Plaintiffs need to confirm public reporting and identify which agencies Defendants will target next so Plaintiffs can seek preliminary relief and mitigate further harm.

In light of the Plaintiff States' forthcoming motion for a preliminary injunction, the limited and targeted discovery that Plaintiffs seek, the comparably low burden of production for Defendants, and the strength of Plaintiffs' merits case, this District's caselaw strongly supports granting expedited discovery.

ADD096

## BACKGROUND

### I.    This Court's TRO Order

Plaintiff States filed their complaint for declaratory and injunctive relief on February 13, 2025, ECF No. 2, and their application for a temporary restraining order ("TRO") the following morning, ECF No. 6. On February 18, 2025, this Court found that "Plaintiffs raise a colorable Appointments Clause claim with serious implications" and "legitimately call into question what appears to be the unchecked authority of an unelected individual and an entity that was not created by Congress and over which it has no oversight." ECF No. 29 at 8-9.

This Court declined to grant a TRO on the record before it, however, finding that Plaintiffs had not established irreparable injury sufficient to support emergency relief. *Id.* at 6. In particular, this Court found that "[i]t remains 'uncertain' when and how the catalog of state programs that Plaintiffs identify will suffer," and that Plaintiffs had not "adequately linked Defendants' actions [regarding past and future mass terminations] to imminent harm to Plaintiff States." *Id.* at 6, 8. The Court also found that it could not rely exclusively on "widespread media reports that DOGE has taken or will soon take certain actions, such as mass terminations" in order to find irreparable harm. *Id.* at 7.

Plaintiffs continue to conduct extensive factual investigation through information available in the public domain in an effort to streamline discovery and fact development in this case. *See generally* Compl., ECF No. 2; Pls.' Suppl. Notice, ECF No. 19-2. But "DOGE's unpredictable actions have resulted in considerable uncertainty and confusion for Plaintiffs and many of their agencies and residents." ECF No. 29 at 6. Concrete information about when, where, and how Defendants will conduct mass layoffs, freeze funding, cancel contracts, or access and use sensitive data next is solely within Defendants' possession.

ADD097

## II.    Plaintiffs' Requested Discovery

This Court cautioned "that the requested discovery must be limited and narrowly tailored to the preliminary injunction."  ECF No. 36 at 1.  Plaintiffs therefore seek limited written and document discovery, attached as Exhibit A to this motion, and two depositions that will be noticed based on Defendants' responses and production.  Specifically, the documents and information that Plaintiffs seek are intended to confirm public reporting about Defendants' conduct, show Defendants' future plans, and illustrate the nature and scope of the unconstitutional and unlawful authority that Defendants are exercising and will continue to imminently exercise.

**Requests for Production (5).**  Plaintiffs seek DOGE planning, implementation, and operational documents regarding the conduct that is harming and will imminently harm Plaintiff States.

**Interrogatories (6).**  Plaintiffs seek information regarding the organization and structure of DOGE, the nature of Defendants' authority, and where, when, and how Defendants have exercised that authority.

**Requests for Admission (6).**  Plaintiffs seek admissions to verify certain evidence in the public domain and confirm Defendants' positions about the actions they have taken.

**Depositions (2).**  Plaintiffs seek two depositions, which Plaintiffs will notice based on the written and document discovery, to obtain testimonial evidence regarding Defendants' unlawful conduct and plans and the resulting harms.

These requests are targeted to seek only facts that will inform consideration of Plaintiffs' forthcoming motion.  Accordingly, Plaintiffs ask this Court to (a) order Defendants to produce the documents requested in Plaintiffs' Requests for Production within 7 days of any Court order authorizing such discovery; (b) order Defendants to respond to Plaintiffs' Interrogatories and Requests for Admission within 7 days of any Court order authorizing such discovery; and (c) to

ADD098

authorize Plaintiffs to take two depositions no later than April 4, 2025, unless this Court subsequently extends that deadline for good cause.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 26, this Court has broad discretion to "dictate the sequence of discovery." *Watts v. S.E.C.*, 482 F.3d 501, 507 (D.C. Cir. 2007) (citation omitted). Expedited discovery can be "appropriate in some cases, such as those involving requests for a preliminary injunction." Fed. R. Civ. P. 26(d) advisory committee's note to 1993 amendment.

Courts generally evaluate requests for expedited discovery under a reasonableness test that considers "all of the surrounding circumstances," including five factors: "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 97-98 (D.D.C. 2014) (citation omitted).[1]

These factors "provide 'guidelines for the exercise of the Court's discretion,'" but "[c]ourts are not limited to these factors." *Attkisson v. Holder*, 113 F. Supp. 3d 156, 162 (D.D.C. 2015) (citation omitted).

---

[1] Plaintiffs do not discuss the alternative *Notaro* standard because, as this Court has previously concluded, "the reasonableness test is the appropriate standard when a plaintiff seeks expedited discovery in order to support a preliminary injunction motion because the *Notaro* test overlaps with [the] preliminary injunction standard." *Afghan & Iraqi Allies Under Serious Threat v. Pompeo*, No. 18-cv-01388 (TSC), 2019 WL 9598404, at *2 (D.D.C. Jan. 30, 2019); *see also Guttenberg*, 26 F. Supp. 3d at 97 (stating that "recent cases have rejected the *Notaro* test in favor of a reasonableness test, particularly in cases where the expedited discovery is related to a motion for a preliminary injunction"); *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) (citing cases holding same and noting additional reasoning).

ADD099

## ARGUMENT

The five reasonableness factors and the overall circumstances of this case support granting the limited expedited discovery that Plaintiffs seek here.

**I.    Plaintiffs are preparing a preliminary injunction motion, and expedited discovery will support that motion.**

The first and third factors (pendency of a PI motion and purpose) support Plaintiffs' request.  Plaintiffs will file their preliminary injunction motion by April 11, 2025, *see* ECF No. 36, and the purpose of Plaintiffs' discrete discovery is to support that motion.

To start, the procedural history here—Plaintiffs' forthcoming motion and prior efforts to obtain a TRO—preclude any suggestion that the instant discovery request is "a thinly veiled attempt to circumvent the normal litigation process." *In re Fannie Mae Derivative Litig.*, 227 F.R.D. 142, 143 (D.D.C. 2005); *see Guttenberg*, 26 F. Supp 3d at 98-99 (noting that months-long delay in seeking expedited discovery "demonstrated lack of urgency").  Plaintiffs have moved promptly and seek to conclude their requested discovery by April 4—a week before the deadline for Plaintiffs' preliminary injunction motion.  Therefore, Plaintiffs' request is demonstrably urgent and not intended to cause, nor will it cause, any delay in the current briefing schedule.  To the contrary, Plaintiffs have every interest in preserving the briefing schedule.

Plaintiffs' proposed requests illustrate that the purpose is to support Plaintiffs' forthcoming motion and further crystallize the issues and scope of relief.  For example, Plaintiffs seek information regarding Defendants' recent and ongoing conduct, as well as their near-future plans, so that Plaintiffs can show which of their state agencies and instrumentalities face imminent irreparable harm due to Defendants' actions.  *See Tracfone Wireless, Inc. v. Adams*, 304 F.R.D. 672, 673 (S.D. Fla. 2015) (finding "expedited discovery [was] warranted so that [plaintiff could] mitigate any additional irreparable harm caused by Defendants' ongoing alleged scheme"); *see*

ADD100

*also Twentieth Cen. Fox Film Corp. v. Mow Trading Corp.*, 749 F. Supp. 473, 475 (S.D.N.Y. 1990) (allowing expedited discovery that could "lead to evidence of continuing infringement … [and] discovery of future plans to infringe").  Plaintiffs also seek limited discovery to show that Elon Musk has acted as an officer of the United States and that DOGE has acted in excess of its statutory authority.

This limited discovery is necessary for Plaintiffs to confirm public reporting about DOGE orders and actions and to understand Defendants' imminent plans.  That information is otherwise unavailable to Plaintiffs, and in light of the Court's TRO ruling, that unavailability is a significant obstacle to much-needed preliminary relief.  *See ELargo Holdings, LLC v. Doe-68.105.146.38*, 318 F.R.D. 58, 63-64 (M.D. La. 2016) ("The Court finds that [plaintiff] has shown a pressing and legitimate need for the expedited discovery because it has no other way of identifying the actual infringer and prosecuting the claims raised in this litigation.").

