**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 25-5072**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

In re ELON MUSK, in his official capacity, et al.,

Petitioners.

---

On Petition for a Writ of Mandamus to the United States
District Court for the District of Columbia

---

**REPLY IN SUPPORT OF
PETITION FOR A WRIT OF MANDAMUS**

---

YAAKOV M. ROTH
*Acting Assistant Attorney
General*

ERIC D. McARTHUR
*Deputy Assistant Attorney
General*

MARK R. FREEMAN
GERARD SINZDAK
JOSHUA DOS SANTOS
*Attorneys, Appellate Staff
Civil Division, Room 7242
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 353-0213*

# TABLE OF CONTENTS

**<u>Page</u>**

GLOSSARY

INTRODUCTION ................................................................................. 1

ARGUMENT ..................................................................................... 2

    A.    Plaintiffs' attempts to narrow *Cheney* fail. ...................................3

    B.    The district court's analysis contravenes *Cheney*. ..........................6

        1.    Plaintiffs' burden analysis restates the district court's errors. ...........................................................7

        2.    Plaintiffs do not show that any discovery is necessary. ..............................................................9

        3.    The district court failed to consider obvious alternatives. ...........................................................13

        4.    Plaintiffs' discovery requests cannot reasonably be called "narrowly tailored." ....................................14

    C.    Plaintiffs' other arguments lack merit............................................17

CONCLUSION....................................................................................21

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                    **Page(s)**

*Andrade v. Regnery,*
    82 F.2d 1253 (D.C. Cir. 1987) ...........................................................................12

*Cheney v. U.S. Dist. Court for D.C.,*
    542 U.S. 367 (2004) .....................................4, 5, 7, 8, 9, 10, 11, 14, 15, 18, 19, 20

*Commodity Futures Trading Comm'n, In re,*
    941 F.3d 869 (7th Cir. 2019)..............................................................................19

*Sealed Case, In re,*
    121 F.3d 729 (D.C. Cir. 1997) ..............................................................................8

**Statute:**

28 U.S.C. § 1292(b)......................................................................................................19

**Regulatory Material:**

Exec. Order No. 12,835, *Establishment of the National Economic Council,*
    58 Fed. Reg. 6189 (Jan. 27, 1993) .......................................................................6

**Other Authorities:**

90 Fed. Reg. 8441 (Jan. 29, 2025).............................................................................6

90 Fed. Reg. 9669 (Feb. 14, 2025) ...........................................................................6

# GLOSSARY

USDS..........................................................................U.S. DOGE Service

**INTRODUCTION**

This suit and the discovery ordered in it are extraordinary. Various States allege that a close presidential advisor and entities within the Executive Office of the President are improperly directing agency decisions—but rather than challenge any specific decision, the States seek discovery of all that "the [USDS] entities and [USDS] personnel have done and will soon do" so that they can then evaluate which actions they can plausibly challenge and "show … irreparable harm." Dkt. 51 at 2; Dkt. 45 at 5. Plaintiffs justify this discovery-first, legal-theory-later approach "due to the opaque and fast-moving nature of [USDS's] operations" and the fact that "information is exclusively in Defendants' possession"—common features of activities in the Executive Office of the President. Dkt. 45 at 8.

The district court itself found that plaintiffs had not shown any imminent irreparable harm, and the government has a pending motion to dismiss raising numerous arguments that could dispose of the suit or narrow it. Nonetheless, the court granted a dragnet discovery request that seeks— on an expedited basis—information detailing the activities of the White House defendants since the President's inauguration, even reaching document "edits," "draft[s]," the "purposes" for certain actions, and planning

for *future* activities "so that Plaintiffs can bring it to the Court and allow the Court to decide, based on evidence, whether it is legitimate or illegal." Dkt. 51 at 6. And the court did so before considering defendants' motion to dismiss and plaintiffs had even filed a preliminary injunction motion.

That backwards discovery order clearly violates the Supreme Court's express guardrails on discovery against the Office of the President. Plaintiffs' arguments to the contrary repeat the district court's errors by treating this as run-of-the-mill discovery and advancing points that the Supreme Court has already rejected. Plaintiffs' aggressive approach to discovery against White House defendants is irreconcilable with the separation of powers and highlights the danger of allowing such an order to go forward. If allegations that advisors influenced agency decisionmakers is sufficient for discovery, such discovery will become the norm. Mandamus is clearly warranted, and that relief should issue promptly given impending deadlines.

## ARGUMENT

As the government has explained, the district court's order contravenes Supreme Court precedent at every step. In direct violation of the Supreme Court's instruction that discovery against the Office of the

President should be a last resort and that invocation of privilege is itself a burden on the Executive's close advisors and White House entities, the district court applied routine "reasonableness" standards, described the burden on the Executive as "neutral," and relied primarily on the government's ability to invoke privileges to protect its interests. Op. 3-4, 9-12; *see* Pet. 13-18. These blatant errors alone warrant mandamus.

