# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

In re ELON MUSK, in his official capacity, *et al.*

Petitioners.

From the United States District Court for the District of Columbia
Case No. 1:25-cv-00698-TSC (Hon. Tanya S. Chutkan)

## NOTICE

RAÚL TORREZ
  *Attorney General of New Mexico*
Steven Perfrement*
  *Senior Litigation Counsel*
408 Galisteo Street
Santa Fe, NM 87501

KRISTIN K. MAYES
  *Attorney General of Arizona*
Joshua Bendor*
  *Solicitor General*
2005 North Central Avenue
Phoenix, AZ 85004

DANA NESSEL
  *Attorney General of Michigan*
Jason Evans
  *Assistant Attorney General*
525 W. Ottawa Street
Lansing, MI 48933

                                        * *Counsel of Record*
                                        Date: May 28, 2025

(Complete counsel listing appears on signature page.)

In response to the Court's Order dated March 26, 2025, counsel for Respondents write to notify the Court of the attached Opinion and Order entered by D.C. District Court Judge Tanya S. Chutkan granting in part and denying in part Petitioners' motion to dismiss.

Dated: May 28, 2025

Respectfully submitted,

RAÚL TORREZ
Attorney General of the State of
New Mexico

*/s/ Steven Perfrement*
Steven Perfrement
NEW MEXICO DEPARTMENT OF JUSTICE

408 Galisteo Street
Santa Fe, NM 87501
(505) 490-4060
sperfrement@nmdoj.gov

**RAÚL TORREZ**
Attorney General for the State of
New Mexico

James Grayson
*Chief Deputy Attorney General*
Anjana Samant
*Deputy Counsel*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
jgrayson@nmdoj.gov
asamant@nmdoj.gov
(505) 270-4332
*Attorneys for the State of New Mexico*

**DANA NESSEL**
Attorney General for the State of
Michigan

Joseph Potchen
*Deputy Attorney General*
Linus Banghart-Linn
*Chief Legal Counsel*
Michigan Department of
Attorney General
525 W. Ottawa Street
Lansing, MI 48933
(517) 335-7632
evansj@michigan.gov
potchenj@michigan.gov
*Attorneys for the People of the State
of Michigan*

**KRISTIN K. MAYES**
Attorney General for the State of
Arizona

Daniel C. Barr
*Chief Deputy Attorney General*
Joshua Katz
*Assistant Attorney General*
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
*Attorneys for the State of Arizona*

**ROB BONTA**
Attorney General for the State of
California

Nicholas R. Green
*Deputy Attorney General*
Thomas S. Patterson
*Senior Assistant Attorney General*
Mark R. Beckington
John D. Echeverria
*Supervising Deputy Attorneys
General*
Maria F. Buxton
Michael E. Cohen
Carolyn F. Downs
*Deputy Attorneys General*
California Attorney General's Office
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
(415) 510–4400
nicholas.green@doj.ca.gov
*Attorneys for the State of California*

**WILLIAM TONG**
Attorney General for the State of
Connecticut

Timothy Holzman
*Assistant Attorney General*
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5020
Michael.Skold@ct.gov
*Attorneys for the State of Connecticut*

**ANNE E. LOPEZ**
Attorney General for the State of
Hawai'i

Kaliko'onālani D. Fernandes
*Solicitor General*
David D. Day
*Special Assistant to the Attorney
General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorneys for the State of Hawai'i*

**ANTHONY G. BROWN**
Attorney General for the State of
Maryland

Julia Doyle
*Solicitor General*
Adam D. Kirschner
*Senior Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6424
AKirschner@oag.state.md.us
*Attorneys for the State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General for the State of
Massachusetts

Gerard J. Cedrone
D.D.C. Bar ID MA0019
*Deputy State Solicitor*
Massachusetts Office of the Attorney
General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov
*Attorneys for the State of
Massachusetts*


**KEITH ELLISON**
Attorney General for the State of
Minnesota

Liz Kramer
*Solicitor General*
445 Minnesota Street, Suite 600
St. Paul, MN 55101
(651) 757-1010
liz.kramer@ag.state.mn.us
*Attorneys for the State of Minnesota*

**AARON D. FORD**
Attorney General for the State of
Nevada

Heidi Parry Stern
D.D.C. Bar ID 8873
*Solicitor General*
Office of the Nevada Attorney
General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
HStern@ag.nv.gov
*Attorneys for the State of Nevada*

**DAN RAYFIELD**
Attorney General for the State of
Oregon

Brian S. Marshall
D.D.C. Bar ID 501670
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
brian.s.marshall@doj.oregon.gov
*Attorneys for the State of Oregon*

**PETER F. NERONHA**
Attorney General for the State of
Rhode Island

Jeff Kidd
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
jkidd@riag.ri.gov
*Attorneys for the State of
Rhode Island*

**CHARITY R. CLARK**
Attorney General for the State of
Vermont

Ryan P. Kane
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
ryan.kane@vermont.gov
*Attorneys for the State of Vermont*

**NICHOLAS W. BROWN**
Attorney General for the State of
Washington

Kelsey Endres
*Assistant Attorney General*
Emma Grunberg
*Deputy Solicitor General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
kelsey.endres@atg.wa.gov
emma.grunberg@atg.wa.gov
*Attorneys for the State of Washington*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STATE OF NEW MEXICO**, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>**ELON MUSK**, *et al.*<br><br>Defendants. | Civil Action No. 25-cv-429 (TSC) |
| **JAPANESE AMERICAN CITIZENS LEAGUE**, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>**ELON MUSK**, *et al.*<br><br>Defendants. | Civil Action No. 25-cv-643 (TSC) |

## <u>MEMORANDUM OPINION</u>

The Constitution divides and balances power across the three branches—the Executive, Legislature, and Judiciary—as a vital check against tyranny and to promote effective governance. The Appointments Clause embodies this foundational compromise. The Constitution grants Congress the power to create federal offices and agencies. The President shall then appoint individuals to fill such offices, subject to Senate confirmation. And the Judiciary may decide whether the Legislature and Executive acted in accordance with their constitutional prerogatives.

The Constitution does not permit the Executive to commandeer the entire appointments power by unilaterally creating a federal agency pursuant to Executive Order and insulating its

principal officer from the Constitution as an "advisor" in name only. This is precisely what Plaintiffs claim the Executive has done.

President Trump created the U.S. Department of Government Efficiency Service ("DOGE") and U.S. DOGE Service Temporary Organization by Executive Order on January 20, 2025. Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025) ("DOGE EO" or "DOGE Executive Order"). Since then, several federal agencies have been dismantled, thousands of federal employees have been terminated or placed on leave, sensitive data has been haphazardly accessed, edited, and disclosed, and federal grants and contracts have been frozen or terminated. Plaintiffs allege that DOGE and its leader, Elon Musk, are behind these actions.

Fourteen states, represented by their Attorneys General, sued Musk, DOGE, U.S. DOGE Service Temporary Organization, and President Trump, alleging violations of the Appointments Clause of the U.S. Constitution, U.S. Const., Art. II, § 2, cl. 2, and conduct in excess of statutory authority. Compl. ¶¶ 253–72, ECF No. 2. Defendants move to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Defs.' Mem. of L. in Supp. of Mot. to Dismiss at 6, ECF No. 58 ("MTD"). For the following reasons, the court will DENY Defendants' motion as to Musk, DOGE, and DOGE Service Temporary Organization, and GRANT Defendants' motion as to President Trump.

## I.    BACKGROUND

Defendants currently face lawsuits across the country.[1] Several decisions in those actions are legally or factually related to this action. *See, e.g.*, *Am. Fed'n of Gov't Emps., AFL-CIO v.*

---

[1] *See, e.g.*, *AFL-CIO v. Soc. Sec. Admin.*, --- F. Supp. 3d ----, 2025 WL 868953 (D. Md. Mar. 20, 2025); *Citizens for Resp. & Ethics in Wash. v. U.S. DOGE Serv.*, No. 25-cv-511 (CRC), 2025 WL 863947 (D.D.C. Mar. 19, 2025); *Does 1–26 v. Musk*, --- F. Supp. 3d ----, 2025 WL 840574

*Trump*, --- F. Supp. 3d ----, 2025 WL 1358477, at *23 (N.D. Cal. May 9, 2025) (granting temporary restraining order preventing "orders by DOGE to agencies to cut programs or staff" based on *ultra vires* challenge).

## A.  Establishment of U.S. Department of Government Efficiency

Shortly after his inauguration, President Trump renamed the U.S. Digital Service, Compl. ¶¶ 54–55,[2] an office situated within the Office of Management and Budget ("OMB"), as the U.S. Department of Government Efficiency.[3]  Within DOGE, President Trump created a subsidiary organization—the DOGE Service Temporary Organization—"dedicated to advancing the President's 18-month DOGE agenda" and scheduled to terminate on July 4, 2026.  *See* DOGE EO § 3(b).  The DOGE Service Temporary Organization is headed by the DOGE Administrator, who reports to the White House Chief of Staff.  *Id.*  President Trump created the DOGE Service Temporary Organization pursuant to the temporary organization statute, 5 U.S.C. § 3161, which defines a "temporary organization" as a "commission, committee, board, or other organization . . . established by law or Executive order for a specific period not in excess of three years for the

---

(D. Md. Mar. 18, 2025); *New York v. Trump*, --- F. Supp. 3d ---, 2025 WL 573771 (S.D.N.Y. Feb. 21, 2025); *Alliance for Retired Ams. v. Bessent*, --- F. Supp. 3d ----, 2025 WL 740401 (D.D.C. Mar. 7, 2025); *AFL-CIO v. Dep't of Lab.*, --- F. Supp. 3d ----, 2025 WL 542825 (D.D.C. Feb. 14, 2025).

[2] States' Complaint provides sources for certain allegations in footnotes, including citations to Executive Orders, publicly available news reports, social media posts, and federal agencies' websites.  The court omits the States' sources when citing to the Complaint.