Further, the discovery that Plaintiffs seek about Defendants' undisclosed but imminent plans will refine the issues and parties' arguments, especially with respect to the concerns the Court expressed when considering Plaintiffs' application for an emergency TRO, and aid the Court in crafting appropriate relief.  *See KPM Analytics N. Am. v. Blue Sun Scientific, LLC*, 540 F. Supp. 3d 145, 146 (D. Mass. 2021) (finding that "expedited discovery would provide a more fulsome record to consider the preliminary injunction and—should [the plaintiff] prevail and obtain a preliminary injunction—enable the Court to design an equitable remedy that will prevent irreparable harm while the case is litigated").

## II.    Plaintiffs' discovery requests are tailored to the preliminary injunction stage and will minimally burden Defendants.

Although Plaintiffs' request comes early in the case under the fifth factor, the second and fourth factors (breadth and burden, respectively) firmly support granting expedited discovery here.

ADD101

As explained above, Plaintiffs' proposed discovery is narrowly targeted at essential facts related to likelihood of success on the merits and imminent and irreparable harm due to Defendants' unlawful conduct.  And, given the limited scope of the requested discovery, the burden on Defendants is minimal—especially when weighed against the third factor, which reflects Plaintiffs' need for the information and inability to obtain it elsewhere.  *See* Fed. R. Civ. P. 26(b)(1) (establishing general rule that inquiries into "burden" should consider "likely benefit"); *see also ELargo Holdings*, 318 F.R.D. at 63 (noting that "[g]ood cause generally exists 'where the need for expedited discovery outweighs the prejudice to the responding party'" (citation omitted)).

Notably, Plaintiffs seek no emails, text messages, or other electronic communications at this stage, meaning Defendants will not need to sort through such exchanges for relevance or possible privilege.  The documents that Plaintiffs do seek—planning, implementation, and organizational documents—are readily available to Defendants and do not implicate the same privilege concerns.  Moreover, Plaintiffs' request does not require searching through a sprawling agency with thousands of employees and decades of potentially relevant history.  The newly renamed and reorganized DOGE entities are barely four weeks old, which places significant guardrails on the quantity of responsive documents and information.  Even if responsive documents include some information created before DOGE was officially reorganized and fully operational, discovery will be both finite and manageable for Defendants.

## III.    Plaintiffs' request is otherwise reasonable under the circumstances.

In addition to the above factors, the totality of the circumstances of this case supports Plaintiffs' limited request.

Since January 20, 2025, there has been significant uncertainty about what exactly DOGE is doing.  Defendants have "rapidly taken steps to fundamentally reshape the Executive Branch" in unprecedented ways and at an unprecedented speed.  ECF No. 29 at 8.  As this Court recognized,

ADD102

"Defendants concede that there is no apparent 'source of legal authority granting' Musk or DOGE 'the power to order personnel actions' at federal agencies but do not deny that Defendants are taking such actions," ECF No. 29 at 2, and the same is true for ordering contracting actions. Plaintiffs have worked diligently to exhaust publicly available information as to the specific personnel and contracting actions ordered by Musk and DOGE, and they will continue to do so. But due to the opaque and fast-moving nature of DOGE's operations, significant pertinent information is exclusively in Defendants' possession. Plaintiffs' proposed discovery is thus necessary to determine the scope of DOGE's contracting and personnel actions, its decisions with respect to federal funding, and its access to sensitive state data, as well as the corresponding harm to Plaintiffs caused by those DOGE actions and access.

Plaintiffs have drawn their discovery requests to target only what they need now to establish likelihood of success on the merits and irreparable harm as a result of Defendants' unlawful conduct. Nothing more. Those requests and proposed timeframes for responses and depositions are reasonable under the circumstances here, and they are well within the mainstream of expedited discovery that courts grant. *See, e.g.*, *KPM Analytics*, 540 F. Supp. 3d at 147 (allowing ten requests for production and three depositions, including one Rule 30(b)(6) deposition); *Adams*, 304 F.R.D. at 673 (ordering "written discovery responses within fourteen (14) calendar days of receiving [the plaintiff's] discovery requests and that Defendants then be required to appear for deposition within seven (7) calendar days of providing the written discovery responses"); *N. Atl. Operating Co., Inc. v. Evergreen Distribs., LLC*, 293 F.R.D. 363, 371, 374 (E.D.N.Y. 2013) (allowing ten days to respond to seven document requests that were "quite detailed" and permitting seven depositions); *R.R. Donnelley & Sons Co. v. Marino*, 505 F. Supp.

ADD103

3d 194, 210 (W.D.N.Y. 2020) (ordering responses to requests for production within 14 days and authorizing deposition).

## CONCLUSION

Plaintiffs respectfully ask this Court to grant them leave to serve the attached discovery requests. Plaintiffs further ask this Court to order that: (a) Defendants shall produce the documents requested in Plaintiffs' Requests for Production within 7 days of this Court's order; (b) Defendants shall respond to Plaintiffs' Requests for Admission and Interrogatories within 7 days of the Court's order; and (c) Plaintiffs may take up to two depositions, which shall occur no later than April 4, 2025, unless the Court subsequently extends that deadline for good cause.

Dated: February 24, 2025

Respectfully submitted,

**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: /s/ Joshua Bendor
Joshua Bendor
D.D.C. Bar ID 031908
*Solicitor General*
Daniel Clayton Barr
*Chief Deputy Attorney General*
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
Joshua.Bendor@azag.gov
Daniel.Barr@azag.gov

*Attorneys for the State of Arizona*

**RAÚL TORREZ**
Attorney General of the State of New Mexico

Anjana Samant
D.D.C. Bar ID 4267019
*Deputy Counsel*

9

ADD104

James Grayson
*Chief Deputy Attorney General*
Steven Perfrement
*Assistant Attorney General*
Malina Simard-Halm
*Assistant Attorney General*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM  87501
jgrayson@nmdoj.gov
asamant@nmdoj.gov
sperfrement@nmdoj.gov
msimard-halm@nmdoj.gov
(505) 270-4332

*Attorneys for the State of New Mexico*


**DANA NESSEL**
Attorney General, State of Michigan

Jason Evans
*Assistant Attorney General*
Joseph Potchen
*Deputy Attorney General*
Linus Banghart-Linn*
*Chief Legal Counsel*
Michigan Department of Attorney General
525 W. Ottawa St
Lansing, MI 48933
(517) 335-7632
evansj@michigan.gov

*Attorneys for the People of the State of Michigan*


**ROB BONTA**
Attorney General for the State of California

Nicholas R. Green
*Deputy Attorney General*
Thomas S. Patterson*
*Senior Assistant Attorney General*
Mark R. Beckington*
John D. Echeverria*
*Supervising Deputy Attorneys General*

ADD105

Maria F. Buxton*
Michael E. Cohen*
*Deputy Attorneys General*
California Attorney General's Office
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
(415) 510–4400
nicholas.green@doj.ca.gov

*Counsel for the State of California*


**WILLIAM TONG**
Attorney General for the State of Connecticut

Timothy Holzman
*Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.Skold@ct.gov

*Attorneys for the State of Connecticut*


**ANNE E. LOPEZ**
Attorney General for the State of Hawai'i

Kaliko'onālani D. Fernandes
*Solicitor General*
David D. Day
*Special Assistant to the Attorney General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawai'i*


**ANTHONY G. BROWN**
Attorney General for the State of Maryland

Adam D. Kirschner
*Senior Assistant Attorney General*
200 Saint Paul Place, 20th Floor

11

ADD106

Baltimore, MD 21202
(410) 576-6424
AKirschner@oag.state.md.us

*Attorneys for the State of Maryland*


**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

Gerard J. Cedrone
D.D.C. Bar ID MA0019)
*Deputy State Solicitor*
Massachusetts Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

*Attorneys for the Commonwealth of Massachusetts*


**KEITH ELLISON**
Attorney General for the State of Minnesota

Liz Kramer**
*Solicitor General*
445 Minnesota Street, Suite 600
St. Paul, MN 55101
(651) 757-1010
liz.kramer@ag.state.mn.us