The district court also ignored the Supreme Court's directive to consider other avenues before ordering discovery against the Office of the President, despite several obvious alternatives. *See* Pet. 30-34. That error is magnified by the legal irrelevance of the discovery and, indeed, the likelihood that the district court does not even have jurisdiction. *See* Pet. 23-34. And these errors are especially grave because of the sweeping nature of the requested discovery, which essentially asks for everything that White House defendants have ever done regarding a slew of topics since inauguration, including *planning* information expressly to allow plaintiffs to find new claims and harms. *See* Pet. 23-26, 36-38.

### A. Plaintiffs' attempts to narrow *Cheney* fail.

Plaintiffs principally argue that the government is "misreading" *Cheney* and contend that *Cheney* stands only for the proposition that "the

President and Vice President need not invoke executive privilege in order to seek mandamus review of an order compelling discovery in a civil case." Response 21, 24. But it is plaintiffs' cramped interpretation of *Cheney* that does not withstand scrutiny. In reversing the court of appeals' denial of mandamus relief, the Supreme Court provided clear guidelines that courts must follow to "safeguard against unnecessary intrusion into the operation of the Office of the President." *See Cheney v. U.S. Dist. Ct. for District of Columbia*, 542 U.S. 367, 377, 387 (2004). The Court decided that the requests at issue in that case were "overly broad," that the burdens of such requests created inherent separation-of-powers tensions, that the ability to invoke privilege did not cure those burdens, and that such discovery accordingly must be a last resort, not a first step in litigation. *See id.*; Pet. 13-16. Those instructions are binding here.

Rather than grapple with *Cheney*'s clear instructions, plaintiffs attack a strawman and underscore the fundamental error in their approach. No one contends that *Cheney* "shield[s] the Executive Branch" writ large from all discovery or that its considerations "apply to every person in the Executive Branch." Response 21, 31; *see also id.* at 19, 30. Plaintiffs are not seeking discovery from a typical Executive Branch official, but from the Office of the

President and a close presidential advisor.  It is in precisely such circumstances that *Cheney*'s guardrails apply.  *See Cheney*, 542 U.S. at 385-87.

Plaintiffs' other attempts to distinguish *Cheney* lack merit.  Plaintiffs do not defend the district court's reasoning that USDS should not be treated like other senior presidential advisors because another district court found that USDS may wield power "independent" of the President (whatever that means).  *See* Pet. 20-22.  But plaintiffs assert that the close presidential advisor and entities within the Executive Office of the President at issue here are not "akin" to the "senior Government officials" in *Cheney*, which included cabinet members and the Vice President.  Response 31-32.  Plaintiffs even assert that USDS is "not created to deliberate and give advice to the President."  Response 32.

These contentions are meritless.  USDS is "established in the Executive Office of the President" and "report[s] to the White House Chief of Staff."  90 Fed. Reg. 8441, 8441 (Jan. 29, 2025).  As plaintiffs admit, that is precisely where the Group at issue in *Cheney* was located.  *See* Response 22 (noting that the Group was within the Executive Office of the President).  Moreover, USDS coordinates with "Agency heads," including cabinet

members, on "the President's … agenda." 90 Fed. Reg. at 8441-42. And the President has explicitly ordered USDS to provide a "recommendation" to the President regarding its workforce optimization initiative. 90 Fed. Reg. 9669, 9670 (Feb. 14, 2025). Nor does USDS's role in implementing the President's policies distinguish it from other components of the Executive Office of the President. *See, e.g.,* Exec. Order No. 12,835, *Establishment of the National Economic Council*, 58 Fed. Reg. 6189, 6189 (Jan. 27, 1993) (functions of the National Economic Council include "ensur[ing] that economic policy decisions and programs are consistent with the President's stated goals," "ensuring that those goals are being effectively pursued," and "monitor[ing] implementation of the President's economic policy agenda"). As to Mr. Musk, plaintiffs nowhere dispute that he is a close presidential advisor.

Plaintiffs' assertion that defendants would not constitute "senior members of the Executive Branch" is thus implausible on its face. *See Cheney*, 542 U.S. at 385.

## B. The district court's analysis contravenes *Cheney*.

Plaintiffs' alternative argument that the district court "carefully accounted for the special considerations" that *Cheney* requires is meritless. *See* Response 19.