[3] President Obama created the U.S. Digital Service within OMB in 2014 "to apply technology in smarter, more effective ways that improve the delivery of federal services, information, and benefits."  Beth Corbert, Steve Vankroekel, & Todd Park, *Delivering a Customer-Focused Government Through Smarter IT*, The White House: President Barack Obama (Aug. 11, 2014), https://perma.cc/R2RX-GKYQ.  Congress previously appropriated funds for U.S. Digital Service through the Information Technology Oversight Reform Account, which is controlled by the OMB Director, and in the American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 4010 (2021). *See, e.g.*, Budget of the U.S. Gov't App'x at 1142–43, Off. of Mgmt. & Budget (Mar. 28, 2022), https://perma.cc/EPV7-AUZD.

purpose of performing a specific study or other project" that terminates "upon the completion of the study or project." 5 U.S.C. § 3161(a); *see* DOGE EO § 3(b). President Trump did not identify any statutory authority for the umbrella DOGE organization. *See* DOGE EO § 3(a).

President Trump instructed the DOGE Administrator to "commence a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." *Id.* § 4(a). To achieve that goal, President Trump ordered the highest-ranking official at each federal agency to "take all necessary steps . . . to ensure [DOGE] has full and prompt access to all unclassified agency records, software systems, and IT systems" and displaced all prior executive orders and regulations that "might serve as a barrier to providing [DOGE] access to agency records and systems." *Id.* § 4(b), (c). He also ordered the establishment of "DOGE Team members" within each agency "in consultation with the [DOGE] Administrator." *Id.* § 3(c). The DOGE Executive Order identified no statutory authority for these actions. *See* DOGE EO §§ 3–4.

From January 20 to February 26, President Trump signed five additional Executive Orders expanding DOGE's role and authority. *See* Reforming the Federal Hiring Process and Restoring Merit to Government Service, Exec. Order No. 14,170, 90 Fed. Reg. 8621 (Jan. 20, 2025); Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative, Exec. Order No. 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025); Ending Taxpayer Subsidization of Open Borders, Exec. Order No. 14,218, 90 Fed. Reg. 10581 (Feb. 19, 2025); Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative, Exec. Order No. 14,219, 90 Fed. Reg. 10583 (Feb. 19, 2025); Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative, Exec. Order No. 14,222, 90 Fed. Reg. 11095 (Feb. 26, 2025).

Those Executive Orders authorized DOGE to provide "advice and recommendations" on the implementation of a federal hiring plan, Exec. Order No. 14,170 § 2(d); ordered agency heads to consult DOGE regarding hiring decisions and prohibited agencies from filling vacancies that the "DOGE Team Lead assesses should not be filled, unless the Agency Head determines the positions should be filled," Exec. Order No. 14,210 § 3(b); instructed the OMB Director and the DOGE Administrator to "identify all other sources of Federal funding for illegal aliens," and recommend actions to "prohibit[] illegal aliens from obtaining most taxpayer-funded benefits," Exec. Order No. 14,218 §§ 1, 2(b); instructed agency heads to coordinate with "DOGE Team Leads" and the OMB Director on a "process to review all regulations . . . for consistency with law and Administration policy" and to "consult with their DOGE Team Leads . . . on potential new regulations," Exec. Order No. 14,219 §§ 2, 4; and required agencies to work with DOGE to track, review, and, where appropriate, terminate discretionary spending through "Federal contracts, grants, loans, and related instruments," Exec. Order 14,222 §§ 2(d), 3(b).

**B. Elon Musk's Role**

Elon Musk's role, authority, and conduct within the federal government is a central issue in this case. Defendants formally classify Musk as a "special Government employee." Compl. ¶ 25 (citing 18 U.S.C. § 202(a)); *see also* Decl. of Joshua Fisher ¶¶ 3–4, ECF No. 24-1. Plaintiff States allege that Musk leads DOGE and directs the actions of DOGE personnel. Compl. ¶¶ 51, 59. Specifically, they claim that the "statements and actions of President Trump, other White House officials, and Mr. Musk himself indicate that Mr. Musk has been directing the work of DOGE personnel since at least January 21, 2025." *Id.* They allege that, in this role, Musk "exercise[s] virtually unchecked power across the entire Executive Branch, making decisions about expenditures, contracts, government property, regulations, and the very existence of federal agencies." *Id.* ¶ 67.

To substantiate that allegation, States point to public statements by President Trump, Musk, and other White House personnel. For instance, on February 1, Musk called U.S. Agency for International Development ("USAID") officials and "pressured" them to provide DOGE personnel access to the USAID building. Compl. ¶ 94. He "threatened to call federal marshals" when USAID personnel attempted to block secure areas of the building. *Id.* ¶ 95. The following day, Musk posted on X that "We spent the weekend feeding USAID into the woodchipper." *Id.* ¶ 98. Musk stated that he personally discussed shutting down USAID with President Trump—"I actually checked with [President Trump] a few times [and] said 'are you sure?' The answer was yes. And so we're shutting it down." *Id.* ¶ 100. On February 2, Musk responded to a post on X that the "DOGE team" was "rapidly shutting down [] illegal payments" to Lutheran Family Services. *Id.* ¶ 86. On February 3, White House Press Secretary Karoline Leavitt represented that "President Trump tasked Mr. Musk with starting up DOGE, and he already has done that . . ." *Id.* ¶ 60. On February 4, Department of Labor ("DOL") leadership allegedly told employees that when Musk and his team arrive "do whatever they ask," and instructed them "not to push back," "worry about any security protocols," or "ask questions." *Id.* ¶ 178. On February 7, "Musk's aides" entered the Consumer Financial Protection Bureau ("CFPB") headquarters and began reviewing "sensitive personnel and financial records." *Id.* ¶ 146. That afternoon, Musk posted on X "CFBP RIP." *Id.* On February 8, 2025, President Trump told reporters that he "instructed [Musk] to go check out Education, to check out the Pentagon," and to go through "'just about everything' at the Defense Department." *Id.* ¶¶ 72, 151. And, on February 11, Musk and President Trump "jointly addressed the public from the White House Oval Office." *Id.* ¶ 75.

States also rely on parallels between Musk's past business practices and recent events within the Executive Branch as indications of Musk's involvement. Specifically, they allege that Musk "exerted direct control" over a January 28 email sent by the Office of Personnel Management ("OPM") to more than 2.3 million federal employees and contractors regarding a "deferred resignation program" (hereinafter, the "Fork in the Road Email"). *Id.* ¶¶ 116–20. The email offered federal employees "pay and benefits through September 2025 if they resigned by February 6th." *Id.* ¶ 117. States allege Musk sent an "identically titled" email with a similar offer to company employees upon his acquisition of X, then known as Twitter. *Id.* ¶ 118.

## C. **DOGE and Musk Activities**

States claim that DOGE, with Musk at the helm, "has inserted itself into at least 17 federal agencies" and exercises "significant authority" across the Executive Branch. *Id.* ¶¶ 70, 200. They identify the following categories of allegedly unauthorized actions by DOGE and Musk:

- **Controlling Expenditures and Disbursements of Public Funds:** States allege that DOGE obtained "full access" to payment systems at multiple agencies and used that access to halt payments. *Id.* ¶¶ 78–79, 85, 127–30. For instance, after the acting-Secretary at U.S. Department of Treasury refused to "halt" payments, DOGE personnel threatened the acting Secretary with "legal risk [] if he did not comply with DOGE." *Id.* ¶ 84. Then, on February 2, DOGE obtained "full access" to Treasury's Bureau of the Fiscal Services payment systems, which disburses funds for social security benefits, veteran's benefits, childcare tax credits, Medicaid and Medicare reimbursements, federal employee wages, federal tax refunds, and facilitates state recovery of delinquent state income taxes. *Id.* ¶¶ 78–79, 85. That day, Musk posted on X that "[t]he @DOGE team is rapidly shutting down these illegal payments," in response to a post by a non-profit organization receiving funds pursuant to government contracts. *Id.* ¶ 86.

- **Terminating Federal Contracts and Exercising Control over Federal Property:** States allege that Musk and DOGE asserted responsibility for terminating federal contracts across the Executive Branch. *Id.* ¶ 203–04. DOGE reported the cancellation of "104 contracts related to diversity, equity, inclusion and accessibility (DEIA) at more than a dozen federal agencies" on January 31, *id.* ¶ 205; of "thirty-six contracts across six agencies" on February 3, *id.* ¶ 206; of "twelve contracts in the GSA and the Department of Education" on February 4,

*id.* ¶ 207; and "cuts of $250 million through the termination of 199 contracts" on February 7, *id.* ¶ 208. States also allege that DOGE and Musk exercise control over federal property by demanding access to secure facilities and threatening intervention by U.S. Marshals when agency officials refuse, *id.* ¶¶ 94–95; by "push[ing]" high-ranking officials out of their offices at agency headquarters, *id.* ¶¶ 164–66, by terminating leases for federal property, *id.* ¶ 206, and by announcing plans to "liquidate as much as half of the federal government's nonmilitary real estate holdings," *id.* ¶ 160.

- **Binding the Government to Future Financial Commitments without Congressional Authorization**: States point to the Fork in the Road Email, which offered federal employees pay and benefits through September 2025 if they resigned by February 6, as entering into binding financial commitments. *Id.* ¶¶ 116–20, 212.

- **Eliminating Agency Regulations and Entire Agencies and Departments:** States allege that DOGE personnel took steps to dismantle USAID and CFPB. On February 3, DOGE personnel allegedly "handed" USAID's acting leadership "a list of 58 people, almost all senior career officials, to put on administrative leave." *Id.* ¶ 102. The next day, USAID placed "nearly its entire workforce on administrative leave." *Id.* ¶ 103. When "USAID contract officers emailed agency higher-ups" for authorization to cancel programs, DOGE personnel responded directly. *Id.* ¶ 101. Musk posted on X "CFBP RIP" on the same day that Musk's aides "set up shop . . . at CFPB's headquarters" and CFPB's website was taken down. *Id.* ¶¶ 146–47. Three days later, CFPB's acting Director Russell Vought told all employees to "[s]tand down from performing any work task" and "not come into the office." *Id.* ¶ 148.