*Attorneys for the State of Minnesota*


**AARON D. FORD**
Attorney General for the State of Nevada

Heidi Parry Stern
D.D.C. Bar ID 8873
*Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Attorneys for the State of Nevada*

12

ADD107

**DAN RAYFIELD**
Attorney General for the State of Oregon

Brian S. Marshall
D.D.C. Bar ID 501670
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
brian.s.marshall@doj.oregon.gov

*Counsel for the State of Oregon*

**PETER F. NERONHA**
Attorney General for the State of Rhode Island

Jeff Kidd
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
jkidd@riag.ri.gov

*Attorneys for the State of Rhode Island*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

Ryan P. Kane
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
ryan.kane@vermont.gov

*Attorneys for the State of Vermont*

**NICHOLAS W. BROWN**
Attorney General for the State of Washington

Kelsey Endres
*Assistant Attorney General*
Emma Grunberg*
*Deputy Solicitor General*

13

800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
kelsey.endres@atg.wa.gov
emma.grunberg@atg.wa.gov

*Attorneys for the State of Washington*

*\* Pro Hac Vice Motion Forthcoming*
*\*\* Pro Hac Vice Motion Pending*

ADD109

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**STATE OF NEW MEXICO**, *et al*.,

        Plaintiffs,

   v.

**ELON MUSK**, *et al.,*

        Defendants.

Civil Action No.   1:25-cv-00429 (TSC)

### PLAINTIFF STATES' FIRST SET OF WRITTEN DISCOVERY

Pursuant to Federal Rules of Civil Procedure 26, 33, 34, and 36, Plaintiff States serve this First Set of Written Discovery to Defendants.

### DEFINITIONS

In general, words and phrases used in these discovery requests have the meanings ascribed to them under the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Columbia, and other applicable law.  The following specific terms are defined for purposes of these discovery requests:

1.      "Document" is defined pursuant to Federal Rule of Civil Procedure 34 and includes, without limitation, written material of whatever kind or nature, whether in draft form, typed, printed, handwritten, or otherwise produced, including the original or any non-identical copies of correspondence, meeting minutes, resolutions, directives, memos, and any other written, printed, or recorded material of any kind known to you or in the possession, custody, or control of you or anyone acting on your behalf.  *However,* please note that for purposes of this Discovery request only, while the term "document" includes electronically stored information, it does not include emails, text messages, or any other similar electronically exchanged communication, *except* that documents should not be excluded from your response merely because they may be otherwise attached to such communications.

2.      "Describe," when used with respect to an interrogatory, means to give a complete and full accounting concerning the matter about which inquiry is made, based on all facts and information known or reasonably available to you.

3.      "And" and "or" have both conjunctive and disjunctive meanings; "all" and "any" means both "each" and "every"; the plural shall include the singular and vice versa.

4.      "Musk" means Defendant Elon Musk, in his official capacity as an employee and/or volunteer for the United States government.

1

5.      "DOGE" means Defendant the United States Department of Government Efficiency Service established by Executive Order 14158, "Establishing and Implementing the President's 'Department of Government Efficiency,'" on January 20, 2025.  "DOGE" includes the "DOGE Temporary Organization."

6.      "DOGE Temporary Organization" means Defendant the United States Department of Government Efficiency Service Temporary Organization established by Executive Order 14158, "Establishing and Implementing the President's 'Department of Government Efficiency,'" on January 20, 2025.

7.      "DOGE Team" is defined pursuant to section 3(c) of Executive Order 14158, "Establishing and Implementing the President's 'Department of Government Efficiency,'" dated January 20, 2025.

8.      "DOGE personnel" means all persons acting on behalf of, as a part of, or pursuant to the authority of DOGE, DOGE Temporary Organizations, or DOGE Teams.  This includes but is not limited to federal employees, special government employees, contractors, consultants, and volunteers.

9.      "Direct" or "directed" means instances in which an employee, officer, or volunteer instructed, ordered, or otherwise took action to compel a particular course of action by another.

10.     "Database" means an organized collection of electronic information that can be searched, retrieved, changed, and sorted using software.

11.     "Database management system" means one or more software packages that provide the functions required to organize and/or manipulate the contents of a database.

12.     "Identify," when used with respect to an interrogatory, means to state all facts and information known or reasonably available to you.

13.     "Include" and "Including" do not imply any limitation to the items or kinds of items enumerated.

14.     Unless words have been given a specific definition herein, each word or term used herein shall be given its usual and/or customary dictionary definition, except where such words have a specific custom and/or usage definition in your trade or industry or as relevant to the subject matter here, in which case they shall be interpreted in accordance with such usual custom and/or usage definition of which you are aware.

ADD112

## **INSTRUCTIONS**

1.      In answering these discovery requests, you shall comply with the Federal Rules of Civil Procedure, including, without limitation, Fed. R. Civ. P. 33, 34, and 36, and the Local Rules of the United States District Court for the District of Columbia.

2.      These discovery requests are intended to elicit facts, information, and documents from all persons or entities, agents, attorneys, contractors, employees, experts, insurers, investigators, representatives, servants, and others who are in possession of or may have obtained documents and other information for you or anyone acting on your behalf.

3.      Unless specifically stated otherwise in these discovery requests, the time period(s) encompassed by each discovery request includes January 20, 2025 to the present.  Further, these discovery requests are continuing in nature.  Therefore, if any additional, contrary, or supplemental documents or other information are made available to you, supplemental answers to these discovery requests must be made as required by Fed. R. Civ. P. 26(e).

4.      Please restate, verbatim, the text of each of the following discovery requests before providing your response.  We will provide an editable version of these discovery requests upon reasonable advance request.

5.      If the response to a request is the same for all Defendants, there is no need to distinguish between each Defendant's response.  If, however, the response differs between Defendants, please separately state each Defendant's response.

6.      If more than one copy of a document exists, please produce the original, as well as every copy on which appears any notation or marking of any sort not appearing on the original.

7.      For requests seeking information pertaining to non-DOGE federal employees terminated, placed on leave, or otherwise affected by DOGE personnel actions, Defendants may omit, and Plaintiffs do not seek, Personally Identifiable Information, such as name and date of birth, of such non-DOGE federal employees.

8.      Please produce all documents in the possession, custody, or control of you or anyone acting on your behalf, or that are otherwise available to you after a reasonably diligent inquiry, unless any document is claimed to be privileged from discovery.  If you contend any document requested is privileged or immune from discovery, produce a privilege/redaction log pursuant to the Federal Rules of Civil Procedure within the time provided by the order of the court authorizing expedited discovery.

9.      Please produce all documents requested in the requests for production within the time provided by the order of the court authorizing expedited discovery.

10.      When producing documents electronically, please use Bates numbers and provide a description of the documents.  When producing documents electronically, please ensure that each separate document is its own separate file.  This is because documents must be produced "as they are kept in the usual course of business."  Fed. R. Civ. P. 34(b)(2)(E)(i).

3

ADD113

11.     Produce all electronically stored information in native format, with all metadata intact.  Fed. R. Civ. P. 34(b)(1)(C).  "Native Format" means the format of ESI in which it was generated and/or as used by the producing party in the usual course of its business and in its regularly conducted activities.  For example, the native format of an Excel workbook is a .xls or .xlsx file and the native format of a Microsoft Word document is a .doc or .docx file.  "Metadata" means (i) structured (fielded) information embedded in a native file that describes the characteristics, origins, usage, and/or validity of the electronic file; (ii) information generated automatically by operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system; (iii) information, such as Bates numbers, created during the course of processing documents or ESI for production; and (iv) information collected during the course of collecting documents or ESI, such as the name of the media device, or the custodian or non-custodial data source from which it was collected.

12.     Please make reasonably diligent efforts to obtain responsive documents.  If, after reasonably diligent efforts, you still lack responsive documents, please say so, and describe the efforts made.

13.     If you think any request for production is ambiguous, please do not refuse to respond on that ground.  Instead, explain in your response how you have interpreted the request for production.