### 1. Plaintiffs' burden analysis restates the district court's errors.

As to the government's burden, plaintiffs reprise the district court's erroneous approach. Plaintiffs incorrectly treat the discovery at issue as garden-variety, asserting that the "burden [is] no greater than what is inherent to discovery generally" and invoking the "district court's discretion to manage its cases." Stay Response 5; Response 38. Plaintiffs also wrongly assert that the government's ability to produce a privilege log or raise a "particularized privilege or burden argument" "in due course" sufficiently protects the Executive Branch's interests. Response 19, 29, 30. But *Cheney* rejected those very rationales. *See* Pet. 17-18, 20; *Cheney*, 542 U.S. at 387-89.

Plaintiffs assert that the burden here is low because their discovery requests do not seek privileged materials. *E.g.*, Response 25. Even if plaintiffs disclaim privileged materials, however, the government must nonetheless assess and invoke privileges in responding to plaintiffs' vague and broadly worded requests. Indeed, the discovery requests explicitly seek a privilege log. Dkt. 45-1 at 3. There can be little question that plaintiffs' discovery requests implicate potentially privileged material. *See* Pet. 35-38. Plaintiffs acknowledge seeking information regarding how USDS's "decision-making works." Response 15. Such information about the decision-making

process in the Office of the President is exactly the type of material to which executive privilege generally applies. *See In re Sealed Case*, 121 F.3d 729, 745 (D.C. Cir. 1997) (emphasizing that executive privilege is "designed to protect executive branch decisionmaking").

The burden on the government is magnified by the ambiguities in plaintiffs' requests. *See* Pet. 36-37. And plaintiffs' requests even reach *future* plans and state on their face state that the "discovery requests are continuing in nature" and therefore require "supplemental answers." Dkt. 45-1 at 3; *see id.* at 5-6.

The rest of plaintiffs' arguments (Response 15-16, 27) merely restate the district court's flawed conclusions. That the discovery here does not seek presidential communications or electronic communications does not lessen the burden of the broadly worded discovery that *is* sought or the inherent intrusion on the separation of powers. Indeed, the "everything under the sky" discovery requests quoted in *Cheney*—which closely resemble those here—did not seek such information either. 542 U.S. at 387. Nor does the fact that the USDS entities have only existed for a few months make a meaningful difference. *See* Response 31. The committee in *Cheney* had met only for five before disbanding. *See* 542 U.S. at 373, 387. And the fact that

the government had produced some documents in *Cheney* (*see* Response 32) was of no moment in the Court's decision.

Plaintiffs' final attempt to distinguish *Cheney* only highlights the similarity of this case. Plaintiffs emphasize that the discovery order in *Cheney* granted disclosures that were "coextensive with the underlying relief the plaintiffs sought." Response 32; *see Cheney*, 542 U.S. at 388. But that appears true here as well. Plaintiffs' complaint and request for a temporary restraining order sought various disclosures regarding how the White House defendants have used information. *See* Dkt. 2 at 58 (prayer for relief); Dkt. 6 at 3 (TRO motion). And one of the interrogatories that the district court ordered similarly seeks "the actions taken by [USDS] personnel after accessing each system." Dkt. 45-1 at 6. Here as there, discovery is being used as a tool to gain improper access to Executive Branch information and decision-making.

### 2. Plaintiffs do not show that any discovery is necessary.

Just as important, Plaintiffs fail to show how their broadbrush discovery is necessary—or even relevant—to the legal questions at issue. In fact, no discovery is needed to appreciate that their claims are doomed.

Plaintiffs barely defend their need for the defendants' planning information, asserting only that they want to show "which harms they have already suffered" or "are imminent," and "where Mr. Musk and [USDS] will act next, so Respondents can effectively challenge their unlawful conduct before it occurs." Response 34-35. As the government has explained, such a blatant fishing expedition is irrelevant to the resolution of plaintiffs' existing claims and cannot be reconciled with the "special considerations" applicable to the White House defendants. *Cheney*, 542 U.S. at 385.

Similarly, plaintiffs briefly assert that they need detailed information of all personnel names and hiring details "to understand" any documents they obtain and whether "[USDS] Team members" report to their "duly appointed agency head." Response 35. That explanation is implausible on its face, and plaintiffs never grapple with the Supreme Court's rejection of similar reasoning for analogous requests in *Cheney*. *See* 542 U.S. at 385-88.

As to the rest of plaintiffs' kitchen-sink requests, plaintiffs assert that they need them to show what actions are "attributable to" direction by "Mr. Musk and [USDS]." Response 34. Plaintiffs do not deny, however, that such information is irrelevant to many of the arguments currently pending in the

government's motion to dismiss, including standing and whether plaintiffs have stated a valid *ultra vires* claim.  Pet. 28-34.