- **Directing Action by Agencies**: States allege that Musk and DOGE obtain compliance from agency officials and employees by threatening action by U.S. Marshals, legal risks, or termination. *Id.* ¶ 84 (threatening acting-Treasury Secretary with "legal risk"); *id.* ¶ 95 (threatening USAID personnel blocking access to facility with action by U.S. Marshals); *id.* ¶¶ 176–178 (DOL employees told to comply or "face termination"). States claim that if agency officials object or raise concerns, Musk and DOGE ignore or override the agency and place on administrative leave or otherwise remove non-compliant individuals. *Id.* ¶¶ 84–85 (acting-Treasury Secretary "placed on administrative leave" after refusing to halt payments); *id.* ¶ 110 (DOGE "gained full and unfettered access to OPM systems over the existing CIO's objection"); *id.* ¶¶ 137–38 (DOGE representative was "installed" as the Department of Energy's ("DOE") "chief information officer" after DOE's general counsel's office and chief information office opposed DOGE's access to DOE's IT system); *id.* ¶ 166 (DOGE personnel "pushed" the "highest-ranking officials" at the Department of Education ("ED") "out of their own offices").

- **Acting as a Principal Officer Unsupervised by Heads of Departments**: States allege that Musk acts and directs DOGE's conduct without supervision by agency

heads.  For instance, States allege that Musk and his team sent the Fork in the Road Email "via a custom-built email system . . . without consultation with other advisers to the President or OMB officials," *id.* ¶ 120; that DOGE personnel at agencies do not "interact at all with anyone who is not part of their team," *id.* ¶ 165; and that Musk "reports only to President Trump," *id.* ¶ 71.

- **Obtaining Unauthorized Access to Secure Databases and Sensitive Information:**  States allege that Musk and DOGE personnel obtained access to secure databases and systems at Treasury, *id.* ¶ 85, USAID, *id.* ¶ 95, OPM, *id.* ¶ 110, the Department of Health and Human Services, *id.* ¶ 127, DOE, *id.* ¶ 137, ED, *id.* ¶¶ 164, 167, DOL, *id.* ¶¶ 177–78, National Oceanic and Atmospheric Administration, *id.* ¶ 190, Federal Emergency Management Agency, *id.* ¶ 194, and Small Business Association, *id.* ¶ 198.

## D.  Procedural History

States brought this action for declaratory and injunctive relief on February 13, 2025. ECF No. 1.  They immediately moved for a TRO, seeking to enjoin Musk and DOGE from (1) accessing, copying, or transferring any data systems, and (2) terminating or otherwise placing on leave any officers or employees at certain federal agencies.  *New Mexico v. Musk*, No. 25-cv-429 (TSC), 2025 WL 520583, at *2 (D.D.C. Feb. 18, 2025).  The court denied that motion because States failed to provide clear evidence of imminent, irreparable harm, and ordered the parties to propose a schedule for further proceedings.  *Id.* at *4.  States declared their intention to seek expedited discovery to support a forthcoming preliminary injunction motion, while Defendants planned to move to dismiss.  Proposed Briefing Schedule at 1–2, ECF No. 32.  The court permitted both parties to proceed along their preferred paths—scheduling briefing for States' expedited discovery motion, Defendants' motion to dismiss, and States' motion for preliminary injunction.  Order at 1–2, ECF No. 36.  States moved for expedited discovery on February 24, 2025, and briefing concluded on March 3, 2025.  ECF Nos. 45, 48, 51.  Then, Defendants moved to dismiss on March 7, 2025, and briefing concluded on March 19, 2025.  ECF Nos. 58, 64, 67.

On March 12, 2025, while briefing on Defendants' motion to dismiss was ongoing, the court granted in part and denied in part States' request for expedited discovery.  *New Mexico v.*

*Musk*, No. 25-cv-429 (TSC), 2025 WL 783192 (D.D.C. Mar. 12, 2025). The court ordered Defendants to respond to the discovery requests by April 2, 2025. *Id.* at *7. Defendants sought an emergency stay and writ of mandamus quashing the court's discovery order from the D.C. Circuit. Pet. for Writ of Mandamus, *In re Musk*, No. 25-5072 (D.C. Cir. Mar. 18, 2025). The Circuit granted the stay on March 26, 2025, concluding the court should decide the motion to dismiss before allowing discovery. Order, *In re Musk*, No. 25-2072 (D.C. Cir. Mar. 26, 2025). The court stayed discovery, Mar. 26, 2025 Min. Order, and now rules on Defendants' motion to dismiss.

## II.    LEGAL STANDARD

Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The law presumes that "a cause lies outside [the court's] limited jurisdiction" unless the plaintiff establishes otherwise. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citing *Turner v. Bank of North Am.*, 4 U.S. 8, 10 (1799)). When deciding a Rule 12(b)(1) motion, the court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F. 3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F. 3d 970 (D.C. Cir. 2005)). "[T]he court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions." *Disner v. United States*, 888 F. Supp. 2d 83, 87 (D.D.C. 2012) (quoting *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006)). The court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citation omitted).

Alternatively, Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Fed. R. Civ. P. 12(b)(6). A Rule 12(b)(6) motion "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). To survive such a motion, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In other words, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient. *Id.* (citing *Twombly*, 550 U.S. at 555).

## III.    ANALYSIS

### A.  **Standing**

Defendants first seek dismissal for lack of subject matter jurisdiction, arguing that States lack Article III standing. MTD at 6. "Article III of the Constitution confines the federal judicial power to 'Cases' and 'Controversies.'" *United States v. Texas*, 599 U.S. ---, ---, 143 S.Ct. 1964, 1969 (2023). For there to be a case or controversy under Article III, a plaintiff must have a "personal stake" in the case—in other words, standing. *Biden v. Nebraska,* 600 U.S. ---, ---, 143 S.Ct. 2355, 2365 (2023) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. ---, ---, 141 S.Ct. 2190, 2203 (2021)). Standing is "a bedrock constitutional requirement" that "safeguard[s] the Judiciary's proper—and properly limited—role in our constitutional system." *Texas*, 143 S.Ct. at 1969. When a plaintiff lacks standing, the court lacks jurisdiction. *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 131 (2011); *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1361 (D.C. Cir. 2012).

To demonstrate standing at the motion to dismiss stage, plaintiffs must allege (1) an injury in fact—meaning a concrete, particularized, and actual or imminent harm to a legally protected interest; (2) that is fairly traceable to the defendants' challenged behavior; and (3) likely to be redressed by a favorable ruling. *See, e.g.*, *New Jersey v. EPA*, 989 F.3d 1038, 1045 (D.C. Cir. 2021); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs must demonstrate standing at all stages of litigation, "with the manner and degree of evidence required" at each juncture. *Lujan*, 504 U.S. at 561. At the motion to dismiss stage, "general factual allegations of injury resulting from the defendant's conduct" suffice. *Id.* at 562. When evaluating standing, the court assumes plaintiffs would succeed on the merits of their claims. *New Jersey*, 989 F.3d at 1045. "If at least one plaintiff has standing, the suit may proceed." *Nebraska*, 143 S.Ct. at 2365.

  i. <u>Injury in Fact</u>

An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations and internal quotation marks omitted). To evaluate the concrete harm requirement, courts "assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 141 S.Ct. at 2204 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). Traditional tangible harms readily qualify—"[i]f a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *Id.* Intangible harms, such as "reputational harms, disclosure of private information, and intrusion upon seclusion," as well as constitutional harms may also suffice. *Id.* To be particularized, "the injury must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance." *Food & Drug Admin. v. All. of Hippocratic Med.*, 602 U.S. ---, ---, 144 S.Ct. 1540,

1556 (2024) (quoting *Lujan*, 504 U.S. at 560). The actual or imminent component requires an injury that has "already occurred" or is "likely to occur soon." *Id.* (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). When plaintiffs seek prospective relief such as an injunction, as States do here, they must also "establish a sufficient likelihood of future injury." *Id.* (citing *Clapper*, 568 U.S. at 401).

States allege several possible injuries—financial harm based on loss of federal funds, programmatic harm based on dismantling federal agencies upon which States rely to administer programs, increased strains on States' resources based on reductions in enforcement activities by federal agencies, and unauthorized access and increased security risks to States' data at federal agencies. Compl. ¶¶ 227–50. Guided by binding precedent, the court concludes that at least two states—New Mexico and Washington—allege sufficient injuries for Article III standing.

### a. Financial and Programmatic Harm

Defendants concede that States allege financial harm based on loss of federal funding. MTD at 11 (conceding allegation that "Defendants have halted payments from USAID to public universities" is a financial harm that "could support Article III standing"). The court agrees— States sufficiently identify financial harms, which "readily qualify as concrete injuries" under Article III. *TransUnion*, 141 S.Ct. at 2204.

States provide at least two clear examples. First, their public universities have been unable to obtain funds awarded by USAID. Compl. ¶ 231. For instance, Washington State University expected to receive $9,508,761 from USAID, but "received Suspension/Stop Work Orders from either USAID or the prime award recipients" in early January. Decl. of Leslie Anne Brunelli ¶¶ 6–7, ECF No. 6-8. As of February 12, 2025, the day before States filed their Complaint, Washington State University had not received the expected funds from USAID. *Id.*

¶ 12.  Second, New Mexico's Mining and Minerals Division ("MMD") has been unable to obtain its federal funding.  MMD operates the Coal Mine Reclamation Program and Abandoned Mine Lands Program, programs created and organized pursuant to the federal Surface Mining Control and Reclamation Act, to manage the environmental impacts of coal mining, enforce regulations, and reclaim abandoned mines pursuant to federal standards.  Decl. of Albert S. Chang ¶¶ 2–5, ECF No. 6-6.  MMD was awarded $6,036,936 in federal funding for fiscal year 2025.  *Id.* ¶ 21. In January 2025, MMD "was unable to access any of its federal funding for any of its programs" and, as of February 10, 2025, it remained unable to access grants awarded under the federal Bipartisan Infrastructure Law ("BIL").  *Id.* ¶¶ 12–15.  MMD depends on the federal funds to "safeguard . . . thousands of abandoned mines and associated hazards located across New Mexico," including "safeguarding the public from falling into deep mine shafts, preventing ground subsidence from causing large sinkholes . . . and extinguishing coal fires."  *Id.* ¶¶ 18–19.