14.     If you cannot answer an interrogatory in full and you have exercised thorough diligence in an attempt to secure the information requested, then you must so state.  You must also explain to the fullest extent possible the specific facts concerning your inability to answer the interrogatory and supply whatever information or knowledge you have concerning any unanswered portion of the interrogatory.

15.     If your answer to any interrogatory is "unknown," "not applicable," or any similar phrase or answer, state the following: (a) Why the answer to that interrogatory is unknown; and (b) The efforts made to obtain answers to the particular interrogatory.

ADD114

## REQUESTS FOR PRODUCTION

1.      Produce all DOGE and DOGE Temporary Organization planning, implementation, and operational documents concerning: (1) eliminating or reducing the size of federal agencies; (2) terminating employment of federal employees or placing such employees on leave, or (3) cancelling, freezing, or pausing federal contracts, grants, or other federal funding.

- This request includes, but is not limited to, directives, memoranda, presentations, FAQs, scripts (such as interview questions), templates, and phased plans.  By way of illustration, this request includes, but is not limited to, complete copies of the DOGE documents referenced in the Washington Post article dated February 15, 2025, titled "DOGE's Playbook for Eliminating DEI," available at https://www.washingtonpost.com/politics/interactive/2025/doge-playbook-dei-trump/, and any other planning and implementation documents similar in form or function.

2.      Produce all DOGE and DOGE Temporary Organization planning, implementation, and operational documents regarding obtaining access, using, or making changes to federal databases or data management systems.

3.      Produce all documents containing lists, charts, or summaries that DOGE personnel or Musk have created, compiled, or edited reflecting the planned or completed cancellation of federal contracts, grants, or other legal agreements.

4.      Produce all documents containing lists, charts, or summaries that DOGE personnel or Musk have created, compiled, or edited regarding the termination of federal employment, placement of federal personnel on leave, or regarding interviews of federal personnel for the purpose of making an assessment about whether to put them on leave or terminate their employment.

5.      Produce all interagency agreements, memoranda of understanding, memoranda of action, or other similar documents between: (1) DOGE, the DOGE Temporary Organization, one or more DOGE Teams, and/or DOGE personnel, and (2) any federal agency, component, office and/or other federal organization.

ADD115

## **INTERROGATORIES**

1.      Identify every individual who has served as DOGE Administrator or as the functional head of DOGE, including in an acting capacity, since January 20, 2025, and the dates served in that capacity.  As part of this response, identify all individuals with authority to hire or terminate employment of DOGE personnel since January 20, 2025.

2.      Identify every individual serving as DOGE personnel.  For each person, identify (1) their title; (2) whether they are part of a DOGE Team at an agency, and if so, what agency; (3) all individuals to whom they directly report; and (4) who hired them.

3.      Identify all federal agencies for which DOGE personnel or Musk: (1) cancelled or directed the cancellation of federal contracts, grants, or other similar instruments, or plan to do so between now and June 1, 2025, or (2) terminated employment or placed on leave, or directed the termination of employment or placement on leave, of federal employees, or plan to do so between now and June 1, 2025.  For each agency identified, identify each contract, grant, or other agreement cancelled and the number of employees whose employment was terminated or who were placed on leave pursuant to the direction of DOGE personnel or Musk, and the components of the agencies at which those employees who were terminated or placed on leave worked.

4.      Identify all federal agencies for which DOGE personnel or Musk: (1) recommended the cancellation of federal contracts, grants, or other similar instruments, or plan to do so between now and June 1, 2025, or (2) recommended termination of employment or placement on leave of federal employees or plan to do so between now and June 1, 2025.  For each agency identified, identify each contract, grant, or other agreement cancelled and the number of employees whose employment was terminated or who were placed on leave pursuant to the recommendation of DOGE personnel or Musk, and the components of the agencies at which those employees who were terminated or placed on leave worked.

5.      Identify the databases and data management systems at federal agencies to which DOGE personnel have obtained access or plan to obtain access between now and June 1, 2025. For each database and data management system identified, summarize the training received and security measures taken by DOGE personnel prior to accessing each system; DOGE's purpose in accessing each system; the actions taken by DOGE personnel after accessing each system; and whether any data from the system has been transmitted outside the agency.

6.      For each Request for Admission served concurrently with these interrogatories, explain the basis for Defendants' response, including the basis of any partial or full denial, for any request not fully admitted.

ADD116

## <u>REQUESTS FOR ADMISSION</u>

1.     Admit that President Trump stated that he "signed an Order creating the Department of Government Efficiency and put a man named Elon Musk in charge."[1]

2.     Admit that President Trump appointed Elon Musk as the individual in charge of the Department of Government Efficiency.

3.     Admit that DOGE personnel have directed the cancellation of federal contracts at one or more federal agencies other than DOGE.

4.     Admit that DOGE personnel have directed the termination of employment of federal employees at one or more federal agencies other than DOGE.

5.     Admit that Elon Musk has directed actions of DOGE personnel.

6.     Admit that Elon Musk is not supervised by any Officer of the United States other than the President of the United States.

---

[1] *See* Andrea Shalal & Nandita Bose, *Trump appears to contradict White House, says Elon Musk in charge of DOGE*, Reuters (Feb. 20, 2025), https://www.reuters.com/world/us/trump-appears-contradict-white-house-says-elon-musk-charge-doge-2025-02-20/.

ADD117

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| STATE OF NEW MEXICO, *et al.*, | |
| Plaintiffs, | C.A. No. 1:25-cv-00429 |
| v. | **PLAINTIFF STATES' REPLY IN SUPPORT OF THEIR MOTION FOR EXPEDITED DISCOVERY** |
| ELON MUSK, *et al.*, | |
| Defendants. | |

## INTRODUCTION

As this Court has already observed, Defendant Elon Musk "has rapidly taken steps to fundamentally reshape the Executive Branch" while "[b]ypassing" the Appointments Clause. *See* TRO Order, ECF 29, at 8. But despite Mr. Musk's public boasting of trying to tear down the federal government, Defendants have tried to cloak how Mr. Musk and DOGE are operating in practice. *Compare* Compl., ECF 10-1 ¶¶ 98-100, 146, 156 (Mr. Musk boasting of "shutting" USAID, that he would dismantle CFPB, and that he had "deleted" a GSA technology group)[1] *with* Decl. of Joshua Fisher, Director of the Office of the Administration, ECF 24-1, ¶¶ 4-6 (trying to claim that Mr. Musk is just a "Senior Advisor to the President," with "no actual or formal authority

---

[1] *See also, e.g.*, Department of Government Efficiency, *Latest Work*, www.doge.gov/savings (last visited Mar. 3, 2025) (boasting of $105 billion in estimated savings, including for contract and grant cancellations and workforce reductions); Elon Musk (@elonmusk), X (Feb. 22, 2025), x.com/elonmusk/status/1893386883444437415 (Tweet by Mr. Musk stating that "all federal employees will shortly receive an email requesting to understand what they got done last week. Failure to respond will be taken as a resignation."); The White House, *Remarks by President Trump Before Cabinet Meeting*, www.whitehouse.gov/remarks/2025/02/remarks-by-president-trump-before-cabinet-meeting/ (Feb. 26, 2025) (admission by Mr. Musk that DOGE "accidentally canceled" money appropriated by Congress for Ebola prevention).

ADD118

to make government decisions himself," and is unaffiliated from DOGE.).  Limited discovery is therefore essential to determine what Defendants are doing, who is doing it, and under what authority – questions that are directly related to showing likelihood of success on the merits and irreparable injury for Plaintiffs' forthcoming motion for a preliminary injunction.

Rather than grapple with the details of Plaintiffs' discovery requests, Defendants attack a straw man.  To be clear, Plaintiffs seek no information from President Trump nor any communications or materials prepared for presidential decisionmaking.  Instead, Plaintiffs have proposed narrowly tailored and focused discovery directly related to the facts material to their forthcoming preliminary injunction motion.  Specifically, Plaintiffs primarily seek post-decisional documents regarding what the DOGE entities and DOGE personnel have done and will soon do to the federal workforce, agency funding, and data systems.  *See* ECF 45-1 at 6 (Requests for Production (RFP) 1-4); *id.* at 7 (Interrogatories (ROG) 3-5); *id.* at 8 (Requests for Admission (RFA) 3-4).  Only two Requests for Production and two Interrogatories seek any information from Mr. Musk.  *See id.* at 6 (RFP 3-4); *id.* at 7 (ROG 3-4).  And Plaintiffs do not seek any emails.  *See* ECF 45-1 at 1 (definition of Documents); *id.* at 6 (RFPs).