Plaintiffs suggest that discovery may be relevant to their Appointments Clause claim.  Response 35-37.  But their argument only underscores why no discovery is necessary.  Plaintiffs note that the Appointments Clause applies to those holding offices that Congress has "'established by Law,'" Response 36, and do not dispute that Mr. Musk holds no such office.  And they concede that, as this Court has squarely held, no Appointments Clause violation arises even where a non-officer holder "conceive[s]" and "carri[es] out" government policies, "so long as [a] duly appointed official has final authority over the implementation of the governmental action."  Response 37 (quoting *Andrade v. Regnery*, 82 F.2d 1253, 1257 (D.C. Cir. 1987)).

Those concessions negate any need for discovery.  Plaintiffs have not alleged that the agency decisions that purportedly harmed them were made by agency officials who lacked necessary authority.  And while plaintiffs assert that the government has "provided no evidence in this case that any duly appointed officials had final authority over the conduct at issue," Response 37, that reverses the burden of proof and underscores plaintiffs'

failure to identify any discrete agency actions.  Put another way, plaintiffs do not need sweeping discovery into USDS's and Mr. Musk's decision-making process and activities to determine whether a particular agency action was taken by an agency official with the necessary authority.

Plaintiffs' arguments demonstrate the radical nature of their theory, which could encourage discovery against presidential advisors in numerous cases.  Plaintiffs argue that "[t]o exercise power without holding an office violates … the Appointments Clause."  Response 36.  But Appointments Clause precedent concerns only whether *officeholders* are properly *appointed*.  *See* Pet. 25-28.   Plaintiffs' Appointments Clause theory would drastically depart from existing law in an untenable way: it would suggest that *any* influential power broker, from the Chief of Staff to White House Counsel, would be a walking Appointments Clause violation.  *See* Pet. 28.

In their opposition to the government's stay motion, plaintiffs also briefly assert that the requested discovery relates to "a factual defense on the merits Petitioners themselves have raised—that Mr. Musk and [USDS] are not directing agency decisions and actions."  Stay Response 4.  That asserted basis for discovery, on which the district court itself did not rely, only highlights how misguided plaintiffs' discovery request is.  As the

government has explained, the degree to which Mr. Musk and USDS influenced actions taken by agency officials is irrelevant to plaintiffs' Appointments Clause claim, which fails even taking plaintiffs' allegations as true.

### 3. The district court failed to consider obvious alternatives.

Plaintiffs also offer no argument that the district court adequately "explore[d] other avenues" before ordering discovery against the Office of the President. *Cheney*, 542 U.S. at 390. Plaintiffs do not deny that a multitude of purely legal questions may be decided without discovery and could resolve plaintiffs' preliminary injunction motion or the entire case. And plaintiffs do not attempt to justify the need for discovery against the Office of the President without waiting for the preliminary injunction motion or resolution of the issues raised in the government's pending motion to dismiss. Even now, plaintiffs do not articulate any imminent harm to justify this rush.

Plaintiffs assert that the district court reviewed the government's motion to dismiss, discussed standing, and narrowed discovery with its slight modifications. Stay Response 6-7. But the court declined to prioritize a *decision* on standing and the other potentially dispositive issues—which

could well support an interlocutory appeal—and did not even wait for the preliminary injunction motion. And the court's modest alterations of the discovery requested did not absolve it of the need to consider alternatives to the intrusive discovery that it otherwise ordered.

### 4. Plaintiffs' discovery requests cannot reasonably be called "narrowly tailored."

Plaintiffs' assertions (Response 27, 43) that the discovery order is "narrowly tailored" and a "far cry" from *Cheney* are sheer fantasy. The dragnet discovery requests at issue here plainly violate *Cheney*'s requirement that discovery be "precisely identified" and no broader than necessary to serve its purpose. *See* 542 U.S. at 387, 390.

On this point, the requests speak for themselves. The first two document production requests, for example, ask the White House defendants to "[p]roduce *all* [USDS] and [USDS] Temporary Organization *planning*, *implementation*, and *operational* documents concerning" a slew of topics. Dkt. 45-1 at 5 (emphases added). The third and fourth requests require "*all* documents containing lists, charts, or summaries that [USDS] personnel or Musk have *created, compiled, or edited* reflecting the *planned* or *completed*" actions on similar topics, as well as "*regarding interviews* of federal personnel *for the purpose of making an assessment* about whether to put

14

them on leave or terminate their employment." *Id.* (emphases added).  And

the fifth request asks for numerous kinds of agreements "or other similar

documents between" the USDS entities and "*any* federal agency." *See id.*

(emphasis added).

The interrogatories represent an equally unprecedented intrusion.

The first two seek a sweeping array of internal details including

identification of "every individual serving as [USDS] personnel," along with

"title[s]," "all individuals to whom they directly report" and "who hired

them;" as well as "all individuals with authority to hire or terminate

employment of [USDS] personnel since January 20, 2025."  Dkt. 45-1 at 6.