This kind of financial harm—or "pocketbook injury"—is "a prototypical form of injury in fact."  *Collins v. Yellen*, 594 U.S. ---, ---, 141 S.Ct. 1761, 1779 (2021) (citation omitted); *see also Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, --- F. Supp. 3d ----, ----, 2025 WL 752378 (D.D.C. Mar. 10, 2025).  The Supreme Court has repeatedly held that states have standing based on financial harm inflicted by the federal government. *See, e.g.*, *Nebraska*, 143 S.Ct. at 2366 (Missouri's estimated loss of "$44 million a year in fees that it otherwise would have earned under its contract with the Department of Education . . . is an injury in fact . . ."); *Dep't of Comm. v. New York*, 588 U.S. 752, 768 (2019) (States have shown "they will lose out on federal funds that are distributed on the basis of state population.  That is a sufficiently concrete and imminent injury to satisfy Article III."); *Clinton v. City of New York*, 524 U.S. 417, 430 (1998) (State "suffered an immediate, concrete injury the moment that the President used the Line Item

Veto to cancel" a provision relieving New York of retroactive tax liabilities). States' loss of federal funding based on Defendants' allegedly unconstitutional conduct therefore qualifies as an injury in fact.

Because States seek prospective relief, past financial harm alone is insufficient; they must identify a risk of future harm that is "sufficiently imminent and substantial." *TransUnion*, 141 S.Ct. at 2210. Defendants argue that States' financial harms are "speculative, not actual or imminent." MTD at 9. The court disagrees. Accepting States' allegations as true, their public universities and agencies remain unable to access federal funds. Compl. ¶ 231; Brunelli Decl. ¶ 12; Chang Decl. ¶¶ 12–15. States "made plans and allocated funding for staffing based on the anticipated receipt of [federal] funds." Brunelli Decl. ¶ 7.; *see also* Chang Decl. ¶ 20 (MMD "made plans and allocated funding for staffing, regulatory initiatives, engineering design, and construction work based on already awarded dollars."). The continued inability to draw down funds is an ongoing and future injury. *See, e.g*, *New York*, 588 U.S. at 767 (future loss of federal funds qualified as injury in fact); *Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 828–29 (D.C. Cir. 2006) (discussing how "[a]n actual withdrawal of funding from the association's members would clearly qualify" as an injury in fact but association did not "suggest that any such withdrawal has occurred"); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239, 2025 WL 597959, at *6 (D.D.C. Feb. 25, 2025).

Moreover, Defendants ignore the programmatic and public harms stemming from the abrupt loss of federal funding. MMD depends heavily on federal funding—the Abandoned Mine Lands Program is "fully federally funded," Chang Decl. ¶¶ 8–9—and without access to the grant funding, it cannot provide vital safety services. For instance, mine shafts will be left open, sinkholes will expand, and coal fires will advance toward infrastructure, posing wildfire risks.

*Id.* ¶ 20. The financial harm to grant recipients "directly harms the State[s]" by interfering with "performance of its public function[s]." *See Nebraska*, 143 S.Ct. at 2368; *see also New Jersey*, 989 F.3d at 1046 ("[E]xacerbated administrative costs and burdens imposed by the Rule on petitioner constitute a concrete and particularized injury.").[4]

### b.  Unauthorized Access to Private Information and Data

The court also finds New Mexico's allegations that Defendants gained unauthorized access to its private and proprietary information sufficient to allege an injury in fact at the motion to dismiss stage. Compl. ¶ 241; Decl. of Sarita Nair ¶¶ 25–26, ECF No. 6-4 (discussing proprietary data provided to DOL); Decl. of Wayne Propst ¶ 19, ECF No. 6-11 (discussing proprietary data provided to Treasury). Intangible harms, such as "disclosure of private information, and intrusion upon seclusion," may be sufficiently concrete under Article III. *TransUnion*, 141 S.Ct. at 2204. In *TransUnion*, the Supreme Court determined that plaintiffs whose credit reports containing a misleading OFAC alert "were disseminated to third-party businesses" suffered a concrete injury because the dissemination bore a "'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts . . . the tort of defamation." *Id.* at 2208. Plaintiffs whose credit reports contained misleading information, but which were not disseminated to third parties, lacked a concrete injury, however, because defamation requires publication. *Id.* at 2209.

---

[4] In light of the health and safety implications, the court's conclusion is bolstered by Supreme Court and D.C. Circuit precedent granting states a "special solicitude in our standing analysis" when "protecting [] quasi-sovereign interests." *Massachusetts v. EPA*, 549 U.S. 497, 520 & n.17 (2007); *New Jersey v. EPA*, 989 F.3d 1038, 1045 (D.C. Cir. 2021) (State "is 'entitled to special solicitude' in our standing analysis because it has 'quasi-sovereign interests' in reducing air pollution.").

Defendants contend that *TransUnion* supports their position because States do not allege "public disclosure." MTD at 14. But that reads *TransUnion* too narrowly. As another court in this district recently explained, "*TransUnion* does not require that Plaintiffs' injury be analogous to defamation or reputational harm; it requires that Plaintiffs' injury 'has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts.'" *All. for Retired Ams.*, 2025 WL 740401, at *15 (quoting *TransUnion*, 141 S.Ct. at 2204). Unauthorized access to private information "has a close relationship to the harm to privacy vindicated by the common-law tort of intrusion upon seclusion," which *TransUnion* recognized "is an intangible injury sufficiently 'concrete' to satisfy Article III." *Id.* (quoting *TransUnion*, 141 S.Ct. at 2204).

Intrusion upon seclusion occurs when a defendant intentionally interferes "upon the solitude or seclusion of another or his private affairs or concerns" in a manner "that would be highly offensive to a reasonable [person]." Restatement (2d) of Torts § 652B. Under D.C. law, "examining a plaintiff's private bank account" is an "invasion intrinsic in the tort of intrusion upon seclusion." *Wolf v. Regardie*, 553 A.2d 1213, 1218–19 (D.C. 1989). New Mexico provided private and sensitive information, including bank account information, taxpayer identification numbers, and financial account numbers, to Treasury and DOL. Probst Decl. ¶ 17; Nair Decl. ¶ 25. States allege that Defendants obtained access to DOL's "system without regard to security protocols" and to Treasury's "BFS payment systems," which Treasury IT personnel identified as "the single greatest insider threat risk" BFS "has ever faced." Compl. ¶¶ 85, 89, 177. In some circumstances, Defendants allegedly obtained access to systems "by threatening, ignoring, and overriding any objections or concerns raised by agency heads and staff." *Id.* ¶ 221. Using threats or undue pressure to access States' private financial information would likely be highly offensive to a reasonable person. At the motion to dismiss stage, this suffices as

an injury analogous to intrusion upon seclusion. *See All. for Retired Ams*, 2025 WL 740401, at *16 ("Plaintiffs' alleged injury—the disclosure of their private information to third parties without a lawful right to access it—bears a close relationship to the harm essential to an intrusion upon seclusion at common law."); *cf. Trump*, 2025 WL 573771, at *12 (finding States have "standing to seek injunctive relief where inadequate cybersecurity measures put their confidential information at risk of disclosure"); *Univ. of Cal. Student Assoc. v. Carter*, No. 25-cv-354-RDM, 2025 WL 542586, at *4 n.3 (D.D.C. Feb. 17, 2025) (leaving standing for another day but noting plaintiff's "theory of standing—including its contention that its members face an imminent threat of injury analogous to that protected by the common law tort of intrusion upon seclusion—is [not] so implausible that the Court lacks authority" to consider the TRO).

The court is aware that another court has concluded access to sensitive information without disclosure failed to satisfy Article III's injury requirement. *See AFL-CIO*, 2025 WL 542825, at *1 n.1 (Plaintiffs fail to establish "a substantial likelihood of standing" based on "insufficient evidence and argument that any information has been or will be shared unlawfully."). That decision addressed a request for injunctive relief—a Temporary Restraining Order—which requires a "substantial likelihood of standing." *Id.* The bar is not so high at the motion to dismiss stage. At this juncture, a plaintiff need only "state a plausible claim" to standing. *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015).

### c. Reduced Enforcement Activities

Finally, reduced enforcement efforts by federal agencies, namely eliminating CFPB consumer protection efforts, likely do not qualify as an injury in fact under *United States v. Texas*, 599 U.S. ---, 143 S.Ct. 1964 (2023), in which the Supreme Court held that Texas and Louisiana lacked standing to challenge the "Executive Branch's exercise of enforcement

discretion over whether to arrest or prosecute." *Id.* at 1970. The Court identified but did not "analyze" a hypothetical scenario that "might change" the "standing calculus" if the "Executive Branch wholly abandoned its statutory responsibilities to make arrests or bring prosecutions." *Id.* at 1974. States' allegations come close to this hypothetical scenario. But because the court concludes that States sufficiently allege an injury in fact based on financial and programmatic harm and unauthorized access to private information, it need not break new ground regarding "an extreme case of non-enforcement." *Id.*

      ii.    <u>Causation and Redressability</u>

Once an injury in fact is sufficiently alleged, "a plaintiff must demonstrate . . . that the injury likely was caused or will be caused by the defendant, and [] that the injury likely would be redressed by the requested judicial relief." *All. for Hippocratic Med.*, 144 S.Ct. at 1555. Because the causation and redressability requirements "are often 'flip sides of the same coin,'" *id.* (quoting *Sprint Comms. Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)), the court will consider them together. "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* To establish causation, "the plaintiff must show a predictable chain of events leading from the government action to the asserted injury." *Id.* at 1558. "[T]he relevant inquiry is whether the plaintiffs' injury can be traced to 'allegedly unlawful conduct' of the defendant." *Collins,* 141 S.Ct. at 1780 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). The "'links in the chain of causation' . . . must not be too speculative or too attenuated." *All. for Hippocratic Med.*, 144 S.Ct. at 1557 (quoting *Allen*, 468 U.S. at 759; then citing *Clapper*, 568 U.S. at 410–411). When a plaintiff "is an object of the action it seeks to challenge, causation and redressability are usually easy to demonstrate." *Ohio v. EPA*, 98 F.4th 288, 300 (D.C. Cir. 2024). If causation rests on actions taken by third parties not before the court, "plaintiff[s] must show that the 'third parties will likely react in

predictable ways' that in turn will likely injure the plaintiffs." *Id.* (quoting *California v. Texas*, 593 U.S. ---, ---, 141 S.Ct. 2104, 2117 (2021)).