Plaintiffs have raised serious claims and carefully limited their discovery requests.  Expedited discovery is necessary and reasonable for Plaintiffs to gather evidence for preliminary relief.  Plaintiffs' motion should be granted.

## ARGUMENT

Defendants do not dispute that this Court has broad discretion to "dictate the sequence of discovery," *Watts v. S.E.C.*, 482 F.3d 501, 507 (D.C. Cir. 2007) (citation omitted) or that expedited discovery is "appropriate in some cases, such as those involving requests for a preliminary injunction," Fed. R. Civ. P. 26(d) advisory committee's note to 1993 amendment, pursuant to the

ADD119

reasonableness test set forth in *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 97-98 (D.D.C. 2014).  *See*

Mot. for Expedited Discovery, ECF 45 at 4.  This is precisely such a case.

## I.    This Court should not postpone expedited discovery until after Defendants' motion to dismiss is resolved.

Defendants argue that the Court should deny the Motion because they intend to file a

motion to dismiss.  But the fact that Defendants plan to file such a motion is no basis to withhold

discovery critical to Plaintiffs' preliminary injunction motion.  Indeed, just last week, a court in

this district granted a motion for expedited discovery even though the Defendants there intend to

file a motion to dismiss.  *See AFL-CIO v. Dept. of Labor*, No. 1:25-cv-00339 (JDB), ECF 48 at

15-16 (D.D.C. Feb. 27, 2025).  Like that case, "this is not the standard civil case in which a motion

to dismiss is filed before any legal or factual development."  *Id.* at 15.  Rather, Plaintiffs' TRO

motion "has produced a record" and "has revealed the parties' legal arguments," "[s]o this is not a

case where the motion to dismiss will contain dispositive arguments the Court has yet to

contemplate."  *Id.*  Also, Defendants "have thus far not relied solely on legal arguments, but also

on facts they put in the record."  *Id.* at 16 n.6; *see* Fisher Decl., ECF 24-1; Response Br., ECF 48

at 4 (relying on the same).[2]  The evidence that Defendants "have thus far put in the record goes to

the very issues on which plaintiffs seek discovery," and "there is a possibility that defendants'

motion to dismiss could rest on facts outside the pleadings, making discovery both beneficial and

necessary."  *AFL-CIO* at 16 n.6.

As in *AFL-CIO*, Defendants' forthcoming motion to dismiss should not prevent discovery,

because the discovery Plaintiffs request is necessary for their preliminary injunction motion, and

Defendants' motion to dismiss is unlikely to resolve the case.

---

[2] Plaintiffs cite Defendants' Response using the ECF page number at the top of the document.

**A.    The requested discovery is necessary for Plaintiffs' forthcoming preliminary injunction motion.**

Plaintiffs have been ordered to file their preliminary injunction motion by April 11, 2025. ECF 36.  The first reasonableness factor weighs in favor of expedited discovery when "Plaintiffs not only intend to file a preliminary injunction motion imminently, but the Court has ordered them to do so" shortly.  *AFL-CIO* at 7.  Plaintiffs seek information that is unavailable from other sources and that will create a more fulsome record for the Court to consider Plaintiffs' likelihood of success on the merits and the likelihood of imminent, irreparable harm.

Plaintiffs have alleged that Mr. Musk and DOGE have asserted and are exercising the authority to stop payments at the Treasury Department, *see* Compl., ECF 10-1 ¶ 86; the authority to shut down or restructure federal agencies, *id.* ¶¶ 98-103, 146, 156; the authority to extend a "deferred resignation" offer to all federal employees, *id.* ¶¶ 116-120; the authority to fire agency employees, *id.* ¶ 130; the authority to control the Office of Personnel Management and the General Services Administration, *id.* ¶ 157; the authority to cancel federal leases and liquidate federal real estate holdings, *id.* ¶¶ 155, 160; the authority to terminate federal contracts and grants, *id.* ¶ 170, 205-08; and the authority to access sensitive data throughout the federal government, *id.* ¶¶ 82, 84, 85, 94, 95, 110, 111, 113, 114, 127, 129, 137, 138, 146, 157, 164, 167, 177, 183, 186, 190, 192, 194, 198.

Plaintiffs have also alleged they will be harmed by the loss of critical federal funding, *id.* ¶¶ 237-38, and the increased strain on State resources that will result from the effective elimination of federal agencies and the drastic reduction in the federal workforce, *id.* ¶¶ 233-36, 239.  Plaintiffs have further alleged that such actions will harm them because they provide private and sensitive financial information to federal agencies, *id.* ¶ 241, and that this private and sensitive data has been accessed by DOGE without following appropriate security protocols, *id.* ¶¶ 245, 247.

ADD121

Plaintiffs' allegations about Defendants' responsibility for these changes to federal agency structure, staffing, and funding are based on publicly available reporting and the Defendants' own public statements. But there are limits to what Plaintiffs and the Court can discern from these sources, particularly given the contradictory and often shifting representations made by counsel for Defendants in this and other cases about Mr. Musk and DOGE's role within the federal government. Critical information regarding who is responsible for this conduct and similar future conduct is within Defendants' sole custody and control. *See ELargo Holdings, LLC v. Doe-68.105.146.38*, 318 F.R.D. 58, 63 (M.D. La. 2016) ("The Court finds that [the plaintiff] has shown a pressing and legitimate need for the expedited discovery because it has no other way of identifying the actual infringer and prosecuting the claims raised in this litigation."). The way to test the Defendants' assertions and to identify admissible evidence regarding them is through discovery.

Defendants argue that no discovery is appropriate because what matters is "whether the governmental act at issue 'came at the hands of a duly appointed official.'" Response Br., ECF 48 at 9 (quoting *Andrade v. Regnery*, 824 F.2d 1253, 1257 (D.C. Cir. 1987)). But a principal point of the discovery Plaintiffs seek is to determine what actions have been taken, and whether they came at the hands of duly appointed officials. *See AFL-CIO* at 9 ("It would be strange to permit defendants to submit evidence that addresses critical factual issues and proceed to rule on a preliminary injunction motion without permitting plaintiffs to explore those factual issues through very limited discovery.")[3]

---

[3] *See* Matt Bai, *Opinion: The Blinding Contempt of the DOGE Bros*, Washington Post (Feb. 24, 2025), www.washingtonpost.com/opinions/2025/02/24/musk-doge-usaid-cuts-dc/ (reporting that DOGE staffers vetoed payments that the agency head had approved).

Moreover, the discovery Plaintiffs seek is not solely based on one claim.  Plaintiffs also have brought a claim against Mr. Musk and the two DOGE entities for conduct in Excess of Statutory Authority, *see* Compl., ECF 10-1 ¶¶ 261-272, and Plaintiffs' discovery requests seek evidence relevant to the merits and irreparable injury associated with that claim as well.

Defendants also argue that Plaintiffs should not be able to obtain discovery to show harm. Response Br., ECF 48 at 10.  But the discovery is not aimed at whether Plaintiffs have been harmed *at all* by the recent attempts to dismantle large swaths of the federal government; it is aimed at whether Defendants Musk and DOGE are responsible for that harm.[4]  Plaintiffs allege, based on detailed public reporting, that it is Defendants who have harmed them.  Defendants deny this, claiming to be mere advisors.  The purpose of discovery is to show the truth.  It will also show where the next imminent harm will be, so that Plaintiffs can bring it to the Court and allow the Court to decide, based on evidence, whether it is legitimate or illegal.