From there, the third and fourth interrogatories cast a wide net for

disclosure of USDS activities, seeking identification of "*all* federal agencies

for which [USDS] personnel or Musk" "directed" an array of different

actions "*or plan to do so between now and June 1, 2025,*" along with details

about any specific contracts, grants, agreements, or employees involved. *Id.*

(emphases added).  The fifth interrogatory seeks identification of data

systems "to which [USDS] personnel have obtained access *or plan to obtain*

*access* between now and June 1, 2025," including details about "training

received," "security measures," "actions taken by [USDS] personnel after

accessing each system," and even "[USDS's] *purpose* in accessing each system." *Id.* (emphasis added). And the requests for admission seek admissions on similar topics. *See id.* at 7.

The requests' definitions and instructions introduce still more breadth and ambiguity. They call for "draft" documents, define "[USDS] personnel" vaguely, and define the verb "direct" to include "instances in which" a person "instructed, ordered, *or otherwise took action to compel*" an action by another. Dkt. 45-1 at 2-3. The instructions also demand a privilege log and warn that "each discovery request includes January 20, 2025 to the present" and "are continuing in nature." *Id.* at 3.

Those requests in effect seek to know what the White House Defendants "ha[ve] done and will soon do," along with vast amounts about internal operations. *See* Response 14. Given the requests' vague nature and references to planning and edits, it is easy to see why these demands are likely to at least raise privilege questions. Even though the district court exempted privileged materials, evaluating how to respond to requests for "drafts," "edits," or "planning" decisions will be a burdensome task. *See* Pet. 35-38. These broadbrush requests are not the kind of "'precisely identified'

and 'specifically enumerated'" materials that could be appropriate in rare circumstances. *See Cheney*, 542 U.S. at 387.

### C.    Plaintiffs' other arguments lack merit.

Plaintiffs' arguments that the government does not meet the other mandamus factors lack merit. As the government has explained, this Court and the Supreme Court have recognized that mandamus requirements are met when, as here, discovery orders against the Office of the President or close presidential advisors violate the separation of powers. *See* Pet. 12-13.[1]

Plaintiff argues that the government has alternatives to mandamus because it could seek a protective order, in camera review, or interlocutory appeal. Response 20, 39-41. But a request for a protective order or in camera review are essentially ways of raising the kind of "particularized objections" that constitute a burden on the Office of the President, and *Cheney* already held that the ability to do so does not defeat the government's request for mandamus. *See Cheney*, 542 U.S. at 388.

---

[1] Plaintiffs' contentions that the government forfeited various arguments are meritless. The government explained that it has no alternative remedy, and it is not clear how else plaintiffs would have the government explain that absence. *See* Pet. 12-13; Response 19, 38-39. The government likewise explained why plaintiffs' requests are improper and can implicate privilege issues. *See* Pet. 23-26, 35-38; Response 28-29.

Moreover, compelling the Executive Branch to produce the requested materials for the plaintiffs' and the district court's review would itself raise separation-of-powers concerns, as it would intrude upon "the Executive Branch's interests in maintaining the autonomy of its office and safeguarding … confidentiality." *Id.* at 385.

Moreover, plaintiffs cite no authority holding that the government must first ask the district court to certify an interlocutory appeal before seeking mandamus of a discovery order. Practice among the circuits, including this Court, has not required it do so. *See, e.g.*, *In re Commodity Futures Trading Comm'n*, 941 F.3d 869, 872 (7th Cir. 2019) (explaining, for example, that "[m]any decisions hold that mandamus is appropriate" for improper deposition orders).

Nor do plaintiffs explain how the district court's discovery order would satisfy the requirements for interlocutory review under 28 U.S.C. § 1292(b). Indeed, the district court in *Cheney* denied the government's request to certify the discovery order in that case for interlocutory review. *See* Response 40 n.4. The expedited, 21-day deadline that the district court imposed also rendered the interlocutory review process—which requires obtaining both the district court's and this Court's approval—impractical.

And, contrary to plaintiffs' suggestion, nothing in *Cheney* suggests that such actions are necessary before seeking mandamus. *See Cheney*, 542 U.S. at 369 (explaining that the separation of powers issues arising from discovery "remove this case from the category of ordinary discovery orders where interlocutory appellate review is unavailable, *through mandamus* or otherwise" (emphasis added)). To be sure, interlocutory appeal may well be appropriate if the district court denies the pending motion to dismiss—but that is simply another reason why discovery at this juncture is improper.

Plaintiffs' assertions that this case is not an "appropriate" vehicle for mandamus reduce to policy arguments that assume that plaintiffs are correct on the merits. Response 20, 41-42. But plaintiffs cite no case suggesting that such policy concerns should control. In any event, the separation-of-powers concerns that arise from the discovery at issue here outweighs plaintiffs' speculation that their claims will successfully show a novel violation of law. Plaintiffs assert that a writ of mandamus would "frustrate the district court's ability" to decide the case, Response 42, but as discussed, discovery is not necessary to resolve the claims at issue.