Defendants argue that, even if States suffered some harm, that harm is not traceable to Defendants, as opposed to independent third parties at the underlying agencies. MTD at 11–12. The court disagrees and finds that States allege "a predictable chain of events leading from" Defendants' actions to the asserted injuries. *See All. for Hippocratic Med.*, 144 S.Ct. at 1558. For States' financial and programmatic harm, they allege that Musk ordered and oversaw the dismantling of USAID, which provides funds to States' public universities, *see supra* Part I.B–C; Compl. ¶ 98 (Musk posted on X "[t]ime for [USAID] to die" and "[w]e spent the weekend feeding USAID into the woodchipper."); that DOGE cancelled hundreds of contracts at federal agencies, *id.* ¶¶ 205–08 (DOGE posted on X "that it had eliminated 104 contracts related to diversity, equity, inclusion and accessibility (DEIA) at more than a dozen federal agencies" on January 31, "that it had canceled thirty-six contracts across six agencies" on February 3, and that it terminated "199 contracts" across 35 agencies on February 7); and that Musk "has been directing the work of DOGE personnel," *id.* ¶ 59. Accepting these allegations as true, the court finds that States sufficiently allege that Defendants caused their financial and programmatic harm by halting funding and cancelling contracts. Defendants are also the source of harm to States' privacy interests because they allegedly obtained unauthorized access to States' private and sensitive information.

Even if other employees or officials at agencies technically pushed the button to halt payments or provided Defendants with data access, States' allegations permit an inference that the third parties "'react[ed] in predictable ways' to the defendants' conduct." *Murthy v. Missouri*, 603 U.S. ---, ---, 144 S.Ct. 1972, 1986 (2024) (quoting *New York*, 588 U.S. at 768).

States allege that Defendants obtained compliance from agencies by threatening "legal risk," Compl. ¶ 84; "threaten[ing] to call federal marshals" to remove physical obstruction, *id.* ¶ 95; and "push[ing] [officials] out of their own offices," *id.* ¶ 166.  Individuals who continued to object or resist were quickly placed on administrative leave or terminated.  *See id.* ¶ 85 (acting-Treasury Secretary placed on administrative leave after objecting to DOGE's instructions to stop payments); *id.* ¶ 102 ("DOGE personnel approached [USAID's] acting leadership and handed them a list of 58 people, almost all senior career officials, to put on administrative leave."); *id.* ¶ 137 (DOE's chief information officer was replaced by a "DOGE representative" after opposing DOGE's access to DOE's IT system).  It is true that, as Defendants note, "independent acts" by third parties typically break any causal link for standing purposes.  MTD at 11; *see also Murthy*, 144 S.Ct. at 1986 ("[I]t is a bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" (citation omitted)).  But acts obtained through threats are not independent.  Therefore, whether or not third parties at agencies also contributed to States' injuries, they did so at Defendants' direction, and the causal nexus is clear.

In the context of an Appointments Clause violation, causation is satisfied when the injury "was a result of the constitutional infirmity to which [plaintiffs] object."  *Andrade v. Lauer*, 729 F.2d 1475, 1495 (D.C. Cir. 1984).  In *Andrade*, former federal employees challenged their termination by government officials who they alleged occupied their offices in violation of the Appointments Clause and therefore "were constitutionally disqualified from exercising power over them."  *Id.* at 1480–81, 1495.  The same is true here.  The Executive may validly access data or terminate funding or contracts, but States allege that Defendants "had no constitutional [or statutory] authority" to do so.  *See id.*; *cf. Seila Law LLC v. CFPB*, 591 U.S. ---, ---, 140 S.Ct.

2183, 2196 (2020) ("In the specific context of the President's removal power, we have found it sufficient that the challenger sustains injury from an executive act that allegedly exceeds the official's authority." (citation and internal quotation marks omitted))

Assuming States will prevail on the merits for the purposes of assessing standing, their claims are redressable.  If the court finds that Defendants' past actions lack lawful authority and enjoins any future unlawful conduct, including interference with States' funding and access to their data, their injuries will be redressed.  *See Andrade*, 729 F.2d at 1495 ("[I]f the appellants are granted the relief they seek—a declaration and injunction against [Defendants] improperly exercising the powers of office against them—their injury will be redressed."); *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 22 (D.D.C. 2020) (holding plaintiffs had standing to challenge actions by government officials on the ground that the official invalidly held office because court may determine actions "shall have no force or effect").

In sum, at the motion to dismiss stage and accepting States' allegations as true, States have standing to seek declaratory and injunctive relief for Defendants' Appointments Clause violations and *ultra vires* actions.

**B.  Appointments Clause Claim**

i.    Constitutional Framework

States allege that Musk's actions, including actions taken at his direction by DOGE personnel, violate the Appointments Clause because Musk has not been constitutionally appointed.  Article II of the Constitution provides: "The executive Power shall be vested in a President of the United States of America," who must "take Care that the laws be faithfully executed."  U.S. Const., Art. II, § 1, cl. 1; *id.* § 3.  "Because no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance."  *Seila Law*, 140 S.Ct. at 2191.  Individual officials exercising "power on behalf

of the President in the name of the United States" acquire "legitimacy and accountability to the public through 'a clear and effective chain of command' down from the President, on whom all the people vote.'" *United States v. Arthrex, Inc.*, 594 U.S. ---, ---, 141 S.Ct. 1970, 1979 (2021) (quoting *Free Enter. Fund v. Pub. Acct. Oversight Bd.*, 561 U.S. 477, 498 (2010)); *see also Seila Law*, 140 S.Ct. at 2203 ("[I]ndividual executive officials will still wield significant authority, but that authority remains subject to the ongoing supervision and control of the elected President."). Although individual executive officials may assist the President, the "President 'cannot delegate ultimate responsibility or the active obligation to supervise that goes with it.'" *Seila Law*, 140 S.Ct. at 2203 (quoting *Free Enter. Fund*, 561 U.S. at 496–97).

The Appointments Clause states that the President

shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const., Art. II, § 2, cl. 2.  By distributing the power to fill government offices between the Executive and Legislative Branches, separation of powers principles are "embedded in the Appointments Clause." *Freytag v. C.I.R.*, 501 U.S. 868, 882 (1991).  The Founders sought to remedy "one of the American revolutionary generation's greatest grievances against executive power"—the "manipulation of official appointments."  *Id.* at 883 (quoting G. Wood, *The Creation of The American Republic 1776–1787*, 79 (1969)).  The nomination and appointment power "guarantees" the President's "accountability for the appointees' actions" and "adds a degree of accountability in the Senate." *Arthrex*, 141 S.Ct. at 1979.  The President retains "primary responsibility for nominations," ensuring that the "blame of a bad nomination [] fall[s] upon the president singly and absolutely," but the Senate's advice and consent serves as "an

excellent check upon a spirit of favoritism in the President and a guard against the appointment of unfit characters." *Fin. Oversight & Mgmt. Bd. for Puerto Rico, v. Aurelius Inv.*, 590 U.S. ---, ----, 140 S.Ct. 1649, 1657 (2020) (citations omitted). "The Senate's advice and consent power is a critical 'structural safeguard [] of the constitutional scheme.'" *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 293 (2017) (quoting *Edmond v. United States*, 520 U.S. 651, 659 (1997)). Appointments Clause challenges also implicate "the strong interest of the federal judiciary in maintaining the constitutional plan of separation of powers." *Freytag*, 501 U.S. at 879. "The structural interests protected by the Appointments Clause are not those of any one branch of Government but of the entire Republic." *Id.* at 880.

To state an Appointments Clause violation, a plaintiff must allege that an "Officer[] of the United States," U.S. Const., Art. II, § 2, cl. 2, has not been constitutionally appointed. *See, e.g.*, *Lucia v. SEC*, 585 U.S. 237, 244–46 (2018). Defendants do not argue that Musk has been constitutionally appointed, but dispute whether he qualifies as an officer subject to the Appointments Clause. Defs.' Reply at 11, ECF No. 67. "In the constitutional context, an 'officer' is someone who 'occup[ies] a continuing position established by law' and who 'exercis[es] significant authority pursuant to the laws of the United States.'" *Al Bahlul v. United States*, 967 F.3d 858, 869 (D.C. Cir. 2020) (quoting *Lucia*, 585 U.S. at 245). Officers are then subclassified as principal or inferior officers. Whether an officer is a principal or inferior officer "'depends on whether he has a superior' other than the President." *Arthrex*, 141 S.Ct. at 1980 (quoting *Edmond*, 520 U.S. at 662). An inferior officer is "directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond*, 520 U.S. at 663. A principal officer is directed and supervised only by the President. *Id.* The President must appoint, with the advice and consent of the Senate, all

principal officers. *Arthrex*, 141 S.Ct. at 1979. For inferior officers, the "'default manner of appointment' is also nomination by the President and confirmation by the Senate," but Congress may authorize the President, a federal court, or the head of a department to appoint inferior officers without Senate involvement. *Id.* at 12 (quoting *Edmond*, 520 U.S. at 660). Non-officer employees, "the broad swath of 'lesser functionaries' in the Government's workforce," serve in an "occasional or temporary" capacity and "the Appointments Clause cares not a whit about who named them." *Lucia*, 585 U.S. at 245 (quoting *Buckley v. Valeo*, 424 U.S. 1, 126, n.162 (1976)).

ii.    <u>Continuing Position Established by Law</u>

Defendants' primary argument against States' Appointments Clause claim is that States fail to allege, and even concede, that "Musk 'does not occupy an office of the United States.'" MTD at 18 (quoting Compl. ¶¶ 6, 25). They argue that because Musk does not occupy an office vested with formal powers by Congress, he is insulated from the Appointments Clause. But constitutional safeguards are not so easily evaded.