**B.    Defendants' motion to dismiss is unlikely to succeed.**

In addition, Defendants have not proffered a strong motion to dismiss, as they must to justify denying discovery.  *See People With Aids Health Grp. v. Burroughs Wellcome Co.*, No. CIV. A. 91-0574, 1991 WL 221179, at *1 (D.D.C. Oct. 11, 1991) ("[B]are assertions that discovery . . . should be stayed pending dispositive motions that will probably be sustained, are insufficient

---

[4] The exception is the discovery requests related to Defendants' access to data systems, Request for Production 2 and Interrogatory 5, *see* ECF 45-1 at 6-7, which would show whether Defendants have unlawfully accessed Plaintiffs' confidential data without publicly disclosing that fact.  *See, e.g.*, Jesse Coburn, *DOGE Gains Access to Confidential Records on Housing Discrimination, Medical Details — Even Domestic Violence*, ProPublica (Feb. 26, 2025), https://www.propublica.org/article/doge-elon-musk-hud-housing-discrimination-privacy-domestic-violence (revealing that DOGE has gained access to the Department of Housing and Urban Development's Enforcement Management System, access to which "is typically strictly limited because it contains medical records, financial files, documents that may list Social Security numbers and other private information," including information about confidential civil rights investigations performed by state employees and their personally identifiable information).

to justify the entry of an order staying discovery generally.")   To the contrary—based on Defendants' description, their motion to dismiss is destined to fail.

First, Defendants argue that Plaintiffs lack standing, but their argument is premised on a five-word quotation from this Court's order denying the TRO, which held only that Plaintiffs' *declarations* had not *proven* irreparable injury, not that their *Complaint* had failed to *allege* an injury-in-fact sufficient for standing.  *See* Response Br., ECF 48 at 4; TRO Order, ECF 29, at 6. Defendants do not even bother to cite or reference the Complaint.  And in fact, the Complaint alleges plenty of present or imminent injury-in-fact.  *See, e.g.*, ECF 10-1 ¶¶ 78-91 (access to Treasury's payments system), 92-105 (dismantling of USAID, which provides funds to Plaintiffs' public universities), 142-150 (dismantling of CFPB), 227-252 (funding, programmatic, and data injuries).  Subsequent events have caused even more injury.  *See, e.g.*, Notice, ECF 19-2; Reply in Support of TRO, ECF 21 at 5-6; *supra* n.4.  And even though the States have suffered significant injury, not much is needed here to support standing—"judicial review of an Appointments Clause claim will proceed even where any possible injury is radically attenuated."  *Landry v. F.D.I.C.*, 204 F.3d 1125, 1131 (D.C. Cir. 2000); *see also Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 251 n.5 (2018) ("Appointments Clause remedies are designed not only to advance [the Appointment Clause's structural] purposes directly, but also to create incentives to raise Appointments Clause challenges."); *Lofstad v. Raimondo*, 117 F.4th 493, 497 (3rd Cir. 2024) ("[A] litigant need not show direct harm or prejudice caused by an Appointments Clause violation . . . Such harm is presumed.").

Next, Defendants advance their "nothing to see here" theory, asserting that as long as the person taking the action in question is a duly appointed official, Defendants' conduct is irrelevant. Defendants do not cite a single case that supports this assertion.  The only case they rely on,

*Andrade v. Regnery*, 824 F.2d 1253 (D.C. Cir. 1987), is readily distinguishable.  In *Andrade*, the officer in question was not properly appointed at the time he conceived of the Reduction in Force (RIF) that plaintiffs challenged under the Appointments Clause.  *Id.* at 1257.  Nonetheless, the court found the RIF did not violate the Appointments Clause, because the same officer *was* duly appointed by the time the RIF was actually executed.  *Id.*  Not so here, where it is undisputed that Elon Musk has not been properly appointed to any officer position, yet Plaintiffs have alleged that in fact it was Defendants Musk and DOGE, at his direction, who actually directed the ultimate firing of the employees, cancelled the contracts, and dismantled the agencies.  *See, e.g.*, Compl., ECF 10-1 ¶¶ 92-105, 142-150, 203-207; *see also id.* ¶¶ 5, 64-70, 76-77, 201-202 (allegations regarding Mr. Musk's assertions and exercise of authority).

Thus, even if Defendants were right on the law, there is a factual dispute about who actually made the decisions at issue, and Plaintiffs' well-pled allegations would defeat Defendants' motion to dismiss.  An officer can take responsibility for the actions of a subordinate, as in *Andrade*, 824 F.2d at 1257, but government employees outside an agency cannot direct or compel agency action and assert officer-level authority without having been appointed consistent with the Appointments Clause.  Indeed, the Court has already stated that "Plaintiffs raise a colorable Appointments Clause claim with serious implications" and "legitimately call into question what appears to be the unchecked authority of an unelected individual and an entity that was not created by Congress and over which it has no oversight."  TRO Order, ECF 29 at 8-9.

Defendants also greatly misuse *Landry*, purporting to find in it a rule that as long as a person does not hold an office established by law, he cannot violate the Appointments Clause.  *See* Response Br., ECF 48 at 6.  But *Landry* held no such thing, and Defendants have the rule exactly backwards.  If a person occupies a position that constitutes an office based on "the extent of power

8

an individual wields," *Lucia*, 585 U.S. at 245, then the Appointments Clause *requires* that the office have been "established by Law" and that the person have been duly nominated by the President and confirmed by the Senate (unless it is an inferior office for which Congress has created an exception to that default rule).  U.S. Const. art. II, § 2, cl. 2.  Contrary to Defendants' view, the President cannot circumvent the Appointments Clause by inventing powerful positions not established by law.  *See Trump v. United States*, 603 U.S. 593, 650 (2024) (Thomas, J., concurring) ("If Congress has not reached a consensus that a particular office should exist, the Executive lacks the power to unilaterally create and then fill that office.")

## II.    The requested discovery is carefully targeted and Defendants' burden arguments are unsupported.

### A.    The requested discovery is narrowly tailored to support the preliminary injunction.

Plaintiffs' proposed discovery is narrowly targeted to show that Defendants are responsible for the conduct they have boasted about—firing federal workers, cancelling federal contracts and grants, and dismantling federal agencies—and to show where that conduct will occur next, so Plaintiffs can seek an appropriate injunction and provide the Court with the requisite evidentiary basis to determine whether an injunction is authorized under the Rules.

Plaintiffs' main discovery requests seek DOGE's post-decisional documents regarding what it has done and will soon do to the federal workforce, funding, and data systems.  *See* ECF 45-1 at 6 (RFP 1-4); *id.* at 7 (ROG 3-5); *id.* at 8 (RFA 3-4).  As noted above, Plaintiffs have not requested any emails, just documents such as memos, presentations, or lists that Defendants – self-proclaimed data analysis experts – can easily compile.  *See id.* at 1 (definition of Documents); *id.* at 6 (RFP 1-4); *see also AFL-CIO* at 13 (noting the narrow nature of the discovery requests in part because "none of this information would require going back further than January 20, 2025").

Plaintiffs also seek limited documents explaining the DOGE entities' relationship with other federal agencies, *see* ECF 45-1 at 6 (RFP 5), and DOGE's personnel and reporting structure, *id.* at 7 (ROG 1-2), to clarify who authored the documents and how decision-making works, both at DOGE and between the main DOGE operation and its agency teams. And a handful of Requests for Admission aim to verify Defendants' public statements and other information regarding Mr. Musk's role with respect to DOGE. *See id.* at 8 (RFA 1-2, 5-6). All this information should be easy to collect.

Plaintiffs also seek two depositions of DOGE personnel to obtain targeted testimony on the documents produced and the responses to the written discovery. To be clear, Plaintiffs are not seeking to depose President Trump or Mr. Musk.

If Defendants wish to dispute the proposed deposition of a particular DOGE official, they can make an appropriate motion at that time and the Court can resolve that question with the benefit of relevant facts and argument. At the present time, Defendants have not identified any DOGE employees who constitute "top executive department officials [who] should not, absent extraordinary circumstances, be called to testify regarding their reasons for taking official actions." *Simplex Time Recorder Co. v. Sec'y of Lab.*, 766 F.2d 575, 586 (D.C. Cir. 1985) (quoted by Defendants at ECF 48 at 7). And such an argument would likely be in significant tension with Defendants' merits theory that DOGE is filled with mere advisors.