Nor do plaintiffs have any response to the likelihood that the discovery order here will invite similar discovery attempts. If this discovery order is

permissible, litigants could obtain sweeping discovery into the Office of the President and the President's close advisors, at the outset of litigation, simply by alleging that those advisors directed or significantly influenced agency actions.  Mandamus is amply warranted to correct the grievous burden on the separation of powers in this case and prevent the proliferation of similar orders in the future.

## CONCLUSION

For the foregoing reasons, this Court should grant the petition for a writ of mandamus and quash the discovery order.

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney*
*General*

ERIC D. McARTHUR
*Deputy Assistant Attorney*
*General*

MARK R. FREEMAN
GERARD SINZDAK
*s/ Joshua Dos Santos*
JOSHUA DOS SANTOS
*Attorneys, Appellate Staff*
*Civil Division, Room 7242*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*
*joshua.y.dos.santos@usdoj.gov*

March 2025

# CERTIFICATE OF COMPLIANCE

This reply complies with the type-volume limit of Federal Rule of Appellate Procedure 21(d)(1) because it contains 3,861 words. This reply also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 21(d) and 32(c) because it was prepared using Microsoft Word 2016 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*s/ Joshua Dos Santos*

_____
JOSHUA DOS SANTOS

## CERTIFICATE OF SERVICE

I certify that, on March 25, 2025, I electronically filed this reply through this Court's CM/ECF system.  I also certify that five copies of the reply will be delivered to the D.C. Circuit.  I further certify that the reply has been served on counsel by email on March 25, 2025 and will also be served by first-class mail.  Finally, I certify that the reply has been served on the district court via email on March 25, 2025, and will be delivered by courier on the next business day.

*s/ Joshua Dos Santos*

JOSHUA DOS SANTOS

# ADDENDUM

# TABLE OF CONTENTS

Discovery Requests (Dkt. 45-1) ............................................................A2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**STATE OF NEW MEXICO**, *et al*.,

　　　　　　Plaintiffs,

　　v.

**ELON MUSK**, *et al.,*

　　　　　　Defendants.

---

Civil Action No.　1:25-cv-00429 (TSC)

## PLAINTIFF STATES' FIRST SET OF WRITTEN DISCOVERY

　　　　Pursuant to Federal Rules of Civil Procedure 26, 33, 34, and 36, Plaintiff States serve this First Set of Written Discovery to Defendants.

## DEFINITIONS

　　　　In general, words and phrases used in these discovery requests have the meanings ascribed to them under the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Columbia, and other applicable law.  The following specific terms are defined for purposes of these discovery requests:

　　　　1.　　　　"Document" is defined pursuant to Federal Rule of Civil Procedure 34 and includes, without limitation, written material of whatever kind or nature, whether in draft form, typed, printed, handwritten, or otherwise produced, including the original or any non-identical copies of correspondence, meeting minutes, resolutions, directives, memos, and any other written, printed, or recorded material of any kind known to you or in the possession, custody, or control of you or anyone acting on your behalf.  *However,* please note that for purposes of this Discovery request only, while the term "document" includes electronically stored information, it does not include emails, text messages, or any other similar electronically exchanged communication, *except* that documents should not be excluded from your response merely because they may be otherwise attached to such communications.

　　　　2.　　　　"Describe," when used with respect to an interrogatory, means to give a complete and full accounting concerning the matter about which inquiry is made, based on all facts and information known or reasonably available to you.

　　　　3.　　　　"And" and "or" have both conjunctive and disjunctive meanings; "all" and "any" means both "each" and "every"; the plural shall include the singular and vice versa.

　　　　4.　　　　"Musk" means Defendant Elon Musk, in his official capacity as an employee and/or volunteer for the United States government.

5.     "DOGE" means Defendant the United States Department of Government Efficiency Service established by Executive Order 14158, "Establishing and Implementing the President's 'Department of Government Efficiency,'" on January 20, 2025.  "DOGE" includes the "DOGE Temporary Organization."

6.     "DOGE Temporary Organization" means Defendant the United States Department of Government Efficiency Service Temporary Organization established by Executive Order 14158, "Establishing and Implementing the President's 'Department of Government Efficiency,'" on January 20, 2025.

7.     "DOGE Team" is defined pursuant to section 3(c) of Executive Order 14158, "Establishing and Implementing the President's 'Department of Government Efficiency,'" dated January 20, 2025.

8.     "DOGE personnel" means all persons acting on behalf of, as a part of, or pursuant to the authority of DOGE, DOGE Temporary Organizations, or DOGE Teams.  This includes but is not limited to federal employees, special government employees, contractors, consultants, and volunteers.