States allege that Musk is a "special Government employee." Compl. ¶ 25 (quoting 18 U.S.C. § 202(a)); Reply at 17–18. Defendants argue that a special government employee can never qualify as an officer because the position is "necessarily time-limited." MTD at 30. The court disagrees for two reasons.

First, the plain text of the statute defining special government employees confirms such individuals may qualify as officers. *See* 18 U.S.C. § 202(a). Congress defined "special Government employee" in the conflict-of-interest provisions of Title 18 as

> an *officer* or employee of the executive or legislative branch of the United States Government . . . who is retained, designated, appointed, or employed to perform, with or without compensation, for not to exceed [130] days during any period of [365] consecutive days, temporary duties either on a full-time or intermittent basis.

*Id.* (emphasis added); *see also Assoc. of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 914–15 (D.C. Cir. 1993) (noting special government employees are defined in 18 U.S.C. § 202(a)).    As the D.C. Circuit recently explained in addressing an Appointments Clause challenge in *Al Bahlul v. United States*, 967 F.3d 858 (D.C. Cir. 2020), "Congress generally uses the word 'officer' to refer to principal and inferior officers who must be appointed in accordance with the Appointments Clause."  *Id.* at 869; *see also Steele v. United States*, 267 U.S. 505, 507 (1925) (explaining that it is usually "true that the words 'officer of the United States,' when employed in . . . statutes . . . have the limited constitutional meaning").  If a special government employee could never qualify as an officer in the constitutional sense, Congress easily could have omitted "officer" from the definition.  Defendants do not identify a single case, statute, regulation, executive order, or other persuasive authority that concludes that special government employee and Officer of the United States are mutually exclusive positions.  *See* MTD at 30; Reply at 17–18.

Second, even necessarily time-limited positions may require appointment.  An individual may qualify as a constitutional officer even though their position is "temporary" and created "essentially to accomplish a single task, and when that task is over the office is terminated." *Morrison v. Olson*, 487 U.S. 654, 672 (1988) (holding temporary independent counsel was "an 'inferior' officer in the constitutional sense").  Accordingly, individuals designated as special government employees have been subject to the appointment process when placed in positions that exercise significant authority.  *See In re Khadr*, 823 F.3d 92, 96–97 (D.C. Cir. 2016) (explaining that Department of Defense has designated civilian judges nominated by President and confirmed by Senate to serve on U.S. Court of Military Commission Review as "'special government employees' under the relevant government employment statutes" (citation omitted)).

Defendants may not circumvent the Appointments Clause by designating individuals as special government employees. *Cf. Assoc. of Am. Physicians & Surgeons, Inc.*, 997 F.2d at 915 (agencies may not "simply appoint 10 private citizens as special government employees for two days" to avoid Federal Advisory Committee Act).

That does not end the court's inquiry. Having concluded that special government employees are not automatically exempt from the Appointments Clause, the court must assess whether Musk's particular position is "sufficiently 'continuing' to constitute an office." *United States v. Donziger*, 38 F. 4th 290, 296 (2d Cir. 2022), *cert denied*, 142 S.Ct. 868 (2023). In doing so, the court takes a holistic approach, focusing on a position's "tenure, duration, emolument, and duties," and whether the duties are "continuing and permanent, not occasional or temporary." *United States v. Germaine*, 99 U.S. 508, 511–12 (1878); *The Test for Determining "Officer" Status Under the Appointments Clause*, 49 Op. O.L.C. __, slip op. at 3 (Jan. 16, 2025) ("[T]he Supreme Court's approach to assessing the 'continuing' nature of a position has been a holistic one that considers both how long a position lasts as well as other attributes of the position that bear on continuity." (citations omitted)). Positions that do not qualify are "transient or fleeting," "personal to a particular individual," and assigned merely "incidental" duties. *Donziger*, 38 F.4th at 296–97 (citation omitted).

Special government employee describes Musk's formal classification within the federal government, but not necessarily the position he holds. *See In re Khadr*, 823 F.3d at 96 (special government employees served as civilian judges); *Assoc. of Am. Physicians & Surgeons, Inc.*, 997 F.2d at 900–01 (special government employees served on "President's Task Force on National Health Care Reform"); *Physicians for Social Resp. v. Wheeler*, 956 F.3d 634, 640 (D.C. Cir. 2020) (special government employees served on EPA scientific advisory committees).

States allege that Musk is DOGE's leader. Compl. ¶¶ 59–60, 224. The court finds that States have sufficiently pleaded that this position qualifies as "continuing and permanent, not occasional or temporary," *Germaine*, 99 U.S. at 511–12. The subsidiary DOGE Service Temporary Organization has a termination date of July 4, 2026, but there is no termination date for the overarching DOGE entity or its leader, suggesting permanence. *See* Compl. ¶¶ 52–58; Pls.' Opp'n to Defs.' MTD ("Opp'n") at 27–28, ECF No. 64; DOGE EO § 3(a)–(b); MTD at 31 (conceding "neither" Musk nor USDS "are temporary organizations"). Even if the DOGE entity and all affiliated positions terminated alongside the DOGE Temporary Service, that does not defeat an Appointments Clause claim. *See Morrison*, 487 U.S. at 672; *Donziger*, 38 F.4th at 297 ("Although the special prosecutors' duties terminate upon performance, the positions are not transient or fleeting."). President Trump may instruct another individual to lead DOGE and, if he does, States' Appointments Clause claim may also lie against that individual. Thus, the position is not personal to Musk. And, as discussed in greater detail below, *infra* Part III.B.iii, Musk's duties are not incidental. States allege that Musk influences the operations of at least 17 agencies, the existence of federal programs, employment terms for millions of individuals, federal funding decisions, and data usage practices. Compl. ¶¶ 24, 70, 98–100, 200, 228. Those duties are central, as opposed to incidental, to the regular operations of government. Pursuant to the DOGE Executive Order, and subsequent Executive Orders further clarifying and expanding DOGE's authority, *see supra* Part I.C, the leader of DOGE performs duties that are "continuing and permanent, not occasional or temporary." *Germaine*, 99 U.S. at 511–12.

Defendants focus on the requirement that constitutional offices "be established by law," U.S. Const., Art. II, § 2, cl. 2, in a left-field effort to dismiss States' claim. MTD at 18–22. They advance a circular reading of the Appointments Clause that would allow the President to

restructure the entire federal government without legislative authority and to evade judicial review. According to Defendants, the Appointments Clause "turns exclusively on the *de jure*— not *de facto*—authority that a person wields as a matter of law." MTD at 18. Under this theory, for a violation to occur, there must first be an office lawfully established and imbued with formal authority. *Id.* at 18–20. But if the President creates a position without Congressional authority, there is no violation. Essentially, Defendants argue, so long as the Executive acts without Congressional authority, the court cannot review its conduct. Under this reasoning, the President could authorize an individual to act as a Prime Minister who vetoes, amends, or adopts legislation enacted by Congress, as an Ultimate Justice who unilaterally overrules any decision by the Supreme Court, as a King who exercises preeminent authority over the entire nation, or allow a foreign leader to direct American armed forces without violating the Appointments Clause. *See* MTD at 15.

Defendants appear to sanction unlimited Executive power, free from checks and balances, but the Constitution prohibits unilateral control over "official appointments" by "dividing the power to appoint the principal federal offices . . . between the Executive and Legislative Branches." *Freytag*, 501 U.S. at 883–84. It has been accepted since the first Congress that "the legislature gets to 'create[ ] the office, define[ ] the powers, [and] limit[ ] its duration.'" *Seila Law*, 140 S.Ct. at 2227 (Kagan, J., concurring in part and dissenting in part) (alterations in original) (quoting 1 Annals of Cong. 582 (1789)); *see, e.g.*, *United States v. Maurice,* 26 F. Cas. 1211, 1213 (C.C.D. Va. 1823) ("[T]he general spirit of the constitution [] seems to have arranged the creation of office among legislative powers[.]"); *Cochnower v. United States,* 248 U.S. 405, 407 (1919) ("Primarily we may say that the creation of offices and the assignment of their compensation is a legislative function."); *Myers v. United States*, 272

U.S. 52, 130 (1926) ("[T]he power of appointment and removal cannot arise until Congress creates the office and its duties and powers, and must accordingly be exercised and limited only as Congress shall in the creation of the office prescribe."); *Buckley*, 424 U.S. at 138 ("Congress may undoubtedly under the Necessary and Proper Clause create 'offices' in the generic sense[.]"); *Weiss v. United States,* 510 U.S. 163, 184 (1994) (Souter, J., concurring) ("Framers came to appreciate the necessity of separating at least to some degree the power to create federal offices (a power they assumed would belong to Congress) from the power to fill them[.]"); *Seila Law*, 140 S.Ct. at 2227 (Kagan, J., concurring in part and dissenting in part) ("The President, as to the construction of his own branch of government, can only try to work his will through the legislative process."); *Trump v. United States*, 603 U.S. ---, ---, 144 S.Ct. 2312, 2349 (2024) (Thomas, J., concurring) ("If Congress has not reached a consensus that a particular office should exist, the Executive lacks the power to unilaterally create and then fill that office.").