**B.    Plaintiffs do not seek discovery from the President and their discovery requests are not aimed at information implicating the presidential communications privilege or the deliberative process privilege.**

Defendants spend a great deal of their response brief on privilege, yet as noted above, they never grapple in detail with the discovery requests that Plaintiffs have proffered. Plaintiffs have made clear they do not seek any privileged documents or communications. They primarily seek planning, implementation, and operational documents from the DOGE entities. *See* ECF 45-1

10

(RFP 1-4). Plaintiffs intentionally crafted their requests not to aim at communications or materials prepared for presidential decisionmaking or pre-decisional deliberative documents. Plaintiffs seek no information from President Trump,[5] and only two requests for production and two interrogatories even mention Mr. Musk. Those two interrogatories seek information that Defendants have, in part, already placed in the public domain as part of DOGE's stated mission to "upload all of our receipts in a digestible and transparent manner."[6] The remaining requests for production and interrogatories are aimed exclusively at DOGE (which Defendants say Mr. Musk does not lead).

Defendants' arguments about privilege are incorrectly predicated on the notion that Plaintiffs' discovery is aimed at the President, or at his senior advisors' communications with him; those arguments are misguided. Plaintiffs seek no information from "a sitting President concerning his official duties." Response Br., ECF 48 at 12. And Defendants cite no case holding that the presidential communications privilege or the deliberative process privilege applies to all documents created by components of the Executive Office of the President, regardless of whether those documents involved deliberations by the President or communications to or from his senior advisors. Defendants rely on *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367 (2004), but in that case, the Supreme Court cautioned "district courts to explore other avenues, short of forcing the Executive to invoke privilege," *id.* at 390, including the type of narrowing of discovery directed by this Court, ECF 36 at 1, with which Plaintiffs complied. *Cheney*, where the district court

---

[5] To the extent the Requests for Admission could be read to seek admissions from President Trump, Plaintiffs hereby clarify that they seek answers only from Defendants Musk and the DOGE entities, not the President.

[6] Department of Government Efficiency, *Latest Work*, www.doge.gov/savings (last visited Mar. 3, 2025).

ADD128

authorized discovery for "everything under the sky" and where that discovery amounted to more than the relief the plaintiffs sought in their FOIA complaint, 542 U.S. at 387, is distinguishable from the "appropriately narrow" discovery sought here. *In re Cheney*, 544 F.3d 311, 313-14 (D.C. Cir. 2008).

Defendants are also wrong to the extent they argue that the presidential communications privilege shields everything Mr. Musk has done in his capacity as a purported "Senior Advisor" to the President. As to Mr. Musk, the presidential communications privilege applies "only to communications authored or solicited and received by those members of [Mr. Musk's] staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate." *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997). The presidential communications privilege "should not extend to staff outside the White House in executive branch agencies," and "should never serve as a means of shielding information regarding governmental operations that do not call ultimately for direct decisionmaking by the President." *Id.*

As to the deliberative process privilege, Plaintiffs' requests are geared toward decisions that have *already been made* and directives that have been sent or will be sent to agencies or employees. Courts have found that planning documents like the ones Plaintiffs request are not protected by the deliberative process privilege if they "synthesize[] the predecisional materials" to lay out an agency's "framework going forward[.]" *100Reporters LLC v. United States Dep't of Just.*, 316 F. Supp. 3d 124, 154 (D.D.C. 2018) (finding agency's "Work Plan" was discoverable because "each final Work Plan was the final agency document representing DOJ's sub-decision and laying out its information-gathering framework going forward"). Moreover, the deliberative process privilege "is a qualified privilege and can be overcome by a sufficient showing of need."

ADD129

*In re Sealed Case*, 121 F.3d at 737.  And "where there is reason to believe the documents sought may shed light on government misconduct, 'the privilege is routinely denied,' on the grounds that shielding internal government deliberations in this context does not serve 'the public's interest in honest, effective government.'"  *Id.* at 738 (citation omitted).  So even if Plaintiffs sought documents that were deliberative in nature, there are strong arguments that the deliberative process privilege should not apply here.

### C. Defendants fail to provide any evidence supporting their burden argument.

Defendants make generalized objections about burden, but Defendants do not put forth any evidence supporting such a bald assertion.  Nor do they provide any specifics as to why the requested discovery would require excessive document production or attorney time – Plaintiffs have even disclaimed, for this phase, anything that would raise a legitimate privilege issue. Defendants argue that the requests for DOGE's planning and implementation documents improperly target "Senior Advisor" Musk, but those Requests for Production (numbers 1 and 2), ECF 45-1 at 6, are aimed at DOGE, not Mr. Musk, and Defendants have submitted a declaration stating under oath that Mr. Musk is not the administrator of DOGE, *see* ECF 24-1 ¶ 6.  And in objecting to the interrogatories that seek to identify DOGE's personnel and reporting structure, Defendants act as if Plaintiffs have pled only an Appointments Clause claim against Mr. Musk, ignoring Count II, which alleges that Mr. Musk and DOGE have acted in excess of their statutory authority.  *See* Compl., ECF 10-1 ¶¶ 261-272.

### CONCLUSION

In deciding a motion for expedited discovery, courts also consider all the surrounding circumstances.  The circumstances here are unprecedented.  This is not a contractual dispute between former business partners (*Guttenberg*) or a *Bivens* claim (*Attkisson*).  This is a case where an unappointed, unconfirmed special government employee and a group within the Executive

ADD130

Office of the President appear to be exercising extraordinary power well in excess of any constitutional or statutory authority afforded to such positions or entities, or even most constitutionally appointed officers.  Purporting to exercise some form of authority, they are following up on their public promises to close federal agencies, cancel contracts and grants, and fire federal employees.  If, as Defendants appear to argue, they are not the ones taking those actions, then they should welcome the opportunity to demonstrate that the actions causing harm to Plaintiffs were taken by someone with actual authority.  And doing so should not be burdensome.

Accordingly, Plaintiffs respectfully ask the Court to grant the Motion and authorize them to serve their proposed discovery requests.  ECF 45-1.  Plaintiffs further ask this Court to order that: (a) Defendants shall produce the documents requested in Plaintiffs' Requests for Production within 7 days of this Court's order; (b) Defendants shall respond to Plaintiffs' Requests for Admission and Interrogatories within 7 days of the Court's order; and (c) Plaintiffs may take up to two depositions, which shall occur no later than April 4, 2025, unless the Court subsequently extends that deadline.  Because Plaintiffs' discovery requests are crafted to avoid the privilege concerns raised by Defendants, there is no need for a stay.  *See* ECF 48 at 13.

Dated: March 3, 2025

Respectfully submitted,

**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: /s/ Joshua D. Bendor
Joshua D. Bendor
D.D.C. Bar ID 031908
*Solicitor General*
Daniel Clayton Barr
*Chief Deputy Attorney General*
2005 North Central Avenue
Phoenix, AZ 85004

14

ADD131

(602) 542-3333
Joshua.Bendor@azag.gov
Daniel.Barr@azag.gov

*Attorneys for the State of Arizona*


**RAÚL TORREZ**
Attorney General of the State of New Mexico

Anjana Samant
D.D.C. Bar ID 4267019
*Deputy Counsel*
James Grayson
*Chief Deputy Attorney General*
Steven Perfrement
*Assistant Attorney General*
Malina Simard-Halm
*Assistant Attorney General*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM  87501
(505) 270-4332
jgrayson@nmdoj.gov
asamant@nmdoj.gov
sperfrement@nmdoj.gov
msimard-halm@nmdoj.gov

*Attorneys for the State of New Mexico*


**DANA NESSEL**
Attorney General, State of Michigan

Jason Evans
*Assistant Attorney General*
Joseph Potchen
*Deputy Attorney General*
Linus Banghart-Linn*
*Chief Legal Counsel*
Michigan Department of Attorney General
525 W. Ottawa St
Lansing, MI 48933
(517) 335-7632
evansj@michigan.gov

*Attorneys for the People of the State of Michigan*

15

ADD132

**ROB BONTA**
Attorney General for the State of California

Nicholas R. Green
*Deputy Attorney General*
Thomas S. Patterson*
*Senior Assistant Attorney General*
Mark R. Beckington*
John D. Echeverria*
*Supervising Deputy Attorneys General*
Maria F. Buxton*
Michael E. Cohen*
*Deputy Attorneys General*
California Attorney General's Office
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
(415) 510–4400
nicholas.green@doj.ca.gov