9.     "Direct" or "directed" means instances in which an employee, officer, or volunteer instructed, ordered, or otherwise took action to compel a particular course of action by another.

10.     "Database" means an organized collection of electronic information that can be searched, retrieved, changed, and sorted using software.

11.     "Database management system" means one or more software packages that provide the functions required to organize and/or manipulate the contents of a database.

12.     "Identify," when used with respect to an interrogatory, means to state all facts and information known or reasonably available to you.

13.     "Include" and "Including" do not imply any limitation to the items or kinds of items enumerated.

14.     Unless words have been given a specific definition herein, each word or term used herein shall be given its usual and/or customary dictionary definition, except where such words have a specific custom and/or usage definition in your trade or industry or as relevant to the subject matter here, in which case they shall be interpreted in accordance with such usual custom and/or usage definition of which you are aware.

## **INSTRUCTIONS**

1.      In answering these discovery requests, you shall comply with the Federal Rules of Civil Procedure, including, without limitation, Fed. R. Civ. P. 33, 34, and 36, and the Local Rules of the United States District Court for the District of Columbia.

2.      These discovery requests are intended to elicit facts, information, and documents from all persons or entities, agents, attorneys, contractors, employees, experts, insurers, investigators, representatives, servants, and others who are in possession of or may have obtained documents and other information for you or anyone acting on your behalf.

3.      Unless specifically stated otherwise in these discovery requests, the time period(s) encompassed by each discovery request includes January 20, 2025 to the present.  Further, these discovery requests are continuing in nature.  Therefore, if any additional, contrary, or supplemental documents or other information are made available to you, supplemental answers to these discovery requests must be made as required by Fed. R. Civ. P. 26(e).

4.      Please restate, verbatim, the text of each of the following discovery requests before providing your response.  We will provide an editable version of these discovery requests upon reasonable advance request.

5.      If the response to a request is the same for all Defendants, there is no need to distinguish between each Defendant's response.  If, however, the response differs between Defendants, please separately state each Defendant's response.

6.      If more than one copy of a document exists, please produce the original, as well as every copy on which appears any notation or marking of any sort not appearing on the original.

7.      For requests seeking information pertaining to non-DOGE federal employees terminated, placed on leave, or otherwise affected by DOGE personnel actions, Defendants may omit, and Plaintiffs do not seek, Personally Identifiable Information, such as name and date of birth, of such non-DOGE federal employees.

8.      Please produce all documents in the possession, custody, or control of you or anyone acting on your behalf, or that are otherwise available to you after a reasonably diligent inquiry, unless any document is claimed to be privileged from discovery.  If you contend any document requested is privileged or immune from discovery, produce a privilege/redaction log pursuant to the Federal Rules of Civil Procedure within the time provided by the order of the court authorizing expedited discovery.

9.      Please produce all documents requested in the requests for production within the time provided by the order of the court authorizing expedited discovery.

10.      When producing documents electronically, please use Bates numbers and provide a description of the documents.  When producing documents electronically, please ensure that each separate document is its own separate file.  This is because documents must be produced "as they are kept in the usual course of business."  Fed. R. Civ. P. 34(b)(2)(E)(i).

11.    Produce all electronically stored information in native format, with all metadata intact.  Fed. R. Civ. P. 34(b)(1)(C).  "Native Format" means the format of ESI in which it was generated and/or as used by the producing party in the usual course of its business and in its regularly conducted activities.  For example, the native format of an Excel workbook is a .xls or .xlsx file and the native format of a Microsoft Word document is a .doc or .docx file.  "Metadata" means (i) structured (fielded) information embedded in a native file that describes the characteristics, origins, usage, and/or validity of the electronic file; (ii) information generated automatically by operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system; (iii) information, such as Bates numbers, created during the course of processing documents or ESI for production; and (iv) information collected during the course of collecting documents or ESI, such as the name of the media device, or the custodian or non-custodial data source from which it was collected.

12.    Please make reasonably diligent efforts to obtain responsive documents.  If, after reasonably diligent efforts, you still lack responsive documents, please say so, and describe the efforts made.

13.    If you think any request for production is ambiguous, please do not refuse to respond on that ground.  Instead, explain in your response how you have interpreted the request for production.

14.    If you cannot answer an interrogatory in full and you have exercised thorough diligence in an attempt to secure the information requested, then you must so state.  You must also explain to the fullest extent possible the specific facts concerning your inability to answer the interrogatory and supply whatever information or knowledge you have concerning any unanswered portion of the interrogatory.

15.    If your answer to any interrogatory is "unknown," "not applicable," or any similar phrase or answer, state the following: (a) Why the answer to that interrogatory is unknown; and (b) The efforts made to obtain answers to the particular interrogatory.