The fact that President Trump purports to create a position and assign it powers by Executive Order does not preclude review under the Appointments Clause. *Cf. Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 266 (1991) (holding that creation by state enactments is not enough to immunize an agent of the federal government from separation-of-powers review). The court cannot close its eyes to "positions extant in the bureaucratic hierarchy." *Tucker v. Comm'r of Internal Revenue*, 676 F.3d 1129, 1133 (D.C. Cir. 2012). No branch may aggrandize its own appointment power at the expense of another and no branch may abdicate its Appointments Clause duties. *Weiss,* 510 U.S. at 184 (Souter, J., concurring). And the Judiciary has a duty to maintain "the constitutional plan of separation of powers." *Freytag*, 501 U.S. at 879 (citation omitted). Consequently, the court will reject Defendants' perverse reading of the Appointments Clause.

iii.    Exercises Significant Authority

States sufficiently allege that Musk exercises significant authority pursuant to the laws of the United States.  The "significant authority" test, established in *Buckley*, 424 U.S. at 126, and consistently reaffirmed by the Supreme Court, *see, e.g.*, *Lucia*, 585 U.S. at 246–47; *Freytag*, 501 U.S. at 881, focuses on the "extent of power an individual wields in carrying out his assigned functions," *Lucia*, 585 U.S. at 245.  The relevant factors are "(1) the significance of the matters resolved by the officials, (2) the discretion they exercise in reaching their decisions, and (3) the finality of those decisions."  *Tucker*, 676 F.3d at 1133.

States allege that President Trump is the only individual in the Executive Branch who resolves matters of greater significance than Musk.  They claim that Musk decides the continued existence of federal agencies, the employment terms for millions of federal employees, and federal funds allocated by grants, contracts, and loans.  *See* Compl. ¶¶ 98–100, 120, 146–47.  Musk's reach seemingly extends throughout the Executive Branch—"when asked whether there was anything in the federal government that [] Mr. Musk had been instructed not to touch," President Trump stated "we haven't discussed that much," but "maybe" matters involving "some high intelligence or something."  *Id.* ¶ 70.

In carrying out his assigned functions, Musk possesses "significant discretion" and receives minimal supervision.  *See Freytag*, 501 U.S. at 882.  States allege that President Trump assigns tasks and duties to Musk directly, Compl. ¶¶ 72, 100, 151, 169, 220, and "Musk reports only to President Trump," *id.* ¶ 71.  According to States, Musk briefs President Trump only "as needed," *id.* ¶ 73, and takes actions "without advance consultation with President Trump or White House staff," *id.* ¶ 219.

The last factor is not determinative.  An individual may qualify as an officer "even when their decisions [a]re not final."  *Lucia*, 585 U.S. at 247.  At this stage, States plausibly allege that

Musk makes decisions about "federal expenditures, contracts, government property, and the very existence of federal agencies." Opp'n at 26 (citing Compl. ¶¶ 200–25). At a minimum, the Complaint alleges facts indicating that Musk directs DOGE personnel within seventeen agencies, and those personnel have accessed and edited sensitive data, terminated contracts, transferred or cancelled leases, taken down websites, and placed employees on leave. *See supra* I.C. The possibility that a decision may be revisited or reviewed within an agency "make[s] no difference for officer status." *Lucia*, 585 U.S. at 249.

Defendants unsuccessfully attempt to minimize Musk's role, framing him as a mere advisor without any formal authority. MTD at 26–29. They point to a "longstanding historical practice" of Presidents relying on close advisors or forming advisory groups "without having to seek approval from Congress." *Id.* at 27; *see also id.* at 27–29 (discussing advisors or advisory groups relied on by President Andrew Jackson, President Lyndon Johnson, President Woodrow Wilson, President Ronald Reagan, President Bill Clinton, and President Barack Obama). But to conclude that Musk is solely an advisor, the court must ignore, misconstrue, or reject States' allegations, which it cannot do on a motion to dismiss. *Iqbal*, 556 U.S. at 678. States do not allege that Musk serves in a "purely advisory role." MTD at 29. Rather, they point to facts supporting an inference that Musk directs actions by other federal employees, including DOGE personnel, Compl. ¶¶ 60, 70–75, briefs President Trump only "as needed," *id.* ¶ 73, and acts "without advance consultation with President Trump or White House staff," *id.* ¶ 219. These allegations do not describe a mere advisor.

Alternatively, Defendants argue that, even if Musk directed others to take the "complained-of-actions," States fail to establish that the actions "were not formally approved by

a relevant agency actor with proper authority."   MTD at 23.   Defendants insist *Andrade v. Regnery*, 824 F.2d 1253 (D.C. Cir. 1987) thus bars States' claim.  MTD at 24.

In *Andrade*, the D.C. Circuit held that the termination or demotion of federal employees under a reduction in force (RIF) program did not violate the Appointments Clause because a duly appointed officer with the statutory responsibility for demoting or firing employees ratified all actions taken in connection with the RIF before it went into effect.  824 F.2d at 1255–57.  Even though unappointed staff planned and largely executed the RIF, it "did not abridge the requirements of the Appointments Clause" because a duly appointed official had "final authority" on the day it took effect and was "the legal architect" of the RIF.  *Id.* at 1257.  The D.C. Circuit explained that "it is an everyday occurrence in the operation of government for staff members to conceive and even carry out policies for which duly appointed or elected officials take official responsibility."  *Id.*

The D.C. Circuit made that determination following summary judgment proceedings and with the benefit of a factual record that clearly established a duly appointed official ratified the contested actions.  *Id.* at 1255–56.  At this juncture, the court lacks a factual record and must accept States' allegations as true.  *Iqbal*, 556 U.S. at 678.  States allege that Musk and DOGE personnel, not a relevant agency actor with proper authority, took the challenged actions. Compl. ¶¶ 60, 64–225.  The court cannot accept Defendants' contrary claim that agency actors signed off on all decisions.

Moreover, Defendants improperly invert *Andrade*'s holding.  They read *Andrade* to hold that Musk can lawfully direct actions by agency actors, so long as those actors were duly appointed.  MTD at 22–23.  But *Andrade* addressed the "everyday occurrence" of "staff members" carrying out policies adopted by "duly appointed or elected officials."  824 F.2d at

1257.  The apt analogy would be an appointed agency head directing Musk to carry out a policy, not the opposite.  States allege that, rather than subordinate himself to duly appointed officials, Musk "reports only to President Trump," Compl. ¶ 71, removes agency officials that stand in his way, *id.* ¶¶ 84–85, 137–38, or obtains compliance through threats and intimidation, *id.* ¶ 95. *Andrade* did not resolve whether an individual who has not been duly appointed may direct the actions of appointed officials, and extending its holding to encompass that scenario would be particularly inappropriate in the face of allegations that agency actors obeyed Musk's directions to avoid legal action or termination.

Because States allege that Musk occupies a continuing position established by law and exercises significant authority pursuant to the laws of the United States without proper appointment, the Complaint states a claim under the Appointments Clause.  Defendants' motion to dismiss Count I will therefore be denied.

## C. <u>Excess of Statutory Authority Claim</u>

States' second cause of action charges Musk and DOGE with conduct in excess of statutory authority—frequently termed an *ultra vires* claim.  *Id.* ¶¶ 261–72.  In general, courts may review and enjoin illegal executive action.  *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *Leopold v. Manger*, 102 F.4th 491, 494–95 (D.C. Cir. 2024). "The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations."  *Armstrong*, 575 U.S. at 327.  For instance, Congress prescribed the standard manner and scope for judicial review of agency action in the Administrative Procedure Act ("APA"),  5 U.S.C. § 701 *et seq.*, and regularly further limits or defines judicial review over particular agency actions,  *see, e.g.*, *Armstrong*, 575 U.S. at 327 (addressing Congress's implied intent to preclude private enforcement of a statutory provision in the Medicaid Act, 42 U.S.C. § 1386a(a)(30)(A)); *Changji Esquel Textile Co. Ltd. v. Raimondo*,

40 F.4th 716, 722 (D.C. Cir. 2022) (addressing preclusion of judicial review under the APA in the Export Control Reform Act of 2018).  Even if a "specific or a general statutory review provision" does not provide a clear cause of action, a plaintiff "may still be able to institute a non-statutory review action."  *Chamber of Comm. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).

Defendants contend that States' *ultra vires* claim must satisfy the test derived from *Leedom v. Kyne*, 358 U.S. 184 (1958).  *See* MTD at 32 (citing *Changji Esquel*, 40 F.4th at 722). Under that standard, a "plaintiff must establish three things: '(i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory.'" *Changji Esquel*, 40 F.4th at 722 (quoting *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019)).  The court agrees that test applies, but it is not as rigid as Defendants suggest.

*Leedom, Changji Esquel,* and the other cases Defendants cite address *ultra vires* claims against administrative agencies for statutory violations when a statute precludes judicial review. *See, e.g.*, *Leedom*, 358 U.S. at 184–85 (challenging National Labor Relations Board's compliance with Section 9(b)(1) of the National Labor Relations Act); *Changji Esquel*, 40 F.4th at 719 (challenging Department of Commerce's compliance with the Export Control Reform Act of 2018, 50 U.S.C. § 4813(a)); *Fed. Express Corp. v. U.S. Dep't of Comm.*, 39 F.4th 756, 759 (D.C. Cir. 2022) (same); *Trudeau v. Fed. Trad Com'n*, 456 F.3d 178, 188 (D.C. Cir. 2006) (challenging FTC's compliance with 15 U.S.C. § 46(f)).  Here, States do not claim that Defendants violated a specific statutory prohibition but argue that Musk and DOGE exceed the authority granted to temporary organizations by 5 U.S.C. § 3161 and no other statute authorizes

their actions.  Compl. ¶¶ 261–72.  Conduct in violation of specific statutory limitations "is just one example of an *ultra vires* act—not the *only* example of an *ultra vires* action."  *Leopold*, 102 F.4th at 495.

Courts may enjoin federal officials where their actions are not authorized by statute, the Constitution, or common law.  *Id.* at 495–96 (collecting cases).  The history and tradition of judicial review of executive actions unauthorized by law is well established.  *See, e.g., Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902) (upholding jurisdiction to review *ultra vires* claim "[o]therwise the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law").  "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority."  *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988).  Absent clear and convincing evidence that Congress intended to preclude judicial review, courts may ensure the Executive abides by "the scope of authority granted or [] the objectives specified" by Congress. *Id.* (quoting S. Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)).  Reading *Changji Esquel* as consistent with this Circuit's *ultra vires* precedents, a plaintiff must show that: (1) equitable review is not expressly precluded, (2) there is no alternative procedure for review, and (3) the Executive plainly acts in excess of its delegated powers and contrary to law.  *See id.* at 224–27; *Reich*, 74 F.3d at 1327.