*Counsel for the State of California*


**WILLIAM TONG**
Attorney General for the State of Connecticut

Timothy Holzman
*Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Timothy.Holzman@ct.gov

*Attorneys for the State of Connecticut*


**ANNE E. LOPEZ**
Attorney General for the State of Hawai'i

Kaliko'onālani D. Fernandes
*Solicitor General*
David D. Day
*Special Assistant to the Attorney General*
425 Queen Street

16

Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaiʻi*


**ANTHONY G. BROWN**
Attorney General for the State of Maryland

Adam D. Kirschner
*Senior Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6424
AKirschner@oag.state.md.us

*Attorneys for the State of Maryland*


**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

Gerard J. Cedrone
*Deputy State Solicitor*
Massachusetts Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

*Attorneys for the Commonwealth of Massachusetts*


**KEITH ELLISON**
Attorney General for the State of Minnesota

Liz Kramer**
*Solicitor General*
445 Minnesota Street, Suite 600
St. Paul, MN 55101
(651) 757-1010
liz.kramer@ag.state.mn.us

*Attorneys for the State of Minnesota*

ADD134

**AARON D. FORD**
Attorney General for the State of Nevada

Heidi Parry Stern
D.D.C. Bar ID 8873
*Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Attorneys for the State of Nevada*


**DAN RAYFIELD**
Attorney General for the State of Oregon

Brian S. Marshall
D.D.C. Bar ID 501670
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
brian.s.marshall@doj.oregon.gov

*Counsel for the State of Oregon*


**PETER F. NERONHA**
Attorney General for the State of Rhode Island

Jeff Kidd
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
jkidd@riag.ri.gov

*Attorneys for the State of Rhode Island*


**CHARITY R. CLARK**
Attorney General for the State of Vermont

Ryan P. Kane
*Deputy Solicitor General*
109 State Street

ADD135

Montpelier, VT 05609
(802) 828-2153
ryan.kane@vermont.gov

*Attorneys for the State of Vermont*

**NICHOLAS W. BROWN**
Attorney General for the State of Washington

Kelsey Endres
*Assistant Attorney General*
Emma Grunberg*
*Deputy Solicitor General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
kelsey.endres@atg.wa.gov
emma.grunberg@atg.wa.gov

*Attorneys for the State of Washington*

*\* Pro Hac Vice Motion Forthcoming*
*\*\* Pro Hac Vice Motion Pending*

ADD136

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF NEW MEXICO, *et al.*, | |
| Plaintiffs, | C.A. No. 1:25-cv-00429 |
| v. | **PLAINTIFF STATES' SUPPLEMENTAL NOTICE IN SUPPORT OF MOTION FOR EXPEDITED DISCOVERY** |
| ELON MUSK, *et al.*, | |
| Defendants. | |

In support of their Motion for Expedited Discovery, ECF No. 45, the Plaintiff States submit this notice of supplemental information.  Last night, Defendant President Donald Trump stated to Congress:

> To further combat inflation, we will not only be reducing the cost of energy, but will be ending the flagrant waste of taxpayer dollars. And to that end, I have created the brand new Department of Government Efficiency, DOGE. Perhaps you've heard of it. Perhaps. *Which is headed by Elon Musk*, who is in the gallery tonight.

*LIVE: Donald Trump delivers speech to Congress*, Assoc. Press (Mar. 4, 2025), https://www.youtube.com/watch?v=LEygBVr1neI, at Tr. 1:26:52 (emphasis added).

This admission is in conflict with statements made in the Fisher Declaration, previously submitted by Defendants in this action.  *See* ECF No. 24-1 at 1-2 (stating that Defendant Musk is merely a "Senior Advisor to the President" and "is not the U.S. DOGE Service Administrator").

Plaintiffs submit this supplemental information as further support for their request for expedited discovery.

1

ADD137

Dated:  March 5, 2025

Respectfully submitted,

**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: /s/ Joshua D. Bendor
Joshua D. Bendor
D.D.C. Bar ID 031908
*Solicitor General*
Daniel Clayton Barr
*Chief Deputy Attorney General*
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
Joshua.Bendor@azag.gov
Daniel.Barr@azag.gov

*Attorneys for the State of Arizona*


**RAÚL TORREZ**
Attorney General of the State of New Mexico

Anjana Samant
D.D.C. Bar ID 4267019
*Deputy Counsel*
James Grayson
*Chief Deputy Attorney General*
Steven Perfrement*
*Assistant Attorney General*
Malina Simard-Halm
*Assistant Attorney General*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM  87501
(505) 270-4332
jgrayson@nmdoj.gov
asamant@nmdoj.gov
sperfrement@nmdoj.gov
msimard-halm@nmdoj.gov

*Attorneys for the State of New Mexico*

2

ADD138

**DANA NESSEL**
Attorney General, State of Michigan

Jason Evans
*Assistant Attorney General*
Joseph Potchen
*Deputy Attorney General*
Linus Banghart-Linn*
*Chief Legal Counsel*
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48933
(517) 335-7632
evansj@michigan.gov

*Attorneys for the People of the State of Michigan*


**ROB BONTA**
Attorney General for the State of California

Nicholas R. Green
*Deputy Attorney General*
Thomas S. Patterson*
*Senior Assistant Attorney General*
Mark R. Beckington*
John D. Echeverria*
*Supervising Deputy Attorneys General*
Maria F. Buxton*
Michael E. Cohen*
*Deputy Attorneys General*
California Attorney General's Office
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
(415) 510–4400
nicholas.green@doj.ca.gov

*Counsel for the State of California*


**WILLIAM TONG**
Attorney General for the State of Connecticut

Timothy Holzman
*Assistant Attorney General*
165 Capitol Ave

3

Hartford, CT 06106
(860) 808-5020
Timothy.Holzman@ct.gov

*Attorneys for the State of Connecticut*


**ANNE E. LOPEZ**
Attorney General for the State of Hawai'i

Kaliko'onālani D. Fernandes
*Solicitor General*
David D. Day
*Special Assistant to the Attorney General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawai'i*


**ANTHONY G. BROWN**
Attorney General for the State of Maryland

Adam D. Kirschner
*Senior Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6424
AKirschner@oag.state.md.us

*Attorneys for the State of Maryland*


**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

Gerard J. Cedrone
*Deputy State Solicitor*
Massachusetts Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

*Attorneys for the Commonwealth of Massachusetts*

4

ADD140

**KEITH ELLISON**
Attorney General for the State of Minnesota

Liz Kramer**
*Solicitor General*
445 Minnesota Street, Suite 600
St. Paul, MN 55101
(651) 757-1010
liz.kramer@ag.state.mn.us

*Attorneys for the State of Minnesota*


**AARON D. FORD**
Attorney General for the State of Nevada

Heidi Parry Stern
D.D.C. Bar ID 8873
*Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Attorneys for the State of Nevada*


**DAN RAYFIELD**
Attorney General for the State of Oregon

Brian S. Marshall
D.D.C. Bar ID 501670
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
brian.s.marshall@doj.oregon.gov

*Counsel for the State of Oregon*


**PETER F. NERONHA**
Attorney General for the State of Rhode Island

Jeff Kidd
*Special Assistant Attorney General*

ADD141

150 South Main Street
Providence, RI 02903
(401) 274-4400
jkidd@riag.ri.gov

*Attorneys for the State of Rhode Island*


**CHARITY R. CLARK**
Attorney General for the State of Vermont

Ryan P. Kane
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
ryan.kane@vermont.gov

*Attorneys for the State of Vermont*


**NICHOLAS W. BROWN**
Attorney General for the State of Washington

Kelsey Endres
*Assistant Attorney General*
Emma Grunberg*
*Deputy Solicitor General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
kelsey.endres@atg.wa.gov
emma.grunberg@atg.wa.gov

*Attorneys for the State of Washington*


*\* Pro Hac Vice Motion Forthcoming*
*\*\* Pro Hac Vice Motion Pending*

ADD142