## REQUESTS FOR PRODUCTION

1.      Produce all DOGE and DOGE Temporary Organization planning, implementation, and operational documents concerning: (1) eliminating or reducing the size of federal agencies; (2) terminating employment of federal employees or placing such employees on leave, or (3) cancelling, freezing, or pausing federal contracts, grants, or other federal funding.

- This request includes, but is not limited to, directives, memoranda, presentations, FAQs, scripts (such as interview questions), templates, and phased plans.  By way of illustration, this request includes, but is not limited to, complete copies of the DOGE documents referenced in the Washington Post article dated February 15, 2025, titled "DOGE's Playbook for Eliminating DEI," available at https://www.washingtonpost.com/politics/interactive/2025/doge-playbook-dei-trump/, and any other planning and implementation documents similar in form or function.

2.      Produce all DOGE and DOGE Temporary Organization planning, implementation, and operational documents regarding obtaining access, using, or making changes to federal databases or data management systems.

3.      Produce all documents containing lists, charts, or summaries that DOGE personnel or Musk have created, compiled, or edited reflecting the planned or completed cancellation of federal contracts, grants, or other legal agreements.

4.      Produce all documents containing lists, charts, or summaries that DOGE personnel or Musk have created, compiled, or edited regarding the termination of federal employment, placement of federal personnel on leave, or regarding interviews of federal personnel for the purpose of making an assessment about whether to put them on leave or terminate their employment.

5.      Produce all interagency agreements, memoranda of understanding, memoranda of action, or other similar documents between: (1) DOGE, the DOGE Temporary Organization, one or more DOGE Teams, and/or DOGE personnel, and (2) any federal agency, component, office and/or other federal organization.

## **INTERROGATORIES**

1.      Identify every individual who has served as DOGE Administrator or as the functional head of DOGE, including in an acting capacity, since January 20, 2025, and the dates served in that capacity.  As part of this response, identify all individuals with authority to hire or terminate employment of DOGE personnel since January 20, 2025.

2.      Identify every individual serving as DOGE personnel.  For each person, identify (1) their title; (2) whether they are part of a DOGE Team at an agency, and if so, what agency; (3) all individuals to whom they directly report; and (4) who hired them.

3.      Identify all federal agencies for which DOGE personnel or Musk: (1) cancelled or directed the cancellation of federal contracts, grants, or other similar instruments, or plan to do so between now and June 1, 2025, or (2) terminated employment or placed on leave, or directed the termination of employment or placement on leave, of federal employees, or plan to do so between now and June 1, 2025.  For each agency identified, identify each contract, grant, or other agreement cancelled and the number of employees whose employment was terminated or who were placed on leave pursuant to the direction of DOGE personnel or Musk, and the components of the agencies at which those employees who were terminated or placed on leave worked.

4.      Identify all federal agencies for which DOGE personnel or Musk: (1) recommended the cancellation of federal contracts, grants, or other similar instruments, or plan to do so between now and June 1, 2025, or (2) recommended termination of employment or placement on leave of federal employees or plan to do so between now and June 1, 2025.  For each agency identified, identify each contract, grant, or other agreement cancelled and the number of employees whose employment was terminated or who were placed on leave pursuant to the recommendation of DOGE personnel or Musk, and the components of the agencies at which those employees who were terminated or placed on leave worked.

5.      Identify the databases and data management systems at federal agencies to which DOGE personnel have obtained access or plan to obtain access between now and June 1, 2025. For each database and data management system identified, summarize the training received and security measures taken by DOGE personnel prior to accessing each system; DOGE's purpose in accessing each system; the actions taken by DOGE personnel after accessing each system; and whether any data from the system has been transmitted outside the agency.

6.      For each Request for Admission served concurrently with these interrogatories, explain the basis for Defendants' response, including the basis of any partial or full denial, for any request not fully admitted.

6

## <u>REQUESTS FOR ADMISSION</u>

1.       Admit that President Trump stated that he "signed an Order creating the Department of Government Efficiency and put a man named Elon Musk in charge."[1]

2.       Admit that President Trump appointed Elon Musk as the individual in charge of the Department of Government Efficiency.

3.       Admit that DOGE personnel have directed the cancellation of federal contracts at one or more federal agencies other than DOGE.

4.       Admit that DOGE personnel have directed the termination of employment of federal employees at one or more federal agencies other than DOGE.

5.       Admit that Elon Musk has directed actions of DOGE personnel.

6.       Admit that Elon Musk is not supervised by any Officer of the United States other than the President of the United States.

---

[1] *See* Andrea Shalal & Nandita Bose, *Trump appears to contradict White House, says Elon Musk in charge of DOGE*, Reuters (Feb. 20, 2025), https://www.reuters.com/world/us/trump-appears-contradict-white-house-says-elon-musk-charge-doge-2025-02-20/.

A8