Defendants point to no statute that expressly or impliedly precludes equitable judicial review here.  Instead, they argue that the temporary organization statute, 5 U.S.C. § 3161, does not contain a private cause of action.  MTD at 31.  But the D.C. Circuit has "never held that a lack of a statutory cause of action is *per se* a bar to judicial review."  *Reich*, 74 F.3d at 1328. Therefore, equitable review is not expressly precluded.

There is no apparent "alternative procedure" for States' claim. *Changji Esquel*, 40 F.4th at 722. Defendants argue that "the States could potentially direct their lawsuit at the agencies pursuant to the [APA]." MTD at 32. But States are not challenging agency action. President Trump expressly exempted DOGE from the definition of an agency under the APA. *See* DOGE EO §§ 2(a) (excluding "the Executive Office of the President or any components thereof" from the definition of agency under the APA). In doing so, President Trump at least attempted to insulate DOGE from judicial review as an agency under the APA. And, in a petition before the Supreme Court, Defendants argue that DOGE is not an agency under another statute—the Freedom of Information Act. *See* Appl. to Stay Pending Cert. or Mandamus and Req. for Immediate Admin. Stay, *In re U.S. DOGE Serv.*, (No. 24A1122). The fact that States may obtain judicial review of actions by other Executive Branch components does not address whether States may seek judicial review of DOGE and Musk's actions—which is the question before this court.

Actions taken pursuant to Executive Orders are not insulated from judicial review. *Reich,* 74 F.3d at 1328. In *Reich*, plaintiffs challenged an "Executive Order barring the federal government from contracting with employers who hire replacements during a lawful strike" as *ultra vires*. *Id.* at 1324. The D.C. Circuit held that the President may not use an Executive Order to "insulate the entire executive branch from judicial review." *Id.* at 1328. Rather, it is "well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" *Id.* (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 815 (1992) (Scalia, J., concurring in part and concurring in the judgment)). If the President issues an illegal command, "courts have [the]

power to compel subordinate executive officials to disobey" that command. *Id.* (quoting *Soucie v. David*, 448 F.2d 1067, 1072 n.12 (D.C. Cir. 1971)).

Finally, States allege that conduct by Musk and DOGE exceeds the authority granted by the temporary organization statute, 5 U.S.C. § 3161, and that no other statute authorizes Defendants' actions. Compl. ¶¶ 261–72. The Executive Branch is subject to limitations imposed by Congress and the Constitution. The Constitution allocates power across the three branches— Legislative, Executive, and Judicial—but "requires cooperation among the three branches in specified areas." *Aurelius Inv.*, 140 S.Ct. at 1656. The President's power to act, and in turn executive power wielded by officers on behalf of the President, "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). When the President "acts pursuant to the powers invested exclusively in him by the Constitution," his authority is "conclusive and preclusive"—neither Congress nor the courts may interfere with the President's discretion. *Trump*, 144 S.Ct. at 2327 (citations omitted). If the Constitution does not grant the President power to act, his authority is limited to an express or implied authorization from Congress. *See Youngstown*, 343 U.S. at 588–89; *id.* at 635–38 (J. Jackson, concurring). And, "[i]f the President claims authority to act" but lacks authority from Congress or the Constitution, "the courts may say so." *Trump*, 144 S.Ct. at 2327. "[T]he doctrine of separation of powers was established in the Constitution not to promote governmental efficiency but to prevent arbitrary power." *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 611 (D.C. Cir. 1974).

Congress alone has the power to create offices and departments. *Maurice,* 26 F. Cas. at 1213; *Myers*, 272 U.S. at 130; *Trump*, 144 S.Ct. at 2349 (Thomas, J., concurring) ("By keeping the ability to create offices out of the President's hands, the Founders ensured that no President

could unilaterally create an army of officer positions to then fill with his supporters."). "The President, as to the construction of his own branch of government, can only try to work his will through the legislative process." *Seila Law*, 140 S.Ct. at 2228 (Kagan, J., concurring in part and dissenting in part). The only statutory basis for the DOGE Executive Order is the temporary organization statute, 5 U.S.C. § 3161. That statute contains no substantive delegation of powers. It merely permits the creation of "a commission, committee, board, or other organization" for "the purpose of performing a specific study or other project." *Id.* § 3161(a). And while it may authorize the creation of an organization, that organization may only wield executive power pursuant to statutory or Constitutional authority. *See Youngstown*, 343 U.S. at 585. Defendants do not claim that Musk or DOGE's conduct falls under the President's express constitutional powers, and the only comparator they provide—an Executive Order establishing a temporary organization to facilitate the reconstruction of Iraq, MTD at 33–34—confirms that the DOGE Executive Order lacks statutory authority. In the comparator Executive Order, President Bush established a temporary organization known as the "Iraq Transition Assistance Office" pursuant to the temporary organization statute, 5 U.S.C. § 3161, *and* the management of foreign affairs statute, 22 U.S.C. § 2656. Exec. Order No. 13,431, 72 Fed. Reg. 26,709 (May 8, 2007). The latter statute authorizes the President to assign "matters respecting foreign affairs" to the Department of State and Secretary of State. 22 U.S.C. § 2656. The DOGE Executive Order lacks a comparable substantive statutory grant.

*Youngstown* is particularly informative here. As in *Youngstown*, the DOGE Executive Order "does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President." 343 U.S. at 588; DOGE EO § 3(b) (DOGE "dedicated to advancing the President's

18-month DOGE agenda"). "The Constitution did not subject this law-making power of Congress to presidential . . . control." 343 U.S. at 589. The States adequately allege that Musk and DOGE's conduct is "unauthorized by any law" and, in doing so, state an *ultra vires* claim. *McAnnulty*, 187 U.S. at 110; *see also id.* at 108, 110 ("[A]cts of all [a government department's] officers must be justified by some law[.] . . . Otherwise, the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer.").

Even if the temporary organization statute granted substantive authority to the subsidiary DOGE Service Temporary Organization, it does not authorize or grant any powers to the permanent, overarching DOGE organization. The DOGE Executive Order "established in the Executive Office of the President" the principal DOGE entity, which it defined using the acronym "USDS". DOGE EO § 3(a). Defendants concede that the principal DOGE organization is not a temporary organization. MTD at 31. Within DOGE, President Trump created the DOGE Service Temporary Organization pursuant to the temporary organization statute, with a termination date in July 2026. DOGE EO § 3(b). He "dedicated" the DOGE Service Temporary Organization "to advancing the President's 18-month DOGE agenda," but did not instruct the subsidiary organization to take any specific actions. *Id.* Rather, President Trump instructed the principal DOGE entity, which is not a temporary organization or authorized by any other statute, to consult with agency heads to establish DOGE teams at each agency and to gain "full and prompt access to all unclassified agency records." *Id.* § 4(b) (Agencies shall "ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems."); *id.* § 3(c) ("In consultation with USDS," agencies "shall establish . . . a DOGE Team . . ."). The subsequent DOGE related Executive Orders refer to the principal DOGE organization and do not mention the DOGE Service Temporary Organization. *See* Exec.

Order No. 14,170 §§ 1–4; Exec. Order No. 14,210 § 2(c); Exec. Order No. 14,218 §§ 1, 2(b); Exec. Order No. 14,219 §§ 2, 4; Exec. Order No. 14,222 §§ 2–3.  Because the DOGE Executive Order provides no statutory or Constitutional basis for establishing the principal DOGE entity, States state a claim for *ultra vires* conduct, and the court will therefore deny Defendants' motion to dismiss Count II.

### D.   President Trump in his Official Capacity

Defendants seek to dismiss President Trump as a defendant because the court may not enjoin the President in the performance of his official duties.  MTD at 35–37; *id.* at 36 & n.7 (collecting cases).  The court agrees.  *See, e.g.*, *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866) (holding Court had "no jurisdiction of a bill to enjoin the President in the performance of his official duties").  States concede the court may not enjoin President Trump but argue that a declaratory judgment may issue against the President under *National Treasury Employees Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974).  Opp'n at 37–38.  That case recognized a narrow circumstance in which a court may issue a declaratory judgment recognizing the President's constitutional duty to perform a "ministerial duty."  492 F.2d at 608. For declaratory judgment to be appropriate, the duty cannot be discretionary and must be "simple, definite[,] . . . arising under conditions admitted or proved to exist, and imposed by law."  *Id.* at 608–09.  The President's power to select and nominate officers under the Appointments Clause is highly discretionary and assigned squarely to the President.  Declaratory judgment against the President, a "coequal branch of government," pertaining to the Executive's exclusive powers under the Constitution "at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers." *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996).  Consequently, the court will dismiss President Trump as a defendant.

### IV.    CONCLUSION

For the reasons stated above, the court will **DENY** Defendants' motion to dismiss Counts I and II, but **GRANT** Defendants' motion to dismiss President Trump.


Date: May 27, 2025

*Tanya S. Chutkan*

TANYA S. CHUTKAN
United States District Judge

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STATE OF NEW MEXICO**, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>**ELON MUSK**, *et al.*<br><br>Defendants.<br><br>**JAPANESE AMERICAN CITIZENS LEAGUE**, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>**ELON MUSK**, *et al.*<br><br>Defendants. | Civil Action No. 25-cv-429 (TSC)<br><br><br><br><br><br>Civil Action No. 25-cv-643 (TSC) |

## <u>ORDER</u>

For the reasons set forth in the accompanying Memorandum Opinion, ECF No. 93, Defendants' Motion to Dismiss, ECF No. 58, the Complaint, ECF No. 2, filed by Plaintiffs—fourteen states, represented by their Attorneys General—in Case No. 25-cv-429, is GRANTED in part and DENIED in part.

Defendants' motion to dismiss Count I against President Donald J. Trump, in his official capacity as President of the United States, is GRANTED. Defendants' motion to dismiss Count I against all other defendants and Count II is DENIED.

Date: May 27, 2025

_Tanya S. Chutkan_
TANYA S. CHUTKAN
United States District Judge